## Exhibit 1

**Draft DIP Credit Agreement**

*Execution Version*

SENIOR SECURED SUPER-PRIORITY PRIMING TERM LOAN DEBTOR-IN-POSSESSION
CREDIT AGREEMENT

dated as of

November 7, 2024

among

FRANCHISE GROUP, INC.,
as a Borrower, as Lead Borrower and as a Debtor and Debtor-in-Possession under Chapter 11 of the
Bankruptcy Code,

FRANCHISE GROUP NEWCO PSP, LLC,
as a Borrower and as a Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code,

VALOR ACQUISITION, LLC,
as a Borrower and as a Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code,

FRANCHISE GROUP NEWCO INTERMEDIATE AF, LLC,
as a Borrower and as a Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code,

the Guarantors from time to time party hereto,

the Lenders from time to time party hereto,

and

WILMINGTON TRUST, NATIONAL ASSOCIATION,
as Administrative Agent and as Collateral Agent,

**TABLE OF CONTENTS**

(continued)

**Page**

ARTICLE I DEFINITIONS ................................................................................................. 1

    SECTION 1.01    Defined Terms. ........................................................................ 1
    SECTION 1.02    Classification of Loans and Borrowings............................... 40
    SECTION 1.03    Terms Generally.................................................................... 40
    SECTION 1.04    Accounting Terms; GAAP..................................................... 41
    SECTION 1.05    Effectuation of Transactions................................................. 41
    SECTION 1.06    [Reserved]............................................................................. 41
    SECTION 1.07    Certain Determinations.......................................................... 41
    SECTION 1.08    Divisions............................................................................... 42
    SECTION 1.09    Interest Rates......................................................................... 42

ARTICLE II THE CREDITS............................................................................................. 42

    SECTION 2.01    Commitments......................................................................... 42
    SECTION 2.02    Loans and Borrowings. .......................................................... 44
    SECTION 2.03    Requests for Borrowings. ...................................................... 45
    SECTION 2.04    Syndication. ........................................................................... 46
    SECTION 2.05    [Reserved]............................................................................. 46
    SECTION 2.06    Funding of Borrowings. ........................................................ 46
    SECTION 2.07    Interest Elections................................................................... 47
    SECTION 2.08    Termination and Reduction of Commitments........................ 48
    SECTION 2.09    Repayment of Loans; Evidence of Debt. ............................... 48
    SECTION 2.10    [Reserved]............................................................................. 49
    SECTION 2.11    Prepayment of Loans. ........................................................... 49
    SECTION 2.12    Fees. ...................................................................................... 50
    SECTION 2.13    Interest. ................................................................................. 51
    SECTION 2.14    Benchmark Unavailability; Benchmark Replacement Setting....... 52
    SECTION 2.15    Increased Costs. .................................................................... 54
    SECTION 2.16    [Reserved]............................................................................. 55
    SECTION 2.17    Taxes. .................................................................................... 55
    SECTION 2.18    Payments Generally; Pro Rata Treatment; Sharing of Setoffs........ 58
    SECTION 2.19    Mitigation Obligations; Replacement of Lenders.................. 60
    SECTION 2.20    [Reserved]............................................................................. 61
    SECTION 2.21    [Reserved]............................................................................. 61
    SECTION 2.22    Defaulting Lenders................................................................ 61
    SECTION 2.23    Illegality. .............................................................................. 62

ARTICLE III REPRESENTATIONS AND WARRANTIES ........................................... 62

    SECTION 3.01    Organization; Powers............................................................ 62
    SECTION 3.02    Authorization; Enforceability. .............................................. 63
    SECTION 3.03    Governmental Approvals; No Conflicts. ............................... 63
    SECTION 3.04    Financial Condition; No Material Adverse Effect. ................ 63
    SECTION 3.05    Properties. ............................................................................. 63
    SECTION 3.06    Litigation and Environmental Matters. ................................. 64
    SECTION 3.07    Compliance with Laws. ........................................................ 64
    SECTION 3.08    Investment Company Status. ................................................. 64
    SECTION 3.09    Taxes. .................................................................................... 64
    SECTION 3.10    ERISA; Labor Matters. ......................................................... 64
    SECTION 3.11    Disclosure. ............................................................................ 65

# TABLE OF CONTENTS
(continued)

Page

SECTION 3.12   Subsidiaries. ................................................................................... 65
SECTION 3.13   Intellectual Property; Licenses, Etc. .............................................. 66
SECTION 3.14   [Reserved]. ...................................................................................... 66
SECTION 3.15   Federal Reserve Regulations. ......................................................... 66
SECTION 3.16   Use of Proceeds. ............................................................................. 66
SECTION 3.17   Anti-Corruption Laws and Sanctions. ............................................ 66
SECTION 3.18   Security Documents. ....................................................................... 67
SECTION 3.19   Insurance. ........................................................................................ 67
SECTION 3.20   Franchise Agreements. .................................................................... 67
SECTION 3.21   Budget; Variance Report. ................................................................ 68
SECTION 3.22   Orders. ............................................................................................. 68
SECTION 3.23   Bankruptcy Matters. ....................................................................... 68

ARTICLE IV CONDITIONS ................................................................................................. 69

SECTION 4.01   Effective Date. ................................................................................ 69
SECTION 4.02   Each Credit Event after the Effective Date. .................................... 71

ARTICLE V AFFIRMATIVE COVENANTS ........................................................................ 71

SECTION 5.01   Financial Statements and Other Information. .................................. 72
SECTION 5.02   Notices of Material Events. ............................................................. 74
SECTION 5.03   Information Regarding Collateral. .................................................... 74
SECTION 5.04   Existence; Conduct of Business. ..................................................... 74
SECTION 5.05   Payment of Taxes, etc. .................................................................... 75
SECTION 5.06   Maintenance of Properties. .............................................................. 75
SECTION 5.07   Insurance. ........................................................................................ 75
SECTION 5.08   Books and Records; Inspection and Audit Rights. .......................... 75
SECTION 5.09   Compliance with Laws. ................................................................... 76
SECTION 5.10   Use of Proceeds. ............................................................................. 76
SECTION 5.11   Additional Subsidiaries. .................................................................. 76
SECTION 5.12   Further Assurances. ......................................................................... 77
SECTION 5.13   Franchise Agreements. .................................................................... 77
SECTION 5.14   [Reserved]. ...................................................................................... 77
SECTION 5.15   Maintenance of Ratings. .................................................................. 77
SECTION 5.16   Additional Chapter 11 Reporting. ................................................... 77

ARTICLE VI NEGATIVE COVENANTS ............................................................................. 79

SECTION 6.01   Indebtedness; Certain Equity Securities. ........................................ 79
SECTION 6.02   Liens. ............................................................................................... 82
SECTION 6.03   Fundamental Changes; Lead Borrower Covenant. .......................... 84
SECTION 6.04   Investments, Loans, Advances, Guarantees and Acquisitions. ........ 85
SECTION 6.05   Asset Sales. ..................................................................................... 87
SECTION 6.06   [Reserved]. ...................................................................................... 89
SECTION 6.07   Restricted Payments; Certain Payments of Indebtedness. ............... 89
SECTION 6.08   Transactions with Affiliates. ........................................................... 91
SECTION 6.09   Restrictive Agreements. ................................................................... 91
SECTION 6.10   [Reserved]. ...................................................................................... 93
SECTION 6.11   Changes in Fiscal Periods. .............................................................. 93
SECTION 6.12   Amendment of Financing Documents. ............................................ 93
SECTION 6.13   Franchise Agreements. .................................................................... 93

**TABLE OF CONTENTS**

(continued)

Page

SECTION 6.14    [Reserved]..................................................................................... 93
SECTION 6.15    Minimum Liquidity........................................................................... 93
SECTION 6.16    [Reserved]..................................................................................... 93
SECTION 6.17    Milestones...................................................................................... 93
SECTION 6.18    Permitted Variance.......................................................................... 93
SECTION 6.19    Chapter 11 Cases ............................................................................ 93

ARTICLE VII EVENTS OF DEFAULT............................................................................ 94

SECTION 7.01    Events of Default............................................................................. 95
SECTION 7.02    [Reserved].................................................................................... 100
SECTION 7.03    Application of Proceeds.................................................................. 100
SECTION 7.04    Bankruptcy Code and Other Remedies............................................. 101

ARTICLE VIII ADMINISTRATIVE AGENT .................................................................. 103

SECTION 8.01    Appointment and Authority. ........................................................... 103
SECTION 8.02    Rights as a Lender. ........................................................................ 104
SECTION 8.03    Exculpatory Provisions. ................................................................. 104
SECTION 8.04    Reliance by Agents. ....................................................................... 106
SECTION 8.05    Delegation of Duties. ..................................................................... 108
SECTION 8.06    Resignation of Administrative Agent; Mergers. ................................ 108
SECTION 8.07    Non-Reliance on Agents and Lenders. ............................................. 109
SECTION 8.08    Existing Intercreditor Agreements. .................................................. 110
SECTION 8.09    Administrative Agent May File Proofs of Claim................................. 110
SECTION 8.10    No Waiver; Cumulative Remedies; Enforcement................................ 110
SECTION 8.11    Withholding Taxes......................................................................... 111
SECTION 8.12    Credit Bidding. .............................................................................. 111
SECTION 8.13    Erroneous Payments....................................................................... 112

ARTICLE IX MISCELLANEOUS ................................................................................. 114

SECTION 9.01    Notices. ......................................................................................... 114
SECTION 9.02    Waivers; Amendments.................................................................... 116
SECTION 9.03    Expenses; Indemnity; Damage Waiver............................................. 119
SECTION 9.04    Successors and Assigns................................................................... 121
SECTION 9.05    Survival. ........................................................................................ 125
SECTION 9.06    Counterparts; Integration; Effectiveness........................................... 126
SECTION 9.07    Severability.................................................................................... 127
SECTION 9.08    Right of Setoff. .............................................................................. 127
SECTION 9.09    Governing Law; Jurisdiction; Consent to Service of Process............... 127
SECTION 9.10    WAIVER OF JURY TRIAL.............................................................. 128
SECTION 9.11    Headings. ...................................................................................... 128
SECTION 9.12    Confidentiality. .............................................................................. 128
SECTION 9.13    USA PATRIOT Act........................................................................ 130
SECTION 9.14    Release of Liens and Guarantees...................................................... 130
SECTION 9.15    No Advisory or Fiduciary Responsibility. ........................................ 131
SECTION 9.16    Interest Rate Limitation. ................................................................. 132
SECTION 9.17    [Reserved] ..................................................................................... 132
SECTION 9.18    Judgment Currency ........................................................................ 132
SECTION 9.19    Acknowledgement and Consent to Bail-In of Affected Financial
                Institutions ................................................................................... 132

## TABLE OF CONTENTS
(continued)

SECTION 9.20    Acknowledgement Regarding Any Supported QFCs ..................................... 133

SECTION 9.21    Orders Control ............................................................................................. 133

ARTICLE X GUARANTEE ........................................................................................................ 133

SECTION 10.01    Guarantee ................................................................................................. 133

SECTION 10.02    Guarantee of Payment; Continuing Guarantee ............................... 134

SECTION 10.03    No Limitations. ......................................................................................... 134

SECTION 10.04    Reinstatement .......................................................................................... 136

SECTION 10.05    Agreement to Pay; Subrogation ....................................................... 136

SECTION 10.06    Information ................................................................................................ 136

SECTION 10.07    [Reserved] ................................................................................................. 136

SECTION 10.08    Indemnity and Subrogation ................................................................. 136

SECTION 10.09    Contribution and Subrogation .............................................................. 137

SECTION 10.10    Subordination. ........................................................................................... 137

SCHEDULES:

| Schedule 2.01 | — | Commitments and Loans |
| Schedule 2.04 | — | Syndication |
| Schedule 3.03 | — | Government Approvals; No Conflicts |
| Schedule 3.06 | — | Litigation and Environmental Matters |
| Schedule 3.12 | — | Subsidiaries |
| Schedule 3.20 | — | Franchise Agreements |
| | | |
| Schedule 6.01 | — | Existing Indebtedness |
| Schedule 6.02 | — | Existing Liens |
| Schedule 6.04(e) | — | Existing Investments |
| Schedule 6.08 | — | Existing Affiliate Transactions |
| Schedule 6.09 | — | Existing Restrictions |
| Schedule 6.17 | — | Milestones |
| Schedule 9.01 | — | Notices |

EXHIBITS:

| Exhibit A | — | Form of Assignment and Assumption |
| Exhibit B | — | Form of Closing Certificate |
| Exhibit C-1 | — | Form of United States Tax Compliance Certificate 1 |
| Exhibit C-2 | — | Form of United States Tax Compliance Certificate 2 |
| Exhibit C-3 | — | Form of United States Tax Compliance Certificate 3 |
| Exhibit C-4 | — | Form of United States Tax Compliance Certificate 4 |
| Exhibit D | — | Form of Note |
| Exhibit E | — | Form of Notice of Borrowing |
| Exhibit F | — | Form of Syndication Procedures |
| | | |
| Annex A | — | Initial Budget |

SENIOR SECURED SUPER-PRIORITY PRIMING TERM LOAN DEBTOR-IN-POSSESSION CREDIT AGREEMENT, dated as of November 7, 2024 (this "<u>Agreement</u>"), among FRANCHISE GROUP, INC., a Delaware corporation ("<u>Lead Borrower</u>"), as a debtor and debtor-in-possession in the Chapter 11 Cases (as defined below), FRANCHISE GROUP NEWCO PSP, LLC, a Delaware limited liability company ("<u>FG Newco PSP</u>"), as a debtor and debtor-in-possession in the Chapter 11 Cases (as defined below), VALOR ACQUISITION, LLC, a Delaware limited liability company ("<u>Valor</u>"), as a debtor and debtor-in-possession in the Chapter 11 Cases (as defined below), FRANCHISE GROUP NEWCO INTERMEDIATE AF, LLC, a Delaware limited liability company ("<u>FG Newco Intermediate AF</u>", and together with Lead Borrower, FG Newco PSP and Valor, individually and collectively, the "<u>Borrower</u>"), as a debtor and debtor-in-possession in the Chapter 11 Cases (as defined below), the Guarantors from time to time party hereto, the Lenders from time to time party hereto and Wilmington Trust, National Association, as Administrative Agent and as Collateral Agent.

WHEREAS, on November 3, 2024 (the "<u>Petition Date</u>"), the Borrower and certain affiliates and direct and indirect Subsidiaries of the Borrower (each, a "<u>Chapter 11 Debtor</u>" and collectively, the "<u>Chapter 11 Debtors</u>") filed voluntary petitions with the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>") initiating their respective jointly administered case under Chapter 11 of Title 11 of the United States Code (the "<u>Bankruptcy Code</u>") (Case No. 24-12480-JTD (Bankr. D. Del.)) (collectively, the "<u>Chapter 11 Cases</u>"), and each Chapter 11 Debtor has continued and is continuing in the possession of its assets and management of its business pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, the Borrower has asked the Lenders to provide the Borrower with a senior secured super-priority priming term loan debtor-in-possession credit facility (the "<u>DIP Facility</u>") consisting of (a) $250,000,000 of "new money" first-out delayed draw term loans that will be made available to the Borrower pursuant to the terms, and subject to the conditions set forth, in this Agreement and the Orders; and (b) a second-out roll up facility pursuant to which a portion of the Prepetition Senior Priority Obligations arising under the Prepetition Senior Priority Credit Agreement will be deemed "rolled up" as term loans and shall automatically be deemed to be substituted and exchanged, and paid-off and discharged, for second-out Roll-Up Term Loans (as defined herein) pursuant to the terms, and subject to the conditions set forth, in this Agreement and the Orders;

WHEREAS, the Lenders are willing to make term loans to the Borrower, subject to the terms and conditions set forth in this Agreement and the Orders; and

WHEREAS, the Secured Obligations of the Borrower are guaranteed by the Guarantors and subject to the Carve-Out, secured by Liens on the Collateral, in each case, as set forth in, and subject to, the Loan Documents and the Orders.

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby covenant and agree as follows:

ARTICLE I

DEFINITIONS

SECTION 1.01     <u>Defined Terms</u>.

As used in this Agreement, the following terms have the meanings specified below:

1

"ABR" when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Alternate Base Rate.

"Ad Hoc Lender Group" means that certain group of Lenders constituting the Required Lenders and represented by the Lender Professionals, as may be reconstituted from time to time.

"Adequate Protection Claims" shall have the meaning assigned to such term in the Orders.

"Adequate Protection Liens" shall have the meaning assigned to such term in the Orders.

"Adjusted Term SOFR" means, subject to Section 2.14(b), with respect to any SOFR Borrowing, for any Interest Period, a rate per annum equal to the sum of (i) Term SOFR as in effect at such time for such Interest Period and (ii) the Term SOFR Adjustment for such Interest Period; provided that if Adjusted Term SOFR as so determined shall ever be less than the Floor, then Adjusted Term SOFR shall be deemed to be the Floor.

"Administrative Agent" means Wilmington Trust, National Association, in its capacity as administrative agent hereunder and under the other Loan Documents, and its successors in such capacity as provided in Article VIII.

"Administrative Agent Fee Letter" means that certain fee letter dated as of the date hereof, by and among the Borrower and the Agents.

"Administrative Questionnaire" means an administrative questionnaire in a form supplied by the Administrative Agent.

"Affected Financial Institution" means (a) any EEA Financial Institution or (b) any UK Financial Institution.

"Affiliate" means, with respect to a specified Person, another Person that directly or indirectly Controls or is Controlled by or is under common Control with the Person specified.

"Agent" means the Administrative Agent and the Collateral Agent, and any successors and assigns in such capacity, and "Agents" means two or more of them.

"Agent Parties" has the meaning given to such term in Section 9.01(c).

"Agreement" has the meaning given to such term in the preliminary statements hereto.

"Agreement Currency" has the meaning given to such term in Section 9.18.

"Alternate Base Rate" means, for any day, a rate per annum equal to the greatest of (a) the Prime Rate in effect on such day, (b) the NYFRB Rate in effect on such day plus ½ of 1.00%, (c) Adjusted Term SOFR for a one month Interest Period as published two U.S. Government Securities Business Days prior to such day (or if such day is not a U.S. Government Securities Business Day, the immediately preceding U.S. Government Securities Business Day) plus 1%, and (d) 2.00%; provided that for the purpose of this definition, Adjusted Term SOFR for any day shall be based on the Term SOFR Reference Rate at approximately 6:00 a.m. (New York City time) on such day (or any amended publication time for the Term SOFR Reference Rate, as specified by the Term SOFR Administrator in the Term SOFR Reference Rate methodology). Any change in the Alternate Base Rate due to a change in the Prime Rate, the NYFRB Rate

2

or Adjusted Term SOFR shall be effective from and including the effective date of such change in the Prime Rate, the NYFRB Rate or Adjusted Term SOFR, respectively. If the Alternate Base Rate is being used as an alternate rate of interest pursuant to Section 2.14 hereof, then the Alternate Base Rate shall be the greater of clause (a) and (b) above and shall be determined without reference to clause (c) above.

"Ancillary Document" has the meaning assigned to such term in Section 9.06.

"Anti-Corruption Laws" means the U.S. Foreign Corrupt Practices Act of 1977, as amended, the U.K. Bribery Act 2010, and all other applicable laws, rules, and regulations concerning or relating to bribery or corruption.

"Applicable Account" means, with respect to any payment to be made to the Administrative Agent hereunder, the account specified by the Administrative Agent from time to time for the purpose of receiving payments of such type.

"Applicable Period" means (w) with respect to the first Variance Report against the Initial Budget, the first full one-week period ending on Friday of the week immediately preceding the first Variance Report Deadline, (x) with respect to the second Variance Report against the Initial Budget, the first full 2-week period ending on Friday of the week immediately preceding the second Variance Report Deadline, (y) with respect to the third Variance Report against the Initial Budget, the first full 3-week period ending on Friday of the week immediately preceding the third Variance Report Deadline for such Variance Report, and (z) with respect to the fourth Variance Report, and each Variance Report thereafter, the 4-week period ending on the Friday of the week immediately preceding the applicable Variance Report Deadline.

"Applicable Rate" means, (a) with respect to any New Money Term Loans maintained as ABR Loans, 8.00% per annum, and with respect to any New Money Term Loans maintained as SOFR Loans, 9.00% per annum, and (b) with respect to any Roll-Up Term Loans maintained as ABR Loans, 3.75% per annum, and with respect to any Roll-Up Term Loans maintained as SOFR Loans, 4.75% per annum.

"Approved Bank" has the meaning assigned to such term in the definition of the term "Permitted Investments."

"Approved Budget" has the meaning assigned to such term in Section 5.16(a).

"Approved Fund" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or investing in commercial loans and similar extensions of credit in the ordinary course of its activities and that is administered, advised or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers, advises or manages a Lender.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of any Person whose consent is required by Section 9.04), substantially in the form of Exhibit A or any other form reasonably approved by the Administrative Agent.

"Audited Financial Statements" means (a) the audited consolidated balance sheet of the Lead Borrower and its Subsidiaries, and the related audited statements of income, cash flows and stockholders' equity, for the fiscal year of the Lead Borrower ended on or about December 31, 2023 and (b) the audited consolidated balance sheet of PSP and its Subsidiaries, and the related audited statements of income, cash flows and stockholders' equity, for the fiscal year of PSP, ended on or about December 31, 2023.

"Available Tenor" means, as of any date of determination and with respect to the then-current Benchmark, as applicable, any tenor for such Benchmark or payment period for interest calculated with reference to such Benchmark, as applicable, that is or may be used for determining the length of an Interest Period pursuant to this Agreement as of such date and not including, for the avoidance of doubt, any tenor for such Benchmark that is then-removed from the definition of "Interest Period" pursuant to Section 2.14(e).

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"Bail-In Legislation" means (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, regulation rule or requirement for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"Bankruptcy Code" has the meaning specified in the recitals to this Agreement.

"Bankruptcy Court" has the meaning specified in the recitals to this Agreement.

"Bankruptcy Event" means, with respect to any Person, such Person becomes the subject of a voluntary or involuntary bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee, administrator, custodian, assignee for the benefit of creditors or similar Person charged with the reorganization or liquidation of its business appointed for it, or, in the good faith determination of the Administrative Agent, has taken any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any such proceeding or appointment or has had any order for relief in such proceeding entered in respect thereof; provided that a Bankruptcy Event shall not result solely by virtue of any ownership interest, or the acquisition of any ownership interest, in such Person by a Governmental Authority or instrumentality thereof, unless such ownership interest results in or provides such Person with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permits such Person (or such Governmental Authority or instrumentality) to reject, repudiate, disavow or disaffirm any contracts or agreements made by such Person.

"Basel III" means: (i) the agreements on capital requirements, a leverage ratio and liquidity standards contained in "Basel III: A global regulatory framework for more resilient banks and banking systems", "Basel III: International framework for liquidity risk measurement, standards and monitoring" and "Guidance for national authorities operating the countercyclical capital buffer" published by the Basel Committee on Banking Supervision on 16 December 2010, each as amended, supplemented or restated; (ii) the rules for global systemically important banks contained in "Global systemically important banks: assessment methodology and the additional loss absorbency requirement – Rules text" published by the Basel Committee on Banking Supervision in November 2011, as amended, supplemented or restated; and (iii) any further guidance or standards published by the Basel Committee on Banking Supervision relating to Basel III.

"Benchmark" means, initially, the Term SOFR Reference Rate; provided that if a Benchmark Transition Event and its related Benchmark Replacement Date have occurred with respect to the Term SOFR Reference Rate or the then-current Benchmark, then "Benchmark" means the applicable

Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate pursuant to Section 2.14(b).

"Benchmark Replacement" means, with respect to any Benchmark Transition Event, the first alternative set forth in the order below that is administratively feasible for the Administrative Agent and selected by the Required Lenders:

(a)        the sum of: (1) Daily Simple SOFR and (2) the related Benchmark Replacement Adjustment;

(b)        the sum of: (1) the alternate benchmark rate that has been selected by the Required Lenders and the Lead Borrower as the replacement for the then-current Benchmark giving due consideration to (i) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the Relevant Governmental Body or (ii) any evolving or then-prevailing market convention for determining a benchmark rate as a replacement for the then-current Benchmark for dollar-denominated syndicated credit facilities at such time and (2) the related Benchmark Replacement Adjustment;

If the Benchmark Replacement as determined pursuant to clause (a) or (b) above would be less than the Floor, the Benchmark Replacement will be deemed to be the Floor for the purposes of this Agreement and the other Loan Documents.

"Benchmark Replacement Adjustment" means, with respect to any replacement of the then-current Benchmark with an Unadjusted Benchmark Replacement, the spread adjustment, or method for calculating or determining such spread adjustment (which may be a positive or negative value or zero) that has been selected by the Required Lenders and the Lead Borrower giving due consideration to (a) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body and/or (b) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement for dollar-denominated syndicated credit facilities at such time; provided that such Benchmark Replacement Adjustment is administratively feasible for the Administrative Agent.

"Benchmark Replacement Conforming Changes" means, with respect to either the use or administration of Term SOFR or the use, administration, adoption or implementation of any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Alternate Base Rate," the definition of "Business Day," the definition of "U.S. Government Securities Business Day," the definition of "Interest Period" or any similar or analogous definition (or the addition of a concept of "interest period"), timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices, length of lookback periods, the applicability of breakage provisions, the applicability of Section 2.14 and other technical, administrative or operational matters) that the Required Lenders decides may be appropriate to reflect the adoption and implementation of any such rate and to permit the administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent decides that adoption of any portion of such market practice is not administratively feasible or if the Required Lenders determines that no market practice for the administration of any such rate exists, in such other manner of administration as the Required Lenders decides is reasonably necessary in connection with the administration of this Agreement and the other Loan Documents); provided that such Benchmark Replacement Conforming Changes implement changes that are administratively feasible for the Administrative Agent.

"Benchmark Replacement Date" means the earliest to occur of the following events with respect to the then-current Benchmark:

(a)        in the case of clause (a) or (b) of the definition of "Benchmark Transition Event," the later of (i) the date of the public statement or publication of information referenced therein and (ii) the date on which the administrator of such Benchmark (or the published component used in the calculation thereof) permanently or indefinitely ceases to provide all Available Tenors of such Benchmark (or such component thereof); or

(b)        in the case of clause (c) of the definition of "Benchmark Transition Event," the first date on which such Benchmark (or the published component used in the calculation thereof) has been determined and announced by the regulatory supervisor for the administrator of such Benchmark (or such component thereof) to be non-representative; provided that such non-representativeness will be determined by reference to the most recent statement or publication referenced in such clause (c) and even if any Available Tenor of such Benchmark (or such component thereof) continues to be provided on such date.

For the avoidance of doubt, (i) if the event giving rise to the Benchmark Replacement Date occurs on the same day as, but earlier than, the Reference Time in respect of any determination, the Benchmark Replacement Date will be deemed to have occurred prior to the Reference Time for such determination and (ii) the "Benchmark Replacement Date" will be deemed to have occurred in the case of clause (a) or (b) with respect to any Benchmark upon the occurrence of the applicable event or events set forth therein with respect to all then-current Available Tenors of such Benchmark (or the published component used in the calculation thereof).

"Benchmark Transition Event" means the occurrence of one or more of the following events with respect to the then-current Benchmark:

(a)        a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such administrator has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof), permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof);

(b)        a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof), the Board of Governors, the NYFRB, an insolvency official with jurisdiction over the administrator for such Benchmark (or such component), a resolution authority with jurisdiction over the administrator for such Benchmark (or such component) or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark (or such component), which states that the administrator of such Benchmark (or such component) has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof) permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof); or

(c)        a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that all Available Tenors of such Benchmark (or such component thereof) are no longer representative.

For the avoidance of doubt, a "Benchmark Transition Event" will be deemed to have occurred with respect to any Benchmark if a public statement or publication of information set forth above has occurred with respect to each then-current Available Tenor of such Benchmark (or the published component used in the calculation thereof).

"Benchmark Unavailability Period" means the period (if any) (x) beginning at the time that a Benchmark Replacement Date has occurred if, at such time, no Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 2.14 and (y) ending at the time that a Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 2.14.

"Beneficial Ownership Certification" means a certification regarding beneficial ownership or control as required by the Beneficial Ownership Regulation.

"Beneficial Ownership Regulation" means 31 C.F.R. § 1010.230.

"BHC Act Affiliate" of a party means an 'affiliate' (as such term is defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)) of such party.

"Board of Directors" means, with respect to any Person, (a) in the case of any corporation, the board of directors of such Person or any committee thereof duly authorized to act on behalf of such board, (b) in the case of any limited liability company, the board of managers, board of directors, manager or managing member of such Person or the functional equivalent of the foregoing or any committee thereof duly authorized to act on behalf of such board, manager or managing member, (c) in the case of any partnership, the board of directors or board of managers of the general partner of such Person and (d) in any other case, the functional equivalent of the foregoing.

"Board of Governors" means the Board of Governors of the Federal Reserve System of the United States of America.

"Borrower" has the meaning assigned to such term in the preliminary statements hereto.

"Borrower Materials" has the meaning assigned to such term in Section 5.01.

"Borrowing" means Loans of the same Class and Type, made, converted or continued on the same date and, in the case of SOFR Loans, as to which a single Interest Period is in effect.

"Borrowing Minimum" means $1,000,000.

"Borrowing Multiple" means $500,000.

"Borrowing Request" means a request by the Borrower for a Borrowing in accordance with Section 2.03.

"Business Day" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by Requirements of Law to remain closed.

"Capital Lease Obligations" of any Person means the obligations of such Person to pay rent or other amounts under any Capitalized Leases; provided, that lease liabilities and associated expenses recorded by the Loan Parties (or any other applicable Persons) pursuant to ASU 2016-02, Leases, shall not be treated as Indebtedness, unless the corresponding leases would have been treated as Capitalized Leases

under GAAP as in effect prior to the adoption of ASU 2016-02, Leases (in which case such leases shall be treated as Capitalized Leases). For purposes of <u>Section 6.02</u>, a Capital Lease Obligation shall be deemed to be secured by a Lien on the property being leased and such property shall be deemed to be owned by the lessee.

"<u>Capitalized Lease</u>" means, as applied to any Person, any lease of any property (whether real, personal, or mixed) by that Person (a) as lessee that, in conformity with GAAP, is or should be accounted for as a capital lease on the balance sheet of that Person or (b) as lessee which is a transaction of a type commonly known as a "synthetic lease" (<u>i.e.</u>, a transaction that is treated as an operating lease for accounting purposes but with respect to which payments of rent are intended to be treated as payments of principal and interest on a loan for Federal income Tax purposes); <u>provided</u>, that lease liabilities and associated expenses recorded by the Loan Parties (or any other applicable Persons) pursuant to ASU 2016-02, Leases, shall not be treated as Indebtedness, unless the corresponding leases would have been treated as Capitalized Leases under GAAP as in effect prior to the adoption of ASU 2016-02, Leases (in which case such leases shall be treated as Capitalized Leases).

"<u>Carve-Out</u>" shall have the meaning assigned to such term in the Orders.

"<u>Cash Management Obligations</u>" means (a) obligations of the Borrower or any Subsidiary in respect of any overdraft and related liabilities arising from treasury, depository, cash pooling arrangements and cash management services or any automated clearing house transfers of funds and (b) other obligations in respect of netting services, employee credit or purchase card programs and similar arrangements.

"<u>Casualty Event</u>" means any event that gives rise to the receipt by the Borrower or any Subsidiary of any insurance proceeds or condemnation awards, in each case, in respect of any equipment, fixed assets or real property (including any improvements thereon) to replace or repair such equipment, fixed assets or real property.

"<u>Challenge Deadline</u>" shall have the meaning assigned to such term in the Orders.

"<u>Change in Law</u>" means: (a) the adoption of any rule, regulation, treaty or other law after the date of this Agreement, (b) any change in any rule, regulation, treaty or other law or in the administration, interpretation or application thereof by any Governmental Authority after the date of this Agreement or (c) the making or issuance of any request, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the date of this Agreement; <u>provided</u> that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all rules, regulations, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank of International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall, in each case, be deemed to be a "Change in Law," to the extent enacted, adopted, promulgated or issued after the date of this Agreement, but only to the extent such rules, regulations, or published interpretations or directives are applied to the Borrower and its Subsidiaries by the Administrative Agent or any Lender in substantially the same manner as applied to other similarly situated borrowers under comparable syndicated credit facilities, including for purposes of <u>Section 2.15</u>.

"<u>Chapter 11 Cases</u>" shall have the meaning specified in the recitals to this Agreement.

"<u>Chapter 11 Debtors</u>" shall have the meaning specified in the recitals to this Agreement.

"<u>Claiming Party</u>" has the meaning assigned to such term in <u>Section 10.09</u>.

"<u>Class</u>" when used in reference to (a) any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are New Money Term Loans or Roll-Up Term Loans and (b) any Lender, refers to whether such Lender has a Loan or Commitment with respect to a particular Class of Loans or Commitments.

"<u>Code</u>" means the Internal Revenue Code of 1986, as amended from time to time.

"<u>Collateral</u>" means any and all assets, whether real or personal, tangible or intangible, on which Liens are purported to be granted pursuant to the Security Documents or any Order as security for the Secured Obligations (including, for the avoidance of doubt, the "DIP Collateral" as defined under and in accordance with the Orders).

"<u>Collateral Agent</u>" means Wilmington Trust, National Association, in its capacity as collateral agent hereunder and under the other Loan Documents, and its successors in such capacity as provided in <u>Article VIII</u>.

"<u>Collateral and Guarantee Requirement</u>" means, at any time, the requirement that:

(a)     all outstanding Equity Interests owned by or on behalf of any Loan Party (other than Equity Interests owned by or on behalf of Holdco Borrower or Holdco Intermediate Parent), shall have been pledged, and, the Collateral Agent shall have pursuant to the Orders, a valid and perfected superpriority lien on such Equity Interests; and

(b)     all Secured Obligations shall have been unconditionally guaranteed by each Borrower (other than with respect to such Borrower's direct Secured Obligations as a primary obligor (as opposed to a guarantor) under the Loan Documents) and each other Loan Party; and

(c)     the Orders shall have created valid and perfected liens securing the Secured Obligations consistent with the priorities set forth in the Orders.

For the avoidance of doubt, Holdco Borrower and Holdco Intermediate Parent shall not be Guarantors under this Agreement and are not granting Collateral or Liens to secure the Secured Obligations under this Agreement or the Orders. Notwithstanding anything herein to the contrary, in any Loan Document or in the Orders, the Holdco Loan Parties shall only provide Liens and Guarantees on its assets to secure the Secured Obligations in an amount not to exceed the outstanding principal balance (together with any interest, fees, reimbursement, indemnity and other amounts owed in respect thereof) of the New Money Term Loans at any time outstanding. Upon the reasonable request of the Required Lenders, the Loan Parties shall make filings or take any other actions with respect to the perfection of liens unless expressly otherwise set forth in the Orders.

"<u>Commitment</u>" means with respect to any Lender, the New Money Term Loan Commitment of any Class, the Roll-Up Term Loan Commitment or any combination thereof (as the context requires).

"<u>Commitment Premium</u>" has the meaning assigned to such term in <u>Section 2.12(b)</u>.

"<u>Commodity Exchange Act</u>" means the Commodity Exchange Act (7 U.S.C. § 1 <u>et</u> <u>seq</u>.), as amended from time to time, and any successor statute.

"Company Advisors" has the meaning assigned to such term in Section 5.16(c). "Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies, or the dismissal or appointment of the management, of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Confirmation Order" means the final order entered by the Bankruptcy Court in the Chapter 11 Cases confirming the Plan of Reorganization pursuant to section 1129 of the Bankruptcy Code, in form and substance acceptable to the Required Lenders, which shall be in full force and effect and shall not be reversed, vacated, stayed, amended, supplemented or otherwise modified, in each case, without the prior written consent of the Required Lenders (which may be provided via email by counsel to the Required Lenders).

"Contributing Party" has the meaning assigned to such term in Section 10.09.

"Covered Entity" means any of the following: (i) a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b), (ii) a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b) or (iii) a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

"Covered Party" has the meaning specified in Section 9.20.

"Daily Simple SOFR" means, for any day, SOFR, with the conventions for this rate (which will include a lookback) being established by the Administrative Agent in accordance with the conventions for this rate selected or recommended by the Relevant Governmental Body for determining "Daily Simple SOFR" for syndicated business loans; provided, that if the Administrative Agent decides that any such convention is not administratively feasible for the Administrative Agent, then the Administrative Agent (acting at the direction of the Required Lenders) may establish another convention, provided that such convention is administratively feasible for the Administrative Agent. .

"Debtor Relief Laws" means the Bankruptcy Code, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"Default" means any event or condition that constitutes an Event of Default or that upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

"Default Right" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

"Defaulting Lender" means any Lender that (a) has failed, within two Business Days of the date required to be funded or paid, to (i) fund any portion of its Loans, or (ii) pay over to the Administrative Agent or any other Lender any other amount required to be paid by it hereunder, unless, in the case of clause (i) above, such Lender notifies the Administrative Agent in writing that such failure is the result of such Lender's good faith determination that a condition precedent to funding (specifically identified and including the particular default, if any) has not been satisfied, (b) has notified the Lead Borrower or the Administrative Agent, or any other Lender, as applicable, in writing, or has made a public statement to the effect, that it does not intend or expect to comply with any of its funding obligations under this Agreement (unless such writing or public statement indicates that such position is based on such Lender's good faith determination that a condition precedent (specifically identified and including the

particular default, if any) to funding a Loan under this Agreement cannot be satisfied) or generally under other agreements in which it commits to extend credit, (c) has failed, within three Business Days after request by the Administrative Agent or any other Lender, as applicable, acting in good faith, to provide a certification in writing from an authorized officer of such Lender that it will comply with its obligations (and is financially able to meet such obligations as of the date of certification) to fund prospective Loans and under this Agreement; provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon the Administrative Agent's or any other Lender's, as applicable, receipt of such certification in form and substance satisfactory to it and the Administrative Agent or such Lender or (d) has become the subject of (i) a Bankruptcy Event or (ii) a Bail-In Action.

"Deposit Accounts" shall have the meaning set forth in Article 9 of the UCC.

"DIP Backstop Parties" has the meaning assigned to such term in the Restructuring Term Sheet.

"DIP Backstop Premium" has the meaning assigned to such term in Section 2.12(e).

"DIP Facility" shall have the meaning assigned to such term in the recitals hereto.

"DIP Superpriority Claims" shall have the meaning assigned to such term in the Orders.

"Disbursements Variance" has the meaning assigned to such term in Section 5.16(b).

"Dispose" and "Disposition" each has the meaning assigned to such term in Section 6.05.

"Disqualified Equity Interest" means, with respect to any Person, any Equity Interest in such Person that by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable, either mandatorily or at the option of the holder thereof), or upon the happening of any event or condition:

(a)     matures or is mandatorily redeemable or contains any mandatory put, redemption or repayment provision (other than solely for Equity Interests in such Person that do not constitute Disqualified Equity Interests and cash in lieu of fractional shares of such Equity Interests), whether pursuant to a sinking fund obligation or otherwise;

(b)     is convertible or exchangeable, either mandatorily or at the option of the holder thereof, for Indebtedness or Equity Interests (other than solely for Equity Interests in such Person that do not constitute Disqualified Equity Interests and cash in lieu of fractional shares of such Equity Interests);

(c)     is redeemable (other than solely for Equity Interests in such Person that do not constitute Disqualified Equity Interests and cash in lieu of fractional shares of such Equity Interests) or is required to be repurchased by such Person or any of its Affiliates, in whole or in part, at the option of the holder thereof; or

(d)     in the case of any preferred Equity Interest, provides for scheduled payments of dividends and/or distributions in cash;

in each case, on or prior to the date ninety-one (91) days after the Maturity Date; provided, however, that (i) an Equity Interest in any Person that would not constitute a Disqualified Equity Interest but for terms thereof giving holders thereof the right to require such Person to redeem or purchase such Equity Interest upon the occurrence of an "asset sale" or a "change of control" or similar event shall not constitute a

Disqualified Equity Interest if any such requirement becomes operative only after, or payment thereunder is subject to the prior, repayment in full of all the Loans and all other Secured Obligations that are accrued and payable and the termination of the Commitments, (ii) if an Equity Interest in any Person is issued pursuant to any plan for the benefit of employees of the Borrower (or any direct or indirect parent thereof) or any of its subsidiaries or by any such plan to such employees, such Equity Interest shall not constitute a Disqualified Equity Interest solely because it may be required to be repurchased by the Borrower or any of its subsidiaries in order to satisfy applicable statutory or regulatory obligations of such Person and (iii) any Equity Interest in any Person that would not constitute a Disqualified Equity Interest but for a requirement of payment of dividends or distributions in violation of <u>clauses (a)</u> or <u>(b)</u> above shall not constitute a Disqualified Equity Interest if the terms of such Equity Interest (x) give the applicable issuer the option to elect to pay such dividends or distributions on a non-cash basis and (y) do not require the cash payment of dividends or distributions at any time that such cash payment is not permitted under <u>Section 6.07</u> of this Agreement or would result in an Event of Default hereunder.

"<u>Disqualified Lenders</u>" means (i) those Persons identified by the Lead Borrower to the Administrative Agent in writing prior to the Effective Date as being "Disqualified Lenders", (ii) those Persons who are competitors of the Lead Borrower and/or any of their Subsidiaries or Persons Controlling or Controlled by any of the foregoing, in each case, identified by the Lead Borrower to the Administrative Agent from time to time in writing (including by email) which designation shall become effective three (3) Business Days after the delivery of each such written designation to the Administrative Agent, but which shall not apply retroactively to disqualify any persons that have previously acquired, or entered into a trade to acquire, an assignment or participation interest in the Loan and (iii) in the case of each Person identified pursuant to clauses <u>(i)</u> and <u>(ii)</u> above, any of their Affiliates (other than any such Affiliate that is primarily engaged in, or that advises funds or other investment vehicles that are engaged in, making, purchasing, holding or otherwise investing in commercial loans, bonds and similar extensions of credit or securities in the ordinary course and with respect to which the primary Disqualified Lender does not possess the power to direct or cause the direction of the investment policies of such entity referenced in clause (ii) above, unless separately identified by the Lead Borrower pursuant to clause (i) above) that are either (x) identified in writing by the Lead Borrower to the Administrative Agent from time to time or (y) clearly identifiable as Affiliates on the basis of such Affiliate's name. Such list of Disqualified Lenders shall be available for inspection upon request by any Lender.

"<u>dollars</u>" or "<u>$</u>" refers to lawful money of the United States of America.

"<u>Earn-Outs</u>" means, with respect to any Person, obligations of such Person arising from Permitted Acquisitions or other Investments permitted hereunder which are payable to the sellers thereunder in their capacity as such based on the achievement of specified financial results or other criteria or milestones over time.

"<u>EEA Financial Institution</u>" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"<u>EEA Member Country</u>" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"<u>EEA Resolution Authority</u>" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having

responsibility for the resolution of any EEA Financial Institution.

"Effective Date" means the date on which the conditions precedent set forth in Sections 4.01 and 4.02 have been satisfied.

"Electronic Signature" means an electronic sound, symbol, or process attached to, or associated with, a contract or other record and adopted by a Person with the intent to sign, authenticate or accept such contract or record.

"Eligible Assignee" means (a) a Lender, (b) an Affiliate of a Lender, (c) an Approved Fund and (d) any other Person (other than the Borrower or any of its Affiliates), other than, in each case, (i) a natural person (or a holding company, investments vehicle, investment vehicle or trust for, or owned and operated by or for the primary benefit of a natural person), (ii) a Defaulting Lender or (iii) a Disqualified Lender; provided that a Disqualified Lender will constitute an Eligible Assignee solely to the extent that such assignment is consented to in writing by the Lead Borrower.  Notwithstanding the foregoing, each Loan Party and the Lenders acknowledge and agree that the Administrative Agent shall have no liability with respect to any assignment made to a Disqualified Lender unless (i) the Administrative Agent has acted with gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable judgment) and (ii) the Lead Borrower has not consented to such assignment or is not deemed to have consented to such assignment to the extent required by Section 9.04(b).

"Environmental Laws" means all applicable treaties, rules, regulations, codes, ordinances, judgments, orders, decrees and other applicable Requirements of Law, and all applicable injunctions or binding agreements issued, promulgated or entered into by or with any Governmental Authority, in each instance relating to the protection of the environment, to preservation or reclamation of natural resources, to Release or threatened Release of any Hazardous Material or to the extent relating to exposure to Hazardous Materials, to health or safety matters.

"Environmental Liability" means any liability, obligation, loss, claim, action, order or cost, contingent or otherwise (including any liability for damages, costs of medical monitoring, costs of environmental remediation or restoration, administrative oversight costs, consultants' fees, fines, penalties and indemnities) directly or indirectly resulting from or based upon (a) any actual or alleged violation of any Environmental Law or permit, license or approval issued thereunder, (b) the generation, use, handling, transportation, storage, or treatment of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the Release or threatened Release of any Hazardous Materials or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Equity Interests" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that, together with any Loan Party, is treated as a single employer under Section 414(b) or 414(c) of the Code or, solely for purposes of Title IV and Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 4001(b) of ERISA or Section 414 of the Code.

"ERISA Event" means (a) any "reportable event," as defined in Section 4043(c) of ERISA

or the regulations issued thereunder with respect to a Plan (other than an event for which the 30-day notice period is waived); (b) any failure by any Plan to satisfy the minimum funding standard (within the meaning of Section 412 of the Code or Section 302 of ERISA) applicable to such Plan, in each case whether or not waived; (c) the filing pursuant to Section 412(c) of the Code or Section 302(c) of ERISA, of an application for a waiver of the minimum funding standard with respect to any Plan; (d) a determination that any Plan is, or is expected to be, in "at-risk" status (as defined in Section 303(i)(4) of ERISA or Section 430(i)(4) of the Code); (e) the incurrence by a Loan Party or any ERISA Affiliate of any liability under Title IV of ERISA (other than premiums due and not delinquent under Section 4007 of ERISA) with respect to the termination of any Plan or by application of Section 4069 of ERISA with respect to any terminated plan; (f) the receipt by a Loan Party or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan, or to an intention to terminate or to appoint a trustee to administer any plan or plans in respect of which such Loan Party or ERISA Affiliate would be deemed to be an employer under Section 4069 of ERISA; (g) the incurrence by a Loan Party or any ERISA Affiliate of any liability with respect to the withdrawal or partial withdrawal from any Multiemployer Plan; (h) the receipt by a Loan Party or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from a Loan Party or any ERISA Affiliate of any notice, concerning the imposition of Withdrawal Liability, or the failure of a Loan Party or any ERISA Affiliate to pay when due, after the expiration of any applicable grace period, any installment payment with respect to any Withdrawal Liability; or (i) the withdrawal of a Loan Party or any ERISA Affiliate from a Plan subject to Section 4063 of ERISA during a plan year in which such entity was a "substantial employer" as defined in Section 4001(a)(2) of ERISA or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA.

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Event of Default" has the meaning assigned to such term in Section 7.01.

"Exchange Act" means the United States Securities Exchange Act of 1934, as amended from time to time.

"Excluded Party" has the meaning assigned to such term in Section 9.03(b).

"Excluded Taxes" means, with respect to any Recipient, (a) Taxes imposed on (or measured by) net income (however denominated) and franchise Taxes by a jurisdiction (i) as a result of such recipient being organized or having its principal office or, in the case of any Lender, its applicable lending office located in such jurisdiction (or any political subdivision thereof), or (ii) that are Other Connection Taxes, (b) any branch profits tax imposed under Section 884(a) of the Code, or any similar Tax, imposed by any jurisdiction described in clause (a) above, (c) any withholding Tax imposed pursuant to FATCA, (d) any Tax that is attributable to a Lender's failure to comply with Section 2.17(e) and (e) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or Commitment (other than pursuant to an assignment request by the Lead Borrower under Section 2.19(b)) or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 2.17(a), amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office.

"Existing ABL Intercreditor Agreement" means that certain Amended and Restated Intercreditor Agreement, dated as of November 22, 2021, by and among the Prepetition Senior Priority Agent, the Prepetition Junior Priority Agent and the Prepetition ABL Agent (and any other Persons party

thereto), and acknowledged by certain of the Loan Parties, as may be amended, amended and restated, modified, supplemented, extended or renewed from time to time not in violation of the terms hereof or thereof.

"Existing First Lien/Second Lien Intercreditor Agreement" means that certain Amended and Restated First Lien/Second Lien Intercreditor Agreement, dated as of November 22, 2021, by and among, among others, the Prepetition Senior Priority Agent, the Prepetition Junior Priority Agent and the Prepetition ABL Agent, and acknowledged by certain of the Loan Parties, as may be amended, amended and restated, modified, supplemented, extended or renewed from time to time not in violation of the terms hereof or thereof.

"Existing Intercreditor Agreements" means the Existing ABL Intercreditor Agreement and the Existing First Lien/Second Lien Intercreditor Agreement, as the context may require.

"Exit Premium" has the meaning assigned to such term in Section 2.12(c).

"Extraordinary Net Cash Receipts" means any cash (determined on a net basis) received by or paid to or for the account of the Borrower or any Subsidiary not in the ordinary course of business consisting of (a) proceeds of directors and officers insurance (other than proceeds not payable to the Loan Parties or the estates pursuant to the terms of any such insurance policy), (b) judgments, proceeds of settlements or other consideration of any kind in connection with any cause of action (other than with respect to reimbursement of third party claims) relating to the Collateral and (c) foreign, United States, state or local tax refunds; in each case, net of reasonable and documented costs and expenses associated therewith, including reasonable and documented legal fees and expenses; provided, however, that Extraordinary Net Cash Receipts shall not include cash receipts to the extent that such funds are received by the Borrower or any Subsidiary in respect of any third party claim against such Person and applied to pay (or reimburse such Person for its prior payment of) such claim plus related costs and expenses.

"FATCA" means Sections 1471 through 1474 of the Code as of the date of this Agreement (or any amended or successor version that is substantively comparable thereto and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the Code.

"Federal Funds Effective Rate" means, for any day, the rate calculated by the NYFRB based on such day's federal funds transactions by depositary institutions, as determined in such manner as shall be set forth on the Federal Reserve Bank of New York's Website from time to time, and published on the next succeeding Business Day by the NYFRB as the effective federal funds rate; provided that if the Federal Funds Effective Rate as so determined would be less than zero, such rate shall be deemed to be zero for the purposes of this Agreement.

"Federal Reserve Bank of New York's Website" means the website of the NYFRB at http://www.newyorkfed.org, or any successor source.

"Final Borrowing Cap" means the remaining New Money Term Loan Commitments after giving effect to the incurrence of New Money Term Loans pursuant to Sections 2.01(a)(i) through 2.01(a)(ii).

"Final DIP Order" means the final order entered by the Bankruptcy Court in the Chapter 11 Cases approving (i) the Loan Parties' entry into the Loan Documents, (ii) the making of the Loans, (iii)

the granting of the DIP Superpriority Claims and Liens against the Loan Parties and their assets in accordance with the Loan Documents with respect to the Collateral, (iv) the payment of the applicable premiums and fees under the Loan Documents (including the Commitment Premium, the Exit Premium, and the DIP Backstop Premium), (v) the items set forth in "Debtors' Stipulations, Releases and Acknowledgements Regarding DIP Secured Parties" and "Debtors' Stipulations, Releases and Acknowledgements Regarding Prepetition Secured Parties" in the Final DIP Order, (vi) the use of cash collateral, and (vii) the granting of adequate protection to the Prepetition Secured Parties, in each case, on a final basis, in form and substance acceptable to the Agents and the Required Lenders, which shall be in full force and effect and shall not be reversed, vacated, stayed, amended, supplemented or otherwise modified, in each case, without the prior written consent of the Required Lenders and, solely to the extent any such reversal, vacation, stay, amendment, supplement or other modification affects the rights or obligation of any Agent, such Agent.

"Financial Advisor" means AlixPartners, LLP, as financial officer to the Loan Parties.

"Financial Officer" means the chief financial officer, principal accounting officer, treasurer or corporate controller of the Lead Borrower, another officer of the Lead Borrower with similar responsibilities, or the chief executive officer or chief operating officer of the Lead Borrower.

"Financing Transactions" means (a) the execution, delivery and performance by each Loan Party of the Loan Documents to which it is to be a party and (b) the borrowing of Loans hereunder and the use of the proceeds thereof.

"FIRREA" means the Financial Institutions Reform, Recovery and Enforcement Act of 1989, as amended.

"First Day Orders" means all material orders entered by the Bankruptcy Court pursuant to motions filed on or about the Petition Date by the Chapter 11 Debtors. The First Day Orders must be reasonably acceptable to the Required Lenders; *provided*, that the Orders and the interim and final order (I) Authorizing Debtors (as defined therein) to (A) Continue their Existing Cash Management System, (B) Maintain Existing Business Forms, (C) Continue Intercompany Arrangements, (D) Continue Using P-Cards, and (E) Pay Bank Fees; (II) Granting an Extension of Time to Comply With 11 U.S.C. § 345(B); and (III) Granting Related Relief must be acceptable to the Required Lenders.

"Floor" means a rate of interest equal to 1.00% per annum.

"Foreign Lender" has the meaning assigned to such term in Section 2.17(e)(ii).

"Foreign Subsidiary" means each Subsidiary that is organized under or incorporated in the laws of a jurisdiction other than the United States, any state thereof or the District of Columbia.

"Franchise Agreement" means a franchising agreement between any Loan Party or any Subsidiary thereof, as franchisor, and any other Person, as franchisee, pertaining to the establishment and operation of a business with operations comparable to the operations of the Lead Borrower and its Subsidiaries.

"Franchise Disclosure Documents" means any uniform franchise offering circulars and franchise disclosure documents used by (and, to the extent required, filed by) any Loan Party or Subsidiary of a Loan Party to comply with any applicable law, rule, regulation or order of any Governmental Authority.

"Franchise Laws" means all applicable laws, rules, regulations, orders, binding guidance or other requirements of the United States Federal Trade Commission or any other Governmental Authority relating to the relationship between franchisor and franchisees or to the offer, sale, termination, non-renewal or transfer of a franchise.

"Fronting Fee" has the meaning assigned to such term in Section 9.12(d).

"Fronting Fee Letter" means that certain Jefferies Fronting Fee Letter, dated as of the Effective Date, by and among, *inter alia*, the Lead Borrower and the Fronting Lender (as such Fronting Fee Letter may be amended, restated, amended and restated, supplemented or otherwise modified from time to time).

"Fronting Lender" means Jefferies Capital Services, LLC and/or its Affiliates.

"GAAP" means generally accepted accounting principles in the United States of America, as in effect from time to time; provided, however, that if the Borrower notifies the Administrative Agent that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the Effective Date in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Borrower that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith. Notwithstanding any other provision contained herein, (a) all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made, without giving effect to any election under FASB Accounting Standards Codification 825-Financial Instruments, or any successor thereto (including pursuant to the FASB Accounting Standards Codification), to value any Indebtedness of any subsidiary at "fair value," as defined therein and (b) the amount of any Indebtedness under GAAP with respect to Capital Lease Obligations or Capitalized Leases shall be determined in accordance with the definitions of such terms.

"Governmental Approvals" means all authorizations, consents, approvals, permits, licenses and exemptions of, registrations and filings with, and reports to, Governmental Authorities.

"Governmental Authority" means any (i) federal, state, local, municipal, or other government, (ii) governmental or quasi-Governmental Authority of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal) or (iii) body exercising, or entitled to exercise any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature, including any arbitral tribunal.

"Guarantee" of or by any Person (the "guarantor") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness of any other Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness; provided that the term Guarantee shall not include endorsements for collection or deposit in the ordinary course of business or customary and

reasonable indemnity obligations in effect on the Effective Date or entered into in connection with any acquisition or disposition of assets permitted under this Agreement (other than such obligations with respect to Indebtedness). The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined in good faith by a Financial Officer. The term "Guarantee" as a verb has a corresponding meaning.

"Guarantor" means the Lead Borrower, each Subsidiary of the Lead Borrower (other than the other Borrowers), Topco and each Subsidiary of Topco (other than the Lead Borrower) (in each case, on a secured or unsecured basis, as applicable, pursuant to the terms and conditions hereof and in the Orders).

"Guaranty" means, collectively, the guaranty of the Secured Obligations by the Guarantors pursuant to this Agreement.

"Hazardous Materials" means all explosive, radioactive, hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum by-products or distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances, wastes, chemicals, pollutants, contaminants of any nature and in any form regulated pursuant to any Environmental Law.

"Holdco Borrower" means Freedom VCM, Inc., a Delaware corporation.

"Holdco Credit Agreement" means that certain Credit Agreement dated as of August 21, 2023 and as the same may be amended, amended and restated, modified, supplemented, extended or renewed from time to time, among Holdco Intermediate Parent, as holdings, Holdco Borrower, as borrower, certain lenders party thereto and Alter Domus (US) LLC, as administrative agent and collateral agent.

"Holdco Deferred Interest Amount" means an amount equal to $19,505,047.98 which is comprised of the amount of the interest payment due under the Holdco Credit Agreement on or around August 21, 2024.

"Holdco Intermediate Parent" means Freedom VCM Interco, Inc., a Delaware corporation.

"Holdco Loan Document" means the "Loan Documents" (or any similar term) under the Holdco Credit Agreement.

"Holdco Loan Parties" means Topco, Freedom VCM Interco Holdings, Inc., a Delaware corporation, and the Receivables Entities.

"Indebtedness" of any Person means, without duplication, (a) all obligations of such Person for borrowed money, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments to the extent the same would appear as a liability on a balance sheet of such Person prepared in accordance with GAAP, (c) all obligations of such Person under conditional sale or other title retention agreements relating to property acquired by such Person, (d) all obligations of such Person in respect of the deferred purchase price of property or services (excluding (w) trade accounts payable in the ordinary course of business, (x) any Earn-Out obligation, purchase price adjustment or similar obligation until such obligation becomes a liability on the balance sheet of such Person in accordance with GAAP and if not paid within thirty (30) days after being due and payable, (y) liabilities associated with customer prepayments and deposits and (z) expenses accrued in the ordinary course of business), (e) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to

be secured by) any Lien on property owned or acquired by such Person, whether or not the Indebtedness secured thereby has been assumed, (f) all Guarantees by such Person of Indebtedness of others, (g) all Capital Lease Obligations of such Person, (h) all obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit and letters of guaranty, (i) all obligations, contingent or otherwise, of such Person in respect of bankers' acceptances and (j) Disqualified Equity Interests and other preferred equity issuances (and similar instruments); <u>provided</u> that the term "Indebtedness" shall not include (i) deferred or prepaid revenue, (ii) purchase price holdbacks in respect of a portion of the purchase price of an asset to satisfy warranty, indemnity or other unperformed obligations of the seller, (iii) contingent indemnity and similar obligations incurred in the ordinary course of business (iv) any obligations attributable to the exercise of appraisal rights and the settlement of any claims or actions (whether actual, contingent or potential) with respect thereto, (v) Indebtedness of any Person that is a direct or indirect parent of the Borrower appearing on the balance sheet of the Borrower, or solely by reason of push down accounting under GAAP, (vi) any non-compete or consulting obligations incurred in connection with a Permitted Acquisition, (vii) any reimbursement obligations under pre-paid contracts entered into with clients in the ordinary course of business, (viii) for the avoidance of doubt, any Qualified Equity Interests issued by the Borrower. The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor. The amount of Indebtedness of any Person for purposes of clause <u>(e)</u> above shall (unless such Indebtedness has been assumed by such Person) be deemed to be equal to the lesser of (A) the aggregate unpaid amount of such Indebtedness and (B) the fair market value of the property encumbered thereby as determined by such Person in good faith. For all purposes hereof, the Indebtedness of the Borrower and its Subsidiaries shall exclude intercompany liabilities arising from their cash management, tax, and accounting operations and intercompany loans, advances or Indebtedness having a term not exceeding 364 days (inclusive of any rollover or extensions of terms).

"<u>Indemnified Taxes</u>" means Taxes imposed on or with respect to any payment made by or on account of any obligation of the Borrower under any Loan Document, other than Excluded Taxes and Other Taxes.

"<u>Indemnitee</u>" has the meaning assigned to such term in <u>Section 9.03(b)</u>.

"<u>Information</u>" has the meaning assigned to such term in <u>Section 9.12(a)</u>.

"<u>Initial Borrowing Cap</u>" means $100,000,000.

"<u>Initial Budget</u>" means a 13-week cash flow projection in the form of <u>Annex A</u>, reflecting (i) the Loan Parties' anticipated cash receipts and disbursements for each calendar week during the period from the week in which the Petition Date occurs through and including the end of the thirteenth calendar week thereafter, and (ii) a professional fee accrual budget with respect to the anticipated fees and expenses to be incurred by the Company Advisors, the professionals of the Official Committee (if any), and other professionals during the thirteen week period.

"<u>Intellectual Property</u>" means all intellectual property rights of every kind and nature, including rights in inventions, patents, copyrights, licenses, trademarks, rights in trade secrets, and rights in software, all rights to sue or otherwise recover for any past, present and future infringement, dilution, misappropriation, or other violation or impairment thereof, and proceeds of the foregoing, including, without limitation, license fees, royalties, income, payments, claims, damages and proceeds of suit now or hereafter due and/or payable with respect thereto, and all other rights of any kind accruing thereunder or pertaining thereto throughout the world.

19

"Interest Election Request" means a request by the Borrower to convert or continue a Borrowing in accordance with Section 2.07.

"Interest Payment Date" means the last Business Day of each March, June, September and December, upon any prepayment due to acceleration and on the Maturity Date.

"Interest Period" means, with respect to any SOFR Borrowing, the period commencing on the date such Borrowing is disbursed or converted to or continued as a SOFR Borrowing and ending on the date that is one month thereafter as selected by the Borrower in its Borrowing Request; provided that (a) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day, (b) any Interest Period that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the last calendar month of such Interest Period) shall end on the last Business Day of the last calendar month at the end of such Interest Period and (c) no Interest Period shall extend beyond the Maturity Date. For purposes hereof, the date of a Borrowing initially shall be the date on which such Borrowing is made and thereafter shall be the effective date of the most recent conversion or continuation of such Borrowing.

"Interim Borrowing Cap" means $150,000,000.

"Interim DIP Order" means an interim order entered by the Bankruptcy Court in the Chapter 11 Cases approving (i) the Loan Parties' entry into the Loan Documents, (ii) the making of the Loans, (iii) the granting of the DIP Superpriority Claims and Liens against the Loan Parties and their assets in accordance with the Loan Documents with respect to the Collateral, (iv) the payment of the applicable premiums and fees under the Loan Documents (including the Commitment Premium, the Exit Premium, and the DIP Backstop Premium, (v) the items set forth in "Debtors' Stipulations, Releases and Acknowledgements Regarding DIP Secured Parties" and "Debtors' Stipulations, Releases and Acknowledgements Regarding Prepetition Secured Parties" in the Interim Order", (vi) the use of cash collateral, and (vii) the granting of adequate protection to the Prepetition Secured Parties on an interim basis, which order shall be in form and substance acceptable to the Agents and the Required Lenders and shall be in full force and effect, and shall not, subject to entry of the Final DIP Order, be reversed, stayed, amended, supplemented or otherwise modified without the prior written consent of the Required Lenders and, solely to the extent any such reversal, vacation, stay, amendment, supplement or other modification affects the rights or obligations of any Agent, such Agent.

"Investment" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of Equity Interests or Indebtedness or other securities of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of Indebtedness of, or purchase or other acquisition of any other Indebtedness or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person (excluding, in the case of the Borrower and the Subsidiaries (i) intercompany advances arising from their cash management, tax, and accounting operations and (ii) intercompany loans, advances, or Indebtedness having a term not exceeding 364 days (inclusive of any roll-over or extensions of terms)) or (c) the purchase or other acquisition (in one transaction or a series of transactions) of all or substantially all of the property and assets or business of another Person or assets constituting a business unit, line of business or division of such Person. The amount, as of any date of determination, of (a) any Investment in the form of a loan or an advance shall be the principal amount thereof outstanding on such date, minus any cash payments actually received by such investor representing interest in respect of such Investment (to the extent any such payment to be deducted does not exceed the remaining principal amount of such Investment), but without any adjustment for write-downs or write-offs (including as a result of forgiveness of any portion thereof)

with respect to such loan or advance after the date thereof, (b) any Investment in the form of a Guarantee shall be equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof, as determined in good faith by a Financial Officer, (c) any Investment in the form of a transfer of Equity Interests or other non-cash property by the investor to the investee, including any such transfer in the form of a capital contribution, shall be the fair market value (as determined in good faith by a Financial Officer) of such Equity Interests or other property as of the time of the transfer, <u>minus</u> any payments actually received by such investor representing a return of capital of, or dividends or other distributions in respect of, such Investment (to the extent such payments do not exceed, in the aggregate, the original amount of such Investment), but without any other adjustment for increases or decreases in value of, or write-ups, write-downs or write-offs with respect to, such Investment after the date of such Investment, and (d) any Investment (other than any Investment referred to in clause <u>(a)</u>, <u>(b)</u> or <u>(c)</u> above) by the specified Person in the form of a purchase or other acquisition for value of any Equity Interests, evidences of Indebtedness or other securities of any other Person shall be the original cost of such Investment (including any Indebtedness assumed in connection therewith), <u>plus</u> (i) the cost of all additions thereto and <u>minus</u> (ii) the amount of any portion of such Investment that has been repaid to the investor in cash as a repayment of principal or a return of capital, and of any cash payments actually received by such investor representing interest, dividends or other distributions in respect of such Investment (to the extent the amounts referred to in clause <u>(ii)</u> do not, in the aggregate, exceed the original cost of such Investment plus the costs of additions thereto), but without any other adjustment for increases or decreases in value of, or write-ups, write-downs or write-offs with respect to, such Investment after the date of such Investment. For purposes of <u>Section 6.04</u>, if an Investment involves the acquisition of more than one Person, the amount of such Investment shall be allocated among the acquired Persons in accordance with GAAP; <u>provided</u> that pending the final determination of the amounts to be so allocated in accordance with GAAP, such allocation shall be as reasonably determined by a Financial Officer.

"<u>Investors</u>" means the one or more co-investors and other investors who are holders of Equity Interests in the Borrower (or any direct or indirect parent thereof) on the Effective Date after giving effect to the Transactions, together with their Affiliates.

"<u>ISDA Definitions</u>" means the 2006 ISDA Definitions published by the International Swaps and Derivatives Association, Inc. or any successor thereto, as amended or supplemented from time to time, or any successor definitional booklet for interest rate derivatives published from time to time by the International Swaps and Derivatives Association, Inc. or such successor thereto.

"<u>Judgment Currency</u>" has the meaning assigned to such term in <u>Section 9.18</u>.

"<u>Lead Borrower</u>" has the meaning assigned to such term in the preliminary statements hereto.

"<u>Lender Professionals</u>" means, collectively, Paul Hastings LLP, as counsel, and Lazard Frères & Co. LLC, as financial advisor, to certain Lenders constituting the Required Lenders (and/or such other professionals as determined by the Required Lenders from time to time).

"<u>Lenders</u>" means the Fronting Lender, the Persons listed on <u>Schedule 2.01</u> and any other Person that shall have become a party hereto pursuant to an Assignment and Assumption, in each case, other than any such Person that ceases to be a party hereto pursuant to an Assignment and Assumption.

"<u>Lien</u>" means, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, hypothecation, encumbrance, charge or security interest in, on or of such asset and (b) the interest of a vendor or a lessor under any conditional sale agreement, ground lease, capital lease or title retention

agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset.

"Liquidity" means, as of any date of determination, (a) the sum of the daily unrestricted (except for any restrictions pursuant to the collateral and security documents (including any account control agreements), in each case, for the benefit of the respective lenders, agents and/or other secured parties under this Agreement, the Prepetition Junior Priority Credit Agreements and the Prepetition ABL Credit Agreement) cash and cash equivalents of the Loan Parties (other than the Holdco Loan Parties) for such period *minus* (b) any cash in the Deposit Accounts maintained by Lead Borrower at Canadian Imperial Bank of Commerce with the account number ending in x9922 and x0508 needed to cover expenses incurred in connection with the self-insurance policies maintained by the Lead Borrower in accordance with the terms hereof.

"Liquidity Report Deadline" has the meaning assigned to such term in Section 5.16(d).

"Loan Documents" means this Agreement, the Security Documents (including the Orders), the Administrative Agent Fee Letter and, except for purposes of Section 9.02, any Note delivered pursuant to Section 2.09(e).

"Loan Parties" means any Borrower, any Subsidiary Loan Parties and any Holdco Loan Parties.

"Loans" means, individually or collectively as the context requires, the New Money Term Loans and the Roll-Up Term Loans.

"Majority in Interest", when used in reference to Lenders of any Class, means, at any time, Lenders holding outstanding Loans of such Class representing more than 50% of all Loans of such Class outstanding at such time; provided that whenever there are one or more Defaulting Lenders, the total outstanding Loans each Defaulting Lender shall be excluded for purposes of making a determination of the Majority in Interest.

"Manual Sweeping Accounts" shall have the meaning ascribed to the term "Manual Sweeping Accounts" in the Prepetition ABL Credit Agreement as in effect on the date hereof.

"Master Agreement" has the meaning assigned to such term in the definition of "Swap Agreement".

"Material Adverse Effect" means a circumstance or condition that would materially and adversely affect (i) the business, results of operations or financial condition of the Lead Borrower and its Subsidiaries, taken as a whole, (ii) the ability of the Loan Parties, taken as a whole, to perform their payment obligations under the applicable Loan Documents or (iii) the rights and remedies, taken as a whole, of the Agents and the Lenders under the Loan Documents, or on the ability of the Loan Parties, taken as a whole, to perform their payment obligations to the Lenders, in each case, under the Loan Documents, in each case, other than the commencement of a proceeding under chapter 11 of the Bankruptcy Code and the commencement of the Chapter 11 Cases, the events that lead to the commencement of the Chapter 11 Cases, events that customarily and reasonably result from the commencement of the Chapter 11 Cases (in each case, other than matters affecting the Loan Parties that are not subject to the automatic stay) and the consummation of the transactions contemplated by the First Day Orders or the Plan of Reorganization.

"Material Indebtedness" means Indebtedness for borrowed money (other than the Secured Obligations), Capital Lease Obligations, unreimbursed obligations for letter of credit drawings and financial

guarantees (other than ordinary course of business contingent reimbursement obligations) or obligations in respect of one or more Swap Agreements, of any one or more of the Borrower and its Subsidiaries in an aggregate principal amount exceeding $10,000,000. For purposes of determining Material Indebtedness, the "principal amount" of the obligations in respect of any Swap Agreement at any time shall be the maximum aggregate amount (giving effect to any netting agreements) that the Borrower or such Subsidiary would be required to pay if such Swap Agreement were terminated at such time.

"Material Intellectual Property" means any intellectual property owned by the Borrower or any of its Subsidiaries, the loss of which would reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect.

"Material Non-Public Information" means material non-public information with respect to the Lead Borrower or its Affiliates, or the respective securities of any of the foregoing for purposes of United States Federal and state securities laws.

"Material Real Property" means real property (including fixtures) (i) located in the United States, (ii) first acquired by any Loan Party after the Effective Date and (iii) owned (but not leased or ground-leased) by any Loan Party with a book value, as reasonably determined by the Lead Borrower in good faith on the date of acquisition thereof, greater than or equal to $2,000,000.

"Maturity Date" means the earliest to occur of: (a) one hundred and eighty (180) days after the Effective Date (the "Outside Date"); provided, that, the Outside Date may be extended by the Required Supermajority Lenders for up to three (3) consecutive 30-day periods, (b) 11:59 p.m. New York City Time on the date that is five (5) days after the Petition Date (or if such fifth day is not a Business Day, the first succeeding Business Day thereafter) if the Interim DIP Order, which shall be in form and substance consistent with the consent rights set forth in Section 3.02 of the Restructuring Support Agreement, has not been entered by the Bankruptcy Court prior to such date and time, (c) 11:59 p.m. New York City Time on the date that is forty-five (45) days after the Petition Date (or if such forty-fifth day is not a Business Day, the first succeeding Business Day thereafter), if the Final DIP Order, which shall be in form and substance consistent with the consent rights set forth in Section 3.02 of the Restructuring Support Agreement, has not been entered by the Bankruptcy Court prior to such date and time, (d) the effective date of a chapter 11 plan of any Loan Party, which has been confirmed by an order entered by the Bankruptcy Court in any of the Chapter 11 Cases, (e) dismissal of any of the Chapter 11 Cases or conversion of any of the Chapter 11 Cases into a case under chapter 7 of the Bankruptcy Code, (f) consummation of a Sale Transaction (other than a Sale Transaction pursuant to a Sufficient Bid or that is otherwise consented to by the Required Supermajority Lenders in their sole discretion), (g) termination of the Restructuring Support Agreement, and (h) the acceleration of the Loans and the termination of the Commitments pursuant to Article VII.

"Maximum Rate" has the meaning assigned to such term in Section 9.16.

"Milestones" has the meaning assigned to such term in Section 6.17.

"Moody's" means Moody's Investors Service, Inc. and any successor to its rating agency business.

"Multiemployer Plan" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"Net Proceeds" means, with respect to any event, (a) the proceeds received in respect of such event in cash or Permitted Investments, including (i) any non-cash proceeds (including any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or

purchase price adjustment or Earn-Out, but excluding any interest payments), but only as and when received, (ii) in the case of a casualty, insurance proceeds that are actually received, and (iii) in the case of a condemnation or similar event, condemnation awards and similar payments that are actually received, minus (b) the sum of (i) all fees and out-of-pocket expenses paid by the Borrower and its Subsidiaries in connection with such event (including attorney's fees, investment banking fees, survey costs, title insurance premiums, and related search and recording charges, transfer taxes, deed or mortgage recording taxes, underwriting discounts and commissions, other customary expenses and brokerage, consultant, accountant and other customary fees), (ii) in the case of a sale, transfer or other disposition of an asset (including pursuant to a sale and leaseback transaction or a casualty or a condemnation or similar proceeding), (x) the amount of all payments that are permitted hereunder and are made by the Borrower and its Subsidiaries as a result of such event to repay Indebtedness (other than (A) the Loans and (B) in respect of the Collateral, Indebtedness secured by a lien on such Collateral that is *pari passu* or junior to the lien on such Collateral securing the Secured Obligations) secured by such asset or otherwise subject to mandatory prepayment as a result of such event, (y) the *pro rata* portion of net cash proceeds thereof (calculated without regard to this clause (y)) attributable to minority interests and not available for distribution to or for the account of the Borrower or its Subsidiaries as a result thereof and (z) the amount of any liabilities directly associated with such asset and retained by the Borrower or any Subsidiary and (iii) the amount of all taxes paid (or reasonably estimated to be payable) and the amount of any reserves established by the Borrower and its Subsidiaries to fund contingent liabilities reasonably estimated to be payable, that are directly attributable to such event, provided that any reduction at any time in the amount of any such reserves (other than as a result of payments made in respect thereof) shall be deemed to constitute the receipt by the Borrower at such time of Net Proceeds in the amount of such reduction.

"New Money Term Loan Commitments" means, with respect to each Lender, the commitment to make New Money Term Loans hereunder in accordance with Section 2.01(a), expressed as an amount representing the maximum principal amount of the New Money Term Loans to be made by such Lender hereunder, as such commitment may be reduced from time to time (a) pursuant to assignments by or to such Lender pursuant to an Assignment and Assumption, including in connection with the Syndication Procedures or (b) pursuant to a reduction of the Commitments by the Borrower.  As of the date hereof, the aggregate amount of New Money Term Loan Commitments is $250,000,000.  The amount of each Lender's New Money Term Loan Commitment is set forth on Schedule 2.01 or in the Assignment and Assumption pursuant to which such Lender shall have assumed its New Money Term Loan Commitment.

"New Money Term Loans" has the meaning assigned to such term in Section 2.01(a).

"Non-Consenting Lender" has the meaning assigned to such term in Section 9.02(c).

"Note" means a promissory note of the Borrower, in substantially the form of Exhibit D, payable to a Lender in a principal amount equal to the principal amount of the Loans of such Lender.

"NYFRB" means the Federal Reserve Bank of New York.

"NYFRB Rate" means, for any day, the greater of (a) the Federal Funds Effective Rate in effect on such day and (b) the Overnight Bank Funding Rate in effect on such day (or for any day that is not a Business Day, for the immediately preceding Business Day); provided that if none of such rates are published for any day that is a Business Day, the term "NYFRB Rate" means the rate (which rate shall be administratively feasible for the Administrative Agent) for a federal funds transaction quoted at 11:00 a.m. on such day received by a financial institution selected by the Required Lenders from a federal funds broker of recognized standing selected by such financial institution; provided, further, that if any of the aforesaid rates as so determined be less than zero, such rate shall be deemed to be zero for purposes of this Agreement.

"Official Committee" means any official committee of unsecured creditors appointed in any of the Chapter 11 Cases.

"Orders" means the Interim DIP Order and/or the Final DIP Order, as the context requires.

"Organizational Documents" means, with respect to any Person, the charter, articles of association or certificate of organization or incorporation and bylaws or other organizational or governing documents of such Person.

"Other Connection Taxes" means, with respect to any Recipient, Taxes imposed as a result of any present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising solely from such Recipient (x) having executed, delivered, become a party to, performed its obligations or received payments under, received or perfected a security interest under or enforced any Loan Documents or engaged in any other transaction pursuant to this Agreement or (y) having sold or assigned an interest in any Loan Documents).

"Other Taxes" means any and all present or future recording, stamp, documentary or similar Taxes arising from any payment made under any Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, any Loan Document except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 2.19(b)).

"Outside Date" has the meaning specified in the definition of "Maturity Date".

"Overnight Bank Funding Rate" means, for any day, the rate comprised of both overnight federal funds and overnight SOFR Borrowings by U.S.-managed banking offices of depository institutions, as such composite rate shall be determined by the NYFRB as set forth on the Federal Reserve Bank of New York's Website from time to time, and published on the next succeeding Business Day by the NYFRB as an overnight bank funding rate.

"Participant" has the meaning assigned to such term in Section 9.04(c)(i).

"Participant Register" has the meaning assigned to such term in Section 9.04(c)(ii).

"PBGC" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA and any successor entity performing similar functions.

"Periodic Term SOFR Determination Day" has the meaning specified in the definition of "Term SOFR Reference Rate".

"Permitted Acquisition" means the purchase or other acquisition, by merger, consolidation or otherwise, by the Borrower or any Subsidiary of any Equity Interests in, or all or substantially all the assets of (or all or substantially all the assets constituting a business unit, division, product line or line of business of), any Person; provided that (a) in the case of any purchase or other acquisition of Equity Interests in a Person, (i) such Person, upon the consummation of such purchase or acquisition, will be a Subsidiary (including as a result of a merger or consolidation between any Subsidiary and such Person), or (ii) such Person is merged into or consolidated with a Subsidiary and such Subsidiary is the surviving entity of such merger or consolidation, (b) the business of such Person, or such assets, as the case may be, constitute a Similar Business (or assets with respect thereto), (c) with respect to each such purchase or other acquisition, all actions required to be taken with respect to such newly created or acquired Subsidiary (including each subsidiary thereof) or assets in order to satisfy the requirements set forth in the definition

of the term "Collateral and Guarantee Requirement" to the extent applicable shall have been taken to the extent required by <u>Sections 5.11</u> or <u>5.12</u> (or shall be taken within the time periods set forth in this Agreement or such later date as agreed to by the Required Lenders), (d) subject to <u>Section 1.06</u>, after giving effect to any such purchase or other acquisition no Event of Default shall have occurred and be continuing, and (e) all such purchases and acquisitions of the Equity Interests in any Person will result in such Person becoming a Loan Party (within the time periods set forth in this Agreement), or all or substantially all the assets of (or all or substantially all the assets constituting a business unit, division, product line or line of business of) such Person will become owned by a Loan Party (or a Person that will become a Loan Party within the time periods set forth in this Agreement).

"<u>Permitted Encumbrances</u>" means:

(a)  Liens for Taxes, assessments or governmental charges that are not overdue for a period of more than 30 days or that are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP;

(b)  Liens with respect to outstanding motor vehicle fines and Liens imposed by law, such as carriers', warehousemen's, mechanics', materialmen's, repairmen's or construction contractors' Liens and other similar Liens arising in the ordinary course of business that secure amounts not overdue for a period of more than 30 days or, if more than 30 days overdue, are unfiled and no other action has been taken to enforce such Lien or that are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP, in each case so long as such Liens do not individually or in the aggregate have a Material Adverse Effect;

(c)  Liens incurred, pledges or deposits made in the ordinary course of business (i) in connection with payroll taxes, workers' compensation, unemployment insurance and other social security legislation, public liability laws or similar legislation or (ii) securing liability for reimbursement or indemnification obligations of (including obligations in respect of letters of credit or bank guarantees or similar instrument for the benefit of) insurance carriers providing property, casualty or liability insurance to the Borrower or any Subsidiary or otherwise supporting the payment of items of the type set forth in the foregoing clause <u>(i)</u>;

(d)  Liens incurred or deposits made to secure the performance of tenders, bids, trade contracts, customer claims, governmental contracts and leases, statutory obligations, surety, stay, customs and appeal bonds, performance bonds, bankers' acceptance facilities and other obligations of a like nature (including those to secure health, safety and environmental obligations) and obligations in respect of letters of credit, bank guarantees or similar instruments that have been posted to support the same, in each case incurred in the ordinary course of business or consistent with past practices;

(e)  easements, licenses, servitudes, restrictive covenants, rights-of-way, restrictions, encroachments, protrusions, zoning restrictions and other similar encumbrances and title defects affecting real property that, in the aggregate, do not materially interfere with the ordinary conduct of the business of the Borrower and its Subsidiaries taken as a whole;

(f)  leases or subleases of real or personal property granted to other Persons (as lessee thereof) that do not materially interfere with the ordinary conduct of the business of the Borrower and its Subsidiaries taken as a whole;

(g)        rights of future tenants pursuant to written leases entered into in accordance with the terms hereof;

(h)        Liens securing, or otherwise arising from, judgments not constituting an Event of Default under Section 7.01(j) and any pledge and/or deposit securing any settlement of threatened litigation;

(i)        Liens on (i) goods the purchase price of which is financed by a documentary letter of credit issued for the account of the Borrower or any of its Subsidiaries or Liens on bills of lading, drafts or other documents of title arising by operation of law or pursuant to the standard terms of agreements relating to letters of credit, bank guarantees and other similar instruments; provided that such Lien secures only the obligations of the Borrower or such Subsidiaries in respect of such letter of credit to the extent such obligations are permitted by Section 6.01 and (ii) specific items of inventory or other goods and proceeds of any Person securing such Person's obligations in respect of bankers' acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or other goods;

(j)        Liens arising from precautionary Uniform Commercial Code financing statements or similar filings made in respect of operating leases entered into by the Borrower or any of its Subsidiaries;

(k)        rights of recapture of unused real property in favor of the seller of such property set forth in customary purchase agreements and related arrangements with any Governmental Authority;

(l)        Liens in favor of deposit banks or securities intermediaries securing customary fees, expenses or charges in connection with the establishment, operation or maintenance of deposit accounts or securities accounts;

(m)        liens in favor of obligations in respect of performance, bid, appeal and surety bonds and performance and completion guarantees and similar obligations provided by the Borrower or any of the Subsidiaries or obligations in respect of letters of credit, bank guarantees or similar instruments related thereto, in each case in the ordinary course of business or consistent with past practice;

(n)        Liens arising from grants of non-exclusive licenses or sublicenses of Intellectual Property, or covenants not to sue with respect to Intellectual Property, made in the ordinary course of business;

(o)        rights of setoff, banker's lien, netting agreements and other Liens arising by operation of law or by the terms of documents of banks or other financial institutions in relation to the maintenance of administration of deposit accounts, securities accounts, cash management arrangements or in connection with the issuance of letters of credit, bank guarantees or other similar instruments;

(p)        Liens arising from the right of distress enjoyed by landlords or Liens otherwise granted to landlords, in either case, to secure the payment of arrears of rent or performance of other obligations in respect of leased properties, so long as such Liens are not exercised or except where the exercise of such Liens would not reasonably be expected to have a Material Adverse Effect;

(q)        Liens or security given to public utilities or to any municipality or Governmental Authority when required by the utility, municipality or Governmental Authority in connection with the supply of services or utilities to the Borrower or any of its Subsidiaries;

(r)        servicing agreements, development agreements, site plan agreements, subdivision agreements, facilities sharing agreements, cost sharing agreements and other agreements pertaining to the

27

use or development of any of the assets of the Person, provided the same do not result in (i) a substantial and prolonged interruption or disruption of the business activities of the Borrower and its Subsidiaries, taken as a whole, or (ii) a Material Adverse Effect; and

(s)        any valid Liens that constitute Permitted Prior Liens as defined under, and in accordance with, the Orders; provided that such Liens shall have the priorities set forth in the Orders; and

(t)        Liens securing (i) the Secured Obligations under this Agreement and the other Loan Documents and (ii) the Prepetition Senior Priority Obligations; provided that such Liens shall have the priorities set forth in the Orders;

provided that the term "Permitted Encumbrances" shall not include any Lien securing Indebtedness for borrowed money other than Liens referred to in clauses (d) and (k) above securing obligations under letters of credit or bank guarantees or similar instruments related thereto and in clause (g) above, in each case to the extent any such Lien would constitute a Lien securing Indebtedness for borrowed money.

"Permitted Investments" means any of the following, to the extent owned by the Borrower or any Subsidiary:

(a)        dollars, euros, Swiss francs, Sterling, Canadian dollars, or such other currencies held by it from time to time in the ordinary course of business;

(b)        readily marketable obligations issued or directly and fully guaranteed or insured by the government or any agency or instrumentality of (i) the United States, (ii) the United Kingdom, (iii) Canada, (iv) Switzerland or (v) any member nation of the European Union rated A (or the equivalent thereof) or better by S&P and A2 (or the equivalent thereof) or better by Moody's, having average maturities of not more than 24 months from the date of acquisition thereof; provided that the full faith and credit of such country or such member nation of the European Union is pledged in support thereof;

(c)        time deposits with, or certificates of deposit or bankers' acceptances of, any commercial bank that (i) is a Lender or (ii) has combined capital and surplus of at least $250,000,000 in the case of U.S. banks and $100,000,000 (or the dollar equivalent as of the date of determination) in the case of foreign banks (any such bank in the foregoing clauses (i) or (ii) being an "Approved Bank"), in each case with average maturities of not more than 12 months from the date of acquisition thereof;

(d)        commercial paper and variable or fixed rate notes issued by an Approved Bank (or by the parent company thereof) or any variable or fixed rate note issued by, or guaranteed by, a corporation rated A-2 (or the equivalent thereof) or better by S&P or P-2 (or the equivalent thereof) or better by Moody's, in each case with average maturities of not more than 12 months from the date of acquisition thereof;

(e)        repurchase agreements entered into by any Person with an Approved Bank, a bank or trust company (including any of the Lenders) or recognized securities dealer covering securities described in clauses (b) and (c) above;

(f)        marketable short-term money market and similar highly liquid funds substantially all of the assets of which are comprised of securities of the types described in clauses (b) through (e) above;

(g)        securities with average maturities of 24 months or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States, the United Kingdom, Canada, Switzerland, a member of the European Union or by any political subdivision or taxing authority

of any such state, member, commonwealth or territory having an investment grade rating from either S&P or Moody's (or the equivalent thereof);

(h)　　investments with average maturities of 12 months or less from the date of acquisition in mutual funds rated AA- (or the equivalent thereof) or better by S&P or Aa3 (or the equivalent thereof) or better by Moody's;

(i)　　instruments equivalent to those referred to in clauses (a) through (h) above denominated in euros or any other foreign currency comparable in credit quality and tenor to those referred to above and customarily used by corporations for cash management purposes in any jurisdiction outside the United States to the extent reasonably required in connection with any business conducted by any Subsidiary organized or incorporated in such jurisdiction;

(j)　　investments, classified in accordance with GAAP as current assets of the Borrower or any Subsidiary, in money market investment programs that are registered under the Investment Company Act of 1940 or that are administered by financial institutions having capital of at least $250,000,000 or its equivalent, and, in either case, the portfolios of which are limited such that substantially all of such investments are of the character, quality and maturity described in clauses (a) through (i) of this definition;

(k)　　demand deposit accounts holding cash;

(l)　　 interest bearing instruments with a maximum maturity of 180 days in respect of which the obligor is a G7 government or other G7 governmental agency or a G7 financial institution with credit ratings from S&P of at least "A-2" or the equivalent thereof or from Moody's of at least "P-2" or the equivalent thereof;

(m)　　other short-term investments of a type analogous to the foregoing utilized by Foreign Subsidiaries;

(n)　　investment funds investing at least 90% of their assets in securities of the types described in clauses (a) through (m) above; and

(o)　　any guarantee or indemnity for the obligations of a Subsidiary in connection with a Subsidiary claiming exemption from audit, the preparation and filing of its accounts or other similar exemptions (including under section 394C, 448C or 479C of the Companies Act 2006 or other similar or equivalent provisions).

"Permitted Variance" means, (i) with respect to the first Variance Report, no limitations on Disbursements Variance and Receipts Variance, (ii) with respect to the second Variance Report, Disbursements Variance less than 25% and Receipts Variance less than 25%, (iii) with respect to the third Variance Report, Disbursements Variance less than 20% and Receipts Variance less than 20% and (iv) with respect to the fourth Variance Report and every Variance Report thereafter, Disbursements Variance less than 15% and Receipts Variance less than 15%, in each case under the foregoing clauses (i) through (iv), on an aggregate basis (and not on a line item basis) and excluding, in any event, any professional fees.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity, whether existing as of the Effective Date or subsequently created or coming to exist.

"Petition Date" has the meaning assigned to such term in the recitals hereto.

"Plan" means any employee pension benefit plan as such term is defined in Section 3(2) of ERISA (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA, and in respect of which a Loan Party or any ERISA Affiliate is an "employer" as defined in Section 3(5) of ERISA.

"Plan of Reorganization" means a plan of reorganization under the Chapter 11 Cases (including all related schedules, supplements, exhibits and orders, as applicable), which shall be consistent with the Restructuring Support Agreement and otherwise shall be in form and substance satisfactory to the Required Lenders.

"Platform" has the meaning assigned to such term in Section 5.01.

"Prepayment Event" means:

(a)       any non-ordinary course sale, transfer or other disposition of any property or asset of the Borrower or any of its Subsidiaries pursuant to Section 6.05(k) or the occurrence of any other Casualty Event;

(b)       the incurrence by the Borrower or any of its Subsidiaries of any Indebtedness, other than Indebtedness permitted under Section 6.01 or permitted by the Required Lenders pursuant to Section 9.02; or

(c)       the issuance of any equity in the Borrower or any Subsidiary thereof; and

(d)       the receipt of Extraordinary Net Cash Receipts by the Borrower or any of its Subsidiaries.

"Prepayment Percentage" means 100%.

"Prepetition ABL Agent" means JPMorgan Chase Bank, N.A., as "Agent" under, and as such term is defined in, the Prepetition ABL Credit Agreement (and shall also include any successor agent in such capacity).

"Prepetition ABL Collateral" means the "Collateral" as defined in the Prepetition ABL Credit Agreement and any other liens or security interests securing any Prepetition ABL Obligations.

"Prepetition ABL Credit Agreement" means that certain Third Amended and Restated Loan and Security Agreement, dated as of March 10, 2021, among the Borrower, each of the other loan parties party thereto from time to time, the Prepetition ABL Agent and the lenders party thereto from time to time (collectively, the "Prepetition ABL Lenders"), as amended, restated, supplemented or otherwise modified from time to time.

"Prepetition ABL Liens" means the liens and security interests granted by the Loan Parties to secure the Prepetition ABL Obligations.

"Prepetition ABL Loan Documents" means the "Financing Agreements" (or any similar term) under the Prepetition ABL Credit Agreement.

"Prepetition ABL Loans" means the "Loans" under the Prepetition ABL Credit Agreement.

"Prepetition ABL Obligations" means all "Obligations" as such term is defined in the

Prepetition ABL Credit Agreement.

"Prepetition ABL Secured Parties" means, collectively, the Prepetition ABL Lenders, the Prepetition ABL Agent and the other secured parties under the Prepetition ABL Credit Agreement and the other Prepetition ABL Loan Documents.

"Prepetition Debt" means, collectively, Prepetition Senior Priority Obligations, the Prepetition ABL Obligations and the Prepetition Junior Priority Obligations.

"Prepetition Junior Priority Agent" means Alter Domus (US) LC, as administrative agent and collateral agent under each of the Prepetition Junior Priority Credit Agreements, together with its successors and assigns.

"Prepetition Junior Priority Collateral" means the "Collateral" as defined in each of the Prepetition Junior Priority Credit Agreements and any other liens or security interests securing any Prepetition Junior Priority Obligations.

"Prepetition Junior Priority Credit Agreements" means, collectively, (i) that certain Second Lien Credit Agreement, dated as of March 10, 2021, among the Borrower, the Prepetition Junior Priority Agent and the lenders party thereto from time to time (collectively, the "Prepetition Junior Priority Lenders"), as amended, restated, supplemented or otherwise modified from time to time and (ii) that certain Sidecar Pari Passu Second Lien Credit Agreement, dated as of August 21, 2023, among the Borrower, the Prepetition Junior Priority Agent and the Prepetition Junior Priority Lenders.

"Prepetition Junior Priority Liens" means the liens and security interests granted by the Loan Parties to secure the Prepetition Junior Priority Obligations.

"Prepetition Junior Priority Loan Documents" means the "Loan Documents" as defined in each of the Prepetition Junior Priority Credit Agreements.

"Prepetition Junior Priority Loans" means the "Loans" under the Prepetition Junior Priority Credit Agreements.

"Prepetition Junior Priority Obligations" means all "Secured Obligations" as such term is defined in each of the Prepetition Junior Priority Credit Agreements.

"Prepetition Junior Priority Secured Parties" means, collectively, the Prepetition Junior Priority Lenders, the Prepetition Junior Priority Agent and the other secured parties under each of the Prepetition Junior Priority Credit Agreements and the other Prepetition Junior Priority Loan Documents.

"Prepetition Loan Documents" means, collectively, the Prepetition ABL Loan Documents, the Prepetition Junior Priority Loan Documents and the Prepetition Senior Priority Loan Documents.

"Prepetition Secured Obligations" means, collectively, the Prepetition ABL Obligations, the Prepetition Junior Priority Obligations and the Prepetition Senior Priority Obligations.

"Prepetition Secured Parties" means, collectively, the Prepetition ABL Secured Parties, the Prepetition Junior Priority Secured Parties and the Prepetition Senior Priority Secured Parties.

"Prepetition Senior Priority Agent" means Wilmington Trust, National Association, as administrative agent and collateral agent under the Prepetition Senior Priority Credit Agreement, together

with its successors and assigns.

"Prepetition Senior Priority Collateral" means the "Collateral" as defined in the Prepetition Senior Priority Credit Agreement and any other liens or security interests securing any Prepetition Senior Priority Obligations.

"Prepetition Senior Priority Credit Agreement" means that certain First Lien Credit Agreement, dated as of March 10, 2021, among the Borrower, the Prepetition Senior Priority Agent and the lenders party thereto from time to time (collectively, the "Prepetition Senior Priority Lenders"), as the same has been amended, amended and restated, supplemented or otherwise modified from time to time.

"Prepetition Senior Priority Liens" means the liens and security interests granted by the Loan Parties to secure the Prepetition Senior Priority Obligations.

"Prepetition Senior Priority Loan Documents" means the "Loan Documents" as defined in the Prepetition Senior Priority Credit Agreement.

"Prepetition Senior Priority Loans" means the "Loans" under the Prepetition Senior Priority Credit Agreement.

"Prepetition Senior Priority Obligations" means all "Secured Obligations" as such term is defined in the Prepetition Senior Priority Credit Agreement.

"Prepetition Senior Priority Secured Parties" means, collectively, the Prepetition Senior Priority Lenders, the Prepetition Senior Priority Agent and the other secured parties under the Prepetition Senior Priority Credit Agreement and the other Prepetition Senior Priority Loan Documents.

"Prime Rate" means the per annum rate publicly quoted from time to time by The Wall Street Journal as the "Prime Rate" in the United States (or, if The Wall Street Journal ceases quoting a prime rate of the type described, either (a) the per annum rate quoted as the base rate on such corporate loans in a different national publication as reasonably selected by Administrative Agent or (b) the highest per annum rate of interest published by the Federal Reserve Board in Federal Reserve statistical release H.15 (519) entitled "Selected Interest Rates" as the Bank prime loan rate or its equivalent).

"Public Company Costs" means, as to any Person, costs associated with, or in anticipation of, or preparation for, compliance with the requirements of the Sarbanes-Oxley Act of 2002 and the rules and regulations promulgated in connection therewith and charges relating to compliance with the provisions of the Securities Act and the Exchange Act, as applicable to companies with equity or debt securities held by the public, the rules of national securities exchange companies with listed equity or debt securities, directors' or managers' compensation, fees and expense reimbursement, charges relating to investor relations, shareholder meetings and reports to shareholders or debtholders, directors' and officers' insurance and other executive costs, legal and other professional fees and listing fees.

"Public Lender" has the meaning assigned to such term in Section 5.01.

"QFC" has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. 5390(c)(8)(D).

"QFC Credit Support" has the meaning specified in Section 9.20.

"Qualified Equity Interests" means Equity Interests of the Borrower other than Disqualified Equity Interests.

"Receipts Variance" has the meaning assigned to such term in Section 5.16(b).

"Receivables Entities" means, collectively, Freedom Receivables II, LLC, a Delaware limited liability company, and Freedom VCM Receivables, Inc., a Delaware corporation.

"Recipient" means the Administrative Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of any Loan Party hereunder or under any other Loan Document.

"Reference Time" with respect to any setting of the then-current Benchmark means (1) if such Benchmark is Term SOFR, 6:00 a.m. (New York City time) on the day that is two U.S. Government Securities Business Days preceding the date of such setting or (3) if such Benchmark is not Term SOFR, the time determined by the Administrative Agent in its reasonable discretion.

"Register" has the meaning assigned to such term in Section 9.04(b)(iv).

"Related Parties" means, with respect to any specified Person, such Person's Affiliates and the partners, directors, officers, employees, trustees, agents, controlling persons, advisors and other representatives of such Person and of each of such Person's Affiliates and permitted successors and assigns of each of the foregoing.

"Release" means any release, spill, emission, leaking, dumping, injection, pouring, deposit, disposal, emptying, escaping, pumping, discharge, dispersal, leaching or migration into or through the environment (including ambient air, surface water, groundwater, land surface or subsurface strata) and including the environment within any building, or any occupied structure, facility or fixture.

"Relevant Governmental Body" means the Board of Governors or the NYFRB, or a committee officially endorsed or convened by the Board of Governors or the NYFRB, or any successor thereto.

"Remedies Notice Period" has the meaning assigned to such term in Section 7.01.

"Removal Effective Date" has the meaning assigned to such term in Section 8.06.

"Reorganized Common Equity" has the meaning assigned to such term in the Restructuring Support Agreement.

"Representative" means, with respect to any series of Indebtedness permitted by this Agreement to be secured by the Collateral on a *pari passu* or junior or "silent" subordinated basis, the trustee, administrative agent, collateral agent, security agent or similar agent under the indenture or agreement pursuant to which such Indebtedness is issued, incurred or otherwise obtained, as the case may be, and each of their successors in such capacities.

"Required Lenders" means, at any time, Lenders (other than the Fronting Lender, except with respect to waivers, amendments, or consents that directly and materially adversely affect the Fronting Lender; provided that to the extent the Fronting Lender holds any Loans after fifteen (15) Business Days of the Effective Date, after the fifteenth (15th) Business Day, the Fronting Lender's Loans shall be included for purposes of determining the "Required Lenders") having Loans and unused Commitments representing

more than 50.1% of the aggregate Loans and unused Commitments at such time; <u>provided</u> that to the extent set forth in <u>Section 9.02</u> or <u>Section 9.04</u> whenever there are one or more Defaulting Lenders, the total outstanding Loans and the unused Commitments of each Defaulting Lender shall be excluded for purposes of making a determination of Required Lenders.

"<u>Required Supermajority Lenders</u>" means, at any time, Lenders (other than the Fronting Lender, except with respect to waivers, amendments, or consents that directly and materially adversely affect the Fronting Lender; provided that to the extent the Fronting Lender holds any Loans after fifteen (15) Business Days of the Effective Date, after the fifteenth (15th) Business Day, the Fronting Lender's Loans shall be included for purposes of determining the "Required Lenders") having Loans and unused Commitments representing more than 66 2/3% of the aggregate Loans and unused Commitments (other than Commitments of the Fronting Lender) at such time; <u>provided</u> that to the extent set forth in <u>Section 9.02</u> or <u>Section 9.04</u> whenever there are one or more Defaulting Lenders, the total outstanding Loans and the unused Commitments of each Defaulting Lender shall be excluded for purposes of making a determination of Required Supermajority Lenders.

"<u>Requirements of Law</u>" means, with respect to any Person, any statutes, laws, treaties, rules, regulations, orders, decrees, writs, injunctions or determinations of any arbitrator or court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"<u>Resignation Effective Date</u>" has the meaning assigned to such term in <u>Section 8.06</u>.

"<u>Resolution Authority</u>" means an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"<u>Responsible Officer</u>" means the chief executive officer, president, vice president, chief financial officer, treasurer or assistant treasurer, company secretary or other similar officer, manager or a member of the Board of Directors of a Loan Party and with respect to certain limited liability companies or partnerships that do not have officers, any manager, sole member, managing member or general partner thereof, and as to any document delivered on the Effective Date or thereafter pursuant to the definition of the term "Collateral and Guarantee Requirement," any secretary, assistant secretary, company secretary or director of a Loan Party, and as to the Lead Borrower, any Financial Officer. Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"<u>Restricted Payment</u>" means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interests in the Borrower or any Subsidiary, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any Equity Interests in the Borrower or any Subsidiary or any option, warrant or other right to acquire any such Equity Interests in the Borrower or any Subsidiary.

"<u>Restructuring Support Agreement</u>" means that certain Restructuring Support Agreement (including all exhibits, schedules and attachments thereto), dated as of November 1, 2024 (as may be amended, supplemented, amended and restated or otherwise modified from time to time in accordance with the terms thereof), by and among the Chapter 11 Debtors and the Consenting First Lien Lenders (as defined therein).

"<u>Restructuring Term Sheet</u>" has the meaning assigned to such term as in the Restructuring

Support Agreement.

"Roll-Up" means the "roll up" of Prepetition Senior Priority Obligations into Roll-Up Term Loans pursuant to the terms of this Agreement and the Orders.

"Roll-Up Term Loan Commitments" means, with respect to each Lender, the commitment to make Roll-Up Term Loans hereunder in accordance with Section 2.01(b), expressed as an amount representing the maximum principal amount of the Roll-Up Term Loans to be made by such Lender hereunder, as such commitment may be reduced from time to time (a) pursuant to assignments by or to such Lender pursuant to an Assignment and Assumption or (b) upon the incurrence of such Roll-Up Term Loans pursuant to Section 2.01(b). As of the Effective Date, the aggregate amount of Roll-Up Term Loan Commitments is $0, and upon the Syndication Date, the aggregate amount of Roll-Up Term Loan Commitments shall be deemed to be $500,000,000, without any further action of any party to this Agreement or the Loan Documents, the Bankruptcy Court or any other Person. The amount of each Lender's Roll-Up Term Loan Commitment is set forth on Schedule 2.01 (as supplemented by Section 2.01(b)).

"Roll-Up Term Loans" shall have the meaning assigned to such term in Section 2.01.

"S&P" means Standard & Poor's Ratings Services, a Standard & Poor's Financial Services LLC business, and any successor to its rating agency business.

"Sale Transaction" means the closing of a sale of all or substantially all assets or equity of the Loan Parties (other than to another Loan Party).

"Sale Transaction Qualified Extension" means an extension of the Maturity Date that would otherwise result from the consummation of a Sale Transaction (pursuant to clause (f) of the definition of "Maturity Date"), which extension shall be subject to (a) the consent of the Required Supermajority Lenders and (b) the Restructuring Support Agreement being in effect as of the date of such extension; provided, that no such extension shall extend the Maturity Date later than the Outside Date.

"Sanctioned Country" means, at any time, a country, region or territory which is itself the subject or target of any Sanctions (at the time of this Agreement, the Crimea, the so-called Donetsk People's Republic, and the so-called Luhansk People's Republic regions of Ukraine, Cuba, Iran, North Korea and Syria).

"Sanctioned Person" means, at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, or by the United Nations Security Council, the European Union, any EU member state or His Majesty's Treasury of the United Kingdom, (b) any Person operating, organized or resident in a Sanctioned Country, (c) any Person owned 50% or more by any such Person in the foregoing clauses (a) and (b), or (d) any Person otherwise the subject of Sanctions.

"Sanctions" means all economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, or (b) the United Nations Security Council, the European Union, or Her Majesty's Treasury of the United Kingdom.

"SEC" means the Securities and Exchange Commission or any Governmental Authority succeeding to any of its principal functions.

"<u>Secured Holdco Obligations Guarantee</u>" means the supplement to the Guarantee Agreement, dated as of August 19, 2024, by and among the Loan Parties and Alter Domus (US) LLC, as administrative agent and collateral agent, pursuant to which all of the Loan Parties become "New Guarantors" under the "Guarantee Agreement" (as defined in the Holdco Credit Agreement) and which shall terminate upon payment in full of the Holdco Deferred Interest Amount to the respective parties.

"<u>Secured Obligations</u>" means (a) the due and punctual payment in cash by the Borrower of (i) the principal of the Loans and all accrued and unpaid interest thereon at the Applicable Rate or rates provided in this Agreement (including interest accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), when and as due, whether at maturity, by acceleration, upon one or more dates set for prepayment or otherwise and (ii) all other monetary obligations of the Borrower under or pursuant to this Agreement and each of the other Loan Documents to which it is a party, including obligations to pay fees, expenses, reimbursement obligations and indemnification obligations and obligations to provide cash collateral, whether primary, secondary, direct, contingent, fixed or otherwise (including monetary obligations incurred during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), (b) the due and punctual payment in cash and performance of all other monetary obligations of the Borrower under or pursuant to each of the Loan Documents to which it is a party and (c) the due and punctual payment and performance of all the monetary obligations of each other Loan Party under or pursuant to this Agreement and each of the other Loan Documents to which it is a party (including interest and monetary obligations incurred during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding).

"<u>Secured Loan Parties</u>" means each Borrower and each Guarantor.

"<u>Secured Parties</u>" means (a) each Lender, (b) the Administrative Agent, (c) the Collateral Agent, (d) the beneficiaries of each indemnification obligation undertaken by any Loan Party under any Loan Document, and (e) the permitted successors and assigns of each of the foregoing.

"<u>Security Documents</u>" means a collective reference to the Orders and each other security agreement or pledge agreement executed and delivered pursuant to the "Collateral and Guarantee Requirement" and/or <u>Section 5.11</u>, Section <u>5.12(a)</u>, <u>Section 5.12(b)</u> or <u>Section 5.14</u> to secure any of the Secured Obligations.

"<u>Similar Business</u>" means (1) any business conducted by the Borrower or any Subsidiary on the Effective Date or (2) any business or other activities that are reasonably similar, ancillary, incidental, complementary or related to (including non-core incidental businesses acquired in connection with any permitted Investment), or a reasonable extension, development or expansion of, the businesses that the Borrower and its Subsidiaries conduct or propose to conduct on the Effective Date.

"<u>SOFR</u>" means a rate equal to the secured overnight financing rate as administered by the SOFR Administrator.

"<u>SOFR Administrator</u>" means the NYFRB (or a successor administrator of the secured overnight financing rate).

"<u>SOFR Borrowing</u>" means, as to any Borrowing, the SOFR Loans comprising such Borrowing.

"SOFR Loan" means a Loan that bears interest at a rate based on Adjusted Term SOFR, other than pursuant to clause (c) of the definition of "Alternate Base Rate".

"subsidiary" means, with respect to any Person (the "parent") at any date, any corporation, limited liability company, partnership, association or other entity the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP, as well as any other corporation, limited liability company, partnership, association or other entity (a) of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the general partnership interests are, as of such date, owned, controlled or held (unless parent does not Control such entity) or (b) that is, as of such date, otherwise Controlled, by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent; in each case, whether existing as of the Effective Date or subsequently created or coming to exist.

"Subsidiary" means any subsidiary of the Lead Borrower (unless otherwise specified or the context otherwise requires).

"Subsidiary Loan Party" means each Subsidiary of the Lead Borrower.

"Sufficient Bid" has the meaning assigned to such term as in the Restructuring Support Agreement.

"Supported QFC" has the meaning specified in Section 9.20.

"Swap Agreement" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "Master Agreement"), including any such obligations or liabilities under any Master Agreement.

"Syndication" has the meaning assigned to such term in Section 2.04.

"Syndication Date" has the meaning assigned to such term in the Syndication Procedures.

"Syndication Procedures" has the meaning assigned to such term in Section 2.04.

"Tax Restructuring" means any reorganizations and other activities related to tax planning and tax reorganization (as determined by Lead Borrower in good faith) entered into after the Effective Date so long as such Tax Restructuring does not materially impair the Guarantee or the security interests of the Agents and the Lenders under the Security Documents in the Collateral, taken as a whole, and Borrower and its Subsidiaries otherwise comply with Sections 5.11 and 5.12.

"Taxes" means any and all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees, or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Term Commitment" means, with respect to each Lender, the Commitment of such Lender to make Loans hereunder on the Effective Date, expressed as an amount representing the maximum principal amount of the Loans to be made by such Lender hereunder, as such commitment may be (a) reduced from time to time pursuant to Section 2.08 and (b) reduced or increased from time to time pursuant to assignments by or to such Lender pursuant to an Assignment and Assumption. The amount of each Lender's Term Commitment is set forth on Schedule 2.01 or in the Assignment and Assumption pursuant to which such Lender shall have assumed its Term Commitment.

"Term Lender" means a Lender with a Term Commitment or an outstanding Loan.

"Term Loans" means, individually or collectively as the context requires, New Money Term Loans and the Roll-Up Term Loans.

"Term SOFR" means, for any SOFR Loan, the Term SOFR Reference Rate and for any tenor comparable to the applicable Interest Period, the Term SOFR Reference Rate at approximately 6:00 a.m. (New York City time), two U.S. Government Securities Business Days prior to the commencement of such tenor comparable to the applicable Interest Period, as such rate is published by the Term SOFR Administrator.

"Term SOFR Adjustment" means (a) with respect to a SOFR Loan with an Interest Period of one month, 0.11448% per annum, (b) with respect to a SOFR Loan with an Interest Period of three months, 0.26161% per annum and (c) with respect to a SOFR Loan with an Interest Period of six months, 0.42826% per annum.

"Term SOFR Administrator" means CME Group Benchmark Administration Limited (CBA) (or a successor administrator of the Term SOFR Reference Rate selected by the Administrative Agent in its reasonable discretion).

"Term SOFR Reference Rate" means, for any day and time (such day, the "Periodic Term SOFR Determination Day"), with respect to any SOFR Loan and for any tenor comparable to the applicable Interest Period, the rate per annum published by the Term SOFR Administrator and identified by the Administrative Agent as the forward-looking term rate based on SOFR. If by 5:00 pm (New York City time) on such Periodic Term SOFR Determination Day, the "Term SOFR Reference Rate" for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to Term SOFR has not occurred, then, so long as such day is otherwise a U.S. Government Securities Business Day, the Term SOFR Reference Rate for such Periodic Term SOFR Determination Day will be the Term SOFR Reference Rate as published in respect of the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate was published by the Term SOFR Administrator, so long as such first preceding U.S. Government Securities Business Day is not more than five (5) U.S. Government Securities Business Days prior to such Periodic Term SOFR Determination Day.

"Topco" means Freedom VCM Holdings, LLC, a Delaware limited liability company.

"Transaction Costs" means all fees, premiums, costs and expenses incurred or payable by the Borrower or any other Subsidiary in connection with the Transactions.

"<u>Transactions</u>" means (a) the execution and delivery of the Loan Documents, the creation of the Liens pursuant to the Security Documents and the incurrence of the DIP Facility and the funding of the New Money Term Loans on the Effective Date, (c) the consummation of the other transactions contemplated by this Agreement on the Effective Date, (d) the consummation of any other transactions in connection with the foregoing, and (e) the payment of the Transaction Costs related thereto.

"<u>Type</u>," when used in reference to any Loan or Borrowing, refers to whether the rate of interest on such Loan, or on the Loans comprising such Borrowing, is determined by reference to Adjusted Term SOFR or the Alternate Base Rate.

"<u>U.S. Government Securities Business Day</u>" means any day except for (a) a Saturday, (b) a Sunday or (c) a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

"<u>U.S. Special Resolution Regimes</u>" has the meaning specified in <u>Section 9.20</u>.

"<u>UCC</u>" or "<u>Uniform Commercial Code</u>" means the Uniform Commercial Code as in effect from time to time in the State of New York; <u>provided</u>, <u>however</u>, that, at any time, if by reason of mandatory provisions of law, any or all of the perfection or priority of the Collateral Agent's security interest in any item or portion of the Collateral is governed by the Uniform Commercial Code as in effect in a U.S. jurisdiction other than the State of New York, the terms "UCC" and "Uniform Commercial Code" shall mean the Uniform Commercial Code as in effect, at such time, in such other jurisdiction for purposes of the provisions hereof relating to such perfection or priority and for purposes of definitions relating to such provisions.

"<u>UK Financial Institution</u>" means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended from time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"<u>UK Resolution Authority</u>" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"<u>Unadjusted Benchmark Replacement</u>" means the applicable Benchmark Replacement excluding the related Benchmark Replacement Adjustment.

"<u>Unaudited Financial Statements</u>" means the unaudited consolidated balance sheet of the Lead Borrower and its Subsidiaries, and the related unaudited statements of income, cash flows and stockholders' equity, for the fiscal quarter of the Lead Borrower ended on or about June 30, 2024.

"<u>United States Tax Compliance Certificate</u>" has the meaning assigned to such term in Section 2.17(e)(ii)(C).

"<u>Updated Budget</u>" has the meaning assigned to such term in <u>Section 5.16(a)</u>.

"<u>Updated Budget Deadline</u>" has the meaning assigned to such term in <u>Section 5.16(a)</u>.

"USA PATRIOT Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, as amended from time to time.

"Variance Report" has the meaning assigned to such term in Section 5.16(b).

"Variance Report Deadline" has the meaning assigned to such term in Section 5.16(b).

"Wholly Owned Subsidiary" means any Subsidiary that is a wholly owned subsidiary.

"wholly owned subsidiary" means, with respect to any Person at any date, a subsidiary of such Person of which securities or other ownership interests representing 100% of the Equity Interests (other than (a) directors' qualifying shares and (b) nominal shares issued to foreign nationals to the extent required by applicable Requirements of Law) are, as of such date, owned, controlled or held by such Person or one or more Wholly Owned Subsidiaries of such Person or by such Person and one or more Wholly Owned Subsidiaries of such Person.

"Withdrawal Liability" means liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

"Write-Down and Conversion Powers" means, (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

"Zero Balance Accounts" means Deposit Accounts in which a balance of zero is maintained by the depository institution at all times by automatically transferring funds from a master Deposit Account to such Zero Balance Account in an amount only large enough to cover checks presented and other debits to such account, such that any such Zero Balance Account maintains an overnight balance of zero dollars at all times.

SECTION 1.02    Classification of Loans and Borrowings.

For purposes of this Agreement, Loans and Borrowings may be classified and referred to by Class (e.g., an "New Money Term Loan" or "Roll-Up Term Loan") or by Type (e.g., a "SOFR Loan" or "ABR Loan") or by Class and Type (e.g., a "SOFR New Money Term Loan"). Borrowings also may be classified and referred to by Class (e.g., an "New Money Term Loan Borrowing") or by Type (e.g., a "SOFR Borrowing") or by Class and Type (e.g., a "SOFR New Money Term Loan Borrowing").

SECTION 1.03    Terms Generally.

The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed

by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise, (a) any definition of or reference to any agreement (including this Agreement and the other Loan Documents), instrument or other document herein shall be construed as referring to such agreement, instrument or other document, including all schedules, exhibits and other attachments thereto and as from time to time amended, amended and restated, supplemented or otherwise modified (subject to any restrictions on such amendments, restatements, supplements or other modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns (subject to any restrictions on assignment set forth herein) and, in the case of any Governmental Authority, any other Governmental Authority that shall have succeeded to any or all functions thereof, (c) the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement and (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

SECTION 1.04    Accounting Terms; GAAP.

(a)    All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP, applied in a manner consistent with that used in preparing the Audited Financial Statements, except as otherwise specifically prescribed herein.

SECTION 1.05    Effectuation of Transactions.

All references herein to the Borrower and its Subsidiaries shall be deemed to be references to such Persons, and all the representations and warranties of the Borrower and the other Loan Parties contained in this Agreement and the other Loan Documents shall be deemed made, in each case, after giving effect to the Transactions that occurred on the Effective Date, unless the context otherwise requires.

SECTION 1.06    [Reserved].

SECTION 1.07    Certain Determinations.

(a)    [Reserved].

(b)    [Reserved].

(c)    Notwithstanding the foregoing, for purposes of any determination under Article V, Article VI or Article VII or any determination under any other provision of this Agreement subject to any Dollar limitation, threshold or basket, all amounts incurred, outstanding or proposed to be incurred or outstanding in currencies other than Dollars shall be translated into Dollars based on the relevant currency exchange rate in effect on the applicable date of determination (rounded to the nearest currency unit, with 0.5 or more of a currency unit being rounded upward); provided, however, that for purposes of determining compliance with Article VI with respect to any amount in a currency other than Dollars, no Default or Event of Default shall be deemed to have occurred solely as a result of changes in rates of exchange occurring after the time such Indebtedness, Lien or Investment is incurred or Disposition, Restricted Payment or such transaction with an Affiliate is entered into; provided, further, that, for the avoidance of doubt, the foregoing provisions of this Section 1.07(c) shall otherwise apply to such Sections, including with respect to determining whether any Indebtedness, Lien or Investment may be incurred or Disposition, Restricted

Payment or prepayment, redemption, purchase, defeasance or such transaction with an Affiliate may be entered into at any time under such Sections. Each provision of this Agreement shall be subject to such reasonable changes of construction as the Administrative Agent (acting at the direction of the Required Lenders) may from time to time specify with the Borrower's consent (such consent not to be unreasonably withheld) to appropriately reflect a change in currency of any country and any relevant market conventions or practices relating to such change in currency.

SECTION 1.08    Divisions.

For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized and acquired on the first date of its existence by the holders of its Equity Interests at such time.

SECTION 1.09    Interest Rates.

The interest rate on a Loan denominated in dollars may be derived from an interest rate benchmark that may be discontinued or is, or may in the future become, the subject of regulatory reform. Upon the occurrence of a Benchmark Transition Event, Section 2.14(b) provides a mechanism for determining an alternative rate of interest.  The Administrative Agent does not warrant or accept any responsibility for, and shall not have any liability with respect to, the administration, submission, performance or any other matter related to any interest rate used in this Agreement, or with respect to any alternative or successor rate thereto, or replacement rate thereof, including without limitation, whether the composition or characteristics of any such alternative, successor or replacement reference rate will be similar to, or produce the same value or economic equivalence of, the existing interest rate being replaced or have the same volume or liquidity as did any existing interest rate prior to its discontinuance or unavailability.  The Administrative Agent and its affiliates and/or other related entities may engage in transactions that affect the calculation of any interest rate used in this Agreement or any alternative, successor or alternative rate (including any Benchmark Replacement) and/or any relevant adjustments thereto, in each case, in a manner adverse to any Borrower.  The Administrative Agent may select information sources or services in its reasonable discretion to ascertain any interest rate used in this Agreement, any component thereof, or rates referenced in the definition thereof, in each case pursuant to the terms of this Agreement, and shall have no liability to any Borrower, any Lender or any other person or entity for damages of any kind, including direct or indirect, special, punitive, incidental or consequential damages, costs, losses or expenses (whether in tort, contract or otherwise and whether at law or in equity), for any error or calculation of any such rate (or component thereof) provided by any such information source or service.

ARTICLE II

THE CREDITS

SECTION 2.01    Commitments.

(a)    New Money Term Loans.  Subject to the terms and conditions hereof and the Orders, the Lenders with New Money Term Loan Commitments (which, as of the Effective Date, will be the Fronting Lender) hereby severally, but not jointly, agree to make term loans in Dollars (the "New Money Term Loans") to the Borrower: (i) on the Effective Date, in a single borrowing in an aggregate principal amount equal to the Initial Borrowing Cap, (ii) on or after the entry of the Final DIP Order, in a single

borrowing in an aggregate principal amount not to exceed the Interim Borrowing Cap as set forth in the Approved Budget and subject to the approval of the Required Lenders, (iii) on or after the entry of the Confirmation Order, if the entire amount of the New Money Term Loan Commitments have not been fully drawn pursuant to the foregoing clauses (i) and (ii) and, subject to the approval of the Required Lenders in their sole discretion and to the extent set forth in the Approved Budget, in a single borrowing in an aggregate principal amount not to exceed the Final Borrowing Cap; it being understood and agreed that the Fronting Lender shall initially provide the New Money Term Loans on the date set forth in the foregoing clause (i) and, thereafter, such New Money Term Loans and related New Money Term Loan Commitments shall be assigned by the Fronting Lender in accordance with Section 2.04 and Section 9.04.  In no event shall any Lender be required to make New Money Term Loans in excess of its New Money Term Loan Commitments. Amounts borrowed under this Section 2.01(a) and subsequently repaid or prepaid may not be reborrowed.

        (b)     Roll-Up Term Loans.

        (1)     Initial Roll-Up-Term Loans.  Subject to the terms and conditions of the Interim DIP Order and this Agreement, effective immediately upon the Syndication Date, and without any further action by any party to this Agreement or the Loan Documents, the Bankruptcy Court or any other Person (i) up to $100,000,000 of Prepetition Senior Priority Loans  (together with accrued and unpaid interest thereon) held by the Lenders party hereto (or any of their respective designated Approved Funds) as of the Syndication Date that are Prepetition Senior Priority Secured Parties shall be, on the Syndication Date, automatically deemed (on a cashless basis of one dollar of Roll-Up Term Loans for every dollar of the principal amount of New Money Term Loans funded on or prior to the Syndication Date (i.e., $100,000,000)), to constitute U.S. Dollar-denominated term loans under this Agreement (the "Initial Roll-Up Term Loans") based upon each such Person's (or any of their respective designated Approved Funds) pro rata share of principal amount of such funded New Money Term Loans (determined by reference to the amount of funded New Money Term Loans (or any of its designated Approved Funds that is an Eligible Assignee) either (i) is deemed to have elected to purchase or (ii) has delivered a binding and irrevocable election notice pursuant to the Syndication Procedures) or, in the case of any Lender that is a DIP Backstop Party, determined by reference to the full amount of funded New Money Term Loans allocated to such Lender in accordance with the terms of the Restructuring Support Agreement), which Initial Roll-Up Term Loans shall be due and payable in accordance with the terms and conditions set forth in this Agreement as if originally funded hereunder on the Effective Date and (ii) from and after the Effective Date, the outstanding aggregate amount of the Prepetition Senior Priority Loans held by each such Lender (or any of its designated Approved Funds that is an Eligible Assignee) shall be automatically and irrevocably deemed reduced by such amount of Initial Roll-Up Term Loans allocated to each such Lender (or any of its designated Approved Funds that is an Eligible Assignee).  On or about the Syndication Date, a supplement to Schedule 2.01, which shall be prepared by the Lender Professionals, shall be delivered to the Administrative Agent and the Borrower, which shall set forth the aggregate amount of Initial Roll-Up Term Loans and Roll-Up Term Loan Commitment held by each Lender on the Syndication Date. The Administrative Agent (i) shall be entitled to conclusively rely on the supplement to Schedule 2.01 prepared by the Lender Professionals without investigation, (ii) shall incur no liability for acting in reliance upon such supplement to Schedule 2.01 delivered to it by the Lender Professionals, and (iii) is hereby directed by the Borrower and the Lenders to update the Register to reflect the Lender allocations set forth in such supplement to Schedule 2.01.  Schedule 2.01 shall thereby be deemed amended and supplemented notwithstanding any other provision of this Agreement.

        (2)     Final Order Roll-Up Term Loans.  Subject to the terms and conditions of the Final DIP Order and this Agreement, effective immediately upon the entry of the Final DIP Order (such

date, the "Subsequent Roll-Up Date"), and without any further action by any party to this Agreement or the Loan Documents, the Bankruptcy Court or any other Person (i) up to $500,000,000, less any Initial Roll-Up Term Loans incurred pursuant to Section 2.01(b)(1) prior to the Subsequent Roll-Up Date of Prepetition Senior Priority Loans (together with accrued and unpaid interest thereon) held by the Lenders party hereto (or any of their respective designated Approved Funds) as of the Syndication Date that are Prepetition Senior Priority Secured Parties shall be, on the Subsequent Roll-Up Date, automatically deemed (on a cashless basis of two dollars of Roll-Up Term Loans for every dollar of the sum of (i) the principal amount of New Money Term Loans funded on or prior to the Syndication Date and (ii) undrawn New Money  Term Loan Commitments as of the Syndication Date (i.e., $250,000,000)) to constitute U.S. Dollar-denominated term loans under this Agreement (the "Subsequent Roll-Up Term Loans", and together with the Initial Roll-Up Term Loans, the "Roll-Up Term Loans"), which shall be allocated such that each Lender (or any of their respective designated Approved Funds) shall receive its pro rata share of the aggregate amount of Roll-Up Term Loans (i.e., $500,000,000) based upon each such Person's (or any of their respective designated Approved Funds) pro rata share of principal amount of funded New Money Term Loans and undrawn New Money Term Loan Commitments on the Syndication Date, which Subsequent Roll-Up Term Loans shall be due and payable in accordance with the terms and conditions set forth in this Agreement as if originally funded hereunder on the Subsequent Roll-Up Date and (ii) from and after the Subsequent Roll-Up Date, the outstanding aggregate amount of the Prepetition Senior Priority Loans held by each such Lender (or any of its designated Approved Funds that is an Eligible Assignee) shall be automatically and irrevocably deemed reduced by such amount of Subsequent Roll-Up Term Loans allocated to each such Lender (or any of its designated Approved Funds that is an Eligible Assignee).   On or about the Subsequent Roll-Up Date, a supplement to Schedule 2.01, which shall be prepared by the Lender Professionals, shall be delivered to the Administrative Agent and the Borrower, which shall set forth the aggregate amount of Initial Roll-Up Term Loans and Subsequent Roll-Up Term Loans held by each Lender on the Subsequent Roll-Up Date. The Administrative Agent (i) shall be entitled to conclusively rely on the supplement to Schedule 2.01 prepared by the Lender Professionals without investigation, (ii) shall incur no liability for acting in reliance upon such supplement to Schedule 2.01 delivered to it by the Lender Professionals, and (iii) is hereby directed by the Borrower and the Lenders to update the Register to reflect the Lender allocations set forth in such supplement to Schedule 2.01.  Schedule 2.01 shall thereby be deemed amended and supplemented notwithstanding any other provision of this Agreement.

(c)     Subject to the terms and conditions of this Agreement (including the priorities set forth herein), the Term Loans may be repaid or prepaid in accordance with the provisions hereof, but once repaid or prepaid may not be reborrowed.  The Term Loans may from time to time be SOFR Loans or ABR Loans, as determined by the Borrower and notified to the Administrative Agent as set forth herein.

SECTION 2.02       Loans and Borrowings.

(a)     Each Loan shall be made as part of a Borrowing consisting of Loans of the same Class and Type made by the Lenders ratably in accordance with their respective Commitments of the applicable Class. The failure of any Lender to make any Loan required to be made by it shall not relieve any other Lender of its obligations hereunder, provided that the Commitments of the Lenders are several and other than as expressly provided herein with respect to a Defaulting Lender, no Lender shall be responsible for any other Lender's failure to make Loans as required hereby.

(b)     Subject to Section 2.14, each Term Loan Borrowing shall be comprised entirely of ABR Loans or SOFR Loans as the Borrower may request in accordance herewith. Each Lender at its option may make any Loan by causing any domestic or foreign branch or Affiliate of such Lender to make such

Loan; provided that any exercise of such option shall not affect the obligation of the Borrower to repay such Loan in accordance with the terms of this Agreement;

(c)     At the commencement of each Interest Period for any SOFR Borrowing, such Borrowing shall be in an aggregate amount that is an integral multiple of the Borrowing Multiple and not less than the Borrowing Minimum; provided that a SOFR Borrowing that results from a continuation of an outstanding SOFR Borrowing may be in an aggregate amount that is equal to such outstanding Borrowing. At the time that each ABR Borrowing is made, such Borrowing shall be in an aggregate amount that is an integral multiple of the Borrowing Multiple and not less than the Borrowing Minimum. Borrowings of more than one Type and Class may be outstanding at the same time; provided that there shall not at any time be more than a total of fifteen (15) SOFR Borrowings outstanding.

SECTION 2.03     Requests for Borrowings.

To request a Term Loan Borrowing, the Lead Borrower shall notify the Administrative Agent, and in the case of Borrowings on the Effective Date, the Fronting Lender, of such request in writing by telecopy, electronic mail, facsimile or overnight courier (a) in the case of a SOFR Borrowing, not later than 12:00 p.m., New York City time, three (3) U.S. Government Securities Business Days before the date of the proposed Borrowing, (b) in the case of an ABR Borrowing, not later than 12:00 p.m., New York City time, on the date of the proposed Borrowing; provided that any notice given in connection with Borrowings on the Effective Date (including SOFR Borrowings) may be given not later than 2:00 p.m., New York City time, one (1) Business Day before the Effective Date; provided further that, in each case, the Administrative Agent may in its discretion accept any later request. Each such written Borrowing Request shall be signed by the Lead Borrower substantially in the form of Exhibit E and shall be irrevocable. Each such written Borrowing Request shall specify the following information:

(i)     whether the requested Borrowing is to be a Borrowing of New Money Term Loans and/or a Borrowing of any other Class (specifying the Class thereof);

(ii)     the aggregate amount of such Borrowing;

(iii)     the date of such Borrowing, which shall be a Business Day;

(iv)     whether such Borrowing is to be an ABR Borrowing or a SOFR Borrowing;

(v)     in the case of a SOFR Borrowing, the initial Interest Period to be applicable thereto, which shall be a period contemplated by the definition of the term "Interest Period";

(vi)     the location and number of the Borrower's account to which funds are to be disbursed, which shall comply with the requirements of Section 2.06; and

(vii)     that the Borrowing amounts are being used solely in accordance with the Approved Budget and that, as of the date of such Borrowing, the conditions set forth in Sections 4.02(e) and 4.02(f) are satisfied.

If no election as to the Type of Borrowing is specified as to any Borrowing, then the requested Borrowing shall be an ABR Borrowing. If no Interest Period is specified with respect to any requested SOFR Borrowing, then the Lead Borrower shall be deemed to have selected an Interest Period of one month's duration. Promptly following receipt of a Borrowing Request in accordance with this Section 2.03, the

45

Administrative Agent shall advise each Lender of the applicable Class of the details thereof and of the amount of such Lender's Loan to be made as part of the requested Borrowing.

SECTION 2.04 <u>Syndication</u>.

Following the Effective Date, the Lead Borrower shall use commercially reasonable efforts to assist the Fronting Lender in connection with a syndication process (the "<u>Syndication</u>") for the assignment of a proportionate share of New Money Term Loans and New Money Term Loan Commitments in each case in accordance with syndication procedures set forth in <u>Exhibit F</u> (the "<u>Syndication Procedures</u>"), which shall be acceptable to each of the Administrative Agent (acting in consultation with the Required Lenders), the Fronting Lender and the Lead Borrower (each in their reasonable discretion). The Syndication shall terminate on the date the Fronting Lender shall have notified Lead Borrower and the Administrative Agent that the syndication of the New Money Term Loans and New Money Term Loan Commitments (including any fees that have been capitalized and paid in the form of New Money Term Loans pursuant to <u>Section 2.12</u>) has been completed.  Upon completion of the Syndication, a <u>Schedule 2.04</u>, which shall be prepared by the Lender Professionals and reasonably satisfactory to the Required Lenders, shall be delivered to the Administrative Agent and the Borrower, which shall set forth the aggregate New Money Term Loans and New Money Term Loan Commitment held by each Lender upon closing of the Syndication (broken out by New Money Term Loans, New Money Term Loan Commitments, Roll-Up Term Loans and Roll-Up Term Loan Commitments). The Administrative Agent (i) shall be entitled to conclusively rely on the <u>Schedule 2.04</u> prepared by the Lender Professionals without investigation, (ii) shall incur no liability for acting in reliance upon such <u>Schedule 2.04</u> delivered to it by the Lender Professionals, and (iii) is hereby directed by the Borrower and the Lenders to update the Register pursuant to <u>Section 9.04(b)(iv)</u> to reflect the Lender allocations set forth in such <u>Schedule 2.04</u>.

SECTION 2.05        [Reserved].

SECTION 2.06        <u>Funding of Borrowings</u>.

(a)        Each Lender shall make each Loan to be made by it hereunder on the proposed date thereof by wire transfer of immediately available funds by 12:00 noon, New York City time, to the Applicable Account of the Administrative Agent most recently designated by it for such purpose by notice to the Lenders. The Administrative Agent will make such Loans available to the Borrower by promptly crediting the amounts so received, in like funds, to an account of the Borrower designated by the Lead Borrower in the applicable Borrowing Request.

(b)        Unless the Administrative Agent shall have received notice from a Lender prior to the proposed date of any Borrowing that such Lender will not make available to the Administrative Agent such Lender's share of such Borrowing, the Administrative Agent may assume that such Lender has made such share available on such date in accordance with paragraph <u>(a)</u> of this <u>Section 2.06</u> and may, in reliance on such assumption and in its sole discretion, make available to the Borrower a corresponding amount. In such event, if a Lender has not in fact made its share of the applicable Borrowing available to the Administrative Agent, then the applicable Lender agrees to pay to the Administrative Agent an amount equal to such share on demand of the Administrative Agent. If such Lender does not pay such corresponding amount forthwith upon demand of the Administrative Agent therefor, the Administrative Agent shall promptly notify the Borrower, and the Borrower agrees to pay such corresponding amount to the Administrative Agent forthwith on demand. The Administrative Agent shall also be entitled to recover from such Lender or Borrower interest on such corresponding amount, for each day from and including the date such amount is made available to the Borrower to but excluding the date of payment to the Administrative Agent, at (i) in the case of such Lender, the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation, or (ii)

in the case of the Borrower, the interest rate applicable to such Borrowing in accordance with <u>Section 2.13</u>. If such Lender pays such amount to the Administrative Agent, then such amount shall constitute such Lender's Loan included in such Borrowing.

(c)     The obligations of the Lenders hereunder to make Term Loans and to make payments pursuant to <u>Section 9.03(c)</u> are several and not joint. The failure of any Lender to make any Loan, to fund any such participation or to make any payment under <u>Section 9.03(c)</u> on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its Loan, to purchase its participation or to make its payment under <u>Section 9.03(c)</u>.

SECTION 2.07     <u>Interest Elections</u>.

(a)     Each Term Loan Borrowing initially shall be of the Type specified in the applicable Borrowing Request or designated by <u>Section 2.03</u> and, in the case of a SOFR Borrowing, shall have an initial Interest Period as specified in such Borrowing Request or designated by <u>Section 2.03</u>. Thereafter, the Lead Borrower may elect to convert such Borrowing to a different Type or to continue such Borrowing and, in the case of a SOFR Borrowing, may elect Interest Periods therefor, all as provided in this <u>Section 2.07</u>. The Lead Borrower may elect different options with respect to different portions of the affected Borrowing, in which case each such portion shall be allocated ratably among the Lenders holding the Loans comprising such Borrowing, and the Loans comprising each such portion shall be considered a separate Borrowing.

(b)     To make an election pursuant to this <u>Section 2.07</u>, the Lead Borrower shall notify the Administrative Agent of such election in writing by telecopy, electronic mail, facsimile or overnight courier by the time that a Borrowing Request would be required under <u>Section 2.03</u> if the Lead Borrower were requesting a Borrowing of the Type resulting from such election to be made on the effective date of such election. Each such written Interest Election Request shall be irrevocable and shall be signed by the Lead Borrower.

(c)     Each written Interest Election Request shall specify the following information in compliance with <u>Section 2.03</u>:

(i)     the Borrowing to which such Interest Election Request applies and, if different options are being elected with respect to different portions thereof, the portions thereof to be allocated to each resulting Borrowing (in which case the information to be specified pursuant to clauses <u>(iii)</u> and <u>(iv)</u> below shall be specified for each resulting Borrowing);

(ii)     the effective date of the election made pursuant to such Interest Election Request, which shall be a Business Day;

(iii)     whether the resulting Borrowing is to be an ABR Borrowing or a SOFR Borrowing; and

(iv)     if the resulting Borrowing is to be a SOFR Borrowing, the Interest Period to be applicable thereto after giving effect to such election, which shall be a period contemplated by the definition of the term "Interest Period."

If any such Interest Election Request requests a SOFR Borrowing but does not specify an Interest Period, then the Lead Borrower shall be deemed to have selected an Interest Period of one month's duration.

(d)     Promptly following receipt of an Interest Election Request in accordance with this Section 2.07, the Administrative Agent shall advise each Lender of the applicable Class of the details thereof and of such Lender's portion of each resulting Borrowing.

(e)     If the Lead Borrower fails to deliver a timely Interest Election Request with respect to a SOFR Borrowing prior to the end of the Interest Period applicable thereto, then, unless such Borrowing is repaid as provided herein, at the end of such Interest Period such Borrowing shall be converted to an ABR Borrowing. Notwithstanding any contrary provision hereof, if an Event of Default has occurred and is continuing and the Administrative Agent, at the request of the Required Lenders, so notifies the Lead Borrower, then, so long as an Event of Default is continuing (i) no outstanding Borrowing may be converted to or continued as a SOFR Borrowing and (ii) unless repaid, each SOFR Borrowing shall be converted to an ABR Borrowing at the end of the Interest Period applicable thereto.

SECTION 2.08     Termination and Reduction of Commitments.

(a)     Each Lender's New Money Term Loan Commitments shall each be (A) permanently reduced on a dollar-for-dollar basis by the aggregate principal amount of any New Money Term Loans made by such Lender in accordance with Section 2.01(a) in respect of such applicable New Money Term Loan Commitments, (B) terminated in full on the Maturity Date, and (C) terminated in full to the extent done so pursuant to Article VII.  The Roll-Up Term Loan Commitments shall be reduced on a dollar-for-dollar basis by the aggregate principal amount of Roll-Up Term Loans deemed made by such Lender in accordance with Section 2.01(b), in respect of such Roll-Up Term Loan Commitments, and shall be reduced to zero upon the entry of the Final DIP Order after giving effect to the Roll-Up Term Loans deemed made on such date in accordance with Section 2.01(b).

(b)     The Lead Borrower may at any time terminate, or from time to time reduce, the Commitments of any Class, provided that each reduction of the Commitments of any Class shall be in an amount that is an integral multiple of $500,000 and not less than $1,000,000 unless such amount represents all of the remaining Commitments of such Class.

(c)     The Lead Borrower shall notify the Administrative Agent of any election to terminate or reduce the Commitments under paragraph (b) of this Section 2.08 at least one (1) Business Day prior to the effective date of such termination or reduction, specifying such election and the effective date thereof. Promptly following receipt of any such notice, the Administrative Agent shall advise the Lenders of the contents thereof. Each notice delivered by the Borrower pursuant to this Section 2.08 shall be irrevocable. Any termination or reduction of the Commitments of any Class shall be permanent. Each reduction of the Commitments of any Class shall be made ratably among the Lenders in accordance with their respective Commitments of such Class.

SECTION 2.09     Repayment of Loans; Evidence of Debt.

(a)     The Borrower hereby unconditionally promises to repay to the Administrative Agent for the account of each Lender in cash the entire outstanding principal amount of, and all accrued but unpaid interest on, the Loans and all other Secured Obligations then due and payable (if any) on the Maturity Date.

(b)     Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to such Lender resulting from each Loan made by such Lender, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.

(c)    The Administrative Agent shall maintain accounts in which it shall record (i) the amount of each Loan made hereunder, the Class and Type thereof and the Interest Period applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof.

(d)    The entries made in the accounts maintained pursuant to paragraph (b) or (c) of this Section 2.09 shall be prima facie evidence of the existence and amounts of the obligations recorded therein, provided that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrower to pay any amounts due hereunder in accordance with the terms of this Agreement. In the event of any inconsistency between the entries made pursuant to paragraphs (b) and (c) of this Section 2.09, the accounts maintained by the Administrative Agent pursuant to paragraph (c) of this Section 2.09 shall control.

(e)    Any Lender may request that Loans of any Class made by it be evidenced by a Note. In such event, the Borrower shall execute and deliver to such Lender a Note payable to such Lender (or, if requested by such Lender, to such Lender and its registered assigns).

Notwithstanding anything to the contrary in the foregoing, each Lender agrees that, on the Plan Effective Date (as defined in the Restructuring Support Agreement) and so long as the Restructuring Support Agreement remains in effect (and there shall not have occurred and be continuing any event, act, or omission that, but for the expiration of time, would permit the Required Consenting First Lien Lenders (as defined in the Restructuring Support Agreement) to terminate the Restructuring Support Agreement, unless such act or occurrence was waived, cured or extended in accordance with the terms of the Restructuring Support Agreement), the New Money Term Loans, Roll-Up Term Loans held by each Lender (or any of its designated Approved Funds), the Commitment Premium, the Exit Premium (which is to be paid, for the avoidance of doubt, in the form of New Money Term Loans) and the DIP Backstop Premium, in each case to the extent outstanding at such time, shall convert either into "Loans" under the Take-Back Debt Facility (as such term is defined in the Restructuring Support Agreement) or Reorganized Common Equity, in each case in accordance with the terms set forth in the Restructuring Support Agreement and Restructuring Term Sheet. For the avoidance of doubt, in no event will any Agent be required to track, calculate or confirm the amount of the Commitment Premium, the Exit Premium or the DIP Backstop Premium, in each case except to the extent such Commitment Premium, DIP Backstop Premium, or Exit Premium has been capitalized and "paid in kind" by being added to the outstanding principal amount of New Money Term Loans.

SECTION 2.10    [Reserved].

SECTION 2.11    Prepayment of Loans.

(a)    The Lead Borrower shall have the right at any time and from time to time to prepay any Borrowing in whole or in part, without penalty or premium, except with respect to the Exit Premium described in Section 2.12(c), in each case subject to the requirements of this Section 2.11 and Section 2.16. All voluntary prepayments shall be applied first toward repayment of the New Money Term Loans and then, following payment in full of the New Money Term Loans, to the repayment of the Roll-Up Term Loans, in each case, on a *pro rata* basis.

(b)    In the event and on each occasion that any Net Proceeds are received by or on behalf of the Borrower or any of its Subsidiaries in respect of any Prepayment Event, the Borrower shall, within three (3) Business Days after such Net Proceeds are received by or on behalf of the Borrower (or, in the case of a Prepayment Event described in clauses (b) and (c) of the definition of "Prepayment Event", on the date of such Prepayment Event), prepay Term Loan Borrowings (with respect to a Prepayment Event

described in underline(clause (b)) of the definition of "Prepayment Event", in each case, *pro rata* based on the aggregate principal amount of outstanding Borrowings of each such Class, among (x) first New Money Term Loans until paid in full and (y) second to Roll-Up Term Loans until paid in full) in an aggregate amount equal to the Prepayment Percentage of the amount of such Net Proceeds. All mandatory prepayments subject to this Section 2.11(b) shall be applied first toward repayment of the New Money Term Loans and then, following payment in full of the New Money Term Loans, to the repayment of the Roll-Up Term Loans until paid in full, in each case, *pro rata* based on the aggregate principal amount of outstanding Borrowings of each such Class.

(c)     [Reserved]

(d)     All optional prepayment of Borrowings pursuant to Section 2.11(a), shall be applied (x) first toward repayment of the New Money Term Loans and (y) then to the repayment of the Roll-Up Term Loans, in each case, *pro rata* based on the aggregate principal amount of outstanding Borrowings of each such Class. Optional prepayments of Term Loan Borrowings shall be allocated in direct order of maturity, and subject to the foregoing, the Administrative Agent shall apply such prepayments in its reasonable discretion with a view, but no obligation, to minimize breakage costs owing under Section 2.16; provided that, in connection with any mandatory prepayments by the Borrower of the Term Loans pursuant to Section 2.11(c) or (d), such prepayments shall be applied on a *pro rata* basis to the then outstanding Term Loans being prepaid irrespective of whether such outstanding Term Loans are ABR Loans or SOFR Loans.

(e)     The Borrower shall notify the Administrative Agent of any optional prepayment pursuant to Section 2.11(a)(i) in writing by telecopy, electronic mail, facsimile or overnight courier of any prepayment hereunder (i) in the case of prepayment of a SOFR Borrowing, not later than 11:00 a.m., New York City time, three (3) U.S. Government Securities Business Days before the date of prepayment or (ii) in the case of prepayment of an ABR Borrowing, not later than 11:00 a.m., New York City time, one (1) Business Day before the date of prepayment (or, in each case, such later date or date which the Administrative Agent may agree to in its sole discretion). Each such notice shall be irrevocable and shall specify the prepayment date and the principal amount of each Borrowing or portion thereof to be prepaid and, in the case of a mandatory prepayment, a reasonably detailed calculation of the amount of such prepayment; provided that a notice of optional prepayment may state that such notice is conditional upon the effectiveness of other credit facilities or the receipt of the proceeds from the issuance of other Indebtedness or the occurrence of some other identifiable event or condition, in which case such notice of prepayment may be revoked by the Borrower (by notice to the Administrative Agent on or prior to the specified date of prepayment) if such condition is not satisfied. Promptly following receipt of any such notice, the Administrative Agent shall advise the Lenders of the contents thereof. Each partial prepayment of any Borrowing shall be in an amount that would be permitted in the case of an advance of a Borrowing of the same Type as provided in Section 2.02, except as necessary to apply fully the required amount of a mandatory prepayment. Each prepayment of a Borrowing shall be applied ratably to the Loans included in the prepaid Borrowing. Prepayments shall be accompanied by accrued interest to the extent required by Section 2.13, and subject to Section 2.11(b), shall be without premium or penalty. At the Borrower's election in connection with any prepayment pursuant to this Section 2.11, such prepayment shall not be applied to any Term Loan of a Defaulting Lender (under any of subclauses (a), (b) or (c) of the definition of "Defaulting Lender") and shall be allocated ratably among the relevant non-Defaulting Lenders.

SECTION 2.12    Fees.

(a)     The Borrower agrees to pay to the Agents for their own account, fees payable in the amounts and at the times separately agreed upon between the Borrower and the Agents pursuant to the Administrative Agent Fee Letter.

(b)        The Borrower agrees to pay, on the Effective Date, for the ratable account of each of the Lenders providing New Money Term Loan Commitments on the Effective Date, as compensation for the funding of such Lender's New Money Term Loans, a commitment premium (the "Commitment Premium") in an amount equal to 1.50% of such Lender's New Money Term Loan Commitments on the Effective Date.  The Commitment Premium shall be payable in kind on the Effective Date by adding the aggregate amount thereof to the outstanding principal balance of the New Money Term Loans on such date, on a ratable basis with respect to the New Money Term Loans of each Lender as of the Effective Date and shall be subject to the Syndication.  The Commitment Premium will be in all respects fully earned, due and payable on the Effective Date and non-refundable and non-creditable thereafter.  For the avoidance of doubt, the Lenders agree to the treatment of the Commitment Premium as set forth in the final paragraph of Section 2.09.

(c)        The Borrower agrees to pay to the Administrative Agent, for the ratable account of each of the Lenders on the Maturity Date or on any other date that the Loans are repaid in full (whether through a mandatory prepayment, voluntary prepayment, acceleration or otherwise) a non-refundable fee (the "Exit Premium") equal to 2.50% of the aggregate principal amount of the New Money Term Loans funded under this Agreement, which fee shall be in all respects fully earned, due and payable in accordance with the terms of the Restructuring Term Sheet on such date and non-refundable and non-creditable thereafter.  For the avoidance of doubt, the Lenders agree to the treatment of the Exit Premium as set forth in the final paragraph of Section 2.09.

(d)        The Borrower agrees to pay to the Fronting Lender for the sole account of the Fronting Lender, the fronting fee set forth in the Fronting Fee Letter (the "Fronting Fee").  The Fronting Fee will be in all respects fully earned, due and payable pursuant to the terms and conditions of the Fronting Fee Letter.

(e)        The Borrower agrees to pay to the Fronting Lender, for the ratable account of the DIP Backstop Parties, a non-refundable put option premium equal to 9.00% of the aggregate amount of New Money Term Loan Commitments (the "DIP Backstop Premium").  The DIP Backstop Premium will be in all respects fully due, earned and payable in accordance with the terms of the Restructuring Term Sheet.  For the avoidance of doubt, the Lenders agree to the treatment of the DIP Backstop Premium as set forth in the final paragraph of Section 2.09.

(f)        Notwithstanding the foregoing, and subject to Section 2.22, the Borrower shall not be obligated to pay any amounts to any Defaulting Lender pursuant to this Section 2.12.

SECTION 2.13        Interest.

(a)        The Loans comprising each ABR Borrowing shall bear interest at the Alternate Base Rate plus the Applicable Rate.

(b)        The Loans comprising each SOFR Borrowing shall bear interest at Adjusted Term SOFR for the Interest Period in effect for such Borrowing plus the Applicable Rate.

(c)        Notwithstanding the foregoing, if upon the occurrence and during the continuance of any Event of Default under paragraph (a), (b), (h) or (i) of Section 7.01 any principal of or interest on any Loan or any fee or other amount payable by any Loan Party under a Loan Document is not paid when due, whether at stated maturity, upon acceleration or otherwise, all overdue principal amounts of the Loans shall bear interest, after as well as before judgment, at a rate per annum equal to (i) in the case of the principal of any Loan, 2.00% per annum plus the rate otherwise applicable to such Loan as provided in the preceding paragraphs of this Section 2.13 or (ii) in the case of any other amount, 2.00% per annum plus the

rate applicable to ABR Loans as provided in paragraph (a) of this Section 2.13; provided that no amount shall be payable pursuant to this Section 2.13(c) to a Defaulting Lender so long as such Lender shall be a Defaulting Lender; provided, further that no amounts shall accrue pursuant to this Section 2.13(c) on any overdue amount or other amount payable to a Defaulting Lender so long as such Lender shall be a Defaulting Lender.

(d)        Accrued interest on each Loan shall be payable in arrears on each Interest Payment Date for such Loan, provided that (i) interest accrued pursuant to paragraph (c) of this Section 2.13 shall be payable on demand, (ii) in the event of any repayment or prepayment of any Loan, accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment and (iii) in the event of any conversion of any SOFR Loan prior to the end of the current Interest Period therefor, accrued interest on such Loan shall be payable on the effective date of such conversion.

(e)        All interest hereunder shall be computed on the basis of a year of 360 days, except that interest computed by reference to the Prime Rate shall be computed on the basis of a year of 365 days (or 366 days in a leap year), and in each case shall be payable for the actual number of days elapsed (including the first day but excluding the last day). The applicable Alternate Base Rate or Adjusted Term SOFR shall be determined by the Administrative Agent, and such determination shall be conclusive absent manifest error.

SECTION 2.14        Benchmark Unavailability; Benchmark Replacement Setting.

(a)        If prior to the commencement of any Interest Period for a SOFR Borrowing:

(1)        the Administrative Agent or the Required Lenders determines (which determination shall be conclusive absent manifest error) that adequate and reasonable means do not exist for ascertaining Adjusted Term SOFR or Term SOFR, as applicable, for such Interest Period; provided that no Benchmark Transition Event with respect to such benchmark shall have occurred at such time; or

(2)        the Administrative Agent is advised by the Required Lenders that Adjusted Term SOFR or Term SOFR, as applicable, for such Interest Period will not adequately and fairly reflect the cost to such Lenders of making or maintaining their Loans included in such Borrowing for such Interest Period;

then in each such case, the Administrative Agent shall give notice thereof to the Lead Borrower and the Lenders in writing by telecopy, electronic mail, facsimile or overnight courier as promptly as practicable thereafter and, until the Administrative Agent (acting at the direction of the Required Lenders) notifies the Lead Borrower and the Lenders that the circumstances giving rise to such notice no longer exist, (i) any Interest Election Request that requests the conversion of any Borrowing to, or continuation of any Borrowing as, a SOFR Borrowing shall be ineffective and (ii) if any Borrowing Request requests a SOFR Borrowing, then such Borrowing shall be made as an ABR Borrowing; provided, however, that, in each case, the Lead Borrower may revoke any Borrowing Request that is pending when such notice is received.

(b)        *Benchmark Replacement*. Notwithstanding anything to the contrary herein or in any other Loan Document (and any Swap Agreement shall be deemed not to be a "Loan Document" for purposes of this Section 2.14), if a Benchmark Transition Event and its related Benchmark Replacement Date have occurred prior to the Reference Time in respect of any setting of the then-current Benchmark, then (x) if a Benchmark Replacement is determined in accordance with clause (a) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Loan Document in respect of such

Benchmark setting and subsequent Benchmark settings without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document and (y) if a Benchmark Replacement is determined in accordance with clause (b) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Loan Document in respect of any Benchmark setting at or after 5:00 p.m. (New York City time) on the fifth (5th) Business Day after the date notice of such Benchmark Replacement is provided to the Lenders without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document so long as the Administrative Agent has not received, by such time, written notice of objection to such Benchmark Replacement from Lenders comprising the Required Lenders (or, if such Benchmark Replacement affects fewer than all Classes, the Majority in Interest Lenders of each affected Class).  If the Benchmark Replacement is Daily Simple SOFR, all interest payments will be payable on a monthly basis.

(c)    *Benchmark Replacement Conforming Changes*. In connection with the use, administration, adoption or implementation of a Benchmark Replacement, the Administrative Agent (acting at the direction of the Required Lenders) will have the right to make Benchmark Replacement Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Benchmark Replacement Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document.

(d)    *Notices; Standards for Decisions and Determinations*. The Administrative Agent will promptly notify the Lead Borrower and the Lenders of (i) the occurrence of a Benchmark Transition Event and its related Benchmark Replacement Date, (ii) the implementation of any Benchmark Replacement, (iii) the effectiveness of any Benchmark Replacement Conforming Changes, (iv) the removal or reinstatement of any tenor of a Benchmark pursuant to Section 2.14(e) and (v) the commencement or conclusion of any Benchmark Unavailability Period.  Any determination, decision or election that may be made by the Administrative Agent or, if applicable, any Lender (or group of Lenders) pursuant to this Section 2.14, including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party to this Agreement or any other Loan Document, except, in each case, as expressly required pursuant to this Section 2.14.

(e)    *Unavailability of Tenor of Benchmark*. Notwithstanding anything to the contrary herein or in any other Loan Document, at any time (including in connection with the implementation of a Benchmark Replacement), (i) if the then-current Benchmark is a term rate (including the Term SOFR Reference Rate) and either (A) any tenor for such Benchmark is not displayed on a screen or other information service that publishes such rate from time to time as selected by the Administrative Agent in its reasonable discretion or (B) the regulatory supervisor for the administrator of such Benchmark has provided a public statement or publication of information announcing that any tenor for such Benchmark is not or will no longer be representative, then the Administrative Agent may modify the definition of "Interest Period" (or any similar or analogous definition) for any Benchmark settings at or after such time to remove such unavailable or non-representative tenor and (ii) if a tenor that was removed pursuant to clause (i) above either (A) is subsequently displayed on a screen or information service for a Benchmark (including a Benchmark Replacement) or (B) is not, or is no longer, subject to an announcement that it is not or will no longer be representative for a Benchmark (including a Benchmark Replacement), then the Administrative Agent may modify the definition of "Interest Period" (or any similar or analogous definition) for all Benchmark settings at or after such time to reinstate such previously removed tenor.

(f)      *Benchmark Unavailability Period*. Upon the Lead Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period, the Borrower may revoke any request for a SOFR Borrowing of, conversion to or continuation of SOFR Loans to be made, converted or continued during any Benchmark Unavailability Period and, failing that, the Borrower will be deemed to have converted any such request into a request for a Borrowing of or conversion to ABR Loans.  During any Benchmark Unavailability Period or at any time that a tenor for the then-current Benchmark is not an Available Tenor, the component of the Alternate Base Rate based upon the then-current Benchmark or such tenor for such Benchmark, as applicable, will not be used in any determination of the Alternate Base Rate.

SECTION 2.15      Increased Costs.

(a)      If any Change in Law shall:

(i)      impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended by, any Lender;

(ii)      subject the Administrative Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of any Loan Party hereunder or under any other Loan Document to any Taxes (other than Indemnified Taxes, Other Taxes or Excluded Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

(iii)      impose on any Lender any other condition, cost or expense (other than Taxes) affecting this Agreement or SOFR Loans made by such Lender;

and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any SOFR Loan (or of maintaining its obligation to make any such Loan) or to reduce the amount of any sum received or receivable by such Lender (whether of principal, interest or otherwise), then, from time to time upon request of such Lender, the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender for such increased costs actually incurred or reduction actually suffered; provided that the Borrower shall not be liable for such compensation if, in the case of requests for reimbursement under clause (ii) above resulting from a market disruption, (A) the relevant circumstances are not generally affecting the banking market or (B) the applicable request has not been made by the Majority in Interest of Term Lenders with respect to Term Loans; provided, further, that to the extent any such costs or reductions are incurred by any Lender as a result of any requests, rules, guidelines or directives enacted or promulgated under the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 and Basel III, then such Lender shall be compensated pursuant to this Section 2.15(a) only to the extent such Lender is imposing such charges on similarly situated borrowers where the terms of other syndicated credit facilities permit it to impose such charges.

(b)      If any Lender determines that any Change in Law regarding capital requirements has the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement or the Loans made by such Lender to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then, from time to time upon request of such Lender, the Borrower will pay to such Lender, as the case may be, such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction actually suffered.

54

(c)      A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company in reasonable detail, as the case may be, as specified in paragraph (a) or (b) of this Section 2.15 delivered to the Borrower shall be conclusive absent manifest error. The Borrower shall pay such Lender the amount shown as due on any such certificate within fifteen (15) days after receipt thereof.

(d)      Failure or delay on the part of any Lender to demand compensation pursuant to this Section 2.15 shall not constitute a waiver of such Lender's right to demand such compensation; provided that the Borrower shall not be required to compensate a Lender pursuant to this Section 2.15 for any increased costs incurred or reductions suffered more than one hundred and eighty (180) days prior to the date that such Lender, as the case may be, notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor; provided further that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

SECTION 2.16      [Reserved].

SECTION 2.17      Taxes.

(a)      Any and all payments by or on account of any obligation of any Loan Party under any Loan Document shall be made free and clear of and without deduction for any Taxes, except as required by applicable Requirements of Law. If the applicable withholding agent shall be required by applicable Requirements of Law (as determined in the good faith discretion of the applicable withholding agent) to deduct any Taxes from such payments, then the applicable withholding agent shall make such deductions and shall timely pay the full amount deducted to the relevant Governmental Authority in accordance with applicable Requirements of Law, and if such Taxes are Indemnified Taxes, then the amount payable by the applicable Loan Party shall be increased as necessary so that after all such required deductions have been made (including such deductions applicable to additional amounts payable under this Section 2.17), each Lender (or, in the case of a payment made to the Administrative Agent for its own account, the Administrative Agent) receives an amount equal to the sum it would have received had no such deductions been made.

(b)      The Borrower shall timely pay to the relevant Governmental Authority in accordance with Requirements of Law or, at the option of the Administrative Agent, timely reimburse it for the payment of, any Other Taxes.

(c)      The Borrower, jointly and severally, shall indemnify the Administrative Agent and each Lender within thirty (30) days after written demand therefor, for the full amount of any Indemnified Taxes paid by the Administrative Agent or such Lender as the case may be, on or with respect to any payment by or on account of any obligation of any Loan Party under any Loan Document, as the case may be (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 2.17) and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate setting forth in reasonable detail the basis and calculation of the amount of such payment or liability delivered to the Borrower by a Lender or by the Administrative Agent shall be conclusive absent manifest error.

(d)      As soon as practicable after any payment of any Taxes by a Loan Party to a Governmental Authority pursuant to this Section 2.17, the Borrower shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such

payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(e)    Each Lender shall, at such times as are reasonably requested by Borrower or the Administrative Agent, provide Borrower and the Administrative Agent with any properly completed and executed documentation prescribed by any Requirement of Law, or reasonably requested by Borrower or the Administrative Agent, certifying as to any entitlement of such Lender to an exemption from, or reduction in, any withholding Tax with respect to any payments to be made to such Lender under the Loan Documents. Each such Lender shall, whenever a lapse in time or change in circumstances renders any such documentation expired, obsolete or inaccurate in any respect (including any specific documentation required below in this Section 2.17(e)), deliver promptly to Borrower and the Administrative Agent updated or other appropriate documentation (including any new documentation reasonably requested by the applicable withholding agent) or promptly notify Borrower and the Administrative Agent in writing of its legal ineligibility to do so. Unless the applicable withholding agent has received forms or other documents satisfactory to it indicating that payments under any Loan Document to or for a Lender are not subject to withholding tax or are subject to Tax at a rate reduced by an applicable tax treaty, Borrower, Administrative Agent or other applicable withholding agent shall withhold amounts required to be withheld by applicable law from such payments at the applicable statutory rate.

Without limiting the generality of the foregoing:

(i)    Each Lender that is a United States person (as defined in Section 7701(a)(30) of the Code) shall deliver to Borrower and the Administrative Agent on or before the date on which it becomes a party to this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent) two properly completed and duly signed copies of Internal Revenue Service Form W-9 (or any successor form) certifying that such Lender is exempt from U.S. federal backup withholding tax.

(ii)    Each Lender that is not a United States person (as defined in Section 7701(a)(30) of the Code) (such Lender, a "Foreign Lender") shall deliver (to the extent it is legally entitled to do so) to Borrower and the Administrative Agent on or before the date on which it becomes a party to this Agreement (and from time to time thereafter upon the reasonable request of Borrower or the Administrative Agent) whichever of the following is applicable:

(A)    in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty,

(B)    two properly completed and duly signed copies of Internal Revenue Service Form W-8ECI (or any successor forms),

(C)    in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 871(h) or Section 881(c) of the Code, (x) two properly completed and duly signed certificates, substantially in the form of Exhibit C-1, C-2, C-3 or C-4, as applicable, to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of such Borrower

within the meaning of Section 871(h)(3)(B) of the Code, or a "controlled foreign corporation" related to such Borrower as described in Section 881(c)(3)(C) of the Code (any such certificate a "<u>United States Tax Compliance Certificate</u>"), and (y) two properly completed and duly signed copies of Internal Revenue Service Form W-8BEN or W-8BEN-E, as applicable (or any successor forms),

(D)    to the extent a Foreign Lender is not the beneficial owner (for example, where the Lender is a partnership or a participating Lender), two properly completed and duly signed copies of Internal Revenue Service Form W-8IMY (or any successor forms) of the Foreign Lender, accompanied by a Form W-8ECI, W-8BEN or W-8BEN-E, United States Tax Compliance Certificate, Form W-9, Form W-8IMY (or other successor forms) or any other required information from each beneficial owner, as applicable (<u>provided</u> that, if the Lender is a partnership and one or more direct or indirect partners are claiming the portfolio interest exemption, the United States Tax Compliance Certificate may be provided by such Lender on behalf of such direct or indirect partner(s)), or

(E)    any other form prescribed by applicable Requirements of Law as a basis for claiming exemption from or a reduction in U.S. federal withholding tax duly completed together with such supplementary documentation as may be prescribed by applicable Requirements of Law to permit Borrower and the Administrative Agent to determine the withholding or deduction required to be made.

(iii)    If a payment made to any Lender under any Loan Document would be subject to U.S. federal withholding tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine whether such Lender has or has not complied with such Lender's obligations under FATCA and to determine the amount, if any, to deduct and withhold from such payment. Solely for purposes of this clause <u>(iii)</u>, "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

On or prior to the date on which the Administrative Agent becomes the Administrative Agent under this Agreement (and from time to time thereafter upon the reasonable request of Borrower or the expiration or lapse of such certification, unless the Administrative Agent promptly notifies Borrower in writing of its legal ineligibility to do so), the Administrative Agent will deliver to Borrower (i) if the Administrative Agent is a U.S. Person, a properly completed and duly signed Internal Revenue Service Form W-9 (or any successor form) certifying that it is not subject to U.S. federal backup withholding, or (ii) if the Administrative Agent is not a U.S. Person, a (A) properly completed and duly signed Internal Revenue Service Form W-8ECI (or any successor form) with respect to any amounts received on its own account and (B) properly completed and duly signed Internal Revenue Service Form W-8IMY (or any successor form) with respect to any amounts payable under any Loan Document to the Administrative Agent for the account of others, certifying that it is a "U.S. branch" and that the payments it receives for the account of others are not effectively connected with the conduct of its trade or business within the United States and that it is using such form as evidence of its agreement with Borrower to be treated as a U.S. Person (and Borrower and the Administrative Agent agree to so treat the Administrative Agent as a U.S. Person

with respect to such payments as contemplated by Treasury Regulations Section 1.1441-1(b)(2)(iv)(A)).

(f)        If the Administrative Agent or a Lender determines, in its sole discretion exercised in good faith, that it has received a refund of Taxes as to which it has been indemnified pursuant to this Section 2.17 or with respect to which additional amounts have been paid pursuant to this Section 2.17, it shall pay over such refund to the Borrower (but only to the extent of indemnity payments made, or additional amounts paid, under this Section 2.17 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of the Administrative Agent or such Lender and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); provided that the Borrower, upon the request of the Administrative Agent or such Lender, agrees promptly to repay the amount paid over to the Borrower pursuant to this Section 2.17(f) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Administrative Agent or such Lender in the event the Administrative Agent or such Lender is required to repay such refund to such Governmental Authority. The Administrative Agent or such Lender, as the case may be, shall, at the Borrower's request, provide the Borrower with a copy of any notice of assessment or other evidence of the requirement to repay such refund received from the relevant taxing authority (provided that the Administrative Agent or such Lender may delete any information therein that the Administrative Agent or such Lender deems confidential). Notwithstanding anything to the contrary in this Section 2.17(f), in no event will the Administrative Agent or any Lender be required to pay any amount to the Borrower pursuant to this Section 2.17(f) the payment of which would place the Administrative Agent or such Lender in a less favorable net after-Tax position than the Administrative Agent or such Lender would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. Notwithstanding anything to the contrary, this Section 2.17(f) shall not be construed to require the Administrative Agent or any Lender to make available its Tax returns (or any other information relating to Taxes which it deems confidential) to any Loan Party or any other person.

(g)        The agreements in this Section 2.17 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

(h)        For purposes of this Section 2.17, the term "applicable Requirements of Law" includes FATCA.

SECTION 2.18        Payments Generally; Pro Rata Treatment; Sharing of Setoffs.

(a)        The Borrower shall make each payment required to be made by it under any Loan Document (whether of principal, interest or fees, or of amounts payable under Sections 2.15, 2.16 or 2.17, or otherwise) prior to the time expressly required hereunder or under such other Loan Document for such payment (or, if no such time is expressly required, prior to 2:00 p.m., New York City time), on the date when due, in immediately available funds, without condition or deduction for any counterclaim, recoupment or setoff. Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon. All such payments shall be made to such account as may be specified by the Administrative Agent, except that payments pursuant to Sections 2.15, 2.16, 2.17 and 9.03 shall be made directly to the Persons entitled thereto and payments pursuant to other Loan Documents shall be made to the Persons specified therein. The Administrative Agent shall distribute any such payments received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof. Except as otherwise provided herein, if any payment under any Loan Document shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day. If any payment

on a SOFR Loan becomes due and payable on a day other than a Business Day, the maturity thereof shall be extended to the next succeeding Business Day unless the result of such extension would be to extend such payment into another calendar month, in which event such payment shall be made on the immediately preceding Business Day. In the case of any payment of principal pursuant to the preceding two sentences, interest thereon shall be payable at the then applicable rate for the period of such extension. All payments or prepayments of any Loan shall be made in dollars, all payments of accrued interest payable on a Loan shall be made in dollars, and all other payments under each Loan Document shall be made in dollars. All payments of principal of any of the Roll-Up Term Loans shall be accompanied by accrued and unpaid post-petition interest thereon.

(b)     If at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, interest and fees then due hereunder, such funds shall be applied towards payment of interest and fees then due hereunder (first, to the interest and fees with respect to the New Money Term Loans and second, to the interest and fees with respect to the Roll-Up Term Loans), ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties.

(c)     If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Term Loans resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Term Loans and accrued interest thereon than the proportion received by any other Lender, then the Lender receiving such greater proportion shall purchase (for cash at face value) participations in the Term Loans to the extent necessary so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Term Loans; provided that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest and (ii) the provisions of this paragraph shall not be construed to apply to (A) any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement (including the application of funds arising from the existence of a Defaulting Lender) or (B) any disproportionate payment obtained by a Lender of any Class as a result of the extension by Lenders of the maturity date or expiration date of some but not all Loans or any increase in the Applicable Rate in respect of Loans of Lenders that have consented to any such extension. The Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrower rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrower in the amount of such participation.

(d)     Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders hereunder that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption and in its sole discretion, distribute to the Lenders the amount due. In such event, if the Borrower has not in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender with interest thereon, for each day from and including the date such amount is distributed to it but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

(e)     If any Lender shall fail to make any payment required to be made by it pursuant to Section 2.06(a) or Section 2.06(b), Section 2.18(d) or Section 9.03(c), then the Administrative Agent may, in its discretion and in the order determined by the Administrative Agent (notwithstanding any contrary

provision hereof), (i) apply any amounts thereafter received by the Administrative Agent for the account of such Lender to satisfy such Lender's obligations under such Section until all such unsatisfied obligations are fully paid and/or (ii) hold any such amounts in a segregated account as cash collateral for, and to be applied to, any future funding obligations of such Lender under any such Section.

SECTION 2.19     Mitigation Obligations; Replacement of Lenders.

(a)     If any Lender requests compensation under Section 2.15, or if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.17 or any event gives rise to the operation of Section 2.23, then such Lender shall (at the request of the Lead Borrower) use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder affected by such event, or to assign and delegate its rights and obligations hereunder to another of its offices, branches or Affiliates, if, in the judgment of such Lender, such designation or assignment and delegation (i) would eliminate or reduce amounts payable pursuant to Sections 2.15 or 2.17 or mitigate the applicability of Section 2.23, as the case may be, and (ii) would not subject such Lender to any unreimbursed cost or expense reasonably deemed by such Lender to be material and would not be inconsistent with the internal policies of, or otherwise be disadvantageous in any material economic, legal or regulatory respect to, such Lender.

(b)     If (i) any Lender requests compensation under Section 2.15 or gives notice under Section 2.23, (ii) the Borrower is required to pay any additional amount to any Lender or to any Governmental Authority for the account of any Lender pursuant to Section 2.17 or (iii) any Lender is a Defaulting Lender, then the Lead Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in Section 9.04), all its interests, rights and obligations under this Agreement and the other Loan Documents to an Eligible Assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment and delegation); provided that (A) the Lead Borrower shall have received the prior written consent of the Administrative Agent to the extent such consent would be required under Section 9.04(b) for an assignment of Loans or Commitments, as applicable, which consents, in each case, shall not unreasonably be withheld or delayed, (C) such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued but unpaid interest thereon, accrued but unpaid fees and all other amounts payable to it hereunder from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts), (B) the Borrower or such assignee shall have paid (unless waived) to the Administrative Agent the processing and recordation fee specified in Section 9.04(b)(ii) and (D) in the case of any such assignment resulting from a claim for compensation under Section 2.15, or payments required to be made pursuant to Section 2.17 or a notice given under Section 2.23, such assignment will result in a material reduction in such compensation or payments. A Lender shall not be required to make any such assignment and delegation if, prior thereto, as a result of a waiver by such Lender or otherwise (including as a result of any action taken by such Lender under paragraph (a) above), the circumstances entitling the Borrower to require such assignment and delegation cease to apply. Each party hereto agrees that an assignment required pursuant to this paragraph may be effected pursuant to an Assignment and Assumption executed by the Lead Borrower, the Administrative Agent and the assignee and that the Lender required to make such assignment need not be a party thereto.

SECTION 2.20    [Reserved].

SECTION 2.21    [Reserved].

SECTION 2.22    Defaulting Lenders.

(a)    Adjustments. Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as that Lender is no longer a Defaulting Lender, to the extent permitted by applicable law:

(i)    Waivers and Amendments. Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in Section 9.02.

(ii)    Reallocation of Payments. Subject to the last sentence of Section 2.11(f), any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of that Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Article VII or otherwise, and including any amounts made available to the Administrative Agent by that Defaulting Lender pursuant to Section 9.08), shall be applied at such time or times as may be determined by the Administrative Agent as follows: first, to the payment of any amounts owing by that Defaulting Lender to the Administrative Agent hereunder; second, as the Borrower may request (so long as no Default or Event of Default exists), to the funding of any Loan in respect of which that Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; third, to the payment of any amounts owing to the Lenders as a result of any judgment of a court of competent jurisdiction obtained by any Lender against that Defaulting Lender as a result of that Defaulting Lender's breach of its obligations under this Agreement; fourth, so long as no Default or Event of Default exists, to the payment of any amounts owing to any Loan Party as a result of any judgment of a court of competent jurisdiction obtained by any Loan Party against that Defaulting Lender as a result of that Defaulting Lender's breach of its obligations under this Agreement; and fifth, to that Defaulting Lender or as otherwise directed by a court of competent jurisdiction; provided that if such payment is a payment of the principal amount of any Loans and such Lender is a Defaulting Lender under clause (a) of the definition thereof, such payment shall be applied solely to pay the relevant Loans of the relevant non-Defaulting Lenders on a pro rata basis prior to being applied pursuant to this Section 2.22(a)(ii). Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender shall be deemed paid to and redirected by that Defaulting Lender, and each Lender irrevocably consents hereto.

(b)    Defaulting Lender Cure. If the Borrower and the Administrative Agent agree in writing in their sole discretion that a Defaulting Lender should no longer be deemed to be a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein (which may include arrangements with respect to any cash collateral), such Lender will, to the extent applicable, purchase that portion of outstanding Loans of the other Lenders or take such other actions as the Administrative Agent may determine to be necessary to cause the Loans to be held on a pro rata basis by the Lenders, whereupon that Lender will cease to be a Defaulting Lender; provided that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrower while that Lender was a Defaulting Lender; and provided further that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

SECTION 2.23    Illegality.

If any Lender determines that any law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for any Lender to make, maintain or fund Loans whose interest is determined by reference to Adjusted Term SOFR, or to determine or charge interest rates based upon Adjusted Term SOFR, then, on notice thereof by such Lender to the Lead Borrower through the Administrative Agent, (i) any obligation of such Lender to make or continue SOFR Loans denominated in dollars or to convert ABR Loans denominated in dollars to SOFR Loans shall be suspended, and (ii) if such notice asserts the illegality of such Lender making or maintaining ABR Loans the interest rate on which is determined by reference to the Adjusted Term SOFR component of the Alternate Base Rate, the interest rate on such ABR Loans of such Lender shall be determined by the Administrative Agent without reference to the Adjusted Term SOFR component of the Alternate Base Rate, in each case until such Lender notifies the Administrative Agent and the Lead Borrower that the circumstances giving rise to such determination no longer exist. Upon receipt of such notice, (x) the Borrower shall, upon three (3) Business Days' notice from such Lender (with a copy to the Administrative Agent), prepay or, if applicable, convert all SOFR Loans denominated in dollars of such Lender to ABR Loans (the interest rate on which ABR Loans of such Lender shall be determined by the Administrative Agent without reference to the Adjusted Term SOFR component of the Alternate Base Rate), either on the last day of the Interest Period if the Administrative Agent is advised in writing by such Lender that it may lawfully continue to maintain such SOFR Loans to such day, or immediately, if the Administrative Agent is advised in writing by such Lender that it may not lawfully continue to maintain such SOFR Loans, and (y) if such notice asserts the illegality of such Lender determining or charging interest rates based upon Adjusted Term SOFR, the Administrative Agent shall during the period of such suspension compute the Alternate Base Rate applicable to such Lender without reference to the Adjusted Term SOFR component thereof until the Administrative Agent is advised in writing by such Lender that it is no longer illegal for such Lender to determine or charge interest rates based upon Adjusted Term SOFR. Each Lender agrees to notify the Administrative Agent and the Lead Borrower in writing promptly upon becoming aware that it is no longer illegal for such Lender to determine or charge interest rates based upon Adjusted Term SOFR. Upon any such prepayment or conversion, the Borrower shall also pay accrued interest on the amount so prepaid or converted.

ARTICLE III

REPRESENTATIONS AND WARRANTIES

Each Loan Party represents and warrants to the Lenders and each Agent that:

SECTION 3.01    Organization; Powers.

Each Loan Party is a Chapter 11 Debtor and is a debtor in the Chapter 11 Cases.  Each Loan Party and each of their respective Subsidiaries (a) is duly organized or incorporated, validly existing and in good standing (to the extent such concept exists in the relevant jurisdictions) under the laws of the jurisdiction of its organization or incorporation, (b) subject to the entry of the Orders, has the corporate or other organizational power and authority to carry on its business as now conducted and to execute, deliver and perform its obligations under each Loan Document to which it is a party and (c) is qualified to do business in, and is in good standing (to the extent such concept exists in the relevant jurisdictions) in, every jurisdiction where such qualification is required, except, with respect to clause (a) above (other than with respect to the Borrower), clause (b) above (other than with respect to the Borrower) and clause (c) above, where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.

SECTION 3.02    Authorization; Enforceability.

Subject to the entry of the Orders, this Agreement has been duly authorized, executed and delivered by each Loan Party and constitutes, and each other Loan Document to which any Loan Party is to be a party, when executed and delivered by such Loan Party, will constitute, a legal, valid and binding obligation of such Loan Party, as the case may be, enforceable against it in accordance with its terms, subject to (i) applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and (ii) general principles of equity, regardless of whether considered in a proceeding in equity or at law, and similar concepts under applicable law.

SECTION 3.03    Governmental Approvals; No Conflicts.

Subject to the entry of the Orders, the execution, delivery and performance by any Loan Party of this Agreement or any other Loan Document (a) does not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority, except such as have been obtained or made and are in full force and effect and except filings necessary to perfect Liens created under the Loan Documents, (b) will not violate (i) the Organizational Documents of any Loan Party, or (ii) any Requirements of Law applicable to any Loan Party, (c) will not violate or result in a default under any indenture or other agreement or instrument binding upon the Loan Parties or any of their respective Subsidiaries or their respective assets, or give rise to a right thereunder to require any payment, repurchase or redemption to be made by the Loan Parties or any of their respective Subsidiaries, or give rise to a right of, or result in, termination, cancellation or acceleration of any obligation thereunder and (d) will not result in the creation or imposition of any Lien on any asset of the Loan Parties or any of their respective Subsidiaries, except Liens created under the Loan Documents or permitted by Section 6.02, except (in the case of each of clauses (a), (b)(ii), (c) and (d)) to the extent that the failure to obtain or make such consent, approval, registration, filing or action, or such violation, default or right, or imposition of Lien, as the case may be, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.

SECTION 3.04    Financial Condition; No Material Adverse Effect.

(a)    The Audited Financial Statements (i) were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein, including the notes thereto and (ii) fairly present in all material respects the financial condition of the Persons covered thereby as of the respective dates thereof and their results of operations for the period covered thereby in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein, including the notes thereto.

(b)    The Unaudited Financial Statements (i) were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein, and (ii) fairly present in all material respects the financial condition of the Persons covered thereby as of the respective dates thereof and their results of operations for the period covered thereby, subject, in the case of clauses (i) and (ii), to the absence of footnotes and to normal year-end audit adjustments.

(c)    Since the date of the Restructuring Support Agreement, there has been no Material Adverse Effect.

SECTION 3.05    Properties.

Subject to the entry of the Orders, each of the Loan Parties and their respective Subsidiaries has good title to, or valid interests in, all its real and personal property material to its business, if any (i)

free and clear of all Liens except for Liens permitted by <u>Section 6.02</u> and (ii) except for minor defects in title that do not interfere with its ability to conduct its business as currently conducted or as proposed to be conducted or to utilize such properties for their intended purposes, in each case, except where the failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

SECTION 3.06      <u>Litigation and Environmental Matters</u>.

(a)      Except as set forth in <u>Schedule 3.06</u> and the commencement of the Chapter 11 Cases, there are no actions, suits or proceedings by or before any arbitrator or Governmental Authority pending against or, to the knowledge of any Loan Party, threatened in writing against or affecting such Loan Party or any of their respective Subsidiaries that could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

(b)      Except as set forth in <u>Schedule 3.06</u>, and except with respect to any other matters that, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect, none of the Loan Parties or any of their respective Subsidiaries (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii) has, to the knowledge of such Loan Party, become subject to any Environmental Liability, (iii) has received written notice of any claim with respect to any Environmental Liability or (iv) has, to the knowledge of such Loan Party, any basis to reasonably expect that such Loan Party or any of its Subsidiaries will become subject to any Environmental Liability.

SECTION 3.07      <u>Compliance with Laws</u>.

Each of the Loan Parties and their respective Subsidiaries is in compliance with all Requirements of Law applicable to it or its property, except where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.

SECTION 3.08      <u>Investment Company Status</u>.

None of the Loan Parties is required to register as an "investment company" under the Investment Company Act of 1940, as amended from time to time.

SECTION 3.09      <u>Taxes</u>.

Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, the Loan Parties and each of their respective Subsidiaries (a) have timely filed or caused to be filed all Tax returns and reports required to have been filed and (b) have paid or caused to be paid all Taxes levied or imposed on their properties, income or assets otherwise due and payable (whether or not shown on a Tax return), except any Taxes that are being contested in good faith by appropriate proceedings, <u>provided</u> that each Loan Party, as the case may be, has set aside on its books adequate reserves therefor in accordance with GAAP. There is no proposed Tax assessment, deficiency or other claim against any Loan Party or any of their respective Subsidiaries that would reasonably be expected to, individually or in the aggregate, have a Material Adverse Effect.

SECTION 3.10      <u>ERISA; Labor Matters</u>.

(a)      Except as would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, each Plan is in compliance with the applicable provisions of ERISA, the Code and other federal or state laws.

64

(b)      Except as would not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect, (i) no ERISA Event has occurred during the six year period prior to the date on which this representation is made or deemed made or is reasonably expected to occur, and (ii) neither any Loan Party nor any ERISA Affiliate has engaged in a transaction that could reasonably be expected to be subject to Section 4069 or 4212(c) of ERISA.

(c)      Except as would not reasonably be expected, individually or in the aggregate to result in a Material Adverse Effect, (i) each employee benefit plan (as defined in Section 3(2) of ERISA) that is intended to be a qualified plan under Section 401(a) of the Code has received a favorable determination letter from the Internal Revenue Service to the effect that the form of such plan is qualified under Section 401(a) of the Code and the trust related thereto has been determined by the Internal Revenue Service to be exempt from federal income tax under Section 501(a) of the Code, or an application for such a letter is currently being processed by the Internal Revenue Service; (ii) to the knowledge of the Loan Parties, nothing has occurred that would prevent or cause the loss of such tax-qualified status; and (iii) there are no pending or, to the knowledge of the Loan Parties, threatened in writing claims, actions or lawsuits, or action by any Governmental Authority, with respect to any such plan.

(d)      Except as would not reasonably be expected to have a Material Adverse Effect, (i) none of the Loan Parties or their respective Subsidiaries has experienced any labor strike or work stoppage or other collective labor dispute by employees due to labor disagreements and (ii) each of the Loan Parties and their respective Subsidiaries is in compliance in all respects with any collective bargaining agreement to which it is a party.

SECTION 3.11      Disclosure.

(a)      The written reports, financial statements, certificates or other written factual information (other than projections and information of a general economic or industry specific nature) furnished by or on behalf of any Loan Party to the Administrative Agent or any Lender in connection with the negotiation of any Loan Document or delivered thereunder (as modified or supplemented by other information so furnished), when taken as a whole, do not contain any untrue statement of a material fact or omit to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not materially misleading; provided that, with respect to projected and pro forma financial information, the Loan Parties represent only that such information, when taken as a whole, was prepared in good faith based upon assumptions believed by it to be reasonable at the time delivered, it being understood that (i) any such projected financial information is merely a prediction as to future events and is not to be viewed as fact, (ii) such projected financial information is subject to significant uncertainties and contingencies, many of which are beyond the control of the Loan Parties or any of their respective Subsidiaries and (iii) no assurance can be given that any particular projections will be realized and that actual results during the period or periods covered by any such projections may differ significantly from the projected results and such differences may be material.

(b)      As of the Effective Date, to the best knowledge of the Loan Parties, the information included in the Beneficial Ownership Certification (if any) provided pursuant to Section 4.01(h) is true and correct in all respects.

SECTION 3.12      Subsidiaries.

Schedule 3.12 sets forth the name of, and the ownership interest of the Loan Parties and each of their subsidiaries in, each subsidiary of the Loan Parties as of the Effective Date.

SECTION 3.13    Intellectual Property; Licenses, Etc.

Except as would not reasonably be expected to have a Material Adverse Effect, to the knowledge of the Loan Parties, each of the Loan Parties and their respective Subsidiaries owns, licenses or possesses the right to use all Intellectual Property that is reasonably necessary for the operation of its business substantially as currently conducted. To the knowledge of the Loan Parties, no Intellectual Property owned by the Loan Parties or any of their respective Subsidiaries and used in the operation of its business as currently conducted infringes upon the Intellectual Property of any Person except for such infringements that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. No claim or litigation regarding any of the Intellectual Property is pending or, to the knowledge of the Loan Parties, threatened in writing against the Loan Parties or any of their respective Subsidiaries, which, individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect.

SECTION 3.14    [Reserved].

SECTION 3.15    Federal Reserve Regulations.

None of the Loan Parties or any of their respective Subsidiaries is engaged or will engage, principally or as one of its important activities, in the business of purchasing or carrying margin stock (within the meaning of Regulation U of the Board of Governors), or extending credit for the purpose of purchasing or carrying margin stock.  No part of the proceeds of the Loans will be used, directly or indirectly, to purchase or carry any margin stock or to refinance any Indebtedness originally incurred for such purpose, or for any other purpose that entails a violation (including on the part of any Lender) of the provisions of Regulations U or X of the Board of Governors.

SECTION 3.16    Use of Proceeds.

Subject to the Orders and the other Loan Documents, proceeds of the New Money Term Loans shall be used only for the following purposes: (a) to make adequate protection payments as required in the Loan Documents and the Orders, (b) to pay the administrative costs of the Chapter 11 Cases (including professional fees and expenses) and the Transactions, (c) to fund the Carve-Out and to make payments under the Carve-Out in accordance with the terms of the Orders, and (d) for general corporate purposes, in each case, solely to the extent in accordance with and subject to the Loan Documents and the Orders  (including the Approved Budget, subject to the Permitted Variances under Section 6.18).

SECTION 3.17    Anti-Corruption Laws and Sanctions.

(a)       Each Loan Party and each of their respective Subsidiaries will not, directly or to their knowledge indirectly, use the proceeds of the Loans to fund any activity or business with any Person, or in any country or territory that, at the time of such funding, is the subject of Sanctions, or in violation of any Anti-Corruption Laws, the USA PATRIOT Act, any sanctions administered by the Office of Foreign Assets Control of the U.S. Department of Treasury and any successor Governmental Authority, or other applicable anti-money laundering or anti-terrorism laws.

(b)       Each Loan Party and each of their respective Subsidiaries and, to the knowledge of the Loan Parties, the officers, directors, employees and agents of the Loan Parties and their Subsidiaries are in compliance in all material respects with applicable Anti-Corruption Laws and applicable Sanctions, the USA PATRIOT Act, and other applicable anti-money laundering and anti-terrorism laws.

(c)        (i) None of the Loan Parties or any of their respective Subsidiaries and (ii) to the knowledge of the Loan Parties or any of their Subsidiaries, none of their respective directors, officers, employees and agents that will act in any capacity in connection with or benefit from the credit facility established hereby, is a Sanctioned Person.

(d)        The Loan Parties have implemented and maintains in effect policies and procedures reasonably designed to ensure compliance in all material respects by the Loan Parties and their respective Subsidiaries with applicable Anti-Corruption Laws and applicable Sanctions.

SECTION 3.18        Security Documents.

(a)        The Security Documents, after giving effect to the Orders, are effective to create in favor of the Collateral Agent for the benefit of the Secured Parties, a legal, valid, enforceable, non-avoidable and automatically and fully perfected security interest in the Collateral described therein and pledged under the Loan Documents and the Orders, in each case, having the priorities set forth in the Orders and subject only to the Carve-Out and other exceptions set forth in the Orders. Upon entry of the Orders, the Collateral Agent shall have a legal, valid, enforceable, non-avoidable and automatically and fully perfected security interest in all right, title and interest in the Collateral, as security for the Secured Obligations, having the priorities set forth in the Orders and subject only to the Carve-Out and other exceptions set forth in the Orders, in each case, for the benefit of the Secured Parties.

(b)        Pursuant to, and except as expressly otherwise set forth in, the Orders, no filing or other action will be necessary under applicable U.S. federal law to perfect or protect such Liens and security interests; provided that the Loan Parties, upon the reasonable request of the Lenders, shall make such filings or take such other actions as necessary to perfect or protect such Liens and security interests.

(c)        Pursuant to and to the extent provided in the Orders, the Secured Obligations of the Loan Parties under this Agreement will constitute allowed superpriority administrative expense claims in the Chapter 11 Cases under section 364(c) of the Bankruptcy Code, having priority over all administrative expense claims and unsecured claims against such Loan Parties now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expense claims of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code on a joint and several basis and all superpriority administrative expense claims granted to any other Person, subject only to the Carve-Out and other exceptions set forth in the Orders, which claims shall have recourse to all of the Loan Parties' assets.

SECTION 3.19        Insurance.

Each Loan Party and each of their respective Subsidiaries maintain, with insurance companies that the Lead Borrower believes (in the good faith judgment of the management of the Lead Borrower) were financially sound and responsible at the time the relevant coverage was last placed or renewed, insurance in at least such amounts (after giving effect to any self-insurance which the Lead Borrower believes (in the good faith judgment of management of the Lead Borrower) is reasonable and prudent in light of the size and nature of its business) and against at least such risks (and with such risk retentions) as the Lead Borrower believes (in the good faith judgment or the management of the Lead Borrower) are reasonable and prudent in light of the size and nature of its business.

SECTION 3.20        Franchise Agreements.

(a)        Schedule 3.20 sets forth a complete and accurate list as of the Effective Date of all Franchise Agreements to which any Loan Party or any of their respective Subsidiaries is a party.

(b)        Except as set forth on Schedule 3.20, to the knowledge of the Loan Parties, none of the Franchise Agreements contains any grant of exclusive rights to a territory designated therein which conflicts, or potentially conflicts, with any grant of exclusive rights to a territory granted under any other Franchise Agreement. Except as set forth in Schedule 3.20, no current franchisee under a Franchise Agreement has given written notice to a Loan Party's management during the six (6) month period before the date of the Restructuring Support Agreement of its intention to rescind or terminate (with or without cause) any Franchise Agreement.

(c)        Except as could not reasonably be expected to have a Material Adverse Effect, (i) each Loan Party has prepared and maintained each of its Franchise Disclosure Documents, in an accurate and correct manner, (ii) each Loan Party has filed all required Franchise Disclosure Documents required by law in all states and jurisdictions requiring registration and approval prior to any offers or sales of franchises in such states, and (iii) each Loan Party has filed all material changes, amendments, renewals thereto on a timely and accurate basis as required under, and required by applicable Requirements of Law. Except as could not reasonably be expected to have a Material Adverse Effect, each Loan Party's Franchise Disclosure Documents were prepared in compliance with applicable Franchise Laws and disclosure guidelines, and there were no misrepresentations or omissions of information in any Franchise Disclosure Documents at the time such Loan Party was using such Franchise Disclosure Documents. Each Franchise Agreement complies, and the offer and sale of such Franchise Agreement complied, in each case at the time such offer and sale was made, with all Franchise Laws, except to the extent of any non-compliance therewith which could not reasonably be expected to have a Material Adverse Effect.

SECTION 3.21        Budget; Variance Report. The Initial Budget, each Approved Budget and each Updated Budget is based upon good faith estimates and assumptions believed by management of the Loan Parties to be reasonable at the time made, in light of the circumstances under which they were made, it being recognized by the Agents and the Lenders that such financial information as it relates to future events is not to be viewed as fact, such financial information as it relates to future events are subject to uncertainties and contingencies, many of which are beyond the Loan Parties' control, no assurance can be given that such financial information as it relates to future events will be realized and that actual results during the period or periods covered by such financial information may differ from the projected results set forth therein and such differences may be material. A true and complete copy of the Initial Budget, as agreed to with the Required Lenders as of the Effective Date, is attached as Annex A. From and after the delivery of any Variance Report in accordance with this Agreement, such Variance Report shall be true, complete and correct in all material respects and fairly represent in all material respects the results of operations of the Loan Parties and their respective Subsidiaries for the period covered thereby and in the detail to be covered thereby.

SECTION 3.22        Orders. The Interim DIP Order is in full force and effect and has not been vacated, reversed or rescinded or, without the prior written consent of the Administrative Agent and the Required Lenders, amended or modified and no appeal of such Interim DIP Order has been timely filed or, if timely filed, no stay pending such appeal is currently effective. After entry of the Final DIP Order, the Final DIP Order is in full force and effect and has not been vacated, reversed or rescinded or, without the prior written consent of the Administrative Agent and the Required Lenders, amended or modified and no appeal of such Final DIP Order has been timely filed or, if timely filed, no stay pending such appeal is currently effective.

SECTION 3.23        Bankruptcy Matters.

(a)        The Chapter 11 Cases were validly commenced on the Petition Date, and (x) proper notice under the circumstances of the motion seeking approval of the Loan Documents and entry of the Orders was given, and (y) the hearing for the approval of the Interim DIP Order has been held by the

Bankruptcy Court.

(b)　　　After the entry of the Orders, and subject to the terms of the Orders, the Secured Obligations will constitute a DIP Superpriority Claim and the liens securing the Secured Obligations shall be senior secured, valid, enforceable, and automatically and properly perfected priming liens on the Collateral, having the priorities set forth in the Orders, subject in all respects to the Carve-Out and other exceptions set forth in the Orders and the Loan Documents.

ARTICLE IV<br>CONDITIONS

SECTION 4.01　　　Effective Date.

The obligation of each Lender to make Loans hereunder on the Effective Date shall be subject to satisfaction of the following conditions (or waiver thereof in accordance with Section 9.02):

(a)　　　The Administrative Agent (or its counsel) shall have received from each party hereto either (i) a counterpart of this Agreement signed on behalf of such party or (ii) written evidence satisfactory to the Administrative Agent (which may include facsimile or other electronic transmission of a signed counterpart of this Agreement) that such party has signed a counterpart of this Agreement.

(b)　　　The Administrative Agent shall have received (i) a certificate of each Loan Party, dated the Effective Date, with appropriate insertions, or otherwise in form and substance reasonably satisfactory to the Administrative Agent, executed by any Responsible Officer of such Loan Party, and including or attaching the documents referred to in paragraph (c) of this Section 4.01 or certifying as to no change as to documentation previously delivered by each Loan Party to the Prepetition Senior Priority Secured Parties, and (ii) a certificate of the Loan Parties, dated the Effective Date, substantially in the form of Exhibit B, executed by any Responsible Officer of each Loan Party.

(c)　　　The Administrative Agent shall have received a copy of (i) each Organizational Document of each Loan Party certified, to the extent applicable, as of a recent date by the applicable Governmental Authority, (ii) with respect to each Loan Party executing the Loan Documents, an incumbency certificate identifying the name and title and bearing the signatures of the authorized signatories of such Loan Party, (iii) copies of resolutions of the Board of Directors of each Loan Party approving and authorizing the execution, delivery and performance of Loan Documents to which it is a party, certified as of the Effective Date by its secretary, an assistant secretary or a Responsible Officer as being in full force and effect without modification or amendment and (iv) a good standing certificate (to the extent such concept exists) from the applicable Governmental Authority of each Loan Party's jurisdiction of incorporation, organization or formation.

(d)　　　All first day motions filed by the Loan Parties on the Petition Date and related orders entered by the Bankruptcy Court in the Chapter 11 Cases (including any motions related to cash management or any critical vendor or supplier motions) shall be in form and substance reasonably satisfactory to the Required Lenders and subject to Section 3.02 of the Restructuring Support Agreement.

(e)　　　The Bankruptcy Court shall have entered the Interim DIP Order no later than five (5) days after the Petition Date (or such longer period agreed to by the Required Lenders), which Interim DIP Order shall be in full force and effect and shall not have been reversed, vacated or stayed, and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Required Lenders.

(f)        The Administrative Agent and the Required Lenders shall have received the Initial Budget.

(g)        The Loan Parties shall have obtained a consent from the Prepetition ABL Agent and Prepetition ABL Secured Parties agreeing to the use of cash collateral and the granting of adequate protection to the Prepetition Secured Parties on an interim basis in accordance with the terms of the Interim DIP Order, which consent shall be in form and substance acceptable to the Administrative Agent and the Required Lenders, in each case, solely to the extent required, and subject to the terms and conditions under the Existing ABL Intercreditor Agreement; provided that if the Bankruptcy Court has entered into an order permitting the non-consensual use of cash collateral and the granting of adequate protection to the Prepetition Secured Parties on an interim basis then the condition set forth in this clause (g) shall be deemed satisfied.

(h)        The representations and warranties of each Loan Party set forth in the Loan Documents shall be true and correct in all material respects on and as of the Effective Date; provided that, in each case, to the extent that such representations and warranties specifically refer to an earlier date, they shall be true and correct in all material respects as of such earlier date; provided further that, in each case, any representation and warranty that is qualified as to "materiality," "Material Adverse Effect" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on the Effective or on such earlier date, as the case may be.

(i)        At the time of and immediately after giving effect to the borrowing on the Effective Date, no Event of Default shall have occurred and be continuing.

(j)        The Restructuring Support Agreement shall be in full force and effect, and no breach, default or event of default shall have occurred or be continuing thereunder except to the extent such default or event of default has been cured or waived in accordance with the terms of the Restructuring Support Agreement.

(k)        The Administrative Agent shall have received a fully executed and delivered Borrowing Request in accordance with the requirements hereof.

(l)        The Administrative Agent and the Lenders shall have received all other premiums, payments, fees, costs and expenses, including, without limitation, (i) all fees required to be paid on the Effective Date, including the Commitment Premium, DIP Backstop Premium (each of which shall have been paid in accordance with Section 2.09) and the fees pursuant to the Administrative Agent Fee Letter, and (ii) the reasonable and documented fees and expenses of the Lender Professionals and other counsel, financial advisors and other professionals of the Lenders and Administrative Agent due on or prior to the Effective Date (whether incurred before or after the Petition Date but only until the Effective Date), in each case, to the extent earned, due and payable, and invoiced no later than one (1) Business Day prior to the Effective Date.

(m)        (i) The Administrative Agent shall have received at least three (3) Business Days before the Effective Date all documentation and other information about the Loan Parties that the Administrative Agent reasonably determines is required by United States regulatory authorities under applicable "know your customer" and anti-money-laundering rules and regulations, including the USA PATRIOT Act and (ii) if any Loan Party qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, the Administrative Agent and each initial Lender that requests a Beneficial Ownership Certification will have received, at least one (1) Business Day prior to the Effective Date, a Beneficial Ownership Certification in relation to such Loan Party, in each case of clauses (i) and (ii), to the

extent that the Administrative Agent has reasonably requested such items in writing delivered to the Loan Parties at least ten (10) Business Days prior to the Effective Date.

(n)    The Effective Date shall have occurred on or before the date that is one (1) Business Day after the entry of the Interim DIP Order unless the Required Lenders consent to a later date.

SECTION 4.02    Each Credit Event after the Effective Date.

The obligation of each Lender to make a Loan on the occasion of any Borrowing following the Effective Date is subject to receipt of the request therefor in accordance herewith and to the satisfaction of the following conditions:

(a)    The Bankruptcy Court shall have entered the Final DIP Order no later than forty-five (45) days after the Petition Date, which shall be in full force and effect and shall not have been reversed, vacated or stayed, and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Required Lenders.

(b)    The Collateral Agent, for the benefit of the Secured Parties, shall have valid, binding, enforceable, non-avoidable, and automatically and fully and perfected Liens on, and security interest in, the Collateral, in each case, having the priorities set forth in the Interim DIP Order.

(c)    The Administrative Agent shall have received a fully executed and delivered Borrowing Request in accordance with the requirements hereof.

(d)    The Restructuring Support Agreement shall be in full force and effect, and no breach, default or event of default shall have occurred or be continuing thereunder except to the extent waived or cured in accordance with the terms thereof.

(e)    In the case of any Borrowing, the representations and warranties of each Loan Party set forth in the Loan Documents shall be true and correct in all material respects on and as of the date of such Borrowing; provided that, in each case, to the extent that such representations and warranties specifically refer to an earlier date, they shall be true and correct in all material respects as of such earlier date; provided further that, in each case, any representation and warranty that is qualified as to "materiality," "Material Adverse Effect" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on the date of such credit extension or on such earlier date, as the case may be.

(f)    At the time of and immediately after giving effect to such Borrowing, no Default or Event of Default shall have occurred and be continuing.

Each Borrowing (provided that a conversion or a continuation of a Borrowing shall not constitute a "Borrowing" for purposes of this Section 4.02) shall be deemed to constitute a representation and warranty by the Loan Parties on the date thereof as to the matters specified in paragraphs (e) and (f) of this Section 4.02.

ARTICLE V

AFFIRMATIVE COVENANTS

From and after the Effective Date and until the Commitments shall have expired or been terminated, the principal of and interest on each Loan and all fees, expenses and other amounts (other than

contingent amounts not yet due) payable under any Loan Document shall have been paid in full, each Loan Party covenants and agrees with the Lenders that:

SECTION 5.01    Financial Statements and Other Information.

The Loan Parties and their respective Subsidiaries will furnish to the Administrative Agent, on behalf of each Lender:

(a)    (i) on or before the date that is one hundred and twenty (120) days after the end of each fiscal year of Topco, commencing with the fiscal year of Topco ended on or about December 31, 2024, the audited consolidated balance sheet and audited consolidated statements of operations and comprehensive income, shareholders' equity and cash flows of Topco and its Subsidiaries as of the end of and for such year, and related notes thereto, setting forth in each case, in comparative form the figures for the previous fiscal year, all reported on by BDO, Deloitte or other independent public accountants of recognized national standing to the effect that such consolidated financial statements present fairly in all material respects the financial condition as of the end of and for such year and results of operations and cash flows of Topco and such Subsidiaries on a consolidated and consolidating basis in accordance with GAAP consistently applied and (ii) management's discussion and analysis of the important operational and financial developments during such fiscal year;

(b)    (i) on or before the date that is 30 days after the end of each of the first three fiscal quarters of each fiscal year of Topco, commencing with the first fiscal quarter of Topco ended after the Effective Date, the unaudited consolidated balance sheet and unaudited consolidated statements of operations and comprehensive income, shareholders' equity and cash flows of Topco and its Subsidiaries as of the end of and for such fiscal quarter and the then elapsed portion of the fiscal year, setting forth in each case, in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous fiscal year, all certified by a Financial Officer as presenting fairly in all material respects the financial condition as of the end of and for such fiscal quarter and such portion of the fiscal year and results of operations and cash flows of Topco and its Subsidiaries on a consolidated and consolidating basis in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes and (ii) management's discussion and analysis of the important operational and financial developments during such fiscal quarter;

(c)    on or before the date that is 30 days after the last day of each calendar month of Topco, the unaudited consolidated balance sheet and unaudited consolidated statements of operations and comprehensive income, shareholders' equity and cash flows of Topco and its Subsidiaries as of the end of and for such calendar month, including an income statement for such calendar month, balance sheet as of the end of such month and a cash flow statement for such month; provided, that with respect to any month that is a year-end month, the Lead Borrower will provide preliminary financial statements thirty (30) days respectively after such year-end and final financial statements within ninety (90) calendar days, respectively, of year-end;

(d)    not later than ten (10) Business Days of any delivery of financial statements under paragraph (a) above, a reasonably detailed annual budget for the Loan Parties and their respective Subsidiaries on a consolidated basis, in a form customarily prepared by the Lead Borrower or otherwise as may be reasonably agreed between the Lead Borrower and the Administrative Agent (it being agreed that such annual budget shall not be provided to Public Lenders);

(e)    [reserved];

(f)    [reserved]; and

72

(g)      promptly following any request therefor, such other information regarding the operations, business affairs and financial condition of the Loan Parties or any of their respective Subsidiaries, or compliance with the terms of any Loan Document, as the Administrative Agent on its own behalf or on behalf of any Lender may reasonably request in writing.

Notwithstanding the foregoing, the obligations in paragraphs (a), (b) and (c) of this Section 5.01 may be satisfied with respect to financial information of the Loan Parties and their respective Subsidiaries by furnishing the Form 10-K or 10-Q (or the equivalent), as applicable, of the Loan Parties (or a parent company thereof) filed with the SEC within the applicable time periods required by applicable law and regulations; provided that such materials are accompanied by a report and opinion of BDO, Deloitte or any other independent registered public accounting firm of nationally recognized standing, which report and opinion shall be prepared in accordance with generally accepted auditing standards.

Documents required to be delivered pursuant to Section 5.01(a), (b), (c) or (f) (to the extent any such documents are included in materials otherwise filed with the SEC) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (i) on which the Lead Borrower posts such documents, or provides a link thereto on the Lead Borrower's website on the Internet at the website address listed on Schedule 9.01 (or otherwise notified pursuant to Section 9.01(d)); or (ii) on which such documents are posted on the Lead Borrower's behalf on an Internet or intranet website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent). The Administrative Agent shall have no obligation to request the delivery of or maintain paper copies of the documents referred to above, and each Lender shall be solely responsible for timely accessing posted documents and maintaining its copies of such documents.

Notwithstanding anything to the contrary herein, no Loan Party nor any Subsidiary thereof shall be required to deliver, disclose, permit the inspection, examination or making of copies of or excerpts from, or any discussion of, any document, information, or other matter (i) that constitutes non-financial trade secrets or non-financial proprietary information, (ii) in respect of which disclosure to the Administrative Agent (or any Lender (or their respective representatives or contractors)) is prohibited by applicable law, (iii) that is subject to attorney-client or similar privilege or constitutes attorney work product or (iv) with respect to which any Loan Party owes confidentiality obligations (to the extent not created in contemplation of such Loan Party's obligations under this Section 5.01) to any third party.

The Loan Parties hereby acknowledges that (a) the Administrative Agent will make available to the Lenders materials and/or information provided by or on behalf of the Borrower or the other Loan Parties hereunder (collectively, "Borrower Materials") by posting the Borrower Materials on IntraLinks or another similar electronic system (the "Platform") and (b) certain of the Lenders (each, a "Public Lender") may have personnel who do not wish to receive Material Non-Public Information and who may be engaged in investment and other market-related activities with respect to the Loan Parties' or their Affiliates' securities. Each Loan Party hereby agrees that it will use commercially reasonable efforts to identify that portion of the Borrower Materials that may be distributed to the Public Lenders and that (w) all such Borrower Materials shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (x) by marking Borrower Materials "PUBLIC," the Loan Parties shall be deemed to have authorized the Administrative Agent and the Lenders to treat such Borrower Materials as not containing any Material Non-Public Information (although it may be sensitive and proprietary) (provided, however, that to the extent such Borrower Materials constitute Information, they shall be treated as set forth in Section 9.12); (y) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Side Information"; and (z) the Administrative Agent shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Side Information"; provided that the Loan Parties' failure to comply with

this sentence shall not constitute a Default or an Event of Default under this Agreement or the Loan Documents. Notwithstanding the foregoing, the Loan Parties shall be under no obligation to mark any Borrower Materials as "PUBLIC". Each Loan Party hereby acknowledges and agrees that, unless the Borrower notifies the Administrative Agent in advance, all financial statements and certificates furnished pursuant to Sections 5.01(a), (b) and (c) above are hereby deemed to be suitable for distribution, and to be made available, to all Lenders and may be treated by the Administrative Agent and the Lenders as not containing any Material Non-Public Information.

SECTION 5.02    Notices of Material Events.

Promptly after any Responsible Officer of any Loan Party or any of their respective Subsidiaries obtains knowledge thereof, the applicable Loan Party or the applicable Subsidiary of such Loan Party will furnish to the Administrative Agent (for distribution to each Lender through the Administrative Agent) written notice of the following:

(a)    the occurrence of any Default or Event of Default (other than any Default resulting from any non-compliance with Section 5.01);

(b)    the occurrence of any ERISA Event that would reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect;

(c)    any litigation, or governmental investigation or proceeding pending against the Loan Parties or any of their respective Subsidiaries which, either individually or in the aggregate, has had, or would reasonably be expected to have, a Material Adverse Effect; and

(d)    any other development or event that would reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect (including, any default notice received by the Loan Parties with respect to each of the Prepetition Junior Priority Credit Agreements, Holdco Credit Agreement and Prepetition ABL Credit Agreement).

Each notice delivered under this Section 5.02 shall be accompanied by a written statement of a Responsible Officer of the Lead Borrower setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

SECTION 5.03    Information Regarding Collateral.

The Loan Parties will furnish to the Administrative Agent prompt (and in any event within thirty (30) days or such longer period as reasonably agreed to by the Administrative Agent) written notice of any change (i) in any Loan Party's legal name (as set forth in its certificate of organization or incorporation or like document), (ii) in the jurisdiction of incorporation or organization of any Loan Party or in the form of its organization or (iii) in any Loan Party's organizational identification number to the extent that such Loan Party is organized or owns Material Real Property in a jurisdiction where an organizational identification number is required to be included in a UCC financing statement for such jurisdiction.

SECTION 5.04    Existence; Conduct of Business.

The Loan Parties will, and will cause each of their respective Subsidiaries to, do or cause to be done all things necessary to obtain, preserve, renew and keep in full force and effect its legal existence and the rights, licenses, permits, privileges, franchises, Material Intellectual Property and Governmental Approvals used in the conduct of its business, except to the extent (other than with respect to the

preservation of the existence of any Loan Party) that the failure to do so would not reasonably be expected to have a Material Adverse Effect; provided that the foregoing shall not prohibit any merger, consolidation, liquidation or dissolution permitted under Section 6.03 or any Disposition permitted by Section 6.05.

SECTION 5.05    Payment of Taxes, etc.

The Loan Parties will, and will cause each of their respective Subsidiaries to, pay all Taxes (whether or not shown on a Tax return) imposed upon it or its income or properties or in respect of its property or assets, before the same shall become delinquent or in default, except where (a) the same are being contested in good faith by an appropriate proceeding diligently conducted by the Loan Parties or any of their respective Subsidiaries or (b) the failure to make payment would not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

SECTION 5.06    Maintenance of Properties.

The Loan Parties will, and will cause each of their respective Subsidiaries to, keep and maintain all tangible property material to the conduct of its business in good working order and condition (subject to casualty, condemnation and ordinary wear and tear), except where the failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

SECTION 5.07    Insurance.

(a)    The Loan Parties will, and will cause each of their respective Subsidiaries to, maintain, with insurance companies that the Lead Borrower believes (in the good faith judgment of the management of the Lead Borrower) are financially sound and responsible at the time the relevant coverage is placed or renewed, insurance in at least such amounts (after giving effect to any self-insurance which the Lead Borrower believes (in the good faith judgment of management of the Lead Borrower) is reasonable and prudent in light of the size and nature of its business) and against at least such risks (and with such risk retentions) as the Lead Borrower believes (in the good faith judgment or the management of the Lead Borrower) are reasonable and prudent in light of the size and nature of its business, and will furnish to the Lenders, upon written request from the Collateral Agent, information presented in reasonable detail as to the insurance so carried. Upon the reasonable request of the Lenders, the Loan Parties shall use commercially reasonable efforts to deliver to the Collateral Agent endorsements with respect to each such general liability policy of insurance (other than directors and officers policies, workers compensation policies and business interruption insurance), to the extent covering Collateral and to the extent that Collateral Agent can be granted an insurable interest therein, (i) in the case of each such general liability policy, naming the Collateral Agent, on behalf of the Secured Parties, as an additional insured thereunder as its interests may appear and (ii) in the case of each such casualty insurance policy, containing a loss payable clause that names the Collateral Agent, on behalf of the Secured Parties as the loss payee thereunder.

SECTION 5.08    Books and Records; Inspection and Audit Rights.

(a)    The Loan Parties will, and will cause each of their respective Subsidiaries to, maintain proper books of record and account in which entries that are full, true and correct in all material respects and are in conformity with GAAP (or applicable local standards) consistently applied shall be made of all material financial transactions and matters involving the assets and business of the Loan Parties or their respective Subsidiaries, as the case may be. The Loan Parties will, and will cause each of their respective Subsidiaries that is a Loan Party to, permit any representatives designated by the Administrative Agent or any Lender, during normal business hours and upon reasonable prior notice, to visit and inspect its properties, to examine and make extracts from its books and records, and to discuss its affairs, finances and condition with its officers and independent accountants, all at such reasonable times and as often as

reasonably requested; provided that, excluding any such visits and inspections during the continuation of an Event of Default, only the Administrative Agent (or its designees) on behalf of the Lenders may exercise visitation and inspection rights of the Administrative Agent and the Lenders under this Section 5.08 and the Administrative Agent shall not exercise such rights more often than one time during any calendar year absent the existence of an Event of Default and such time shall be at the Loan Parties' expense; provided, further that (a) when an Event of Default exists, the Administrative Agent or any Lender (or any of their respective representatives or independent contractors) may do any of the foregoing at the expense of the Loan Parties at any time during normal business hours and upon reasonable advance notice and (b) the Administrative Agent and the Lenders shall give the Loan Parties the opportunity to participate in any discussions with the Loan Parties' independent public accountants.

(b)     The Lead Borrower will, within 30 days (or, after using commercially reasonable efforts to schedule such call at a later date agreed to by the Required Lenders, at their sole discretion) after the date of the delivery (or, if later, required delivery) of the quarterly and annual financial information pursuant to Sections 5.01(a) and (b), hold a conference call or teleconference, at a time selected by the Lead Borrower and reasonably acceptable to the Required Lenders, with all of the Lenders that choose to participate, to review the financial results of the previous fiscal quarter or fiscal year of the Lead Borrower, as the case may be, of the Lead Borrower (it being understood that any such call may be combined with any similar call held for any of the Lead Borrower's other lenders or security holders).

SECTION 5.09     Compliance with Laws.

(a)     The Loan Parties will, and will cause each of their respective Subsidiaries to, comply with its Organizational Documents and all Requirements of Law (including ERISA, Environmental Laws, the USA PATRIOT Act, Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, the U.S. Foreign Corrupt Practices Act of 1977 and other anti-money laundering, anti-corruption, sanctions and anti-terrorism laws) with respect to it, its property and operations, except where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.

(b)     The Borrower will not request any Borrowing, and the Borrower shall not use, and shall procure that its Subsidiaries and the other Loan Parties and its or their respective directors, officers, employees and agents shall not use, the proceeds of any Borrowing (i) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Sanctioned Person, or in any Sanctioned Country except to the extent permissible for a Person required to comply with Sanctions, (ii) in any manner that would result in the violation of any Sanctions applicable to such Loan Party and their respective Subsidiaries or to the knowledge of the Loan Parties, any other party hereto or (iii) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any legislation.

SECTION 5.10     Use of Proceeds.

The Loan Parties will use the proceeds of the Loans for the purposes set forth in Section 3.16.

SECTION 5.11     Additional Subsidiaries.

If any additional Subsidiary of a Loan Party is formed or acquired after the Effective Date, then, such Loan Party will, concurrently with such formation or acquisition, cause such Subsidiary to satisfy the Collateral and Guarantee Requirement with respect to such Subsidiary and with respect to any Equity Interest in or Indebtedness of such Subsidiary owned by or on behalf of any Loan Party.

SECTION 5.12    Further Assurances.

(a)    The Loan Parties will, and will cause each of their respective Subsidiaries to, execute any and all further documents, financing statements, agreements and instruments, and take all such further actions (including the filing and recording of financing statements, fixture filings, mortgages, deeds of trust and other documents), that may be required under any applicable law and that the Administrative Agent or the Required Lenders may reasonably request, in each case, to cause the "Collateral and Guarantee Requirement" to be and remain satisfied, all at the expense of the Loan Parties.

(b)    If, after the Effective Date, any material assets, including any owned (but not leased or ground-leased) Material Real Property or improvements thereto or any interest therein, are acquired by the Borrower or any other Loan Party or are held by any Subsidiary of any Loan Party on or after the time it becomes a Loan Party pursuant to Section 5.11 (other than assets constituting Collateral under a Security Document that become subject to the Lien created by such Security Document upon acquisition thereof), the Loan Parties will notify the Administrative Agent thereof, and, if requested by the Administrative Agent or the Required Lenders, the Loan Parties will cause such assets to be subjected to a Lien securing the Secured Obligations and will take and cause the other Loan Parties to take, such actions as shall be necessary and reasonably requested by the Administrative Agent or the Required Lenders to grant and perfect such Liens, including actions described in paragraph (a) of this Section and as required pursuant to the "Collateral and Guarantee Requirement", all at the expense of the Loan Parties and subject to the last paragraph of the definition of the term "Collateral and Guarantee Requirement".

SECTION 5.13    Franchise Agreements.

The Loan Parties will, and will cause each of their respective Subsidiaries to, satisfy and perform in all material respects all obligations of each such Person under each Franchise Agreement, except such non-compliance that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

SECTION 5.14    [Reserved].

SECTION 5.15    Maintenance of Ratings.

The Loan Parties (i) shall use commercially reasonable efforts to maintain a public corporate credit rating (but not any particular rating) from S&P and a public corporate family rating (but not any particular rating) from Moody's, in each case in respect of the Lead Borrower, and (ii) within seventy-five (75) days following the Effective Date, shall use commercially reasonable efforts to obtain a public rating (but not any particular rating) in respect of the Term Loans made available under this Agreement from each of S&P and Moody's.

SECTION 5.16    Additional Chapter 11 Reporting.

(a)    Updated Budgets.  No later than 5:00 p.m. (New York City time) on every fourth Thursday following the Petition Date (each such Thursday, the "Updated Budget Deadline"), the Loan Parties shall deliver to the Lender Professionals a supplement to the Initial Budget (each, an "Updated Budget"), covering the then-upcoming 13-week period that commences with Saturday of the calendar week immediately preceding such Updated Budget Deadline, in each case consistent with the form and detail set forth in the Initial Budget and including a forecasted unrestricted cash balance as well as a line-item report setting forth the estimated fees and expenses to be incurred by each professional advisor on a weekly basis; provided, however, that (x) (i) the Updated Budget will be deemed, in each case, conditionally approved unless the Required Lenders provide written notice of their objection to such Updated Budget (which notice

may be provided by one of the Lender Professionals on their behalf via email) within four (4) Business Days of the delivery of such Updated Budget, and during such period, the Initial Budget or most recent Approved Budget, as applicable, shall remain in effect (the "Interim Approval Period"), (ii) following the Interim Approval Period, if no objection is received from the Required Lenders pursuant to clause (i), the Updated Budget shall be deemed the Approved Budget, shall be in full force and effect and shall constitute the "Approved Budget" (which Approved Budget shall be the Initial Budget until superseded by an approved Updated Budget), provided, that the Required Lenders may, at any time after such Interim Approval Period and until the date that is seven (7) Business Days after delivery of the Updated Budget (each such date, an "Objection Deadline"), object to such Updated Budget, and upon receipt of such objection, the Initial Budget or the most recent Approved Budget shall be deemed the Approved Budget and (y) if the Required Lenders do not provide written notice of their objection to such Updated Budget (which notice of objection may be provided by one the Lender Professionals on their behalf via email) by the applicable Objection Deadline, the Updated Budget shall be in full force and effect and shall constitute the Approved Budget for all purposes hereunder; (iii) the Required Lenders shall not have any obligation to approve any Updated Budget, and (iv) no modification to the Initial Budget or any Updated Budget, any reforecasting of any information relating to any period covered thereby or the inclusion of new line items in any Updated Budget, as the case may be, shall in any event be effective without the affirmative written consent of the Required Lenders (which may be provided by one of the Lender Professionals on their behalf via email).

(b)    Variance Reporting.  No later than 5:00 p.m. (New York City time) every Thursday, commencing with the first Thursday immediately following the first full week after the week in which the Petition Date occurs (each such Thursday, the "Variance Report Deadline"), the Loan Parties shall deliver to the Lender Professionals a variance report, each in form, detail and substance satisfactory to the Required Lenders in their sole discretion (each, a "Variance Report"), setting forth the difference between, on a line-by-line and aggregate basis, (i) actual operating receipts and budgeted operating receipts as set forth in the Approved Budget, as the case may be (the "Receipts Variance"), and (ii) actual operating disbursements and budgeted operating disbursements as set forth in the Approved Budget, as the case may be (the "Disbursements Variance"), in each case, for the Applicable Period, in each case, together with a reasonably detailed explanation of such Receipts Variance and Disbursements Variance.

(c)    Management Calls.  On the first Thursday immediately following the Effective Date, upon request by the Lender Professionals and on no more than a weekly basis thereafter, at a time to be agreed with the Ad Hoc Lender Group (or the Lender Professionals on their behalf), the Loan Parties shall host a conference call with the Lenders who are subject to a non-disclosure agreement and their advisors (including the Lender Professionals) that choose to participate to discuss, among other things, the Loan Parties' financial performance, the Initial Budget and any Updated Budget, the Variance Report, and any other issues related to the financial affairs, finances, business, assets, operations or condition (financial or otherwise) of the Loan Parties and their respective Subsidiaries with the relevant members of the Loan Parties' management and their advisors, including, to the extent applicable, the Financial Advisor, Willkie Farr & Gallagher LLP, as special counsel to the Loan Parties, and Ducera Partners LLC, as the investment banker for the Loan Parties (collectively, the "Company Advisors").

(d)    Liquidity Reporting.  No later than 5:00 p.m. (New York City time) every Thursday, commencing with the first Thursday immediately following the first full week after the week in which the Petition Date occurs (each such Thursday, the "Liquidity Report Deadline"), the Loan Parties shall deliver to the Lender Professionals and the Lenders a report setting forth the Liquidity as of the Friday most recently ended prior to such Liquidity Report Deadline, in each case, as well as the aggregate amounts outstanding and available under the Prepetition ABL Credit Agreement (to the extent updated information is available to the Loan Parties) and a certification as to compliance with Section 6.15.

SECTION 5.17 [Reserved].

SECTION 5.18 Bankruptcy Related Matters.

(a)    The Loan Parties shall cause all proposed (i) "first day" orders, (ii) "second day" orders, (iii) orders related to or affecting the Secured Obligations and/or the Loan Documents, the Prepetition Secured Obligations and applicable loan documents, any other financing or use of cash collateral, any sale or other disposition of Collateral outside the ordinary course or adequate protection, (iv) any Plan of Reorganization and/or any disclosure statement related thereto, (v) orders concerning the financial condition of the Chapter 11 Debtors, or other Indebtedness of the Chapter 11 Debtors and (vi) orders establishing procedures for administration of the Chapter 11 Cases or approving significant transactions submitted to the Bankruptcy Court, in each case, proposed by the Chapter 11 Debtors, to be in accordance with the terms of this Agreement in all material respects and the relevant consent rights under the Restructuring Support Agreement, to the extent applicable;

(b)    The Loan Parties shall comply in all material respects with each order entered by the Bankruptcy Court in connection with the Chapter 11 Cases Bankruptcy Order;

(c)    The Loan Parties shall deliver to the Administrative Agent and the Lender Professionals not less than five (5) days (or, if not reasonably practicable as a result of exigent circumstances, as soon as reasonably practicable) prior to any filing, copies of all proposed material pleadings, motions, applications, orders, financial information and other documents to be filed by or on behalf of the Loan Parties with the Bankruptcy Court in the Chapter 11 Cases, and shall consult in good faith with the Lender Professionals and the Required Lenders regarding the form and substance of any such document; and

(d)    The Loan Parties shall if not otherwise provided through the Bankruptcy Court's electronic docketing system, as soon as available, deliver to the Administrative Agent and to the Lender Professionals promptly as soon as available, copies of all final pleadings, motions, applications, orders, financial information and other documents distributed by or on behalf of the Loan Parties to any official or unofficial committee appointed or appearing in the Chapter 11 Cases or any other party in interest.

ARTICLE VI

NEGATIVE COVENANTS

From and after the Effective Date and until the Commitments have expired or been terminated and the principal of and interest on each Loan and all fees, expenses and other amounts payable (other than (i) contingent amounts not yet due and (ii) Cash Management Obligations) under any Loan Document have been paid in full, the Loan Parties covenants and agrees with the Lenders that:

SECTION 6.01      Indebtedness; Certain Equity Securities.

(a)    The Loan Parties will not, and will not permit any of their respective Subsidiaries to, create, incur, assume or permit to exist any Indebtedness, except:

(i)    Indebtedness of the Loan Parties and any of their respective Subsidiaries under the Loan Documents (including any Indebtedness incurred pursuant to Sections 2.20 or 2.21);

(ii)    Indebtedness outstanding on the Effective Date and set forth on Schedule 6.01;

(iii)    Guarantees by the Loan Parties and their respective Subsidiaries in respect of Indebtedness of the Loan Parties (other than Holdco Loan Parties) or any of their respective Subsidiaries otherwise permitted hereunder; provided that (A) such Guarantee is otherwise permitted by Section 6.04, (B) no Guarantee by any Subsidiary of a Loan Party of any unsecured Indebtedness for borrowed money that constitutes Material Indebtedness shall be permitted unless such Subsidiary shall have also provided a Guarantee of the applicable Secured Obligations pursuant to the Guaranty, as the case may be, and (C) if the Indebtedness being guaranteed is subordinated to the Secured Obligations, such Guarantee shall be subordinated to the Guarantee of the Secured Obligations on terms at least as favorable to the Lenders as those contained in the subordination of such Indebtedness;

(iv)    Indebtedness of the Loan Parties or any of their respective Subsidiaries owing to the Loan Parties (other than Holdco Loan Parties) or any of their Subsidiaries, to the extent permitted by Section 6.04; provided that all such Indebtedness of any Loan Party owing to any Subsidiary of a Loan Party that is not a Loan Party shall be subordinated to the Secured Obligations (to the extent any such Indebtedness is outstanding at any time after the date that is thirty (30) days after the Effective Date (or the date of acquisition of such Subsidiary) or such later date as the Required Lenders, may reasonably agree) (but only to the extent permitted by applicable law and not giving rise to material adverse tax consequences) on terms otherwise reasonably satisfactory to the Required Lenders;

(v)    Indebtedness (including Capital Lease Obligations and purchase money indebtedness) incurred, issued or assumed by the Borrower or any Subsidiary to finance the acquisition, purchase, lease, construction, repair, replacement or improvement of fixed or capital property, equipment or other assets; provided that, in the case of any purchase money Indebtedness, such Indebtedness is incurred concurrently with or within 270 days after the applicable acquisition, purchase, lease, construction, repair, replacement or improvement; provided, further that, at the time of any such incurrence of Indebtedness and after giving Pro Forma Effect thereto and the use of the proceeds thereof, the aggregate principal amount of Indebtedness that is outstanding in reliance of this clause (v) shall not exceed $10,000,000 in the aggregate at any time outstanding, to the extent that the incurrence of such debt and the payments in respect thereof are expressly permitted by the Approved Budget then in effect;

(vi)    [reserved];

(vii)    [reserved];

(viii)    [reserved];

(ix)    [reserved];

(x)    Indebtedness in respect of Cash Management Obligations and other Indebtedness in respect of netting services, automated clearinghouse arrangements, overdraft protections and similar arrangements, in each case, in connection with deposit accounts or from the honoring of a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business;

(xi)    Indebtedness consisting of obligations under deferred compensation (including indemnification obligations, obligations in respect of purchase price adjustments, Earn-Outs, incentive non-competes and other contingent obligations) or other similar arrangements

incurred or assumed in connection with any Permitted Acquisition, any other Investment or any Disposition, in each case, permitted under this Agreement;

(xii)    [reserved];

(xiii)    [reserved];

(xiv)    [reserved];

(xv)    Indebtedness consisting of (A) the financing of insurance premiums or (B) take-or-pay obligations contained in supply arrangements, in each case, in the ordinary course of business;

(xvi)    Indebtedness supported by a letter of credit, in a principal amount not to exceed the face amount of such letter of credit;

(xvii)    [reserved];

(xviii)    [reserved];

(xix)    [reserved];

(xx)    [reserved];

(xxi)    [reserved];

(xxii)    Indebtedness incurred by the Loan Parties or any of their respective Subsidiaries in respect of letters of credit, bank guarantees, warehouse receipts, bankers' acceptances or similar instruments issued or created in the ordinary course of business, including in respect of workers compensation claims, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance or other reimbursement-type obligations regarding workers compensation claims;

(xxiii)    obligations in respect of self-insurance and obligations in respect of performance, bid, appeal and surety bonds and performance and completion guarantees and similar obligations provided by the Loan Parties or any of their respective Subsidiaries or obligations in respect of letters of credit, bank guarantees or similar instruments related thereto, in each case, in the ordinary course of business or consistent with past practice;

(xxiv)    (x) Indebtedness representing retention payments, deferred compensation or stock-based compensation owed to employees, consultants or independent contractors of the Borrower or its Subsidiaries, to the extent that the incurrence of such debt and the payments in respect thereof are expressly permitted by the Approved Budget then in effect;

(xxv)    [reserved];

(xxvi)    [reserved];

(xxvii)    [reserved];

(xxviii) to the extent constituting Indebtedness, motor vehicle leases in the ordinary course of business;

(xxix)   [reserved];

(xxx)    [reserved];

(xxxi)   [reserved];

(xxxii)  [reserved]; and

(xxxiii) all premiums (if any), interest (including post-petition interest), fees, expenses, charges and additional or contingent interest on obligations described in clauses (i) through (xxxii) above.

(b)      The Loan Parties will not, and will not permit any of their respective Subsidiaries to, issue any preferred Equity Interests or any Disqualified Equity Interests.

For purposes of determining compliance with any dollar denominated restriction on the incurrence of Indebtedness, the dollar equivalent principal amount of Indebtedness denominated in a foreign currency will be calculated based on the relevant currency exchange rate in effect on the date such Indebtedness was incurred, in the case of term debt, or first committed, in the case of revolving credit debt. Notwithstanding any other provision of this Section 6.01, the maximum amount of Indebtedness the Loan Parties or any of their respective Subsidiaries may incur pursuant to this Section 6.01 shall not be deemed exceeded by fluctuations in the exchange rate of currencies.

This Agreement will not treat (1) unsecured Indebtedness as subordinated or junior to secured Indebtedness merely because it is unsecured or (2) senior Indebtedness as subordinated or junior to any other senior Indebtedness merely because it has a junior priority with respect to the same collateral.

SECTION 6.02      Liens.

The Loan Parties will not, and will not permit any of their respective Subsidiaries to, create, incur, assume or permit to exist any Lien on any property or asset now owned (but not leased or ground-leased) or hereafter acquired (but not leased or ground-leased) by it, except:

(i)       Liens created under the Loan Documents;

(ii)      Permitted Encumbrances;

(iii)     Liens existing on the Effective Date and set forth on Schedule 6.02;

(iv)      Liens on cash collateral posted to secure insurance policy premiums or other obligations in respect of existing insurance policies in an amount not to exceed $3,000,000 in the aggregate, to the extent expressly permitted by the Approved Budget then in effect;

(v)       (i) easements, leases, licenses, subleases or sublicenses granted to others (including licenses and sublicenses of Intellectual Property) that do not (A) interfere in any material respect with the business of the Loan Parties and their respective Subsidiaries, taken as a whole, or (B) secure any Indebtedness and (ii) any interest or title of a lessor or licensee under any lease or license entered into by the Loan Parties or any of their respective Subsidiaries in the ordinary course of its business and covering only the assets so leased or licensed;

(vi)    Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(vii)    Liens (A) of a collection bank arising under Section 4-210 of the Uniform Commercial Code, or any comparable or successor provision, on items in the course of collection, (B) attaching to pooling, commodity trading accounts or other commodity brokerage accounts incurred in the ordinary course of business or (C) in favor of a banking or other financial institution or entity, or electronic payment service provider, arising as a matter of law encumbering deposits (including the right of setoff) and that are within the general parameters customary in the banking or finance industry;

(viii)    Liens consisting of an agreement to dispose of any property in a Disposition permitted under Section 6.05, in each case, solely to the extent such Disposition would have been permitted on the date of the creation of such Lien;

(ix)    [reserved];

(x)    Liens granted by a Subsidiary of a Loan Party that is not a Loan Party in favor of any Subsidiary of a Loan Party or the Borrower and Liens granted by a Loan Party in favor of any other Loan Party (other than Holdco Loan Parties);

(xi)    [reserved];

(xii)    any interest or title of a lessor or sublessor under leases or subleases (other than leases constituting Capital Lease Obligations) entered into by the Loan Parties or any of their respective Subsidiaries in the ordinary course of business;

(xiii)    Liens arising out of conditional sale, title retention, consignment or similar arrangements for sale or purchase of goods by the Loan Parties or any of their respective Subsidiaries in the ordinary course of business;

(xiv)    Liens deemed to exist in connection with Investments in repurchase agreements under clause (e) of the definition of the term "Permitted Investments";

(xv)    Liens encumbering reasonable customary initial deposits and margin deposits and similar Liens attaching to commodity trading accounts or other brokerage accounts incurred in the ordinary course of business and not for speculative purposes;

(xvi)    Liens that are contractual rights of setoff (A) relating to the establishment of depository relations with banks not given in connection with the incurrence of Indebtedness, (B) relating to pooled deposit or sweep accounts to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Loan Parties and their respective Subsidiaries or (C) relating to purchase orders and other agreements entered into with customers of the Loan Parties or any of their respective Subsidiaries in the ordinary course of business;

(xvii)    [reserved];

(xviii)    Liens on insurance policies and the proceeds thereof securing the financing of the premiums with respect thereto;

(xix)    [reserved];

(xx)    [reserved];

(xxi)    [reserved];

(xxii)    [reserved];

(xxiii)    Liens on cash and Permitted Investments to secure Indebtedness permitted under Section 6.01(a)(x);

(xxiv)    [reserved];

(xxv)    receipt of progress payments and advances from customers in the ordinary course of business to the extent the same creates a Lien on the related inventory and proceeds thereof;

(xxvi)    [reserved];

(xxvii)    [reserved];

(xxviii) other Liens to the extent contemplated by the Approved Budget then in effect; provided that at the time of the granting of and after giving Pro Forma Effect to any such Lien and the obligations secured thereby (including the use of proceeds thereof) the lesser of (x) the aggregate outstanding face amount of obligations secured by Liens existing in reliance on this clause (xxviii) and (y) the fair market value of the assets securing such obligations shall not exceed $2,000,000 in the aggregate at any time outstanding;

(xxix)    Liens in favor of credit card issuers and credit card processors arising in the ordinary course of business securing the obligation to pay customary fees and expenses in connection with credit card arrangements;

(xxx)    Liens granted pursuant to the Orders; and

(xxxi)    Liens on motor vehicles securing Indebtedness permitted by clause (xxviii) of Section 6.01.

SECTION 6.03    Fundamental Changes; Lead Borrower Covenant.

(a)    The Loan Parties will not, and will not permit any of their respective Subsidiaries to, merge into or consolidate with any other Person (including pursuant to a division), or permit any other Person to merge into or consolidate with it, or liquidate or dissolve, except that:

(i)    any Loan Party (other than a Borrower) may merge or consolidate with or into any other Loan Party (other than a Holdco Loan Party);

(ii)    a Borrower may merge or consolidate with any other Person (including another Borrower); provided that a Borrower shall be the continuing or surviving Person (or, if one of the parties to such merger or consolidation is the Lead Borrower, then the Lead Borrower shall be the continuing or surviving Person); and

(iii)    any Subsidiary may effect a merger, dissolution, liquidation, consolidation or amalgamation to effect a Disposition permitted pursuant to Section 6.05.

(b)       No Loan Party nor any of their respective Subsidiaries, shall amend or permit any amendments to such Person's Organizational Documents after the Effective Date in any manner that (when taken as a whole) would be materially adverse to the Lenders.

(c)       The Lead Borrower will not conduct, transact or otherwise engage in any material business or material operations other than (i) the ownership and/or acquisition of the Equity Interests of its Subsidiaries and any other Persons engaged in a Similar Business (subject to Section 6.04), (ii) the performance of obligations under and compliance with its Organizational Documents, or other Requirement of Law (including the maintenance of its legal existence, including the ability to incur fees, costs and expenses relating to such maintenance), ordinance, regulation, rule, order, judgment, decree or permit, including as a result of or in connection with the activities of any of its Subsidiaries, and including in connection with the maintenance of its status as public company and any activities related or incidental thereto, including compliance with Requirements of Law and requirements, rules, regulations and guidance (whether or not binding) of the SEC and Nasdaq, Inc., (iii) subject to Section 6.04, repurchases of Indebtedness through open market purchases and Dutch auctions (to the extent not in violation hereof and to the extent any Loans so purchased are automatically and irrevocably cancelled after repurchase), the making of any loan to any officers, directors, managers, members of management, consultants or independent contractors and the making of any Investment in any of its Subsidiaries, (iv) participating in tax, accounting and other administrative matters related to the Lead Borrower and its Subsidiaries, (v) the entry into, and exercise of rights and performance of its obligations under and in connection with the Loan Documents and Guarantees of other Indebtedness not prohibited from being incurred under this Agreement by the Lead Borrower and its Subsidiaries, including borrowings under this Agreement, the Prepetition Senior Priority Credit Agreement, the Prepetition ABL Credit Agreement, each of the Prepetition Junior Priority Credit Agreements and any other Indebtedness not prohibited from being incurred under this Agreement, (vi) any issuance or registration of its Qualified Equity Interests for sale or resale (including, for the avoidance of doubt, the making of any dividend or distribution on account of, or any redemption, retirement, sinking fund or similar payment, purchase or other acquisition for value of, any shares of any class of Qualified Equity Interests), including the costs, fees and expenses related thereto, (vii) holding of any cash and Permitted Investments, (viii) the payment of dividends or making of distributions, making of loans and contributions to the capital of its Subsidiaries and any other Persons engaged in a Similar Business and guaranteeing the obligations of its Subsidiaries and making Investments, in each case, not in violation of Article VI of this Agreement, (ix) incurring fees, costs and expenses relating to overhead and general operating expenses including professional fees for legal, tax and accounting issues and paying taxes, (x) providing indemnification for its current and former officers, directors, managers, members of management, employees, advisors, consultants or independent contractors, (xi) [reserved], (xii)(1) the payment of Public Company Costs or (2) activities reasonably incidental to the consummation of a Tax Restructuring, (xiii) activities incidental to the businesses or activities described in the foregoing clauses and (xiv) any business or other activities that are identical, reasonably similar, ancillary, incidental, complementary or related to, or a reasonable extension, development or expansion of, the business and activities conducted by or proposed to be conducted by the Lead Borrower on or immediately prior to the Effective Date.

SECTION 6.04       Investments, Loans, Advances, Guarantees and Acquisitions.

The Loan Parties will not, and will not permit any of their respective Subsidiaries to, make or hold any Investment, except:

(a)       Permitted Investments at the time such Permitted Investment is made and purchases of assets in the ordinary course of business consistent with past practice;

(b)       loans or advances to officers, members of the Board of Directors and employees of the Loan Parties and their respective Subsidiaries (i) subject to the Approved Budget, for reasonable and

customary business-related travel, entertainment, relocation and analogous ordinary business purposes, (ii) [reserved] and (iii) [reserved];

(c)        [reserved];

(d)        Investments consisting of extensions of trade credit and accommodation guarantees in the ordinary course of business;

(e)        [reserved];

(f)        Investments existing or contemplated on the Effective Date and set forth on Schedule 6.04(e);

(g)        promissory notes and other non-cash consideration received in connection with Dispositions permitted by Section 6.05, subject to prior written consent by the Required Lenders in their sole discretion;

(h)        [reserved];

(i)        Investments in connection with the Transactions;

(j)        Investments in the ordinary course of business consisting of Uniform Commercial Code Article 3 endorsements for collection or deposit and Uniform Commercial Code Article 4 customary trade arrangements with customers in the ordinary course of business;

(k)        Investments (including debt obligations and Equity Interests) received in connection with the bankruptcy or reorganization of suppliers and customers or in settlement of delinquent obligations of, or other disputes with, customers and suppliers or upon the foreclosure with respect to any secured Investment or other transfer of title with respect to any secured Investment;

(l)        subject to prior written consent by the Required Lenders to be granted in their sole discretion, loans and advances to officers or members of the Board of Directors of any equity holder of the Lead Borrower (or any direct or indirect parent thereof) in lieu of, and not in excess of the amount of (after giving effect to any other loans, advances or Restricted Payments in respect thereof), Restricted Payments to the extent permitted to be made to such holder (or such parent) in accordance with Section 6.07(a);

(m)        [reserved];

(n)        advances of payroll payments to employees in the ordinary course of business;

(o)        [reserved];

(p)        [reserved];

(q)        receivables owing to the Loan Parties or any of their respective Subsidiaries, if created or acquired in the ordinary course of business;

(r)        Investments (A) for utilities, security deposits, leases and similar prepaid expenses incurred in the ordinary course of business and (B) trade accounts created, or prepaid expenses accrued, in the ordinary course of business;

(s)        [reserved];

(t)    [reserved];

(u)    Investments consisting of Indebtedness, Liens, fundamental changes, Dispositions and Restricted Payments permitted (other than by reference to this Section 6.04(u)) under Sections 6.01, 6.02, 6.03, 6.05 and 6.07, respectively;

(v)    contributions to a "rabbi" trust for the benefit of employees, directors, consultants, independent contractors or other service providers or other grantor trust subject to claims of creditors in the case of a bankruptcy of the Loan Parties;

(w)    to the extent that they constitute Investments, purchases and acquisitions of inventory, supplies, materials or equipment or purchases, acquisitions, licenses or leases of other assets, Intellectual Property, or other rights, in each case in the ordinary course of business;

(x)    Investments in any other Loan Party (other than a Holdco Loan Party);

(y)    [reserved];

(z)    [reserved];

(aa)    [reserved];

(bb)    [reserved]; and

(cc)    loans and advances to franchisees in the ordinary course of business to the extent contemplated by the Approved Budget then in effect (A) in connection with the sale of Franchise Rights or (B) to provide working capital to franchisees; provided that (i) such loans and advances in excess of $750,000 individually shall be evidenced by promissory notes and any such promissory notes shall be pledged to the Collateral Agent and (ii) the aggregate outstanding principal amount of such loans and advances made in reliance of this clause (cc) shall not exceed $3,000,000 for the most recently ended Test Period at any time.

Notwithstanding anything to the contrary in this Section 6.04, other than by virtue of the sale of the Equity Interests of, or all or substantially all of the assets of, one or more Subsidiaries of the Loan Parties in a transaction not prohibited by this Agreement, no Material Intellectual Property (except for non-exclusive leases or non-exclusive licenses with respect thereto) as of the Effective Date owned or thereafter acquired by any Loan Party or any interest in any Franchise Agreement may be contributed and/or assigned as an Investment or otherwise transferred to any non-Loan Party.

SECTION 6.05    Asset Sales.

The Loan Parties will not, and will not permit any of their Subsidiaries to, (i) sell, transfer, lease or otherwise dispose (including pursuant to a division) of any asset, including any Equity Interest owned by it or (ii) permit any Subsidiary to issue any additional Equity Interest in such Subsidiary (other than issuing directors' qualifying shares, nominal shares issued to foreign nationals to the extent required by applicable Requirements of Law and other than issuing Equity Interests to the Loan Parties or any of their respective Subsidiaries in compliance with Section 6.04(c)) (each, a "Disposition" and the term "Dispose" as a verb has the corresponding meaning), except:

(a)    Dispositions of obsolete, damaged, used, surplus or worn out property, whether now owned or hereafter acquired, in the ordinary course of business and Dispositions of property no longer

used or useful, or economically practicable to maintain, in the conduct of the business of the Loan Parties and their respective Subsidiaries (including allowing any registration or application for registration of any Intellectual Property that is no longer used or useful, or economically practicable to maintain, to lapse, go abandoned, be dedicated to the public domain or be invalidated);

(b)        Dispositions of inventory and other assets in the ordinary course of business and immaterial assets (considered in the aggregate) in the ordinary course of business;

(c)        Dispositions of property to the extent that (i) such property is exchanged for credit against the purchase price of similar replacement property or (ii) an amount equal to Net Proceeds of such Disposition are promptly applied to the purchase price of such replacement property;

(d)        Dispositions of property between or to the Loan Parties (other than a Holdco Loan Party) or any of their respective Subsidiaries; provided that if the transferor in such a transaction is a Loan Party, then (i) the transferee must be a Loan Party or (ii) to the extent constituting an Investment, such Investment must be a Permitted Investment in a Subsidiary that is not a Loan Party in accordance with Section 6.04;

(e)        Dispositions permitted by Section 6.03 and Investments permitted by Section 6.04, Restricted Payments permitted by Section 6.07 and Liens permitted by Section 6.02;

(f)        [reserved];

(g)        Dispositions of Permitted Investments;

(h)        Dispositions of accounts receivable in connection with the collection or compromise thereof (including sales to factors or other third parties);

(i)        leases, subleases, service agreements, product sales, abandonments, licenses, sublicenses or other disposals (including of Intellectual Property), in each case, (A) granted in the ordinary course of business or (B) that do not materially interfere with the business of the Loan Parties and their Subsidiaries, taken as a whole;

(j)        transfers of property subject to Casualty Events;

(k)        Dispositions of property to Persons other than Subsidiaries (including the sale or issuance of Equity Interests of a Subsidiary and including the sale of real property) solely to the extent such Disposition is made in connection with a Sufficient Bid or that is otherwise consented to by the Required Supermajority Lenders in their sole discretion.

(l)        [reserved];

(m)        Dispositions or forgiveness of accounts receivable in the ordinary course of business in connection with the collection or compromise thereof;

(n)        [reserved];

(o)        [reserved];

(p)        transfers of condemned property as a result of the exercise of "eminent domain" or other similar powers to the respective Governmental Authority or agency that has condemned the same

(whether by deed in lieu of condemnation or otherwise), and transfers of property arising from foreclosure or similar action or that have been subject to a casualty to the respective insurer of such real property as part of an insurance settlement;

(q)      [reserved];

(r)      [reserved];

(s)      [reserved];

(t)      sales or other dispositions by any Loan Parties or any of their respective Subsidiaries of assets in connection with the closing or sale of a retail store location (the closure of a store is not in and of itself the disposition of assets), warehouse, distribution center or corporate office of such Loan Party or Subsidiary in the ordinary course of business of such Loan Party or Subsidiary, which sale or disposition consists of leasehold interests in the premises of such store or distribution center, the equipment and fixtures located at such premises and the books and records relating exclusively and directly to the operations of such store or distribution center; provided, that, such sale shall be on commercially reasonable prices and terms in a bona fide arm's length transaction; and

(u)      [reserved].

Notwithstanding anything to the contrary in this Section 6.05, (x) other than by virtue of the sale of the Equity Interests of, or all or substantially all of the assets of, one or more Subsidiaries in a transaction not prohibited by this Agreement, no Loan Party shall, directly or indirectly, sell or otherwise transfer (except for non-exclusive leases or non-exclusive licenses with respect thereto) any Material Intellectual Property owned as of the Effective Date or thereafter acquired or any interest in any Franchise Agreement to any non-Loan Party (y) on and following the Effective Date, (i) any sales or other dispositions by any Loan Party or any of their respective Subsidiaries of assets outside the ordinary course of business in excess of $5,000,000 in the aggregate require prior written consent by the Required Lenders to be granted in their sole discretion and (ii) no Loan Party nor any of their Subsidiaries shall undertake any receivables securitization, any whole business securitization or any other securitization transaction with respect to its assets or businesses.

SECTION 6.06      [Reserved].

SECTION 6.07      Restricted Payments; Certain Payments of Indebtedness.

(a)      The Loan Parties will not, and will not permit any of their respective Subsidiaries to, declare or make, or agree to pay or make, directly or indirectly, any Restricted Payment, except:

(i)      each Subsidiary of the Borrower may make Restricted Payments to the Borrower or any other Subsidiary of the Borrower; provided that in the case of any such Restricted Payment by a Subsidiary that is not a Wholly Owned Subsidiary of the Borrower, such Restricted Payment is made to the Borrower and/or any Subsidiary;

(ii)      the Loan Parties and each of their respective Subsidiaries may declare and make dividend payments or other distributions payable solely in the Equity Interests of such Person;

(iii)      [reserved];

(iv)      [reserved];

(v)      [reserved];

(vi)     [reserved];

(vii)    [reserved];

(viii)   [reserved];

(ix)     [reserved];

(x)      [reserved];

(xi)     the Loan Parties and each of their respective Subsidiaries may make payments with respect to retention payments, deferred compensation or stock-based compensation owed to employees, consultants or independent contractors of the Borrower or its Subsidiaries, to the extent that such payment is expressly permitted by the Approved Budget then in effect;

(xii)    [reserved];

(xiii)   [reserved];

(xiv)    [reserved];

(xv)     [reserved];

(xvi)    [reserved]; and

(xvii)   [reserved].

(b)      The Loan Parties will not, and will not permit any of their respective Subsidiaries to, make or agree to pay or make, directly or indirectly, any payment or other distribution (whether in cash, securities or other property) of or in respect of any Prepetition Debt, or any payment or other distribution (whether in cash, securities or other property), including any sinking fund or similar deposit, or any other payment (including any payment under any Swap Agreement) that has a substantially similar effect to any of the foregoing, in each case, except:

(i)      payments required by the Orders and payments in accordance with the First Day Orders or otherwise with the consent of the Required Lenders;

(ii)     [reserved];

(iii)    [reserved];

(iv)     [reserved];

(v)      [reserved];

(vi)     [reserved];

(vii)    [reserved];

(viii)   [reserved];

(ix)    [reserved]; and

(x)    the Roll-Up.

Notwithstanding anything to the contrary in this Agreement, no Material Intellectual Property (except for non-exclusive leases, non-exclusive licenses with respect thereto) owned as of the Effective Date or thereafter acquired by any Loan Party or any interest in any Franchise Agreement may be made as a Restricted Payment or Investment, or otherwise transferred to or held by, any non-Loan Party.

SECTION 6.08    Transactions with Affiliates.

The Loan Parties will not, and will not permit any of their respective Subsidiaries to, sell, lease or otherwise transfer any property or assets to, or purchase, lease or otherwise acquire any property or assets from, or otherwise engage in any other transactions with, any of its Affiliates, except (i) transactions between or among any Borrower or any Subsidiary of the Borrower or any entity that becomes a Subsidiary of the Borrower as a result of such transaction, (ii) on terms not materially less favorable to the Borrower or such Subsidiary of the Borrower as would be obtainable by such Person at the time in a comparable arm's length transaction with a Person other than an Affiliate (as determined by the majority of the members of the Board of Directors (or a majority of the disinterested members of the Board of Directors of the Lead Borrower in good faith)), (iii) the payment of Transaction Costs, fees and expenses related to the Transactions, (iv) Dispositions in the form of a sale of furniture and assignment of lease agreements to franchisees in the ordinary course of business consistent with past practices, so long as the sale thereof is approved by disinterested members of the Board of Directors, (v) issuances of Equity Interests of the Borrower and its Subsidiaries to the extent otherwise permitted by this Agreement, (vi) employment and severance arrangements and other compensation arrangements between the Borrower and its Subsidiaries and their respective officers and employees in the ordinary course of business or otherwise in connection with the Transactions (including loans and advances pursuant to Sections 6.04(b) and 6.04(n)), (vii) investments by Affiliates in Indebtedness and preferred Equity Interests of the Borrower and its Subsidiaries, (viii) the payment of customary fees and reasonable out-of-pocket costs to, and indemnities provided on behalf of, members of the Board of Directors, officers and employees of the Lead Borrower (or any direct or indirect parent thereof) and its Subsidiaries in the ordinary course of business to the extent attributable to the ownership or operation of the Lead Borrower and its Subsidiaries, (ix) transactions pursuant to agreements in existence or contemplated on the Effective Date and set forth on Schedule 6.08 or any amendment thereto to the extent such an amendment is not adverse to the Lenders in any material respect, (x) Restricted Payments permitted under Section 6.07 and Investments permitted under Section 6.04, (xi) payments to or from, and transactions with, any joint venture in the ordinary course of business (including any cash management activities related thereto), and (xii) transactions with customers, clients, suppliers, contractors, joint venture partners or purchasers or sellers of goods or services that are Affiliates, in each case in the ordinary course of business and which are fair to the Borrower and its Subsidiaries, in the reasonable determination of the Lead Borrower, or are on terms at least as favorable as might reasonably have been obtained at such time from an unaffiliated party; provided that, each such transaction (other than any transaction pursuant to clauses (i)(A), (ii), (iii), (iv), (vi), (x) and (xiii)) shall be on terms not materially less favorable to the Borrower or such Subsidiary as would be obtainable by such Person at the time in a comparable arm's-length transaction with a Person other than an Affiliate.

SECTION 6.09    Restrictive Agreements.

The Loan Parties will not, and will not permit any of their respective Subsidiaries to enter into any agreement, instrument, deed or lease that prohibits or limits the ability of any Loan Party, after giving effect to the Orders, to create, incur, assume or suffer to exist any Lien upon any of their respective properties or revenues, whether now owned or hereafter acquired, for the benefit of the Secured Parties

with respect to the Secured Obligations or under the Loan Documents; <u>provided</u> that the foregoing shall not apply to:

(a)     restrictions and conditions imposed by (1) Requirements of Law, (2) any Loan Document, (3) [reserved], (4) [reserved] or (5) [reserved];

(b)     customary restrictions and conditions existing on the Effective Date and any extension, renewal, amendment, modification or replacement thereof, except to the extent any such amendment, modification or replacement expands the scope of any such restriction or condition;

(c)     restrictions and conditions contained in agreements relating to the sale of a Subsidiary or any assets pending such sale; <u>provided</u> that such restrictions and conditions apply only to the Subsidiary or assets that is or are to be sold and such sale is permitted hereunder;

(d)     customary provisions in leases, licenses, sublicenses and other contracts restricting the assignment thereof;

(e)     restrictions imposed by any agreement relating to secured Indebtedness permitted by this Agreement to the extent such restriction applies only to the property securing such Indebtedness;

(f)     any restrictions or conditions set forth in any agreement in effect at any time any Person becomes a Subsidiary (but not any modification or amendment expanding the scope of any such restriction or condition); <u>provided</u> that such agreement was not entered into in contemplation of such Person becoming a Subsidiary and the restriction or condition set forth in such agreement does not apply to the Loan Parties or any of their respective Subsidiaries;

(g)     conditions in any agreement that was effective prior to the Effective Date and to the extent such agreement was permitted under the Prepetition Senior Priority Credit Agreement;

(h)     restrictions on cash (or Permitted Investments) or other deposits imposed by agreements entered into in the ordinary course of business (or other restrictions on cash or deposits constituting Permitted Encumbrances);

(i)     restrictions set forth on <u>Schedule 6.09</u> and any extension, renewal, amendment, modification or replacement thereof, except to the extent any such amendment, modification or replacement expands the scope of any such restriction or condition;

(j)     customary provisions in joint venture agreements and other similar agreements applicable to joint ventures permitted by <u>Section 6.04</u>;

(k)     customary restrictions contained in leases, subleases, licenses, sublicenses or asset sale agreements otherwise permitted hereby so long as such restrictions relate only to the assets subject thereto;

(l)     customary provisions restricting subletting or assignment of any lease governing a leasehold interest of the Loan Parties or any of their respective Subsidiaries; and

(m)     customary provisions related to creditworthiness of the tenant contained in real property leases entered into by Subsidiaries of any Borrower, so long as the Lead Borrower has determined in good faith that such creditworthiness provisions could not reasonably be expected to impair the ability of any Borrower and its Subsidiaries to meet their ongoing obligations.

SECTION 6.10        [Reserved].

SECTION 6.11        Changes in Fiscal Periods.

No Loan Party will make any change in its fiscal year; provided, however, that the Lead Borrower may, upon written notice to the Administrative Agent, change its fiscal year to any other fiscal year reasonably acceptable to the Required Lenders, in which case, the Lead Borrower and the Administrative Agent (acting at the direction of the Required Lenders) will, and are hereby authorized by the Lenders to, make any adjustments to this Agreement that are necessary to reflect such change in fiscal year, without any requirement of consent by any Lender or other Person (notwithstanding anything to the contrary in Section 9.02).

SECTION 6.12        Amendment of Financing Documents.

The Loan Parties will not, and will not permit any of their respective Subsidiaries to, amend, modify, waive, terminate or release any Prepetition ABL Loan Document, any Prepetition Junior Priority Loan Document or any Holdco Loan Document, in each case, in a manner restricted by the terms of any applicable intercreditor or subordination agreement.

SECTION 6.13        Franchise Agreements.

The Loan Parties will not, and will not permit any of their respective Subsidiaries to, maintain or distribute any Franchise Disclosure Documents, or enter into any Franchise Agreements, in violation of Section 3.20(c).

SECTION 6.14        [Reserved].

SECTION 6.15        Minimum Liquidity.

The Lead Borrower shall not permit Liquidity of the Lead Borrower and its Subsidiaries, determined in accordance with Section 5.16(d) on a consolidated basis in accordance with GAAP, to be less than $50,000,000.

SECTION 6.16        [Reserved].

SECTION 6.17        Milestones.

The Loan Parties will not and will not permit any of their respective Subsidiaries to, directly or indirectly, fail to comply with any of the milestones set forth on Schedule 6.17 (the "Milestones"), except with the prior written consent of the Required Lenders (including by one of the Lender Professionals on their behalf via email).

SECTION 6.18        Permitted Variance.

The Loan Parties shall not permit (i) the Receipts Variance on an aggregate basis or (ii) the Disbursements Variance, in each case on an aggregate basis with respect to any Applicable Period, to exceed the Permitted Variance.

SECTION 6.19        Chapter 11 Cases.

The Loan Parties shall not, and shall not permit any of their respective Subsidiaries to:

(a)    except for the Carve-Out, incur, create, assume, suffer to exist or permit, or file any motion seeking, any other superpriority claim which is pari passu with, or senior to, the Secured Obligations (except as may be set forth in the Orders or the Loan Documents);

(b)    incur, create, assume, suffer to exist or permit or file any motion seeking, any lien which is pari passu with, or senior to, the liens granted hereunder, (except as may be set forth in the Orders or the Loan Documents);

(c)    make or permit to be made any amendment, modification, supplement or change to the Orders, as applicable, (other than technical modifications to correct grammatical, ministerial or typographical errors) without the prior written consent of the Required Lenders;

(d)    (A) make payments under any management incentive, severance, retention or other bonus or compensation plan or on account of claims or expenses arising under section 503(c) of the Bankruptcy Code, except, in each case, (a) in amounts and on terms and conditions that (i) are approved by order of the Bankruptcy Court after notice and hearing, (ii) are expressly permitted by the terms of the Loan Documents and within the limits, including any allowed variance, of the Approved Budget, and (iii) as approved in writing by the Required Lenders, or (B)(1) enter into or make or implement any amendment, waiver, supplement, or other modification to any employment agreement or employee compensation plan or (2) pay or cause to be paid any amount contemplated by such agreements or plans before the date on which such amount becomes due and payable pursuant to the terms of such agreements or plans, as applicable, in each case, unless in the ordinary course of business;

(e)    commence any adversary proceeding, contested matter or other action (or otherwise support any party) asserting any claims or defenses or otherwise against (or asserting any surcharge under section 506(c) of the Bankruptcy Code or otherwise against) the Administrative Agent, any Lender, any other Secured Party and any Prepetition Secured Parties, the other Loan Documents, the transactions contemplated hereby or thereby, the Prepetition Loan Documents, the other documents or agreements executed or delivered in connection therewith or the transactions contemplated thereby;

(f)    except as expressly set forth in the Orders and solely to the extent of the budgeted amount set forth therein with respect to an Official Committee investigation prior to the Challenge Deadline, use any cash collateral, proceeds of the Loans, or any cash or other amounts to (i) investigate, challenge, object to or contest the extent, validity, enforceability, security, perfection or priority of any of the Liens securing the Loans, the Liens securing the Prepetition Debt or the Secured Obligations hereunder, (ii) investigate or initiate any claim or cause of action against any of the Administrative Agent, the Collateral Agent or the Lenders or Prepetition Secured Parties, (iii) object to or seek to prevent, hinder or delay or take any action to adversely affect the rights or remedies of the Lenders or the Prepetition Secured Parties, (iv) seek to approve superpriority claims or grant liens or security interests (other than those expressly permitted under the Loan Documents and the Orders) that are senior to or pari passu with the Liens securing the Prepetition Debt, the DIP Superpriority Claims or the adequate protection liens or claims granted under the Orders or (v) take any other actions prohibited by the Orders; or

(g)    file any motion or application with the Bankruptcy Court with regard to actions taken outside the ordinary course of business of the Loan Parties without consulting with the Lenders and providing the Lenders three (3) Business Days' (or as soon thereafter as is practicable) notice and the opportunity to review and comment on each such motion.

ARTICLE VII

EVENTS OF DEFAULT

SECTION 7.01      Events of Default.

If any of the following events (any such event, an "Event of Default") shall occur:

(a)      any Loan Party shall fail to pay any principal or interest on any Loan or any other amount (other than reimbursement of professional fees pursuant to Section 9.03) of any Loan when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or otherwise, and such failure shall continue unremedied for a period of three (3) days;

(b)      any Loan Party shall fail to pay the reimbursement of any professional fees pursuant to Section 9.03 when and as the same shall become due and payable, and such failure shall continue unremedied for a period of three (3) days;

(c)      any representation or warranty made or deemed made by or on behalf of any Loan Party or any of their respective Subsidiaries in connection with any Loan Document or any amendment or modification thereof or waiver thereunder, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with any Loan Document or any amendment or modification thereof or waiver thereunder, shall prove to have been incorrect in any material respect (or all respects to the extent already qualified by materiality) when made or deemed made, and such incorrect representation or warranty (if curable) shall remain incorrect for a period of thirty (30) days after notice thereof from the Administrative Agent to the Borrower;

(d)      the Loan Parties or any of their respective Subsidiaries shall fail to observe or perform any covenant, condition or agreement contained in Sections 5.02(a), 5.04 (with respect to the existence of the Borrower), 5.10, 5.14, 5.16, 5.17, 5.18 or in Article VI (other than Section 6.17);

(e)      the Loan Parties or any of their respective Subsidiaries shall fail to observe or perform any covenant, condition or agreement contained in any Loan Document (other than those specified in paragraph (a), (b) or (d) of this Section 7.01) and such failure shall continue unremedied for a period of five (5) Business Days after written notice thereof from the Administrative Agent to the Borrower;

(f)      the Loan Parties or any of their respective Subsidiaries shall fail to observe or perform any covenant, condition or agreement contained in Section 6.17, except where such failure to achieve a Milestone has been waived or extended by the Required Lenders, or the failure to achieve the Milestone is directly caused by, or results from, an act, omission, or delay by one or more Lenders;

(g)      so long as the enforcement of remedies is not subject to the automatic stay as a result of the commencement of the Chapter 11 Cases, any event or condition occurs that results in any Material Indebtedness, Indebtedness under the Prepetition ABL Loan Documents, Indebtedness under the Prepetition Junior Priority Credit Agreements, or Indebtedness under the Secured Holdco Obligations Guarantee becoming due prior to its scheduled maturity or that enables or permits (with all applicable grace periods having expired) the holder or holders of any such Indebtedness or any trustee or agent on its or their behalf to cause any such Indebtedness to become due, or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity, provided that this paragraph (g) shall not apply to (i) secured Indebtedness that becomes due as a result of the sale, transfer or other disposition (including as a result of a casualty or condemnation event) of the property or assets securing such Indebtedness (to the extent such sale, transfer or other disposition is not prohibited under this Agreement) or (ii) termination events or similar events occurring under any Swap Agreement that constitutes Material Indebtedness, other than on account of failure to make a payment required as a result of such termination or similar events;

(h)      [reserved];

(i)      [reserved];

(j)      so long as the enforcement of remedies is not subject to the automatic stay as a result of the commencement of the Chapter 11 Cases, one or more final, non-appealable, enforceable judgments for the payment of money in an aggregate amount in excess of $10,000,000 (to the extent not covered by insurance (including self-insurance) as to which the insurer has been notified of such judgment or order and has not denied coverage) shall be rendered against any Loan Parties and any of their respective Subsidiaries or any combination thereof and the same shall remain undischarged for a period of sixty (60) consecutive days during which execution shall not be effectively stayed, or any judgment creditor shall legally attach or levy upon assets of such Loan Party that are material to the businesses and operations of the Loan Parties and their Subsidiaries, taken as a whole, to enforce any such judgment;

(k)      an ERISA Event occurs that has resulted or would reasonably be expected to result in a Material Adverse Effect;

(l)      [reserved];

(m)      any material provision of any Loan Document or any material Guarantee of the Secured Obligations shall for any reason be asserted in writing by any Loan Party not to be a legal, valid and binding obligation of any Loan Party thereto other than as expressly permitted hereunder or thereunder;

(n)      any material Guarantee of the Secured Obligations by any Loan Party pursuant to the Guaranty shall cease to be in full force and effect (other than in accordance with the terms of the Loan Documents);

(o)      [reserved]; or

(p)      any of the following shall have occurred in the Chapter 11 Cases;

(i)  the Effective Date shall not have occurred within three (3) Business Days after the date of entry of the Interim DIP Order (or such later date as the Required Lenders may agree in their sole discretion);

(ii)  any act or occurrence that would, upon the delivery of notice, permit the Restructuring Support Agreement to be terminated unless such act or occurrence was waived, cured or extended in accordance with the terms of the Restructuring Support Agreement;

(iii)  the Loan Parties' failure to satisfy any of the Milestones subject to the waiver or extension of such Milestones pursuant to the terms of the Restructuring Support Agreement;

(iv)  the Loan Parties' (i) (A) failure to conduct a marketing and sale process for the Loan Parties' assets or (B) taking of actions during such a marketing and sale process that are not provided by the Bidding Procedures (as defined in the Restructuring Support Agreement), or (ii) subject to the terms of the Restructuring Support Agreement, failure to promptly terminate the Sale Process (as defined in the Restructuring Support Agreement) if the Loan Parties have not received a Sufficient Bid (as defined in the Restructuring Support Agreement) on or before the Bid Deadline (as defined in the Restructuring Support Agreement), in each case, without the prior written consent of the Required Consenting First Lien Lenders (as defined in the Restructuring Support Agreement);

(v)   the filing by any Chapter 11 Debtor of any chapter 11 plan (or any amendment thereof or supplement thereto), other than the Plan of Reorganization, that is inconsistent in any material respect with the Plan of Reorganization or the Restructuring Support Agreement to which the Required Lenders do not consent in writing;

(vi)  the Interim DIP Order (a) at any time ceases to be in full force and effect or (b) shall be vacated, reversed, stayed, amended, supplemented or modified without the prior written consent of the Required Lenders;

(vii)  except with the prior written consent of the Required Lenders, the entry of an order in any of Chapter 11 Cases (a) staying, reversing, amending, supplementing, vacating or otherwise modifying any of the Loan Documents, the Interim DIP Order or the Final DIP Order, or (b) impairing or modifying any of the liens, security interests, claims, rights, remedies, privileges, benefits or protections granted under the Loan Documents or under the Orders to the Secured Parties or the Prepetition Secured Parties;

(viii)  the failure of any of the Chapter 11 Debtors to comply with any of the terms or conditions of the Interim DIP Order or the Final DIP Order;

(ix) the dismissal of any of the Chapter 11 Cases or conversion of any of the Chapter 11 Cases to a Chapter 7 case;

(x)   the appointment or election of a Chapter 11 trustee, a responsible officer or an examiner (other than a fee examiner) under section 1104 of the Bankruptcy Code with enlarged powers (beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) relating to the operation of the business of any Chapter 11 Debtor in the Chapter 11 Cases;

(xi) the entry of an order in any of the Chapter 11 Cases authorizing the Chapter 11 Debtors (i) to obtain additional financing under section 364(c) or (d) of the Bankruptcy Code that does not provide for the repayment in full in cash of all Secured Obligations under this Agreement (without the prior written consent of the Required Lenders); or (ii) to grant any Lien, other than Liens expressly permitted under this Agreement and the Orders, upon or affecting any Collateral;

(xii)   (a)  the consensual use of prepetition cash collateral is terminated or modified, or (b) the entry of an order in any of the Chapter 11 Cases terminating or modifying the use of cash collateral other than as provided in this Agreement and the Orders, in each case, without the prior written consent of the Required Lenders;

(xiii)   except for the Carve-Out, and except as expressly permitted hereunder, the entry of an order in any of the Chapter 11 Cases granting any claim against any Chapter 11 Debtor entitled to superpriority administrative expense status in any of the Chapter 11 Cases pursuant to section 364(c)(2) of the Bankruptcy Code that is *pari passu* with or senior to the claims of the Secured Parties or the Adequate Protection Claims granted to the Prepetition Secured Parties (without the prior written consent of the Required Lenders or the requisite Prepetition Secured Parties with respect to the obligations owed to each of them);

(xiv)   except for the Carve-Out or as expressly permitted hereunder, the entry of an order in any of the Chapter 11 Cases granting any Lien in Collateral that is *pari passu* with

97

or senior to any Lien granted to the Secured Parties, or any Adequate Protection Lien granted to the Prepetition Secured Parties (without the prior written consent of the Required Lenders or the requisite the Prepetition Secured Parties with respect to the obligations owed to each of them);

(xv)     except as provided in the Orders, the making of any adequate protection payment or the granting of any adequate protection (including, without limitation, the granting of any Liens on the Collateral, superpriority claims, the right to receive cash payments or otherwise), without the prior written consent of the Required Lenders and the requisite Prepetition Secured Parties;

(xvi)    the Chapter 11 Debtors' "exclusive period" under Section 1121 of the Bankruptcy Code for the filing and/or solicitation of a chapter 11 plan is terminated or shortened for any reason;

(xvii)   the payment of, or any Chapter 11 Debtors file a motion or application seeking authority to pay, any Prepetition Debt or other prepetition claim other than (A) as provided in any of the First Day Orders, (B) to the extent such payment is expressly permitted pursuant to this Agreement and the Approved Budget, or (C) with the prior written consent of the Required Lenders;

(xviii)  the entry of an order in any of the Chapter 11 Cases granting relief from or otherwise modifying any stay of proceeding (including the automatic stay) to allow a third party to execute upon or enforce a Lien against any assets of the Chapter 11 Debtors that have an aggregate value in excess of $2,000,000 or with respect to any Lien of or the granting of any Lien on any assets of the Chapter 11 Debtors to any state or local environmental or regulatory agency or authority having priority over the Liens in favor of the Secured Parties, without the prior written consent of the Required Lenders;

(xix)    (A) any Chapter 11 Debtor shall (i) challenge or contest the validity or enforceability of the Orders or any Loan Document or deny that it has further liability thereunder, (ii) challenge or contest the nature, extent, amount, enforceability, validity, priority or perfection of the Secured Obligations, Liens securing the Secured Obligations, the DIP Superpriority Claims, Loan Documents, Adequate Protection Liens, Adequate Protection Claims, the Prepetition Senior Priority Obligations, the Liens securing the Prepetition Senior Priority Obligations or the Prepetition Senior Priority Loan Documents, (iii) assert any claim, defense or cause of action that seeks to avoid, recharacterize, subordinate (whether equitable subordination or otherwise), disgorge, disallow, impair or offset all or any portion of the Secured Obligations, Liens securing the Secured Obligations, the DIP Superpriority Claims, Loan Documents, Adequate Protection Liens, Adequate Protection Claims, the Prepetition Senior Priority Obligations, the Liens securing the Prepetition Senior Priority Obligations and the Prepetition Senior Priority Loan Documents, (iv) investigate, join or file any motion, application or other pleading in support of, or publicly support any other Person that has asserted any of the claims, challenges or other requested relief contemplated in clauses (i) - (iii) above, or fails to timely contest such claims, challenges or other requested relief in good faith (provided, that responding to any investigation conducted by an Official Committee or other party with respect to the nature, extent, amount, enforceability, validity, priority or perfection of the Prepetition Senior Priority Obligations, the Liens securing the Prepetition Senior Priority

Obligations and the Prepetition Senior Priority Loan Documents, subject in each case to the Orders, shall not, in and of itself, constitute an Event of Default hereunder); or (B) the entry of a judgment or order in any of the Chapter 11 Cases sustaining any of the claims, challenges, causes of action or other relief contemplated in clauses (i) - (iii) above;

(xx)     the entry of an order in any of the Chapter 11 Cases, avoiding, disallowing, offsetting, recharacterizing, subordinating, disgorging or requiring repayment of any payments made to the Secured Parties on account of the Secured Obligations owing under the Orders, this Agreement, the other Loan Documents;

(xxi)    the entry of any order in any of the Chapter 11 Cases (a) charging any of the Collateral with respect to the Secured Parties, whether under Section 506(c) of the Bankruptcy Code or otherwise or (b) charging any of the Prepetition Senior Priority Collateral with respect to the Prepetition Senior Priority Secured Parties, whether under Section 506(c) of the Bankruptcy Code or otherwise;

(xxii)   any Chapter 11 Debtor shall consummate or seek to obtain Bankruptcy Court approval of any sale or other disposition of all or any portion of the Collateral pursuant to Section 363 of the Bankruptcy Code or otherwise (other than in ordinary course of business and that is contemplated by the Approved Budget and not prohibited by this Agreement), without the prior written consent of the Required Lenders;

(xxiii)  the Restructuring Support Agreement is terminated by any party thereto or otherwise terminates in accordance with the terms thereof;

(xxiv)   if any Chapter 11 Debtor is enjoined, restrained, or in any way prevented by court order or a Governmental Authority from continuing to conduct all or any material part of the business affairs of the Chapter 11 Debtors and their Subsidiaries;

(xxv)    any Chapter 11 Debtor initiates, commences, joins, publicly supports, pursues, files any motion, application or other pleading in support of, or fails to contest in good faith, the actions or relief described in clauses (viii), (x) through (xvii), (xxi) and (xxii) of this Section 7.01(k);

then, and in every such event, and at any time thereafter during the continuance of such event and without order from or application to the Bankruptcy Court, the automatic stay provisions of section 362 of the Bankruptcy Code shall be vacated and modified to the extent necessary to permit the applicable Agent, at the direction of the Required Lenders, to: (A) deliver to the Borrower a notice declaring the occurrence of an Event of Default, (B) declare the termination, reduction, or restriction of the Commitments, (C) declare the Term Loans then outstanding to be due and payable, (D) declare the termination, reduction or restriction on the ability of the Loan Parties to use any cash collateral, (E) terminate this Agreement, (F) charge the default rate of interest under this Agreement, (G) freeze all monies in any deposit accounts of the Loan Parties, (H) exercise any and all rights of setoff, (I) exercise any right or remedy with respect to the Collateral or the Liens created under the Loan Documents, or (J) take any other action or exercise any other right or remedy permitted under the Loan Documents, the Orders or Requirements of Law; provided, however, that in the case of the enforcement of rights against the Collateral pursuant to clauses (D), (F), (G), (H), (I) and (J) above, (i) the Administrative Agent, acting at the request of the Required Lenders, shall provide counsel to the Loan Parties, counsel to the Official Committee (if any), and the Office of the United States Trustee with five (5) days' prior written notice (such period, the "Remedies Notice Period"), and (ii) during the Remedies Notice Period, the applicable Agent shall refrain from exercising its rights and

remedies and the Loan Parties and/or any Official Committee shall be permitted to request an emergency hearing before the Bankruptcy Court (which request must be made prior to the conclusion of the Remedies Notice Period and shall seek consideration of such request on an expedited basis) solely to the extent they, in good faith, dispute the occurrence of an Event of Default, to consider on an expedited basis whether an Event of Default has in fact occurred or is continuing; provided, further, that during the Remedies Notice Period, the Loan Parties shall be permitted to use cash collateral solely to fund expenses critically necessary to preserve the value of the Loan Parties' business, as determined by Required Lenders.

SECTION 7.02    [Reserved].

SECTION 7.03    Application of Proceeds.

(a)    Subject to the terms of any applicable Existing Intercreditor Agreement, in connection with the exercise of remedies provided for in Section 7.01, any amounts received on account of the Secured Obligations (including in respect of any sale of, collection from or other realization upon all or any part of the Collateral (including any Collateral consisting of cash) or the Guarantees) shall be applied by the Administrative Agent to the payment of the Secured Obligations as follows:

(i)    first, to the payment of (x) first, all reasonable and documented or invoiced out of pocket costs and expenses incurred by the Agents in connection with such sale, collection, other realization or otherwise and to the payment of all other amounts owing to each of the Administrative Agent, and the Collateral Agent in connection with this Agreement, any other Loan Document or any of the Secured Obligations, including all reasonable and documented out of pocket costs and the fees and expenses of its agents and counsel (limited, in the case of legal fees and expenses, to the reasonable and documented fees, disbursements and other charges of Seward & Kissel LLP, as counsel to the Agents and, if reasonably necessary, of a single firm of local counsel to the Agents, in each relevant material jurisdiction (which may include a single special counsel acting in multiple jurisdictions)), the repayment of all advances made by it under any Loan Document on behalf of any Grantor and any other costs or expenses incurred in connection with the exercise of any right or remedy under any Loan Document, in each case, if and to the extent payable pursuant to the terms of the Loan Documents and (y) second, all reasonable and documented out-of-pocket costs and expenses incurred by the Lender Professionals in connection with such sale, collection, other realization or otherwise, in each case to the extent required to be reimbursed pursuant to Section 9.03(a) of this Agreement;

(ii)    second, to the payment in full of the New Money Term Loans, (including both the principal and interest owed thereon) (the amounts so applied to be distributed among such Secured Parties pro rata in accordance with the amounts of the New Money Term Loans owed to them on the date of any such distribution) in accordance with this Agreement;

(iii)    third, to the payment in full of the Roll-Up Term Loans (including both the principal and interest owed thereon) (the amounts so applied to be distributed among such Secured Parties pro rata in accordance with the amounts of the Roll-Up Term Loans owed to them on the date of any such distribution) in accordance with this Agreement;

(iv)    fourth, to any agent of any other junior secured debt, in accordance with any applicable Existing Intercreditor Agreement; and

(v)    fifth, to the Borrower, its successors or assigns, or as a court of competent jurisdiction may otherwise direct.

In the event that application of payments, Collateral proceeds is to be made after any

bankruptcy or insolvency proceeding has been commenced, references in this Section 7.03(a) with respect to (i) interest shall include interest accruing after the commencement of such bankruptcy or insolvency proceeding whether or not such interest is an allowed claim in such bankruptcy or insolvency proceeding, and (ii) any other amounts shall only include amounts that are allowed claims in such bankruptcy or insolvency proceeding.

(b)      [Reserved]

SECTION 7.04      Bankruptcy Code and Other Remedies.

(a)      Without in any way limiting the foregoing, during the continuance of an Event of Default, subject to the Orders, the applicable Agent (acting at the direction of the Required Lenders) may exercise, in addition to all other rights and remedies granted to it in this Agreement (including, without limitation, Section 7.01) and in any other instrument or agreement securing, evidencing or relating to any Secured Obligation, all rights and remedies of a secured party under the Bankruptcy Code, the Uniform Commercial Code and any other applicable law.

(b)      Disposition of Collateral. Subject to the Orders, without limiting the generality of the foregoing, the Collateral Agent (acting at the direction of the Required Lenders) may, without demand of performance or other demand, presentment, protest, advertisement or notice of any kind (except any notice required by the Orders and any notice required by law referred to below) to or upon any Loan Party or any other Person (all and each of which demands, defenses, advertisements and notices are hereby waived (except as required by the Orders)), during the continuance of any Event of Default (directly or through its agents, designees or an acquisition vehicle), (i) enter upon the premises where any Collateral is located, without any obligation to pay rent, through self- help, without judicial process, without first obtaining a final judgment or giving any Loan Party or any other Person notice or opportunity for a hearing on the Collateral Agent's claim or action, (ii) collect, receive, appropriate and realize upon any Collateral, (iii) dispose of, sell, grant option or options to purchase and deliver any Collateral (enter into contractual obligations to do any of the foregoing), in one or more parcels at public or private sale or sales, at any exchange, broker's board or office of any Secured Party or elsewhere upon such terms and conditions as it may deem advisable and at such prices as it may deem best, for cash or on credit or for future delivery without assumption of any credit risk, (iv) withdraw all cash and Cash Equivalents in any deposit account or securities account of a Loan Party and apply such cash and Cash Equivalents and other cash, if any, then held by it as Collateral in satisfaction of the Secured Obligations, and (v) give notice and take sole possession and control of all amounts on deposit in or credited to any deposit account or securities account pursuant to any related control agreement. The Collateral Agent (directly or via one or more acquisition vehicles), acting at the direction of the Required Lenders, shall have the right, upon any such public sale or sales and, to the extent permitted by the Bankruptcy Code and other applicable Requirements of Law, upon any such private sale, to purchase the whole or any part of the Collateral so sold (and, in lieu of actual payment of the purchase price, may "credit bid" or otherwise set off the amount of such price against all or any portion of the Secured Obligations), free of any right or equity of redemption of any Loan Party, which right or equity is hereby waived and released.

(c)      Management of the Collateral. Subject to the Orders, each Loan Party further agrees, that, during the continuance of any Event of Default, (i) at the Collateral Agent's request (acting at the direction of the Required Lenders), it shall assemble the Collateral and make it available to the Collateral Agent at places that the Collateral Agent shall reasonably select, whether at such Loan Party's premises or elsewhere, (ii) without limiting the foregoing, the Collateral Agent (acting at the direction of the Required Lenders) also has the right to require that each Loan Party store and keep any Collateral pending further action by the Collateral Agent and, while any such Collateral is so stored or kept, provide such guards and maintenance services as shall be necessary to protect the same and to preserve and maintain such Collateral

in good condition, (iii) until the Collateral Agent is able to sell any Collateral, the Collateral Agent shall have the right to hold or use such Collateral for the purpose of preserving the Collateral or its value or for any other purpose deemed appropriate by the Collateral Agent and (iv) the Collateral Agent may, at the direction of the Required Lenders, seek the appointment of a receiver or keeper to take possession of any Collateral and to enforce any of the Collateral Agent's remedies (for the benefit of the Secured Parties), with respect to such appointment without prior notice or hearing as to such appointment. The Collateral Agent shall not have any obligation to any Loan Party to maintain or preserve the rights of any Loan Party as against third parties with respect to any Collateral.

(d)    <u>Direct Obligation</u>. Subject to the Orders, neither the Collateral Agent nor any other Secured Party shall be required to make any demand upon, or pursue or exhaust any right or remedy against, any Loan Party or any other Person with respect to the payment of the Secured Obligations or to pursue or exhaust any right or remedy with respect to any Collateral therefor or any direct or indirect guaranty thereof. All of the rights and remedies of the Collateral Agent and any other Secured Party under any Loan Document shall be cumulative, may be exercised individually or concurrently and not exclusive of any other rights or remedies provided by any Requirements of Law. To the extent it may lawfully do so, each Loan Party absolutely and irrevocably waives and relinquishes the benefit and advantage of, and covenants not to assert against the Collateral Agent or any Lender or other Secured Party, any valuation, stay, appraisement, extension, redemption or similar laws and any and all rights or defenses it may have as a surety, now or hereafter existing, arising out of the exercise by them of any rights hereunder. If any notice of a proposed sale or other disposition of any Collateral shall be required by law, such notice shall be deemed reasonable and proper if given at least ten (10) calendar days before such sale or other disposition.

(e)    <u>Commercially Reasonable</u>. To the extent that any Requirements of Law impose duties on the Collateral Agent to exercise remedies in a commercially reasonable manner, each Loan Party acknowledges and agrees that it is not commercially unreasonable for the Collateral Agent to do any of the following: (i) fail to incur significant costs, expenses or other liabilities reasonably deemed as such by the Collateral Agent to prepare any Collateral for disposition or otherwise to complete raw material or work in process into finished goods or other finished products for disposition; (ii) fail to obtain permits, or other consents, for access to any Collateral to sell or for the collection or sale of any Collateral, or, if not required by other Requirements of Law, fail to obtain permits or other consents for the collection or disposition of any Collateral; (iii) fail to exercise remedies against account debtors or other Persons obligated on any Collateral or to remove Liens on any Collateral or to remove any adverse claims against any Collateral; (iv) advertise dispositions of any Collateral through publications or media of general circulation, whether or not such Collateral is of a specialized nature or to contact other Persons, whether or not in the same business as any Loan Party, for expressions of interest in acquiring any such Collateral; (v) exercise collection remedies against account debtors and other Persons obligated on any Collateral, directly or through the use of collection agencies or other collection specialists, hire one or more professional auctioneers to assist in the disposition of any Collateral, whether or not such Collateral is of a specialized nature or, to the extent deemed appropriate by the Collateral Agent (acting at the direction of the Required Lenders), obtain the services of other brokers, investment bankers, consultants and other professionals to assist the Collateral Agent in the collection or disposition of any Collateral, or utilize Internet sites that provide for the auction of assets of the types included in the Collateral or that have the reasonable capacity of doing so, or that match buyers and sellers of assets to dispose of any Collateral; (vi) dispose of assets in wholesale rather than retail markets; (vii) disclaim disposition warranties, such as title, possession or quiet enjoyment; or (viii) purchase insurance or credit enhancements to insure the Collateral Agent against risks of loss, collection or disposition of any Collateral or to provide to the Collateral Agent a guaranteed return from the collection or disposition of any Collateral. Each Loan Party acknowledges that the purpose of clauses (i) through (viii) of this <u>Section 7.04(e)</u> is to provide a non-exhaustive list of actions or omissions that are commercially reasonable when exercising remedies against any Collateral and that other actions or omissions by the Secured Parties shall not be deemed commercially unreasonable solely on account of not

being indicated in such clauses. Without limitation upon the foregoing, nothing contained herein shall be construed to grant any rights to any Loan Party or to impose any duties on the Collateral Agent that would not have been granted or imposed by this Agreement or by applicable Requirements of Law in the absence of this Section 7.04.

(f)      Deficiency. Each Loan Party shall remain liable for any deficiency if the proceeds of any sale or other disposition of any Collateral are insufficient to pay the Secured Obligations and the fees and disbursements of brokers, investment bankers, consultants and any attorney or other professionals employed by the Collateral Agent or any other Secured Party to collect such deficiency, in each case to the extent required to be reimbursed pursuant to Section 9.03.

ARTICLE VIII

ADMINISTRATIVE AGENT

SECTION 8.01      Appointment and Authority.

(a)      Each of the Lenders hereby irrevocably (i) designates and appoints (A) Wilmington Trust, National Association to act on its behalf as the Administrative Agent hereunder and under the other Loan Documents and (B) Wilmington Trust, National Association to act on its behalf as Collateral Agent hereunder and under the other Loan Documents and (ii) authorizes the Administrative Agent and the Collateral Agent (in their capacities as such), as applicable, to take such actions on such Lender's behalf and to exercise such powers as are expressly delegated to the Administrative Agent and the Collateral Agent, as applicable, by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto. Each Secured Party that is not a party hereto, by accepting the benefits of the Security Documents, hereby irrevocably appoints Wilmington Trust, National Association to act on its behalf as Collateral Agent under the Security Documents and authorizes Wilmington Trust, National Association (in its capacity as Collateral Agent) to take such actions on such Secured Party's behalf and to exercise such powers as are expressly delegated to the Collateral Agent by the terms hereof or thereof together with such actions and powers as are reasonably incidental thereto. The provisions of this Article are solely for the benefit of the Administrative Agent, the Collateral Agent and the Lenders, and the Borrower shall not have rights as a third party beneficiary of any of such provisions. It is understood and agreed that the use of the term "agent" herein or in any other Loan Documents (or any other similar term) with reference to the Administrative Agent or the Collateral Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable Requirements of Law. Instead such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between contracting parties.

(b)      Each of the Lenders and each Secured Party that is not a party hereto, by accepting the benefits of the Security Documents, hereby irrevocably appoints and authorizes the Collateral Agent, as applicable, to act as the agent of such Lender for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Secured Obligations, together with such powers as are reasonably incidental thereto. In this connection, the Collateral Agent and any co-agents, sub-agents and attorneys-in-fact appointed by the Administrative Agent and/or the Collateral Agent pursuant to Section 8.05 for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Security Documents, or for exercising any rights and remedies thereunder at the direction of the Administrative Agent, shall be entitled to the benefits of all provisions of this Article VIII and Article IX (including Section 9.03 as though such co-agents, sub-agents and attorneys-in-fact were the "collateral agent" under the Loan Documents) as if set forth in full herein with respect thereto.

103

(c)     Notwithstanding anything to the contrary in the Loan Documents, each of the Lenders hereby authorize and empower each Agent, upon prior written consent by the Required Lenders, to (i) execute all documents and (ii) make all acknowledgements.

SECTION 8.02     Rights as a Lender.

Any Person serving as an Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not an Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as Agent hereunder in its individual capacity. Such Person and its Affiliates may accept deposits from, own securities of, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Borrower or any Subsidiary or other Affiliate thereof as if such Person were not an Agent hereunder and without any duty to account therefor to the Lenders.

SECTION 8.03     Exculpatory Provisions.

No Agent shall have any duties or obligations except those expressly set forth herein and in the other Loan Documents. Without limiting the generality of the foregoing, each Agent:

(a)     shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing;

(b)     shall not have any duty to take any discretionary action or exercise any discretionary powers, and shall not be required to exercise any discretion or to take any action, but shall be required to act or refrain from acting (and shall be fully protected in so acting or refraining from acting) as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents); provided that such Agent shall not be required to take any action (i) unless it is furnished with an indemnification satisfactory to such Agent from the Lenders with respect thereto or (ii) that, in its opinion or the opinion of its counsel, may expose such Agent to liability or that is contrary to any Loan Document or applicable law;

(c)     shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of its Affiliates that is communicated to or obtained by the Person serving as such Agent or any of its Affiliates in any capacity;

(d)     shall in no event be responsible or liable for any failure or delay in the performance of its obligations hereunder arising out of or caused by, directly or indirectly, forces beyond its control, including without limitation, any act or provision of any present or future law or regulation or governmental authority; acts of God; earthquakes; fires; floods; wars; terrorism; civil or military disturbances; sabotage; epidemics; riots; interruptions, loss or malfunctions of utilities, computer (hardware or software) or communications service; accidents; labor disputes; acts of civil or military authority or governmental actions;

(e)     shall not be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents)  or (ii) in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction by final and non-appealable judgment;

(f)    shall be deemed not to have knowledge of any Default unless and until written notice describing such Default conspicuously marked as a "notice of default" is given to such Agent by the Borrower or a Lender and received by an officer of such Agent responsible for the administration of this Agreement;

(g)    shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default or Event of Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, or the creation, perfection or priority of any Lien or security interests purported to be granted to such Agent pursuant to this Agreement or any other Loan Document have been or will continue to be properly or sufficiently or lawfully created, perfected or enforced or are entitled to any particular priority, (v) the value or the sufficiency of any Collateral, or (vi) the satisfaction of any condition set forth in <u>Article IV</u>, or (vii) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, or the creation, perfection or priority of any Lien purported to be created by the Security Documents;

(h)    shall not be responsible for nor have any duty to monitor the performance or any action of the Borrower or other Loan Party, or any of their directors, members, officers, agents, affiliates or employees, nor shall it have any liability in connection with the malfeasance or nonfeasance by such party, and may assume performance by all such Persons of their respective obligations and shall have no enforcement or notification obligations relating to breaches of representations or warranties of any other Person;

(i)    shall not be liable for any action taken in good faith and reasonably believed by it to be within the powers conferred upon it, or taken by it pursuant to any direction or instruction by which it is governed, or omitted to be taken by it by reason of the lack of direction or instruction required hereby for such action (including without limitation for refusing to exercise discretion or for withholding its consent in the absence of its receipt of, or resulting from a failure, delay or refusal on the part of any Lender to provide, written instructions to exercise such discretion or grant such consent from any such Lender, as applicable);

(j)    shall not be liable for any error of judgment made by it (or by an officer or other employee of such Agent) in good faith;

(k)    not be liable for any indirect, special, punitive or consequential damages (including, without limitation, lost profits) whatsoever, even if it has been informed of the likelihood thereof and regardless of the form of action;

(l)    not be required to take any action under this Agreement, the other Loan Documents or any related document if taking such action would (A) subject such Agent to a tax in any jurisdiction where it is not then subject to a tax or (B) would require such Agent to qualify to do business in any jurisdiction where it is not then so qualified;

(m)    shall not have any duty as to any collateral in its possession or in the possession of someone under its control or in the possession or control of any agent or nominee of the Agents or any income thereon or as to the preservation of rights prior parties or any other rights pertaining thereto, except the duty to accord such of the collateral as may be in its possession substantially the same care as it accords similar assets held for the benefit of third parties and the duty to account for monies received by it. The

Agents shall not be under any obligation to independently request or examine insurance coverage with respect to any collateral nor shall the Agent's be liable for the acts or omissions of any bank, depositary bank, custodian, independent counsel of any other Person or any other party selected by the Agents with reasonable care or selected by any other party hereto that may hold or possess collateral or documents related to collateral, and the Agents shall not be required to monitor the performance of any such Persons holding collateral. For the avoidance of doubt, the Agents shall not be responsible to the Lenders for the perfection of any lien or for the filing, form, content or renewal of any UCC financing statements, fixture filings, mortgages, deeds of trust and such other documents or instruments;

(n)     notwithstanding anything contained in this Agreement or any other Loan Document to the contrary, shall not be under any obligation (i) to monitor, determine or verify the unavailability or cessation of any Benchmark (or other applicable benchmark interest rate), or whether or when there has occurred, or to give notice to any other transaction party of the occurrence of, any date on which such rate may be required to be transitioned or replaced in accordance with the terms of the Loan Documents, applicable law or otherwise, (ii) to select, determine or designate any replacement to such rate, or other successor or replacement benchmark index, or whether any conditions to the designation of such a rate have been satisfied, (iii) to select, determine or designate any adjustment or modifier to any replacement or successor index, or (iv) to determine whether or what any amendments to this Agreement or the other Loan Documents are necessary or advisable, if any, in connection with any of the foregoing. The Agents shall not be liable for any inability, failure or delay on its part to perform any of its duties set forth in this Agreement or any other Loan Document as a result of the unavailability of any Benchmark (or other applicable benchmark interest rate), including as a result of any inability, delay, error or inaccuracy on the part of any other party, including without limitation any Lenders or any Borrower, in providing any direction, instruction, notice or information required or contemplated by the terms of this Agreement and reasonably required for the performance of such duties. The Agents shall have no liability for any interest rate published by any publication that is the source for determining the interest rates of the Loans, including but not limited to Bloomberg (or any successor source) and the Bloomberg or Reuters screen (or any successor source), or for any rates published on any publicly available source, including without limitation the Federal Reserve Bank of New York's Website or any website administered by the Term SOFR Administrator, or in any of the foregoing cases for any delay, error or inaccuracy in the publication of any such rates, or for any subsequent correction or adjustment thereto; and

(o)     if at any time an Agent is served with any judicial or administrative order, judgment, decree, writ or other form of judicial or administrative process (including orders of attachment or garnishment or other forms of levies or injunctions or stays relating to the transfer of any Collateral), such Agent is authorized to comply therewith in any manner as it or its legal counsel of its own choosing deems appropriate, and if such Agent complies with any such judicial or administrative order, judgment, decree, writ or other form of judicial or administrative process, such Agent shall not be liable to any of the parties hereto or to any other Person even though such order, judgment, decree, writ or process may be subsequently modified or vacated or otherwise determined to have been without legal force or effect.

The Agents' rights, protections, indemnities and immunities provided in this Agreement shall apply to such Agent for any actions taken or omitted to be taken under this agreement and any other Loan Documents and any other related agreements in any of its respective capacities.

SECTION 8.04     Reliance by Agents.

Each Agent shall be entitled to conclusively rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person. Each Agent

also may conclusively rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon. In determining compliance with any condition hereunder to the making of a Loan, that by its terms must be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender unless the Administrative Agent shall have received notice to the contrary from such Lender prior to the making of such Loan. Each Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts. As to any matters not expressly provided for in this Agreement and in the other Loan Documents (including enforcement or collection), the Administrative Agent and/or the Collateral Agent shall not be required to exercise any discretion or take any action, but shall be required to act or to refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the written instructions of the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents), and, unless and until revoked in writing, such instructions shall be binding upon each Lender. Each Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Loan Document unless it shall first receive such advice or concurrence of the Required Lenders as it deems appropriate. Each Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement and the other Loan Documents in accordance with a request of the Required Lenders. Notwithstanding anything herein or in any other Loan Document to the contrary, and without limiting any rights, protections, immunities or indemnities to the Agents hereunder, phrases such as "satisfactory to the [Administrative Agent][Collateral Agent]," "approved by the [Administrative Agent][Collateral Agent]," "acceptable to the [Administrative Agent][Collateral Agent]," "as determined by the [Administrative Agent][Collateral Agent]," "in the [Administrative Agent][Collateral Agent]'s discretion," "selected by the [Administrative Agent][Collateral Agent]," "elected by the [Administrative Agent][Collateral Agent]," "requested by the [Administrative Agent][Collateral Agent]," and phrases of similar import that authorize and permit an Agent to approve, disapprove, determine, act or decline to act in its discretion shall be subject to such Agent receiving written direction from the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents) to take such action or to exercise such rights. Upon request by the Administrative Agent and/or the Collateral Agent, as the case may be, the Required Lenders shall confirm in writing the Administrative Agent's authority and/or the Collateral Agent's authority, as the case may be, to take any action in accordance with the terms of the Loan Documents and this <u>Section 8.04</u> and may refrain from acting until such confirmation has been provided.

Notwithstanding anything else to the contrary herein, whenever reference is made in this Agreement, or any other Loan Document, to any discretionary action by, consent, designation, specification, requirement or approval of, notice, request or other communication from, or other direction given or action to be undertaken or to be (or not to be) suffered or omitted by the Administrative Agent or the Collateral Agent or to any election, decision, opinion, acceptance, use of judgment, expression of satisfaction or other exercise of discretion, rights or remedies to be made (or not to be made) by the Administrative Agent or the Collateral Agent, it is understood that in all cases the Administrative Agent or such Collateral Agent shall be fully justified in failing or refusing to take any such action if it shall not have received written instruction, advice or concurrence from the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in any other Loan Document). The Administrative Agent and Collateral Agent shall have no liability for any failure or delay in taking any actions contemplated above as a result of a failure or delay on the part of the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in any other Loan Document) to provide such instruction, advice or concurrence. This provision is intended solely for the benefit of each of the Administrative Agent and the Collateral Agent and its successors and permitted assigns and is not intended to and will not entitle the other parties hereto to any defense, claim or counterclaim, or confer any rights or benefits on any party hereto.

The Administrative Agent and the Collateral Agent shall in all cases be fully justified in failing or refusing to act unless it shall receive further assurances to its reasonable satisfaction, including indemnification, from the Lenders against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action.  No provision of this Agreement or any Loan Document shall require the Administrative Agent or the Collateral Agent to take any action that it reasonably believes to be contrary to applicable law or to expend or risk its own funds or otherwise incur financial liability in the performance of any of its duties thereunder or in the exercise of any of its rights or powers if it shall have reasonable grounds to believe that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it.

SECTION 8.05    Delegation of Duties.

Each Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by such Agent.  Any Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties. No Agent shall be responsible for the acts or omissions of any sub-agents selected by it without gross negligence or willful misconduct as determined by a court of competent jurisdiction by final and non-appealable judgment.  The exculpatory provisions of this Article shall apply to any such sub-agent and to the Related Parties of any Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the DIP Facility as well as activities as such Agent.

SECTION 8.06    Resignation of Administrative Agent; Mergers.

Each Agent may resign upon thirty (30) days' notice to the Lenders and the Lead Borrower, whether or not a successor Agent has been appointed. Upon receipt of any such notice of resignation, the Required Lenders shall have the right, with the Lead Borrower's consent (such consent not to be unreasonably withheld or delayed) unless an Event of Default has occurred and is continuing, to appoint a successor, which shall be a bank with an office in the United States, or an Affiliate of any such bank with an office in the United States. If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within thirty (30) days after the retiring Agent gives notice of its resignation, then the retiring Agent may (but shall not be obligated to) on behalf of the Lenders, appoint, or petition a court of competent jurisdiction to appoint, a successor Agent, which shall be an Approved Bank with an office in New York, New York, or an Affiliate of any such Approved Bank (the date upon which the retiring Agent is replaced, the "Resignation Effective Date"); provided that if the retiring Agent shall notify the Lead Borrower and the Lenders that no qualifying Person accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice.

If the Person serving as an Agent is a Defaulting Lender, the Required Lenders and the Lead Borrower may, to the extent permitted by applicable law, by notice in writing to such Person remove such Person as Agent and, with the consent of the Lead Borrower, appoint a successor. If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within thirty (30) days (the "Removal Effective Date"), then such removal shall nonetheless become effective in accordance with such notice on the Removal Effective Date.

With effect from the Resignation Effective Date or the Removal Effective Date (as applicable) (1) the retiring or removed Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except (i) that in the case of any collateral security held by the Collateral Agent on behalf of the Lenders under any of the Loan Documents, the retiring or removed Collateral Agent shall continue to hold such collateral security until such time as a successor Collateral Agent is appointed and (ii) with respect to any outstanding payment obligations) and (2) except for any

indemnity payments or other amounts then owed to the retiring or removed Agent, all payments, communications and determinations provided to be made by, to or through the Administrative Agent shall instead be made by or to each Lender directly, until such time, if any, as the Required Lenders appoint a successor Agent as provided for above. Upon the acceptance of a successor's appointment as Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or removed) Agent (other than any rights to indemnity payments or other amounts owed to the retiring or removed Agent as of the Resignation Effective Date or the Removal Effective Date, as applicable), and the retiring or removed Agent shall be discharged from all of its duties and obligations hereunder and under the other Loan Documents as set forth in this Section. The fees payable by the Borrower to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor. After the retiring or removed Agent's resignation or removal hereunder and under the other Loan Documents, the provisions of this Article and <u>Section 9.04</u> shall continue in effect for the benefit of such retiring or removed Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring or removed Agent was acting as Agent.

Any corporation or association into which an Agent may be converted or merged, or with which it may be consolidated, or to which it may sell or transfer all or substantially all of its corporate trust business and assets as a whole or substantially as a whole, or any corporation or association resulting from any such conversion, sale, merger, consolidation or transfer to which an Agent is a party, will be and become the successor Agent under this Agreement and related Loan Documents and will have and succeed to the rights, powers, duties, immunities and privileges as its predecessor, without the execution or filing of any instrument or paper or the performance of any further act.

SECTION 8.07     <u>Non-Reliance on Agents and Lenders</u>.

Each Lender acknowledges that it has, independently and without reliance upon any Agent, any Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each Lender also acknowledges that it will, independently and without reliance upon any Agent or any Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.

Each Lender, by delivering its signature page to this Agreement and funding its Loans on the Effective Date, or delivering its signature page to an Assignment and Assumption pursuant to which it shall become a Lender hereunder, shall be deemed to have acknowledged receipt of, and consented to and approved, each Loan Document and each other document required to be delivered to, or be approved by or satisfactory to, the Agents and/or the Lenders on the Effective Date.

No Lender and no other Secured Party shall have any right individually to realize upon any of the Collateral or to enforce any Guarantee of the Secured Obligations, it being understood and agreed that all powers, rights and remedies under the Loan Documents may be exercised solely by the Administrative Agent and the Collateral Agent on behalf of the Lenders and the other Secured Parties in accordance with the terms thereof. In the event of a foreclosure by the Administrative Agent or the Collateral Agent on any of the Collateral pursuant to a public or private sale or other disposition, the Administrative Agent, the Collateral Agent or any Lender may be the purchaser or licensor of any or all of such Collateral at any such sale or other disposition, and the Administrative Agent or such Collateral Agent, as agent for and representative of the Lenders and the other Secured Parties (but not any Lender, Lenders, Secured Party or Secured Parties in its or their respective individual capacities) (either directly or through one or more acquisition vehicles), upon instructions from Required Lenders, shall be entitled, for the

purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such public sale, to use and apply any of the Secured Obligations (other than Secured Obligations owing to the Agents) as a credit on account of the purchase price for any collateral payable by the Administrative Agent or the Collateral Agent on behalf of the Lenders at such sale or other disposition. Each Lender, whether or not a party hereto, will be deemed, by its acceptance of the benefits of the Collateral and the Guarantees of the Secured Obligations, to have agreed to the foregoing provisions.

SECTION 8.08    Existing Intercreditor Agreements.

The parties hereto acknowledge and agree that: (a) in accordance with the Interim DIP Order and any other order of the Bankruptcy Court, each Agent shall be subject to the terms of the Existing Intercreditor Agreements as if the Agents were party thereto as a "First Lien Term Loan Representative" (as defined in each of the Existing Intercreditor Agreements) and (b) each Agent, acting in the capacity as a First Lien Term Loan Representative, is authorized to perform and take or refrain from taking any actions, and providing any consents or directions, in connection with the Existing Intercreditor Agreements.

SECTION 8.09    Administrative Agent May File Proofs of Claim.

In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Loan Party, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Secured Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders, and any Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and such Agent and their respective agents and counsel and all other amounts due the Lenders and each Agent under Sections 2.12 and 9.03) allowed in such judicial proceeding; and

(b)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender and, by its acceptance of the benefits of the Security Documents, each Secured Party that is not a party hereto, to make such payments to the Administrative Agent and, if the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of any Agent and its agents and counsel, and any other amounts due such Agent under Sections 2.12 and 9.03.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender or any Secured Party that is not a party hereto any plan of reorganization, arrangement, adjustment or composition affecting the Secured Obligations or the rights of any Lender or any Secured Party that is not a party hereto to authorize the Administrative Agent to vote in respect of the claim of any Lender or in any such proceeding.

SECTION 8.10    No Waiver; Cumulative Remedies; Enforcement.

No failure by any Lender or any Agent to exercise, and no delay by any such Person in

exercising, any right, remedy, power or privilege hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided, and provided under each other Loan Document, are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

Notwithstanding anything to the contrary contained herein or in any other Loan Document, the authority to enforce rights and remedies hereunder and under the other Loan Documents against the Loan Parties or any of them shall be vested exclusively in, and all actions and proceedings at law in connection with such enforcement shall be instituted and maintained exclusively by, the Agents in accordance with Article VII for the benefit of all the Secured Parties; provided, however, that the foregoing shall not prohibit (a) any Agent from exercising on its own behalf the rights and remedies that inure to its benefit (solely in its capacity as Agent) hereunder and under the other Loan Documents, (b) any Lender from exercising setoff rights in accordance with Section 9.08 (subject to the terms of Section 2.18), or (c) any Lender from filing proofs of claim or appearing and filing pleadings on its own behalf during the pendency of a proceeding relative to any Loan Party under any Debtor Relief Law; and provided further that if at any time there is no Person acting as an Agent hereunder and under the other Loan Documents, then (i) the Required Lenders shall have the rights otherwise ascribed to such Agent pursuant to Article VII and (ii) in addition to the matters set forth in clauses (b), (c) and (d) of the preceding proviso and subject to Section 2.18, any Lender may, with the consent of the Required Lenders, enforce any rights and remedies available to it and as authorized by the Required Lenders.

SECTION 8.11    Withholding Taxes.

To the extent required by any applicable Requirements of Law (as determined in good faith by the Administrative Agent), the Administrative Agent may deduct or withhold from any payment to any Lender an amount equivalent to any applicable withholding Tax. If the Internal Revenue Service or any other Governmental Authority of the United States or other jurisdiction asserts a claim that the Administrative Agent did not properly withhold Tax from amounts paid to or for the account of any Lender for any reason (including because the appropriate form was not delivered or not property executed, or because such Lender failed to notify the Administrative Agent of a change in circumstance that rendered the exemption from, or reduction of withholding Tax ineffective), such Lender shall indemnify and hold harmless the Administrative Agent (to the extent that the Administrative Agent has not already been reimbursed by the Loan Parties pursuant to Section 2.17 and without limiting any obligation of the Loan Parties to do so pursuant to such Section) fully for all amounts paid, directly or indirectly, by the Administrative Agent as Taxes or otherwise, together with all expenses incurred, including legal expenses and any other out-of-pocket expenses, whether or not such Tax was correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Loan Document against any amount due to the Administrative Agent under this Section 8.11. The agreements in this Section 8.11 shall survive the resignation and/or replacement of the Administrative Agent, any assignment of rights by, or the replacement of, a Lender, the termination of this Agreement and the repayment, satisfaction or discharge of all other obligations under any Loan Document.

SECTION 8.12    Credit Bidding.

The Secured Parties hereby irrevocably authorize the Administrative Agent, at the direction of the Required Lenders, to credit bid all or any portion of the Secured Obligations (other than any Secured

Obligations owing to the Agents) (including by accepting some or all of the Collateral in satisfaction of some or all of the Secured Obligations pursuant to a deed in lieu of foreclosure or otherwise) and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral (a) at any sale thereof conducted under the provisions of the Bankruptcy Code, including under Sections 363, 1123 or 1129 of the Bankruptcy Code, or any similar laws in any other jurisdictions to which a Loan Party is subject, or (b) at any other sale, foreclosure or acceptance of collateral in lieu of debt conducted by (or with the consent or at the direction of) the Administrative Agent (whether by judicial action or otherwise) in accordance with any applicable law.  In connection with any such credit bid and purchase, such Secured Obligations owed to the Secured Parties shall be entitled to be, and shall be, credit bid by the Administrative Agent at the direction of the Required Lenders on a ratable basis (with Secured Obligations with respect to contingent or unliquidated claims receiving contingent interests in the acquired assets on a ratable basis that shall vest upon the liquidation of such claims in an amount proportional to the liquidated portion of the contingent claim amount used in allocating the contingent interests) for the asset or assets so purchased (or for the equity interests or debt instruments of the acquisition vehicle or vehicles that are issued in connection with such purchase). In connection with any such bid, (i) the Administrative Agent (or the Required Lenders on its behalf) shall be authorized to form one or more acquisition vehicles and to assign any successful credit bid to such acquisition vehicle or vehicles, (ii) each of the Secured Parties' ratable interests in the Secured Obligations which were credit bid shall be deemed without any further action under this Agreement to be assigned to such vehicle or vehicles for the purpose of closing such sale, (iii) the Required Lenders shall be authorized to adopt documents providing for the governance of the acquisition vehicle or vehicles (provided that any actions with respect to such acquisition vehicle or vehicles, including any disposition of the assets or equity interests thereof, shall be governed, directly or indirectly, by, and the governing documents shall provide for, control by the vote of the Required Lenders or their permitted assignees under the terms of this Agreement or the governing documents of the applicable acquisition vehicle or vehicles, as the case may be, irrespective of the termination of this Agreement and without giving effect to the limitations on actions by the Required Lenders contained in Section 9.02 of this Agreement), (iv) each of the Secured Parties shall be authorized to receive, ratably on account of the relevant Secured Obligations which were credit bid, interests, whether as equity, partnership interests, limited partnership interests or membership interests, in any such acquisition vehicle and/or debt instruments issued by such acquisition vehicle, all without the need for any Secured Party or acquisition vehicle to take any further action, and (v) to the extent that Secured Obligations that are assigned to an acquisition vehicle are not used to acquire Collateral for any reason (as a result of another bid being higher or better, because the amount of Secured Obligations assigned to the acquisition vehicle exceeds the amount of Secured Obligations credit bid by the acquisition vehicle or otherwise), such Secured Obligations shall automatically be reassigned to the Secured Parties pro rata with their original interest in such Secured Obligations and the equity interests and/or debt instruments issued by any acquisition vehicle on account of such Secured Obligations shall automatically be cancelled, without the need for any Secured Party or any acquisition vehicle to take any further action.  Notwithstanding that the ratable portion of the Secured Obligations of each Secured Party are deemed assigned to the acquisition vehicle or vehicles as set forth in clause (ii) above, each Secured Party shall execute such documents and provide such information regarding the Secured Party (and/or any designee of the Secured Party which will receive interests in or debt instruments issued by such acquisition vehicle) as the Administrative Agent or the Required Lenders may reasonably request in connection with the formation of any acquisition vehicle, the formulation or submission of any credit bid or the consummation of the transactions contemplated by such credit bid.

SECTION 8.13    <u>Erroneous Payments</u>.

(a)    If the Administrative Agent (x) notifies a Lender, Secured Party, or any Person who has received funds on behalf of a Lender or Secured Party (any such Lender, Secured Party or other recipient (and each of their respective successors and assigns), a "<u>Payment Recipient</u>") that the Administrative Agent has determined in its sole discretion (whether or not after receipt of any notice under

immediately succeeding clause (b)) that any funds (as set forth in such notice from the Administrative Agent) received by such Payment Recipient from the Administrative Agent or any of its Affiliates were erroneously or mistakenly transmitted to, or otherwise erroneously or mistakenly received by, such Payment Recipient (whether or not known to such Payment Recipient on its behalf) (any such funds, whether transmitted or received as a payment, prepayment or repayment of principal, interest, fees or otherwise; individually and collectively, an "Erroneous Payment") and (y) demands in writing the return of such Erroneous Payment (or a portion thereof), such Erroneous Payment shall at all time remain the property of the Administrative Agent pending its return or repayment as contemplated below in this Section 8.13 and held in trust for the benefit of the Administrative Agent, and such Lender or Secured Party shall (or, with respect to any Payment Recipient who received funds on its behalf, shall cause such Payment Recipient to) promptly, but in no event later than one (1) Business Day thereafter, return to the Administrative Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made in same day funds (in the currency so received), together with interest thereon (except to the extent waived in writing by the Administrative Agent) in respect of each day from and including the date such Erroneous Payment (or portion thereof) was received by such Payment Recipient to the date such amount is repaid to the Administrative Agent at the greater of the NYFRB Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation from time to time in effect. A notice of the Administrative Agent to any Payment Recipient under this Section 8.13 shall be conclusive, absent manifest error.

(b)    Without limiting the immediately preceding clause (a), each Lender hereby further agrees that if it (or a Payment Recipient on its behalf) receives a payment, prepayment or repayment (whether received as a payment, prepayment or repayment of principal, interest, fees distribution or otherwise) from the Administrative Agent or any of its Affiliates (x) that is in a different amount than, or on a different date from, that specified in this Agreement or in a notice of payment, prepayment or repayment sent by the Administrative Agent (or any of its Affiliates) with respect to such payment, prepayment or repayment, (y) that was not preceded or accompanied by a notice of payment, prepayment or repayment sent by the Administrative Agent (or any of its Affiliates), or (z) that such Lender or Secured Party or other such recipient, otherwise becomes aware was transmitted, or received, in error or by mistake (in whole or in part), then in each such case:

(i)    it acknowledges and agrees that (A) in the case of immediately preceding clauses (x) or (y), an error and mistake shall be presumed to have been made (absent written confirmation from the Administrative Agent to the contrary) or (B) an error and mistake has been made (in the case of immediately preceding clause (z)), in each case, with respect to such payment, prepayment or repayment; and

(ii)    such Lender or Secured Party shall (and shall cause any other recipient that receives funds on its respective behalf to) promptly (and, in all events, within one (1) Business Day of its knowledge of the occurrence of any of the circumstances described in immediately preceding clauses (x), (y) and (z)) notify the Administrative Agent of its receipt of such payment, prepayment or repayment, the details thereof (in reasonable detail) and that it is so notifying the Administrative Agent pursuant to this Section 8.13(b).

For the avoidance of doubt, the failure to deliver a notice to the Administrative Agent pursuant to this Section 8.13(b) shall not have any effect on a Payment Recipient's obligations pursuant to Section 8.13(a) or on whether or not an Erroneous Payment has been made.

(c)    Each Lender or Secured Party hereby authorizes the Administrative Agent to set off, net and apply any and all amounts at any time owing to such Lender or Secured Party under any Loan Document, or otherwise payable or distributable by the Administrative Agent to such Lender or Secured

Party under any Loan Document or from any other source against any amount that the Administrative Agent has demanded to be returned under the immediately preceding clause (a).

(d)      The parties hereto agree that (x) irrespective of whether the Administrative Agent may be equitably subrogated, in the event an Erroneous Payment (or portion thereof) are not recovered from any Payment Recipient that has received such Payment (or portion thereof) for any reason, the Administrative Agent shall be subrogated to all the rights and interests of such Payment Recipient (and in the case of any Payment Recipient who has received funds on behalf of a Lender or Secured Party, to the rights and interests of such Lender or Secured Party as the case may be) under the Loan Documents with respect to such amount (the "Erroneous Payment Subrogation Rights") and (y) an Erroneous Payment shall not pay, prepay, repay, discharge or otherwise satisfy any Secured Obligations owed by any Borrower or any other Loan Party; provided that this Section 8.13(d) shall not be interpreted to increase (or accelerate the due date for), or have the effect of increasing (or accelerating the due date for), the Secured Obligations of the Borrower relative to the amount of the Secured Obligations that would have been payable had such Erroneous Payment not been made by the Administrative Agent; provided further, that for the avoidance of doubt, the immediately preceding clauses, (x) and (y) shall not apply, to the extent such Erroneous Payment is, and solely with respect to the amount of such Erroneous Payment that is, comprised of funds received by the Administrative Agent from the Borrower for purposes of making such Erroneous Payment.

(e)      Notwithstanding anything to the contrary contained herein, and for the avoidance of doubt, in no event shall the occurrence of an Erroneous Payment (or the existence of any Erroneous Payment Subrogation Rights or other rights of the Administrative Agent in respect of an Erroneous Payment) result in the Administrative Agent becoming, or being deemed to be, a Lender hereunder or the holder of any Loans hereunder.

(f)      To the extent permitted by applicable law, no Payment Recipient shall assert any right or claim to an Erroneous Payment, and hereby waives, and is deemed to waive, any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by the Administrative Agent for the return of any Erroneous Payment received, including, without limitation, any defense based on "discharge for value" or any similar doctrine.

(g)      Notwithstanding anything in this Section 8.13 to the contrary, the Borrower shall not be liable for the losses of any party due to an Erroneous Payment. Each party's obligations under this Section 8.13 shall survive the resignation or replacement of the Administrative Agent or any transfer of rights or obligations by, or the replacement of, a Lender, the termination of the Commitments or the repayment, satisfaction or discharge of all Secured Obligations under any Loan Document.

ARTICLE IX

MISCELLANEOUS

SECTION 9.01      Notices.

(a)      Except in the case of notices and other communications expressly permitted to be given by telephone, all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by fax or other electronic transmission, as follows:

(i)      if to the Borrower, the Administrative Agent or the Collateral Agent, to the address, fax number, e-mail address or telephone number specified for such Person on Schedule 9.01; and

(ii)      if to any other Lender, to it at its address (or fax number, telephone number or e-mail address) set forth in its Administrative Questionnaire (including, as appropriate, notices delivered solely to the Person designated by a Lender on its Administrative Questionnaire then in effect for the delivery of notices that may contain Material Non-Public Information relating to the Borrower).

Notices and other communications sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices and other communications sent by fax or other electronic transmission shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient). Notices and other communications delivered through electronic communications to the extent provided in <u>subsection (b)</u> below shall be effective as provided in such <u>subsection (b)</u>.

(b)      <u>Electronic Communications</u>. Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures reasonably approved by the Administrative Agent, <u>provided</u> that the foregoing shall not apply to notices to any Lender pursuant to <u>Article II</u> if such Lender has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication.

Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), <u>provided</u> that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause <u>(i)</u> of notification that such notice or communication is available and identifying the website address therefor.

(c)      <u>The Platform</u>. THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE." THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE BORROWER MATERIALS OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE BORROWER MATERIALS. NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH THE BORROWER MATERIALS OR THE PLATFORM. In no event shall the Administrative Agent or any of its Related Parties (collectively, the "<u>Agent Parties</u>") have any liability to the Borrower, any Lender or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of the Borrower's or the Administrative Agent's transmission of Borrower Materials through the Internet, <u>provided</u>, <u>further</u>, that in no event shall any Agent Party have any liability to the Borrower, any Lender or any other Person for indirect, special, incidental, consequential or punitive damages (as opposed to direct or actual damages).

(d)      <u>Change of Address, Etc</u>. Each of the Borrower and the Administrative Agent may change its address, electronic mail address, fax or telephone number for notices and other communications or website hereunder by notice to the other parties hereto. Each other Lender may change its address, fax or telephone number for notices and other communications hereunder by notice to the Borrower and the

Administrative Agent. In addition, each Lender agrees to notify the Administrative Agent from time to time to ensure that the Administrative Agent has on record (i) an effective address, contact name, telephone number, fax number and electronic mail address to which notices and other communications may be sent and (ii) accurate wire instructions for such Lender.

(e)     Reliance by Administrative Agent and Lenders. The Agents and the Lenders shall be entitled to conclusively rely and act upon any notices purportedly given by or on behalf of the Borrower even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof. The Borrower shall indemnify the each Agent, each Lender and the Related Parties from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of the Borrower in the absence of gross negligence or willful misconduct as determined in a final and non-appealable judgment by a court of competent jurisdiction. All telephonic notices to and other telephonic communications with the Administrative Agent may be recorded by the Administrative Agent and each of the parties hereto hereby consents to such recording.

SECTION 9.02     Waivers; Amendments.

(a)     No failure or delay by the Agents or any Lender in exercising any right or power under this Agreement or any Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the Agents and the Lenders hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of this Agreement or any Loan Document or consent to any departure by any Loan Party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section 9.02, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. Without limiting the generality of the foregoing, the making of a Loan shall not be construed as a waiver of any Default, regardless of whether the Agents or any Lender may have had notice or knowledge of such Default at the time. No notice or demand on the Borrower in any case shall entitle the Borrower to any other or further notice or demand in similar or other circumstances.

(b)     Except as provided in Section 2.14, neither this Agreement, any Loan Document nor any provision hereof or thereof may be waived, amended or modified except, in the case of this Agreement, pursuant to an agreement or agreements in writing entered into by the Lead Borrower, the Administrative Agent (to the extent that such waiver, amendment or modification does not affect the rights, duties, privileges or obligations of the Administrative Agent under this Agreement, the Administrative Agent shall execute such waiver, amendment or other modification to the extent approved by the Required Lenders) and the Required Lenders or, in the case of any other Loan Document, pursuant to an agreement or agreements in writing entered into by the Administrative Agent or the Collateral Agent, as the case may be, and the Loan Party or Loan Parties that are parties thereto, in each case with the consent of the Required Lenders; provided that no such agreement shall (i) increase the Commitment of any Lender or change any ratable sharing or payment provision that directly and adversely affects any Lender (with only such Lenders whose entitlement to a payment under such provisions is reduced being "directly and adversely affected") without the written consent of such Lender (it being understood that a waiver of any condition precedent set forth in Section 4.02 or the waiver of any Default, Event of Default, mandatory prepayment or mandatory reduction of the Commitments shall not constitute an extension or increase of any Commitment of any Lender), (ii) reduce the principal amount of any Loan (it being understood that a waiver of any Default, Event of Default, mandatory prepayment or mandatory reduction of the Commitments shall not constitute a reduction or forgiveness of principal) or reduce the rate of interest thereon, or reduce any fees

payable hereunder, without the written consent of each Lender directly and adversely affected thereby, provided that only the consent of the Required Lenders shall be necessary to waive any obligation of the Borrower to pay default interest pursuant to Section 2.13(c), (iii) postpone the maturity of any Loan (other than pursuant to (A) a Sale Transaction Qualified Extension or (B) an extension of the Outside Date up to ninety (90) days pursuant to the definition thereof, which in each case of clauses (A) or (B), shall require approval by the Required Supermajority Lenders), or any date for the payment of any interest or fees payable hereunder, or reduce the amount of, waive or excuse any such payment, or postpone the scheduled date of expiration of any Commitment (it being understood that a waiver of any Default, Event of Default, mandatory prepayment or mandatory reduction of the Commitments shall not constitute an extension of any maturity date, any scheduled amortization payment or the date for payment of any interest or fees), without the written consent of each Lender directly and adversely affected thereby, (iv) change any of the provisions of this Section without the written consent of each Lender directly and adversely affected thereby; provided that any such change which is in favor of a Class of Lenders holding Loans maturing after the maturity of other Classes of Lenders (and only takes effect after the maturity of such other Classes of Loans or Commitments) will require the written consent of the Required Lenders with respect to each Class directly and adversely affected thereby, (v) change the percentage set forth in the definition of "Required Lenders", "Majority in Interest" or any other provision of any Loan Document specifying the number or percentage of Lenders (or Lenders of any Class) required to waive, amend or modify any rights thereunder or make any determination or grant any consent thereunder, without the written consent of each Lender (or each Lender of such Class, as the case may be), (vi) subordinate (or have the effect of subordinating) Liens securing any material portion of the Collateral, without the written consent of each Lender directly and adversely affected thereby, (vii) release (or have the effect of releasing) all or substantially all or any material portion of the value of the Guarantees under the Guaranty (except as expressly provided in the Loan Documents) without the written consent of each Lender (other than a Defaulting Lender), (viii) release (or have the effect of releasing) all or substantially all or any material portion of the Collateral from the Liens of the Security Documents, without the written consent of each Lender (other than a Defaulting Lender) except as expressly provided in the Loan Documents, (ix) change any pro rata sharing and/or payment provisions or any payment "waterfall" herein or in any other Loan Document, without the written consent of each Lender directly and adversely affected thereby, or (x) change any provisions of any Loan Document in a manner that by its terms adversely affects the rights in respect of payments due to Lenders holding Loans of any Class differently than those holding Loans of any other Class, without the written consent of the Required Lenders with respect to any Class directly and adversely affected thereby; provided further that (A) no such agreement shall amend, modify or otherwise affect the rights, duties, immunities, or indemnities of the Administrative Agent or the Collateral Agent without the prior written consent of the Administrative Agent or the Collateral Agent, as applicable, (B) any provision of this Agreement or any other Loan Document may be amended by an agreement in writing entered into by the Lead Borrower and the Administrative Agent in order (i) to comply with local law or advice of local counsel, (ii) to cure any (1) ambiguity, omission, defect or inconsistency or technical or obvious error or (2) mistake, the cure of which mistake would not be adverse to the Lenders, in the good faith determination of the Lead Borrower and counsel to the Required Lenders, so long as the Required Lenders shall not have provided written objection thereto to the Administrative Agent within five days of receipt of notice thereof, or (iii) to add any provisions to any Loan Documents that, in the reasonable judgment of counsel to the Required Lenders, are more favorable to the Lenders (or to the applicable subset thereof), so long as the Required Lenders shall not have provided written objection thereto to the Administrative Agent within five days of receipt of notice thereof, (C) any waiver, amendment or modification of this Agreement that by its terms affects the rights or duties under this Agreement of Lenders holding Loans or Commitments of a particular Class (but not the Lenders holding Loans or Commitments of any other Class) may be effected by an agreement or agreements in writing entered into by the Lead Borrower and the requisite percentage in interest of the affected Class of Lenders that would be required to consent thereto under this Section if such Class of Lenders were the only Class of Lenders hereunder at the time and (D) no Lenders other than the Lenders holding a Majority in Interest of the applicable Class shall be required to waive, amend,

supplement or modify the conditions precedent to any Borrowings of Loans of such Class.  Notwithstanding the foregoing, (a) this Agreement may be amended (or amended and restated) with the written consent of the Required Lenders, the Administrative Agent and the Lead Borrower (i) to add one or more additional credit facilities to this Agreement and to permit the extensions of credit from time to time outstanding thereunder and the accrued interest and fees in respect thereof to share ratably in the benefits of this Agreement and the other Loan Documents and (ii) to include appropriately the Lenders holding such credit facilities in any determination of the Required Lenders on substantially the same basis as the Lenders prior to such inclusion and (b) guarantees, Security Documents and related documents in connection with this Agreement may be in a form reasonably determined by the Administrative Agent (acting at the direction of the Required Lenders) and may be, together with this Agreement and the other Loan Documents, amended and waived with the consent of the Administrative Agent (acting at the direction of the Required Lenders) at the request of the Lead Borrower without the need to obtain the consent of any other Lender if such amendment or waiver is delivered in order (i) to comply with local law or advice of local counsel, (ii) to cure any (1) ambiguity, omission, defect or inconsistency or technical or obvious error or (2) mistake, the cure of which mistake would not be adverse to the Lenders, in the good faith determination of the Lead Borrower and counsel to the Required Lenders, so long as the Required Lenders shall not have provided written objection thereto to the Administrative Agent within five days of receipt of notice thereof or (iii) to cause such guarantee, collateral security document or other document to be consistent with this Agreement and the other Loan Documents.

(c)     In connection with any proposed amendment, modification, waiver or termination (a "Proposed Change") requiring the consent of all Lenders or all directly and adversely affected Lenders, if the consent of the Required Lenders (and, to the extent any Proposed Change requires the consent of Lenders holding Loans of any Class pursuant to clause (iv), (v) or (ix) of paragraph (b) of this Section 9.02, the consent of a Majority in Interest of the outstanding Loans and unused Commitments of such Class) to such Proposed Change is obtained, but the consent to such Proposed Change of other Lenders whose consent is required is not obtained (any such Lender whose consent is not obtained as described in paragraph (b) of this Section 9.02 being referred to as a "Non-Consenting Lender"), then, the Borrower may, at its sole expense and effort, upon notice to such Non-Consenting Lender and the Administrative Agent, (i) if no Event of Default under Sections 7.01(a) or (b) exists, permanently prepay all of the Loans of any Class owing by it to, and terminate any Commitments of, such Non-Consenting Lender or (ii) require such Non-Consenting Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in Section 9.04), all its interests, rights and obligations under this Agreement to an Eligible Assignee that shall assume such obligations (which Eligible Assignee may be another Lender, if a Lender accepts such assignment), provided that (a) the Borrower shall have received the prior written consent of the Administrative Agent to the extent such consent would be required under Section 9.04(b) for an assignment of Loans or Commitments, as applicable, which consent shall not unreasonably be withheld, conditioned or delayed, (b) such Non-Consenting Lender shall have received payment of an amount equal to the outstanding par principal amount of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder (including pursuant to Section 2.11(a)(i)) from the Eligible Assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts) and (c) unless waived, the Borrower or such Eligible Assignee shall have paid to the Administrative Agent the processing and recordation fee specified in Section 9.04(b).

(d)     Notwithstanding anything in this Agreement or the other Loan Documents to the contrary, Term Loans of any Lender that is at the time a Defaulting Lender shall not have any voting or approval rights under the Loan Documents and shall be excluded in determining whether all Lenders (or all Lenders of a Class), all affected Lenders (or all affected Lenders of a Class), a Majority in Interest of Lenders of any Class or the Required Lenders have taken or may take any action hereunder (including any consent to any amendment or waiver pursuant to this Section 9.02); provided that (x) the Commitment of any Defaulting Lender may not be increased or extended without the consent of such Lender and (y) any

waiver, amendment or modification requiring the consent of all Lenders or each affected Lender that affects any Defaulting Lender more adversely than other affected Lenders shall require the consent of such Defaulting Lender.

SECTION 9.03    Expenses; Indemnity; Damage Waiver.

(a)    The Borrower shall pay, if the Effective Date occurs and the Transactions have been consummated, (i) all reasonable and documented out-of-pocket costs and expenses incurred by the Agents and the Required Lenders (limited, in the case of legal fees and expenses, to the reasonable and documented fees, disbursements and other charges of (A) Seward & Kissel LLP, as counsel to the Administrative Agent, and (B) Paul Hastings LLP, as counsel to the Required Lenders and, if reasonably necessary, of a single firm of local counsel to the Agents, taken as a whole and to a single firm of local counsel to the Required Lenders, taken as a whole, in each case, in each relevant material jurisdiction (which may include a single special counsel acting in multiple jurisdictions) and of such other counsel retained with the Lead Borrower's prior written consent (such consent not to be unreasonably withheld, conditioned or delayed), in each case incurred in connection with the DIP Facility, and the preparation, execution, delivery and administration of the Loan Documents or any amendments, modifications or waivers of the provisions thereof and including the reasonable and documented fees and expense of Lazard Frères & Co., as financial advisor to the Required Lenders) and (ii) all reasonable and documented out-of-pocket expenses incurred by each Agent or any Lender, including the fees, charges and disbursements of counsel for such Agent and the Lenders, in connection with the preservation, enforcement or protection of any rights or remedies (A) in connection with the Loan Documents (including all such costs and expenses incurred during any legal proceeding, including any proceeding under any Debtor Relief Laws), including its rights under this Section 9.03 or (B) in connection with the Loans made hereunder, including all such out-of-pocket costs and expenses incurred during any workout, restructuring or negotiations in respect of such Loans; provided that such counsel shall be limited to one lead counsel and one local counsel to the Agents, taken as a whole, and one lead counsel and one local counsel to the Lenders, taken as a whole, in each case, in each applicable jurisdiction (exclusive of any reasonably necessary special counsel) (and, in the case of a conflict of interest, where each Agent or any Lender affected by such conflict notifies the Lead Borrower of the existence of such conflict and thereafter retains its own counsel, one additional counsel) and such other counsel as may be retained with the Lead Borrower's consent (such consent not to be unreasonably withheld or delayed).  Notwithstanding the foregoing, the expenses of counsel shall not include any allocated costs of in-house counsel.

(b)    The Borrower shall indemnify each Agent, each Lender and each Related Party of any of the foregoing Persons (but excluding any such Person to the extent such Person is acting as a financial advisor to the Investors in connection with the Transactions (any such Person to the extent acting in such capacity, an "Excluded Party")) (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from (without duplication), any and all losses, claims, damages, liabilities and reasonable and documented out-of-pocket fees and expenses (limited, in the case of legal fees and expenses, to the reasonable and documented fees, charges and disbursements of one counsel for the Agents, to the extent reasonably necessary, a single firm of local counsel in each relevant material jurisdiction (which may include a single special counsel acting in multiple jurisdictions) for the Agents, taken as a whole, and one counsel for all other Indemnitees, to the extent reasonably necessary, a single firm of local counsel in each relevant material jurisdiction (which may include a single special counsel acting in multiple jurisdictions) for all such Indemnitees, taken as a whole (and, solely in the case of an actual or potential conflict of interest, where the Indemnitee affected by such conflict notifies the Lead Borrower of the existence of such conflict and thereafter retains its own counsel after receipt of consent from the Lead Borrower (not to be unreasonably withheld or delayed), of one additional firm of counsel for the affected Indemnitees, and, if reasonably necessary, one additional firm of local counsel in each appropriate material jurisdiction (which may include a single special counsel acting in multiple jurisdictions) for such affected Indemnitees, taken

119

as a whole)), incurred by or asserted against any Indemnitee by any third party or by the Borrower or any Subsidiary arising out of, in connection with, or as a result of any claim, litigation, investigation or proceeding (including any inquiry or investigation), regardless of whether any such Indemnitee is a party thereto, whether based on contract, tort or any other theory, relating to (i) the execution or delivery of this Agreement, any Loan Document or any other agreement or instrument contemplated hereby or thereby, the performance by the parties to the Loan Documents of their respective obligations thereunder, the consummation of the Transactions or any other transactions contemplated thereby, the syndication of the DIP Facility or the enforcement of any obligations of a Loan Party hereunder or under any other Loan Document, (ii) any Loan or the use of the proceeds therefrom or (iii) to the extent in any way arising from or relating to any of the foregoing, any actual or alleged presence or Release or threat of Release of Hazardous Materials on, at, to or from any property currently or formerly owned or operated by the Borrower or any Subsidiary, or any other Environmental Liability related in any way to the Borrower or any Subsidiary; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities, costs or related expenses (w) resulted from the gross negligence or willful misconduct of such Indemnitee or its Related Parties acting on behalf of, or at the direction of, the Indemnitee (in each case, as determined by a court of competent jurisdiction in a final and non-appealable judgment), (x) (other than with respect to the Agents and their Related Parties) resulted from a material breach of the Loan Documents by, or the bad faith of, such Indemnitee or its Related Parties acting on behalf of, or at the direction of, the Indemnitees (in each case, as determined by a court of competent jurisdiction in a final and non-appealable judgment) or (y) arise from disputes between or among Indemnitees (other than disputes involving claims against the Agents in their respective capacities) that does not arise from an act or omission by the Borrower or any Subsidiary. This <u>Section 9.03</u> shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.

(c)       To the extent that the Borrower fails to pay any amount required to be paid by it to any Agent or any Lender under paragraph <u>(a)</u> or <u>(b)</u> of this <u>Section 9.03</u>, each Lender severally agrees to pay to such Agent or such Lender, as the case may be, such Lender's pro rata share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount; <u>provided</u> that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against such Agent or such Lender in its capacity as such. For purposes hereof, a Lender's "pro rata share" shall be determined based upon its share of the aggregate outstanding Term Loans and unused Commitments at such time (or if all such amounts have been reduced to zero, at the time immediately preceding such reduction). The obligations of the Lenders under this paragraph <u>(c)</u> are subject to the last sentence of <u>Section 2.02(a)</u> (which shall apply *mutatis mutandis* to the Lenders' obligations under this paragraph <u>(c)</u>).

(d)       To the extent permitted by applicable law, (i) the Borrower shall not assert, and each hereby waives, any claim against any Indemnitee for any direct or actual damages arising from the use by unintended recipients of information or other materials distributed to such unintended recipients by such Indemnitee through telecommunications, electronic or other information transmission systems (including the Internet) in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby; <u>provided</u> that such indemnity shall not, as to any Indemnitee, be available to the extent that such direct or actual damages are determined by a court of competent jurisdiction by final, non-appealable judgment to have resulted from the gross negligence or willful misconduct of, or a material breach of the Loan Documents by, such Indemnitee or its Related Parties and (ii) no Loan Party (or any Affiliate thereof), Investor (or any Affiliate thereof), or Indemnitee shall be liable for any special, indirect, consequential, incidental, exemplary or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the Financing Transactions, any Loan or the use of the proceeds thereof; <u>provided</u> that nothing in this paragraph shall limit any Loan Party's (or any Affiliate thereof) or

Investor's (or any Affiliate thereof) indemnity and reimbursement obligations to the extent that such indirect, special, punitive or consequential damages are included in any claim by a third party unaffiliated with the applicable Indemnitee with respect to which the applicable Indemnitee is entitled to indemnification as set forth in this Section 9.03.

(e)    All amounts due under this Section 9.03 shall be payable not later than thirty (30) Business Days after written demand therefor; provided, however, that any Indemnitee shall promptly refund an indemnification payment received hereunder to the extent that there is a final judicial determination that such Indemnitee was not entitled to indemnification with respect to such payment pursuant to this Section 9.03.

SECTION 9.04    Successors and Assigns.

(a)    The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender and the acknowledgement of the Administrative Agent (and any attempted assignment or transfer by the Borrower without such consent shall be null and void), (ii) no assignment shall be made to any Defaulting Lender or any of its Subsidiaries, or any Persons who, upon becoming a Lender hereunder, would constitute any of the foregoing Persons described in this clause (ii) and (iii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section 9.04. Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants (to the extent provided in paragraph (c) of this Section 9.04), the Indemnitees and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    (i) Subject to the conditions set forth in paragraph (b)(ii) below, any Lender may assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it) with the prior written consent (such consent (except with respect to assignments to competitors of the Borrower) not to be unreasonably withheld, conditioned or delayed) of (A) the Lead Borrower; provided that no consent of the Lead Borrower shall be required for an assignment (x) by a Term Lender to any other Lender, any Affiliate of a Lender or any Approved Fund, or (y) if an Event of Default with respect to the Lead Borrower has occurred and is continuing (other than in respect of a proposed assignment to a Disqualified Lender); provided further that no assignee contemplated by the immediately preceding proviso shall be entitled to receive any greater payment under Section 2.15 or Section 2.17 than the applicable assignor would have been entitled to receive with respect to the assignment made to such assignee, unless the assignment to such assignee is made with the Lead Borrower's prior written consent; provided further that the Lead Borrower shall have the right to withhold its consent to any assignment if in order for such assignment to comply with applicable law, the Lead Borrower or any Subsidiary would be required to obtain the consent of, or make any filing or registration with, any Governmental Authority and (B) the Administrative Agent; provided that no consent of the Administrative Agent shall be required for an assignment of all or any portion of a Loan or Term Commitment to (x) a Lender, an Affiliate of a Lender or an Approved Fund or (y) subject to Section 9.04(g), the Borrower or any of its Subsidiaries. Notwithstanding anything in this Section 9.04 to the contrary, if the Lead Borrower has not given the Administrative Agent written notice of its objection to an assignment of Loans within five (5) Business Days after written notice of such assignment, the Lead Borrower shall be deemed to have consented to such assignment (other than in respect of a proposed assignment to a Disqualified Lender).

(i)     Assignments shall be subject to the following additional conditions: (A) except in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund or an assignment of the entire remaining amount of the assigning Lender's Commitment or Loans of any Class, the amount of the Commitment or Loans of the assigning Lender subject to each such assignment (determined as of the trade date specified in the Assignment and Assumption with respect to such assignment or, if no trade date is so specified, as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall not be less than $2,500,000 (and integral multiples of $500,000 in excess thereof), unless the Administrative Agent otherwise consents (such consent not to be unreasonably withheld, conditioned or delayed), (B) each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement; provided that (x) this clause (B) shall not be construed to prohibit assignment of a proportionate part of all the assigning Lender's rights and obligations in respect of one Class of Commitments or Loans, (y) the Fronting Lender may not assign New Money Term Loans separate from any New Money Term Loan Commitments held by it at the time of such assignment and (z) any Assigning Lender seeking to assign New Money Term Loans or New Money Term Loan Commitments must also assign a proportionate amount of New Money Term Loan Commitments (in the case of an assignment of New Money Term Loans) or New Money Term Loans (in the case of an assignment of New Money Term Loan Commitments) held by such Assigning Lender; provided, further, this clause (z) shall not apply where an Assigning Lender is assigning such New Money Term Loans or New Money Term Loan Commitments, as applicable, to a Lender, an Affiliate of a Lender or an Approved Fund, (C) the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption via an electronic settlement system acceptable to the Administrative Agent or, if previously agreed with the Administrative Agent, manually execute and deliver to the Administrative Agent an Assignment and Assumption, and, in each case, together with a processing and recordation fee of $3,500; provided that the Administrative Agent, in its sole discretion, may elect to waive or reduce such processing and recordation fee; provided further that any such Assignment and Assumption shall include a representation by the assignee that the assignee is not a Disqualified Lender or an Affiliate of a Disqualified Lender; provided further that assignments made pursuant to Section 2.19(b) or Section 9.02(c) shall not require the signature of the assigning Lender to become effective, (D) the assignee, if it shall not be a Lender, shall deliver to the Lead Borrower and the Administrative Agent any tax forms required by Section 2.17(e) and an Administrative Questionnaire in which the assignee designates one or more credit contacts to whom all syndicate-level information (which may contain Material Non-Public Information about the Borrower, the other Loan Parties and their Related Parties or their respective securities) will be made available and who may receive such information in accordance with the assignee's compliance procedures and applicable laws, including Federal and state securities laws; and (E) no assignment may be made to any Person who is not a party to the Restructuring Support Agreement or who does not, concurrently with the closing of such assignment, become a party to the Restructuring Support Agreement; provided however that in no event shall any Agent be responsible or liable for monitoring or confirming whether any assignee or proposed assignee is a party, or will subsequently become a party, to the Restructuring Support Agreement.

(ii)     Subject to acceptance and recording thereof pursuant to paragraph (b)(v) of this Section 9.04, from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the

benefits of (and subject to the obligations and limitations of) Sections 2.15, 2.16, 2.17 and 9.03 and to any fees payable hereunder that have accrued for such Lender's account but have not yet been paid). Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 9.04 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (c)(i) of this Section 9.04.

(iii)    The Administrative Agent, acting for this purpose as a non-fiduciary agent of the Borrower, shall maintain at one of its offices a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitment of, and principal and interest amounts of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register"). The entries in the Register shall be conclusive absent manifest error, and the Borrower, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. In addition, the Administrative Agent shall maintain on the Register information regarding the designation, and revocation of designation, of any Lender as a Defaulting Lender. The Register shall be available for inspection by the Borrower, the Collateral Agent and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(iv)    Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an assignee, the assignee's completed Administrative Questionnaire and any tax forms required by Section 2.17(e) (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in paragraph (b) of this Section 9.04 and any written consent to such assignment required by paragraph (b) of this Section 9.04, the Administrative Agent shall accept such Assignment and Assumption and record the information contained therein in the Register. No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph.

(v)    The words "execution," "signed," "signature" and words of like import in any Assignment and Assumption shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act or any other similar state laws based on the Uniform Electronic Transactions Act.

(c)    (i) Any Lender may, without the consent of the Borrower or the Administrative Agent, sell participations to one or more banks or other Persons (other than to a Person that is not an Eligible Assignee) (a "Participant"), that are a party to the Restructuring Support Agreement or that, concurrently with the closing of such participation, becomes a party to the Restructuring Support Agreement, in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans owing to it); provided that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (C)  the Borrower, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and any other Loan Documents and to approve any amendment, modification or waiver of any provision of this Agreement and any other Loan Documents; provided that such agreement or instrument may provide that

123

such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in the first proviso to Section 9.02(b) that directly and adversely affects such Participant. Subject to paragraph (c)(iii) of this Section, the Borrower agrees that each Participant shall be entitled to the benefits of Sections 2.15, 2.16 and 2.17 (subject to the obligations and limitations thereof and Section 2.19, it being understood that any tax forms required by Section 2.17(e) shall be provided solely to the participating Lender) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section 9.04. To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 9.08 as though it were a Lender; provided that such Participant agrees to be subject to Section 2.18(c) as though it were a Lender.

(i)      Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and related stated interest amounts) of each participant's interest in the Loans or other obligations under this Agreement (the "Participant Register"). The entries in the Participant Register shall be conclusive, absent manifest error, and the parties hereto shall treat each person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. No Lender shall have any obligation to disclose all or any portion of its Participant Register to any Person (including the identity of any Participant or any information relating to a Participant's interest in any Commitments, Loans or other obligations under the Loan Documents) except to the extent that the relevant parties, acting reasonably and in good faith, determine that such disclosure is necessary in connection with a Tax audit or other proceeding to establish that any Loan or other obligation under the Loan Documents is in registered form under Section 5f.103-1(c) and proposed Section 1.163-5(b) of the United States Treasury regulations.

(ii)      A Participant shall not be entitled to receive any greater payment under Section 2.15, 2.16 or 2.17 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent (not to be unreasonably withheld, conditioned or delayed).

(d)      Any Lender may, without the consent of the Borrower or the Administrative Agent, at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or other "central" bank, and this Section 9.04 shall not apply to any such pledge or assignment of a security interest, provided that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(e)      In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to the Administrative Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or subparticipations, or other compensating actions, including funding, with the consent of the Lead Borrower and the Administrative Agent, the applicable pro rata share of Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to (x) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Agents or any Lender hereunder (and interest accrued thereon) and (y) acquire (and fund as appropriate) its full *pro rata* share of all Loans. Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under applicable law without compliance with the provisions of

this paragraph, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

(f)    [Reserved].

(g)    [Reserved].

(h)    Notwithstanding the foregoing, no assignment may be made or participation sold to a Disqualified Lender without the prior written consent of the Lead Borrower.  Upon inquiry by any Lender to the Administrative Agent as to whether a specified potential assignee or prospective participant is on the list of Disqualified Lenders, the Administrative Agent shall be permitted to make the list of Disqualified Lenders available to such Lender for inspection.  Notwithstanding anything contained in this Agreement or any other Loan Document to the contrary, if any Lender was a Disqualified Lender at the time of the assignment of any Loans or Commitments to such Lender, following written notice from the Lead Borrower to such Lender and the Administrative Agent: (1) such Lender shall promptly assign all Loans and Commitments held by such Lender to an Eligible Assignee; provided that (A) the Administrative Agent shall not have any obligation to the Borrower, such Lender or any other Person to find such a replacement Lender, (B) the Borrower shall not have any obligation to such Disqualified Lender or any other Person to find such a replacement Lender or accept or consent to any such assignment to itself or any other Person subject to the Lead Borrower's consent in accordance with Section 9.04(b)(i) and (C) the assignment of such Loans and/or Commitments, as the case may be, shall be at par plus accrued and unpaid interest and fees; (2) such Lender shall not have any voting or approval rights under the Loan Documents and shall be excluded in determining whether all Lenders (or all Lenders of any Class), all affected Lenders (or all affected Lenders of any Class), a Majority in Interest of Lenders of any Class or the Required Lenders have taken or may take any action hereunder (including any consent to any amendment or waiver pursuant to Section 9.02); provided that (x) the Commitment of any Disqualified Lender may not be increased or extended without the consent of such Lender and (y) any waiver, amendment or modification requiring the consent of all Lenders or each affected Lender that affects any Disqualified Lender adversely and in a manner that is disproportionate to other affected Lenders shall require the consent of such Disqualified Lender; and (3) no Disqualified Lender is entitled to receive information provided solely to Lenders by the Administrative Agent or any Lender or will be permitted to attend or participate in meetings attended solely by the Lenders and the Administrative Agent, other than the right to receive notices or Borrowings, notices or prepayments and other administrative notices in respect of its Loans or Commitments required to be delivered to Lenders pursuant to Article II.

SECTION 9.05    Survival.

All covenants, agreements, representations and warranties made by the Loan Parties in the Loan Documents and in the certificates or other instruments delivered in connection with or pursuant to any Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of the Loan Documents and the making of any Loans, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Administrative Agent or any Lender may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any fee or any other amount payable under this Agreement is outstanding and unpaid and so long as the Commitments have not expired or terminated. The provisions of Sections 2.15, 2.16, 2.17 and 9.03 and Article VIII shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans and all other amounts payable hereunder, the expiration or termination of the Commitments or the termination of this Agreement or any provision hereof or the resignation or removal of any Agent.

125

SECTION 9.06    Counterparts; Integration; Effectiveness.

This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement, the other Loan Documents and any separate letter agreements with respect to fees payable to the Agents or the syndication of the Loans and Commitments (including, without limitation, the Fronting Fee Letter) constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns. Delivery of an executed counterpart of a signature page of (x) this Agreement, (y) any other Loan Document and/or (z) any document, amendment, approval, consent, information, notice, certificate, request, statement, disclosure or authorization related to this Agreement, any other Loan Document and/or the transactions contemplated hereby and/or thereby (each an "Ancillary Document") that is an Electronic Signature transmitted by telecopy, emailed pdf. or any other electronic means that reproduces an image of an actual executed signature page shall be effective as delivery of a manually executed counterpart of this Agreement, such other Loan Document or such Ancillary Document, as applicable.  The words "execution," "signed," "signature," "delivery," and words of like import in or relating to this Agreement, any other Loan Document and/or any Ancillary Document shall be deemed to include Electronic Signatures, deliveries or the keeping of records in any electronic form (including deliveries by telecopy, emailed pdf. or any other electronic means that reproduces an image of an actual executed signature page), each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be; provided that nothing herein shall require the Administrative Agent to accept Electronic Signatures in any form or format without its prior written consent and pursuant to procedures approved by it; provided, further, without limiting the foregoing, (i) to the extent the Administrative Agent has agreed to accept any Electronic Signature, the Administrative Agent and each of the Lenders shall be entitled to rely on such Electronic Signature purportedly given by or on behalf of the Borrower or any other Loan Party without further verification thereof and without any obligation to review the appearance or form of any such Electronic Signature and (ii) upon the request of the Administrative Agent (whether on its own behalf or on behalf of any Lender), any Electronic Signature shall be promptly followed by a manually executed counterpart.  Without limiting the generality of the foregoing, the Borrower and each Loan Party hereby (i) agrees that, for all purposes, including without limitation, in connection with any workout, restructuring, enforcement of remedies, bankruptcy proceedings or litigation among the Administrative Agent, the Lenders and the Loan Parties, Electronic Signatures transmitted by telecopy, emailed pdf. or any other electronic means that reproduces an image of an actual executed signature page and/or any electronic images of this Agreement, any other Loan Document and/or any Ancillary Document shall have the same legal effect, validity and enforceability as any paper original, (ii) the Administrative Agent and each of the Lenders may, at its option, create one or more copies of this Agreement, any other Loan Document and/or any Ancillary Document in the form of an imaged electronic record in any format, which shall be deemed created in the ordinary course of such Person's business, and destroy the original paper document (and all such electronic records shall be considered an original for all purposes and shall have the same legal effect, validity and enforceability as a paper record), (iii) waives any argument, defense or right to contest the legal effect, validity or enforceability of this Agreement, any other Loan Document and/or any Ancillary Document based solely on the lack of paper original copies of this Agreement, such other Loan Document and/or such Ancillary Document, respectively, including with respect to any signature pages thereto and (iv) waives any claim against the Administrative Agent, any Lender or any Affiliates or Related Parties of any of the foregoing for any losses, claims (including intraparty claims), demands, damages or liabilities of any kind arising solely from the Administrative Agent's and/or any Lender's reliance on or use of Electronic

Signatures and/or transmissions by telecopy, emailed pdf. or any other electronic means that reproduces an image of an actual executed signature page, including any losses, claims (including intraparty claims), demands, damages or liabilities of any kind arising as a result of the failure of any Loan Party to use any available security measures in connection with the execution, delivery or transmission of any Electronic Signature.

SECTION 9.07    Severability.

Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction. Without limiting the foregoing provisions of this Section 9.07, if and to the extent that the enforceability of any provisions in this Agreement relating to Defaulting Lenders shall be limited by Debtor Relief Laws, as determined in good faith by the Administrative Agent then such provisions shall be deemed to be in effect only to the extent not so limited.

SECTION 9.08    Right of Setoff.

If an Event of Default shall have occurred and be continuing, each Lender is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lender to or for the credit or the account of the Borrower against any of and all the obligations of the Borrower then due and owing under this Agreement held by such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement and although such obligations are owed to a branch or office of such Lender different from the branch or office holding such deposit or obligated on such Indebtedness; provided that in the event that any Defaulting Lender shall exercise any such right of setoff, (x) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of Section 2.22 and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent and the Lenders and (y) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Secured Obligations owing to such Defaulting Lender as to which it exercised such right of setoff. The applicable Lender shall notify the Borrower and the Administrative Agent of such setoff and application; provided that any failure to give or any delay in giving such notice shall not affect the validity of any such setoff and application under this Section. The rights of each Lender under this Section are in addition to other rights and remedies (including other rights of setoff) that such Lender may have. Notwithstanding the foregoing, no amount set off from any Loan Party (other than the Borrower) shall be applied to any Excluded Swap Obligation of such Loan Party (other than the Borrower).

SECTION 9.09    Governing Law; Jurisdiction; Consent to Service of Process.

(a)    This Agreement shall be construed in accordance with and governed by the laws of the State of New York and, as may be applicable, the Bankruptcy Code, regardless of the laws that might otherwise govern under applicable principles of conflicts of laws thereof.

(b)    Each party hereto hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Bankruptcy Court and, solely to the extent that the Bankruptcy Court does not have (or abstains from exercising) jurisdiction over any matter, the Supreme Court of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising

out of or relating to any Loan Document, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in the Bankruptcy Court and, to the extent the Bankruptcy Court does not have (or abstains from exercising) jurisdiction, such New York State or, to the extent permitted by law, in such Federal court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in any Loan Document shall affect any right that the Administrative Agent or any Lender may otherwise have to bring any action or proceeding relating to any Loan Document against the Borrower or its properties in the courts of any jurisdiction.

(c)    Each party hereto hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection that it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to any Loan Document in any court referred to in paragraph (b) of this Section 9.09. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)    Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 9.01. Nothing in any Loan Document will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

SECTION 9.10    WAIVER OF JURY TRIAL.

EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO ANY LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 9.10.

SECTION 9.11    Headings.

Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

SECTION 9.12    Confidentiality.

(a)    Each of the Administrative Agent and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (i) to its and its Affiliates' directors, officers, employees, trustees and agents, including accountants, legal counsel and other agents and advisors, in each case, who need to know such Information in connection with the Transactions (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential and any failure of such Persons acting on behalf of the Administrative Agent or the relevant Lender to comply with this Section 9.12 shall constitute a breach of this Section 9.12 by the Administrative Agent or the relevant

Lender, as applicable), (ii) to the extent requested by any governmental authority or self-regulatory authority having jurisdiction over the Administrative Agent, any Lender or any Affiliates of any of the foregoing, as applicable, or, based on reasonable advice of counsel, to the extent required by (A) an order of any court or administrative agency or in any pending legal, judicial or administrative proceeding, (B) applicable law or by any subpoena or similar compulsory legal process or (C) in connection with the exercise of remedies or enforcement of rights hereunder in any suit, action or proceeding relating to this Agreement; provided that (x) solely to the extent permitted by law and other than in connection with routine audits and reviews by bank accountants or governmental or self-regulatory authorities exercising examination or regulatory authority, each Lender and the Administrative Agent shall notify the Lead Borrower as promptly as practicable of any such requested or required disclosure and (y) in the case of clause (ii) only, each Lender and the Administrative Agent shall use commercially reasonable efforts to ensure that such Information is kept confidential in connection with the exercise of such remedies, and provided further that in no event shall any Lender or the Administrative Agent be obligated or required to return any materials furnished by the Borrower or any of its subsidiaries, (iii) to any other party to this Agreement, (iv) subject to an agreement containing confidentiality undertakings substantially similar to those of this Section 9.12, to (A) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement, (B) any direct or indirect contractual counterparty to any Swap Agreement or derivative transaction relating to any Loan Party or its subsidiaries and its obligations under the Loan Documents or (C) any pledgee referred to in Section 9.04(d), (v) if required by any rating agency in connection with obtaining a rating; provided that prior to any such disclosure, such rating agency shall have agreed in writing to maintain the confidentiality of such Information, (vi) to service providers (including any numbering, administration or settlement service providers) providing administrative and ministerial services solely in connection with the syndication and administration of the Loan Documents and the DIP Facility (e.g., identities of parties, maturity dates, interest rates, etc.) on a confidential basis, (vii) to the extent such Information (x) becomes publicly available other than as a result of a breach of this Section 9.12 or otherwise by reason of improper disclosure by the Administrative Agent any Lender or any Affiliates or Related Parties of any of the foregoing (including the Persons referred to in clauses (i) above) in violation of any confidentiality obligations owing to the Loan Parties or any subsidiaries, Affiliates or Related Parties of any of the foregoing or (y) becomes available to the Administrative Agent, any Lender or any of their respective Affiliates on a non-confidential basis from a source other than the Borrower or any subsidiary, which source is not known by the recipient of such information to be subject to a confidentiality obligation, or (viii) to the extent that such information was already in the possession of the Administrative Agent or any Lender prior to any duty or other undertaking of confidentiality or is independently developed by the Administrative Agent or any Lender without the use of such information and without otherwise violating the terms of this Section 9.12. For the purposes hereof, "Information" means all information received from or on behalf of the Borrower or any of its subsidiaries relating to the Borrower, any of its subsidiaries or their business. Any Person required to maintain the confidentiality of Information as provided in this Section 9.12 shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information. Notwithstanding the foregoing, other than as set forth in the proviso below, (x) no such information shall be disclosed to a Disqualified Lender or Excluded Party that constitutes a Disqualified Lender or Excluded Party, as applicable, at the time of such disclosure without the Lead Borrower's prior written consent and (y) in connection with any proposed assignment of Loans and/or Commitments in accordance with Section 9.04, upon request by the applicable potential assignee therefor, the applicable potential assigning Lender may disclose the list of Disqualified Lenders to such potential assignee solely for purposes of enabling such assignee to make a representation in its applicable Assignment and Assumption that such prospective assignee is an Eligible Assignee, provided, however, that, subject to an agreement containing confidentiality undertakings substantially similar to those of this Section 9.12, the list of Disqualified Lenders may be disclosed to any bona fide potential assignee or Participant, so that such potential assignee or Participant can represent and warrant that it is neither a Disqualified Lender nor an Affiliate of a Disqualified Lender.

(b)	EACH LENDER ACKNOWLEDGES THAT INFORMATION (AS DEFINED IN THIS SECTION 9.12) FURNISHED TO IT PURSUANT TO THIS AGREEMENT MAY INCLUDE MATERIAL NON-PUBLIC INFORMATION CONCERNING THE BORROWER, THE LOAN PARTIES AND THEIR RELATED PARTIES OR THEIR RESPECTIVE SECURITIES AND CONFIRMS THAT IT HAS DEVELOPED COMPLIANCE PROCEDURES REGARDING THE USE OF MATERIAL NON-PUBLIC INFORMATION AND THAT IT WILL HANDLE SUCH MATERIAL NON-PUBLIC INFORMATION IN ACCORDANCE WITH THOSE PROCEDURES AND APPLICABLE LAW, INCLUDING FEDERAL AND STATE SECURITIES LAWS.

(c)	ALL INFORMATION, INCLUDING REQUESTS FOR WAIVERS AND AMENDMENTS FURNISHED BY THE BORROWER OR THE ADMINISTRATIVE AGENT PURSUANT TO, OR IN THE COURSE OF ADMINISTERING, THIS AGREEMENT, WILL BE SYNDICATE-LEVEL INFORMATION, WHICH MAY CONTAIN MATERIAL NON-PUBLIC INFORMATION ABOUT THE BORROWER, THE LOAN PARTIES AND THEIR RELATED PARTIES OR THEIR RESPECTIVE SECURITIES. ACCORDINGLY, EACH LENDER REPRESENTS TO THE BORROWER AND THE ADMINISTRATIVE AGENT THAT IT HAS IDENTIFIED IN ITS ADMINISTRATIVE QUESTIONNAIRE A CREDIT CONTACT WHO MAY RECEIVE INFORMATION THAT MAY CONTAIN MATERIAL NON-PUBLIC INFORMATION IN ACCORDANCE WITH ITS COMPLIANCE PROCEDURES AND APPLICABLE LAW, INCLUDING FEDERAL AND STATE SECURITIES LAWS.

SECTION 9.13	USA PATRIOT Act.

Each Lender that is subject to the USA PATRIOT Act and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies the Borrower that pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of each Loan Party and other information that will allow such Lender or the Administrative Agent, as applicable, to identify each Loan Party in accordance with the USA PATRIOT Act.

SECTION 9.14	Release of Liens and Guarantees.

(a)	A Loan Party shall automatically be released from its obligations under the Loan Documents (including its Guarantee) and all security interests created by the Security Documents in Collateral owned by such Loan Party shall be automatically released, (1) upon the consummation of any transaction or designation permitted by this Agreement as a result of which such Loan Party ceases to be a Subsidiary (including pursuant to a permitted merger with a Subsidiary that is not a Loan Party) or (2) upon the request of the Lead Borrower, in connection with a transaction permitted under this Agreement (but only a transaction (x) in which such Loan Party becomes a bona fide joint venture and the other Person taking an equity interest in such Loan Party takes such equity interest for fair market value (as determined in good faith by the Lead Borrower) and is not an Investor, an Affiliate of an Investor or an Affiliate of the Borrower (other than as a result of such joint venture), (y) in which such Loan Party does not own or have an exclusive license of any Material Intellectual Property or own any Equity Interests of any Person that owns or is the exclusive licensee of any Material Intellectual Property and (z) the primary purpose (as determined by the Lead Borrower in good faith) of which is not the release of any Guarantee of or Lien on the assets of such Loan Party) as a result of which such Loan Party ceases to be a Wholly Owned Subsidiary. Upon any sale or other transfer by any Loan Party (other than to the Borrower or any Loan Party) of any Collateral in a transaction permitted under this Agreement, or upon the effectiveness of any written consent to the release of the security interest created under any Security Document in any Collateral, the security interests in such Collateral created by the Security Documents shall be automatically released.  Upon the release of any Loan Party from its Guarantee in compliance with this Agreement, the security interest in

any Collateral owned by such Subsidiary created by the Security Documents shall be automatically released. Upon termination of the aggregate Commitments and payment in full of all Secured Obligations (other than contingent indemnification obligations), all obligations under the Loan Documents and all security interests created by the Security Documents shall be automatically released. In connection with any termination or release pursuant to this Section 9.14, each Agent shall execute and deliver to any Loan Party, at such Loan Party's expense, all documents that such Loan Party shall reasonably request and prepare to evidence such termination or release so long as the Borrower or applicable Loan Party shall have provided such Agent a certificate, upon which such Agent may conclusively rely and shall be fully protected in acting in reliance upon, of a Responsible Officer certifying that the release of such Loan Party or Lien or such other release and the transactions related thereto (and the execution and delivery of any instruments or documents by such Agent in connection therewith) are authorized or permitted by the terms of this Agreement and the other Loan Documents.

(b)    The Administrative Agent or the Collateral Agent, as the case may be, will, subject to such Agent's receipt of a certificate of a Responsible Officer of the Borrower as provided for in Section 9.14(a), at the Borrower's expense, execute and deliver to the applicable Loan Party such documents as such Loan Party may reasonably request and prepare to subordinate its Lien on any property granted to or held by the Administrative Agent or the Collateral Agent, as the case may be, under any Loan Document to the holder of any Lien on such property that is permitted by Section 6.02(iv).

(c)    Each of the Lenders, and by accepting the benefits of the Security Documents, each Secured Party that is not a party hereto, irrevocably authorizes the Administrative Agent or the Collateral Agent, as the case may be, to provide any release or evidence of release, termination or subordination contemplated by this Section 9.14. Upon request by the Administrative Agent or the Collateral Agent, as the case may be, at any time, the Required Lenders will confirm in writing the Administrative Agent's authority or that Collateral Agent's authority, as the case may be, to release or subordinate its interest in particular types or items of property, or to release any Loan Party from its obligations under any Loan Document, in each case in accordance with the terms of the Loan Documents and this Section 9.14.

SECTION 9.15    No Advisory or Fiduciary Responsibility.

In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), the Borrower acknowledges and agrees that (i) (A) the arranging and other services regarding this Agreement provided by the Administrative Agent and the Lenders are arm's-length commercial transactions between the Borrower and its Affiliates, on the one hand, and the Administrative Agent and the Lenders on the other hand, (B) the Borrower has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (C) the Borrower is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents; (ii) (A) each of the Administrative Agent and the Lenders is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not and will not be acting as an advisor, agent or fiduciary for the Borrower, any of its Affiliates or any other Person and (B) none of the Administrative Agent and the Lenders has any obligation to the Borrower or any of its Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; and (iii) the Administrative Agent and the Lenders and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Borrower and its Affiliates, and none of the Administrative Agent and the Lenders has any obligation to disclose any of such interests to the Borrower or any of its Affiliates. To the fullest extent permitted by law, the Borrower hereby waives and releases any claims that it may have against the Administrative Agent

and the Lenders with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

SECTION 9.16    Interest Rate Limitation.

Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable law (the "Maximum Rate"). If the Administrative Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Borrower. In determining whether the interest contracted for, charged or received by the Administrative Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable law, (a) characterize any payment that is not principal as an expense, fee or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the obligations hereunder.

SECTION 9.17    [Reserved].

SECTION 9.18    Judgment Currency. If, for the purposes of obtaining judgment in any court, it is necessary to convert a sum due hereunder or under any other Loan Document in one currency into another currency, the rate of exchange used shall be that at which in accordance with the normal banking procedures the Administrative Agent could purchase the first currency with such other currency on the Business Day preceding that on which final judgment is given. The obligation of the Borrower in respect of any such sum due from them to the Administrative Agent or the Lenders hereunder or under the other Loan Documents shall, notwithstanding any judgment in a currency (the "Judgment Currency") other than that in which such sum is denominated in accordance with the applicable provisions of this Agreement (the "Agreement Currency"), be discharged only to the extent that on the Business Day following receipt by the Administrative Agent or the relevant Lender of any sum adjudged to be so due in the Judgment Currency, the Administrative Agent or the relevant Lender may in accordance with the normal banking procedures purchase the Agreement Currency with the Judgment Currency. If the amount of the Agreement Currency so purchased is less than the sum originally due to the Administrative Agent or such Lender from the Borrower in the Agreement Currency, each Borrower agrees, as a separate obligation and notwithstanding any such judgment, to indemnify the Administrative Agent, or the Person to whom such obligation was owing against such loss. If the amount of the Agreement Currency so purchased is greater than the sum originally due to the Administrative Agent or such Lender in such currency, the Administrative Agent or such Lender agrees to return the amount of any excess to the Borrower (or to any other Person who may be entitled thereto under applicable law).

SECTION 9.19    Acknowledgement and Consent to Bail-In of Affected Financial Institutions.

Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Affected Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

1.      the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an Affected Financial Institution; and

2.       the effects of any Bail-In Action on any such liability, including, if applicable:

    i.       a reduction in full or in part or cancellation of any such liability;

    ii.       a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

    iii.       the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of the applicable Resolution Authority.

SECTION 9.20      Acknowledgement Regarding Any Supported QFCs. To the extent that the Loan Documents provide support, through a guarantee or otherwise, for Swap Agreements or any other agreement or instrument that is a QFC (such support "QFC Credit Support" and each such QFC a "Supported QFC"), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "U.S. Special Resolution Regimes") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Loan Documents and any Supported QFC may in fact be stated to be governed by the laws of the State of New York and/or of the United States or any other state of the United States):

In the event a Covered Entity that is party to a Supported QFC (each, a "Covered Party") becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of the United States. In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under the Loan Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if the Supported QFC and the Loan Documents were governed by the laws of the United States or a state of the United States. Without limitation of the foregoing, it is understood and agreed that rights and remedies of the parties with respect to a Defaulting Lender shall in no event affect the rights of any Covered Party with respect to a Supported QFC or any QFC Credit Support.

SECTION 9.21      Orders Control.  To the extent that any specific provision hereof is inconsistent with any of the Orders, the Interim DIP Order or Final DIP Order (as applicable) shall control.

ARTICLE X

GUARANTEE

SECTION 10.01  Guarantee.    Each Guarantor absolutely, irrevocably and unconditionally guarantees, as primary obligor and not merely as surety, to each of the Secured Parties, jointly with the other Guarantors and severally, the due and punctual payment and performance of the

Secured Obligations. Each Guarantor further agrees that the Secured Obligations may be increased, extended or renewed, in whole or in part, or amended or modified, without notice to or further assent from it, and that it will remain bound upon its guarantee hereunder notwithstanding any such increase, extension or renewal, or amendment or modification, of any of the Secured Obligations. Each Guarantor waives presentment to, demand of payment from and protest to the Borrower or any other Loan Party of any of the Secured Obligations, and also waives notice of acceptance of its guarantee and notice of protest for nonpayment, notice of dishonor, default and nonpayment. Notwithstanding anything to the contrary contained herein, the obligations of each Guarantor hereunder at any time shall be limited to an aggregate amount equal to the largest amount that would not render its obligations hereunder subject to avoidance as a fraudulent transfer or conveyance under Section 548 of the Bankruptcy Code or any comparable provisions of any other applicable law.

SECTION 10.02    <u>Guarantee of Payment; Continuing Guarantee</u>. Each Guarantor further agrees that its guarantee hereunder constitutes a guarantee of payment when due (whether or not any bankruptcy or similar proceeding shall have stayed the accrual of collection of any of the Secured Obligations or operated as a discharge thereof) and not merely of collection, and waives diligence, marshaling (other than with respect to TopCo, whose guarantee shall be in all respects subject to paragraph 33 of the Interim DIP Order), and any right to require that any resort be had by the Administrative Agent or any other Secured Party to any security held for the payment of any of the Secured Obligations or to any balance of any deposit account or credit on the books of the Administrative Agent or any other Secured Party in favor of any Borrower, any other Loan Party or any other Person. Each Guarantor agrees that its guarantee hereunder is continuing in nature and applies to all of the Secured Obligations, whether currently existing or hereafter incurred.

SECTION 10.03    <u>No Limitations</u>.

(a)    Except for (x) the termination or release of a Guarantor's obligations hereunder as expressly provided in <u>Section 9.14</u> and (y) the limitations set forth in <u>Section 10.01</u>, the obligations of each Guarantor hereunder shall not be subject to any reduction, limitation, impairment or termination for any reason, including any claim of waiver, release, surrender, alteration or compromise of any of the Secured Obligations, and shall not be subject to any defense or set-off, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality or unenforceability of any of the Secured Obligations, any impossibility in the performance of any of the Secured Obligations or otherwise. Without limiting the generality of the foregoing, except for (x) the termination or release of a Guarantor's obligations hereunder as expressly provided in <u>Section 9.14</u> and (y) the limitations set forth in <u>Section 10.01</u>, the obligations of each Guarantor hereunder, to the fullest extent permitted by applicable Requirements of Law, shall not be discharged or impaired or otherwise affected by:

(i)    the failure of any Secured Party or any other Person to assert any claim or demand or to enforce any right or remedy under the provisions of any Loan Document or otherwise;

(ii)    any rescission, waiver, amendment, supplement, restatement or modification of, or any release or departure from any of the terms or provisions of, any Loan Document or any other agreement, including with respect to any other Guarantor under this Agreement;

(iii) the release of, or any impairment of or failure to perfect any Lien on, any security held by any Secured Party for any of the Secured Obligations;

(iv) any default, failure or delay, willful or otherwise, in the performance of any of the Secured Obligations;

(v) any other act or omission that may or might in any manner or to any extent vary the risk of any Guarantor or otherwise operate as a discharge of any Guarantor as a matter of law or equity (other than the payment in full in cash of all the Secured Obligations (excluding contingent obligations as to which no claim has been made or which are otherwise not due));

(vi) any illegality, lack of validity or lack of enforceability of any of this Agreement, any other Loan Document, or the Secured Obligations;

(vii)    any change in the corporate existence, structure or ownership of any Loan Party, or any insolvency, bankruptcy, reorganization or other similar proceeding affecting any Loan Party or its assets or any resulting release or discharge of any of the Secured Obligations (other than the payment in full in cash of all the Secured Obligations (excluding contingent obligations as to which no claim has been made or which are otherwise not due));

(viii)    the existence of any claim, set-off or other rights that any Guarantor may have at any time against the Borrower, any other Guarantor, the Administrative Agent, any other Secured Party or any other Person, whether in connection with this Agreement, the other Loan Documents or any unrelated transaction;

(ix) this Agreement having been determined (on whatsoever grounds) to be invalid, non-binding or unenforceable against any other Guarantor ab initio or at any time after the Effective Date;

(x) the fact that any Person that, pursuant to the Loan Documents, was required to become a party hereto may not have executed or is not effectually bound by this Agreement, whether or not this fact is known to the Secured Parties;

(xi) any action permitted or authorized hereunder;

(xii)    any other circumstance (including any statute of limitations), or any existence of or reliance on any representation by the Administrative Agent, any other Secured Party or any other Person, that might otherwise constitute a defense to, or a legal or equitable discharge of, the Borrower, any other Guarantor or any other guarantor or surety (other than the payment in full in cash of all the Secured Obligations (excluding contingent obligations as to which no claim has been made or which are otherwise not due)); or

(xiii)    any renewal, extension or acceleration of, or any increase in the amount of the Secured Obligations.

(b)    Each Guarantor expressly authorizes the Secured Parties to take and hold security in accordance with the terms of the Loan Documents for the payment and performance of the Secured Obligations, to exchange, waive or release any or all such security (with or without consideration), to enforce or apply such security and direct the order and manner of any sale thereof in their sole discretion or to release or substitute any one or more other guarantors or obligors upon or in respect of the Secured Obligations, all without affecting the obligations of any Guarantor hereunder.

(c)    To the fullest extent permitted by applicable Requirements of Law, each Guarantor hereby waives any defense based on or arising out of any defense of the Borrower or any other Loan Party or the unenforceability of the Secured Obligations or any part thereof from any cause, or the cessation from

any cause of the liability of the Borrower or any other Loan Party, other than the payment in full in cash of all the Secured Obligations and/or the termination or release of such Guarantor's obligations hereunder as expressly provided under Section 9.14. Any Agent (acting at the direction of the Required Lenders) and the other Secured Parties, at their election and in accordance with the terms of the Loan Documents, may foreclose on any security held by one or more of them by one or more judicial or nonjudicial sales, accept an assignment of any such security in lieu of foreclosure, compromise or adjust any part of the Secured Obligations, make any other accommodation with the Borrower or any other Loan Party or exercise any other right or remedy available to them against the Borrower or any other Loan Party, without affecting or impairing in any way the liability of any Guarantor hereunder except to the extent the Secured Obligations have been paid in full in cash and/or such Guarantor has been subject to the termination or release of such Guarantor's obligations hereunder as expressly provided in Section 9.14. To the fullest extent permitted by applicable law, each Guarantor waives any defense arising out of any such election even though such election operates, pursuant to applicable law, to impair or to extinguish any right of reimbursement or subrogation or other right or remedy of such Guarantor against the Borrower or any other Loan Party, as the case may be, or any security.

SECTION 10.04    Reinstatement.  Each Guarantor agrees that, unless released pursuant to Section 9.14, its guarantee hereunder shall continue to be effective or automatically and immediately be reinstated, as the case may be, if at any time payment, or any part thereof, of any Secured Obligations is rescinded or must otherwise be restored by any Secured Party upon the bankruptcy or reorganization (or any analogous proceeding in any jurisdiction) of the Borrower, any other Loan Party or otherwise.

SECTION 10.05    Agreement to Pay; Subrogation.  In furtherance of the foregoing and not in limitation of any other right that the Administrative Agent or any other Secured Party has at applicable law or in equity against any Guarantor by virtue hereof, upon the failure of the Borrower or any other Loan Party to pay any Secured Obligation when and as the same shall become due, whether at maturity, by acceleration, after notice of prepayment or otherwise, each Guarantor hereby promises to and will forthwith pay, or cause to be paid, to the Administrative Agent for distribution to the applicable Secured Parties, in cash the amount of such unpaid Secured Obligation. Upon payment by any Guarantor of any sums to the Administrative Agent as provided above, all rights of such Guarantor against the Borrower or any other Loan Party arising as a result thereof by way of right of subrogation, contribution, reimbursement, indemnity or otherwise shall in all respects be subject to Sections 10.08, 10.09 and 10.10.

SECTION 10.06    Information.  Each Guarantor assumes all responsibility for being and keeping itself informed of the Borrower's and each other Loan Party's financial condition and assets, and of all other circumstances bearing upon the risk of nonpayment of the Secured Obligations and the nature, scope and extent of the risks that such Guarantor assumes and incurs hereunder, and agrees that none of the Secured Parties will have any duty to advise such Guarantor of information known to it or any of them regarding such circumstances or risks.

SECTION 10.07    [Reserved].

SECTION 10.08    Indemnity and Subrogation.  In addition to all such rights of indemnity and subrogation as the Guarantors may have under applicable law (but subject to Section 10.10) in respect of any payment hereunder, each Borrower agrees that (a) in the event a payment in respect of any obligation of any Borrower shall be made by any Guarantor (other than a Borrower in respect of its own obligations) under this Agreement, the Borrower shall indemnify such Guarantor for the full amount of such payment and such Guarantor shall be subrogated to the rights of the Person to whom such payment shall have been made to the extent of such payment and (b) in the event any assets of any Guarantor (other than a Borrower in respect of its own obligations) shall be sold pursuant to any Security Document to satisfy in whole or in part any Secured Obligations owed to any Secured Party, the Borrower shall indemnify such Guarantor in

an amount equal to the greater of the book value or the fair market value of the assets so sold.

SECTION 10.09    Contribution and Subrogation.    Each Guarantor (a "Contributing Party") agrees (subject to Section 10.10) that, in the event a payment shall be made by any other Guarantor hereunder in respect of any Secured Obligations (other than payments made by a Borrower with respect to its own obligations) or assets of any other Guarantor (other than a Borrower in satisfaction of its own obligations) shall be sold pursuant to any Security Document to satisfy any Secured Obligation owed to any Secured Party and such other Guarantor (the "Claiming Party") shall not have been fully indemnified as provided in Section 10.07, the Contributing Party shall indemnify the Claiming Party in an amount equal to the amount of such payment or the greater of the book value or the fair market value of such assets, as the case may be, in each case multiplied by a fraction of which the numerator shall be the net worth of the Contributing Party on the date hereof (or, in the case of any Guarantor becoming a party hereto pursuant to Section 5.11, the date of a joinder executed and delivered by such Guarantor) and the denominator shall be the aggregate net worth of all the Guarantors on the date hereof (or, in the case of any Guarantor becoming a party hereto pursuant to Section 5.11, such other date). Any Contributing Party making any payment to a Claiming Party pursuant to this Section 10.09 shall be subrogated to the rights of such Claiming Party under Section 10.08 to the extent of such payment.

SECTION 10.10    Subordination.

(a)    Notwithstanding any provision of this Agreement to the contrary, all rights of the Guarantors under Sections 10.08 and 10.09 and all other rights of the Guarantors of indemnity, contribution or subrogation under applicable law or otherwise shall be fully subordinated to the payment in full in cash of all the Secured Obligations to the extent set forth in Section 10.10(b). No failure on the part of the Borrower or any Guarantor to make the payments required by Sections 10.08 and 10.09 (or any other payments required under applicable law or otherwise) shall in any respect limit the obligations and liabilities of any Guarantor with respect to its obligations hereunder, and each Guarantor shall remain liable for the full amount of the obligations of such Guarantor hereunder.

(b)    Each Guarantor hereby agrees that upon the occurrence and during the continuance of an Event of Default, all Indebtedness and other monetary obligations owed by it to, or to it by, any other Guarantor or any other Subsidiary shall be fully subordinated to the payment in full in cash of all the Secured Obligations, and any such Indebtedness collected or received by such Guarantor after an Event of Default has occurred and continuing shall be held in trust for the Administrative Agent on behalf of the Secured Parties and shall forthwith be paid over to the Administrative Agent for the benefit of the Secured Parties to be credited and applied against the Secured Obligations, but without affecting, impairing or limiting in any manner the liability such Guarantor under any other provision hereof.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the date first above written.

**BORROWER:**                          **FRANCHISE GROUP, INC.**

By: _____
Name:
Title:

**FRANCHISE GROUP NEWCO PSP, LLC**

By: _____
Name:
Title:

**FRANCHISE GROUP NEWCO INTERMEDIATE AF, LLC**

By: _____
Name:
Title:

**VALOR ACQUISITION, LLC**

By: _____
Name:
Title:

**GUARANTORS:**                          **VITAMIN SHOPPE INDUSTRIES LLC**

By: _____
Name:
Title:

**AMERICAN FREIGHT GROUP, LLC**

By: _____
Name:
Title:

[Signature Page to Senior Secured Super-Priority Priming Term Loan
Debtor-In-Possession Credit Agreement]

**PET SUPPLIES "PLUS", LLC**


By: _____
Name:
Title:

**VITAMIN SHOPPE MARINER, LLC**


By: _____
Name:
Title:

**VITAMIN SHOPPE GLOBAL, LLC**


By: _____
Name:
Title:

**VITAMIN SHOP FLORIDA, LLC**


By: _____
Name:
Title:

**BETANCOURT SPORTS NUTRITION, LLC**


By: _____
Name:
Title:

**VITAMIN SHOPPE PROCUREMENT SERVICES, LLC**


By: _____
Name:
Title:

**VITAMIN SHOPPE FRANCHISING, LLC**


By: _____
Name:
Title:

[Signature Page to Senior Secured Super-Priority Priming Term Loan
Debtor-In-Possession Credit Agreement]

**FRANCHISE GROUP INTERMEDIATE HOLDCO, LLC**

By: _____
Name:
Title:

**FRANCHISE GROUP INTERMEDIATE S, LLC**

By: _____
Name:
Title:

**AMERICAN FREIGHT HOLDINGS, LLC**

By: _____
Name:
Title:

**AMERICAN FREIGHT, LLC**

By: _____
Name:
Title:

**AMERICAN FREIGHT MANAGEMENT COMPANY, LLC**

By: _____
Name:
Title:

**AMERICAN FREIGHT OUTLET STORES, LLC**

By: _____
Name:
Title:

**HOME & APPLIANCE OUTLET, LLC**

By: _____
Name:
Title:

**FRANCHISE GROUP NEWCO S, LLC**

By: _____
Name:
Title:

**AMERICAN FREIGHT FRANCHISING, LLC**

By: _____
Name:
Title:

**AMERICAN FREIGHT FRANCHISOR, LLC**

By: _____
Name:
Title:

**FRANCHISE GROUP NEW HOLDCO, LLC**

By: _____
Name:
Title:

**FRANCHISE GROUP INTERMEDIATE V, LLC**

By: _____
Name:
Title:

**FRANCHISE GROUP NEWCO V, LLC**

By: _____
Name:
Title:

**FRANCHISE GROUP INTERMEDIATE B, LLC**

By: _____
Name:
Title:

**BUDDY'S NEWCO, LLC**

By: _____
Name:
Title:

**BUDDY'S FRANCHISING AND LICENSING LLC**

By: _____
Name:
Title:

**AMERICAN FREIGHT FFO, LLC**

By: _____
Name:
Title:

**FRANCHISE GROUP ACQUISITION TM, LLC**

By: _____
Name:
Title:

**FRANCHISE GROUP INTERMEDIATE PSP, LLC**

By: _____
Name:
Title:

**PSP MIDCO, LLC**

By: _____
Name:
Title:

**PSP GROUP, LLC**

By: _____
Name:
Title:

[Signature Page to Senior Secured Super-Priority Priming Term Loan
Debtor-In-Possession Credit Agreement]

**PSP SERVICE NEWCO, LLC**

By: _____
Name:
Title:

**PSP STORES, LLC**

By: _____
Name:
Title:

**PSP SUBCO, LLC**

By: _____
Name:
Title:

**PSP FRANCHISING, LLC**

By: _____
Name:
Title:

**PSP DISTRIBUTION, LLC**

By: _____
Name:
Title:

**FRANCHISE GROUP INTERMEDIATE BHF, LLC**

By: _____
Name:
Title:

**FRANCHISE GROUP NEWCO BHF, LLC**

By: _____
Name:
Title:

[Signature Page to Senior Secured Super-Priority Priming Term Loan
Debtor-In-Possession Credit Agreement]

**FRANCHISE GROUP INTERMEDIATE SL, LLC,**

By: _____
Name:
Title:

**FRANCHISE GROUP NEWCO SL, LLC**

By: _____
Name:
Title:

**EDUCATE, INC.**

By: _____
Name:
Title:

**FREEDOM VCM HOLDINGS, LLC**

By: _____
Name:
Title:

**FREEDOM VCM INTERCO HOLDINGS, INC.**

By: _____
Name:
Title:

**FREEDOM VCM RECEIVABLES, INC.**

By: _____
Name:
Title:

**FREEDOM RECEIVABLES II, LLC**

By: _____
Name:
Title:

[Signature Page to Senior Secured Super-Priority Priming Term Loan
Debtor-In-Possession Credit Agreement]

**FRANCHISE GROUP INTERMEDIATE L, LLC**

By: _____
Name:
Title:

**WNW FRANCHISING, LLC**

By: _____
Name:
Title:

**WNW STORES, LLC**

By: _____
Name:
Title:

**WILMINGTON TRUST, NATIONAL ASSOCIATION**, as Administrative Agent and Collateral Agent

By: _____
Name:
Title:

**JEFFRIES CAPITAL SERVICES, LLC**, as a Lender


By: _____
Name:
Title:

## Exhibit 2

**Syndication Procedures**

**Exhibit F to DIP Credit Agreement**

**Syndication Procedures**

1.  This is a notification of the syndication procedures with respect to participation as a lender in the DIP Facility (the "***Syndication Procedures***").  In connection with the Chapter 11 Cases, the Debtors entered into that certain Restructuring Support Agreement, dated as of November 1, 2024, by and among the Debtors and the "Consenting First Lien Lenders" (as defined therein) party thereto from time to time (together with any schedules, exhibits, and annexes thereto, each as amended, supplemented or otherwise modified from time to time in accordance therewith, the "***Restructuring Support Agreement***").  All capitalized terms not otherwise defined herein shall have the meanings set forth in the DIP Credit Agreement (as defined in the Restructuring Support Agreement), Interim DIP Order, or Restructuring Support Agreement, as applicable.

2.  Pursuant to the DIP Credit Agreement, commencing on November 7, 2024, each holder of Prepetition First Lien Secured Obligations that is not a DIP Backstop Party as of the Record Date (as defined below) (each such holder, an "***Eligible Lender***") will have the opportunity to purchase from the Fronting Lender (as defined in the DIP Credit Agreement) a *pro rata* share of the New Money Term Loans and New Money Term Loan Commitments (the "***Syndication***").  The amount of New Money Term Loans and New Money Term Loan Commitments shall be determined by the ratio of the aggregate principal amount of Prepetition First Lien Secured Obligations held by such Eligible Lender as of the Record Date to the aggregate principal amount of Prepetition First Lien Secured Obligations held by all Prepetition First Lien Lenders as of the Record Date, in each case, subject in all respects to the terms and conditions of the Interim DIP Order, the Restructuring Support Agreement, the DIP Loan Documents, these Syndication Procedures and the applicable Execution Documents (as defined below); <u>provided</u> that each DIP Backstop Party shall have been deemed to have elected to purchase its respective *pro rata* shares of the New Money Term Loans and New Money Term Loan Commitments in accordance with the Restructuring Support Agreement and will assume such obligations pursuant to Section 9.04 of the DIP Credit Agreement.

3.  The record date for purposes of the Syndication shall be the Petition Date, which was November 3, 2024 (the "***Record Date***").

4.  In order to participate in the Syndication, prior to 5:00 p.m. (Eastern Time), on November 14, 2024 (the "***Election Deadline***"), Eligible Lenders must deliver (email being sufficient) to the notice parties set forth on **Annex 1** attached hereto (collectively, the "***Notice Parties***"), each of the following so that all the items set forth below are *actually received* by the Notice Parties prior to the Election Deadline (collectively, the "***Execution Documents***"):

    (i)    a completed and duly executed copy of the election form (such form, the "***DIP Election Form***"), attached hereto as **Exhibit A**;

    (ii)    a completed and duly executed copy of the Joinder to the Restructuring Supporting Agreement, attached hereto as **<u>Exhibit B</u>**;

    (iii)    a duly executed signature page to the applicable Assignment and Assumption Agreement, which may be in the form of a master Assignment and Assumption or in the form of an individual Assignment and Assumption for each Electing Lender (as defined below) and may be bifurcated among each class of loans or commitments assigned pursuant to such Assignment and Assumption; and

    (iv)    a completed administrative questionnaire and applicable tax form for each Electing Lender (as defined below) or, if noted in the DIP Election Form that an Eligible Lender is designating an Approved Fund to take its allocated portion of the New Money Term Loans and New Money Term Loan Commitments, a completed administrative questionnaire and applicable tax form for such Approved Fund.

5.    The DIP Election Form provides each Eligible Lender with the opportunity to purchase from the Fronting Lender a ratable share of New Money Term Loans and New Money Term Loan Commitments in an aggregate principal amount equal to the product of (a) $250,000,000 and (b) a fraction, expressed as a percentage, (i) the numerator of which is the aggregate principal amount of such Eligible Lender's Prepetition First Lien Secured Obligations as of the Record Date (excluding capitalized interest with respect to the interest payment due under the Prepetition First Lien Credit Agreement on or around October 30, 2024) and (ii) the denominator of which is $1,097,338,954.49 (such product for any Eligible Lender, such Eligible Lender's "***DIP Election Amount***").  An Eligible Lender shall be entitled to elect to purchase from the Fronting Lender its DIP Election Amount as set forth in its DIP Election Form in accordance with the terms thereof (any Eligible Lender that makes such an election, an "***Electing Lender***").  Any such DIP Election Amount shall be binding and irrevocable.

6.    As soon as practicable after the Election Deadline, but in any event no later November 18, 2024 (the "***Syndication Date***"), the Lender Professionals, in consultation with the Lead Borrower and its advisors, will provide written notice to each Electing Lender of its confirmed DIP Election Amount (including applicable fees and premiums to which such Eligible Holder is entitled to under the DIP Loan Documents), based on a review of confirmed holdings of Prepetition First Lien Secured Obligations as of the Record Date and confirmed holdings of the New Money Term Loans as of the Election Deadline.

7.    On or before November 19, 2024 (or such later date as agreed between the Fronting Lender and the Electing Lender) (the "***Funding Date***"), the Fronting Lender and the Electing Lender shall enter into a trade and execute the applicable Assignment & Assumption Agreement, which may be in the form of a master Assignment and Assumption Agreement, pursuant to which the Electing Lender shall purchase from the Fronting Lender the New Money Term Loans and New Money Term Loan Commitments in aggregate amount equal to such Electing Lender's DIP Election Amount.  For the avoidance of doubt, the Fronting Lender shall also assign to such Electing Lender its proportionate share of the Commitment

Premium that has been paid in the form of New Money Term Loans for no additional consideration.

**Annex 1**

Notice Parties

| Notice Parties | |
|---|---|
| **Fronting Lender** | **Jefferies Capital Services, LLC**<br>Attn:     Adam Goodwin (agoodwin@jefferies.com)<br>Attn:     Benjamin Hirsch (bhirsch@jefferies.com )<br>Attn:     Vincent DiBetta (vdibetta@jefferies.com) |
| **Advisors for the Administrative and Collateral Agent for the DIP Facility and the Prepetition First Lien Facility** | **Seward & Kissel LLP**<br>Attn:     Gregg Bateman (bateman@sewkis.com)<br>Attn:     Sagar Patel (patel@sewkis.com) |
| **Advisors for the Debtors** | **Ducera Securities LLC**<br>Attn:     Chris Grubb (frg.ducera@ducerapartners.com)<br>Attn:     Kishan Patel (kpatel@ducerapartners.com)<br><br>**Willkie Farr & Gallagher LLP**<br>Attn:     Andres Mena (amena@willkie.com)<br>Attn:     Charlotta Chung (cchung@willkie.com) |
| **Advisors for the Ad Hoc Lender Group of First Lien Secured Lenders** | **Lazard Frères & Co.**<br>Attn:     Sanjeev Khemlani (sanjeev.khemlani@lazard.com)<br>Attn:     Nathan Mooney (nathan.mooney@lazard.com)<br><br>**Paul Hastings LLP**<br>Attn:     James Longhofer (jameslonghofer@paulhastings.com)<br>Attn:     Jeremy Evans (jeremyevans@paulhastings.com) |

## Exhibit A

**DIP Election Form**

## DIP ELECTION FORM

The undersigned, pursuant to the Syndication Procedures, confirms that is an Eligible Lender and hereby elects to participate in the DIP Facility in the amounts and terms set forth below:

1.    Eligible Lender Name                                      _____

2.    Designated   Approved   Fund   (if
       applicable)                                               _____

3.    Principal amount of Prepetition First
       Lien Secured Obligations held by the
       Eligible Lender as of the Record
       Date[1]                                                  $_____

4.    DIP Election Amount[2]                                   $_____

5.    Amount  of  Prepetition  First  Lien
       Secured Obligations to become Initial
       Roll-Up Term Loans under the DIP
       Facility[3]                                              $_____

6.    Amount  of  Prepetition  First  Lien
       Secured   Obligations   to   become
       Subsequent  Roll-Up  Term  Loans
       under the DIP Facility[4]                                $_____

[*Signature Page Follows.*]

---

[1]    [**NTD:** Amount should exclude accrued but unpaid interest with respect to the interest payment due under the Prepetition First Lien Credit Agreement on or around October 30, 2024.]

[2]    [**NTD:** This should reflect $250,000,000 multiplied by the fraction, expressed as a percentage, of (x) the amount in line 3 divided by (y) $1,097,338,954.49, which is the aggregate principal amount of prepetition First Lien Term Loans as of the Effective Date.]

[3]    [**NTD:** This should be equal to the amount of outstanding New Money Term Loans as of the Election Date purchased pursuant to this DIP Election Form.]

[4]    [**NTD:** This should be equal to the difference of (a) the product of (x) the sum of (i) the amount of outstanding New Money Term Loans plus (ii) New Money Term Loan Commitments multiplied by (y) 2 minus (b) the amount in line 5.]

[ELIGIBLE LENDER]

By _____

Name: _____

Title: _____

Dated:  [•], 20[  ]

## Exhibit B

**Joinder to Restructuring Support Agreement**

## JOINDER

The undersigned ("**Joinder Party**") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of November 1, 2024 (as amended, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof, the "**Agreement**"), by and among the Company Parties and the Consenting First Lien Lenders party thereto.  Capitalized terms used and not otherwise defined herein shall have the meanings set forth in the Agreement.

1. Agreement to be Bound.  The Joinder Party hereby agrees to be bound by all of the terms of the Agreement, a copy of which is attached hereto as **Annex I** (as the same has been or may hereafter be amended, supplemented, amended and restated, or otherwise modified from time to time in accordance with the provisions hereof).  The Joinder Party shall hereafter be deemed to be a "Consenting First Lien Lenders" and a "Party" for all purposes under the Agreement and with respect to all Company Claims/Interests held such Joinder Party.

2. Representations and Warranties.  The Joinder Party hereby makes the representations and warranties of the Parties and Consenting First Lien Lenders set forth in the Agreement to each other Party.

3. Notice.  The Joinder Party shall deliver an executed copy of this joinder agreement (the "**Joinder**") to the Parties identified in Section 14.10 of the Agreement.

*[Signature Page Follows.]*

*[Signature Page to Joinder]*

**[JOINING PARTY]**

_____
Name:
Title:


Address:


E-mail address(es):

| *Aggregate Amounts Beneficially Owned or Managed on Account of:* | |
|---|---|
| First Lien Claims: | |
| Second Lien Claims: | |
| Second Lien Pari Passu Claims: | |
| Prepetition HoldCo Loan Claims: | |
| ABL Claims: | |
| Existing Equity Interests: | |

**<u>Annex I to Joinder</u>**

Restructuring Support Agreement

*Execution Version*

THIS RESTRUCTURING SUPPORT AGREEMENT AND THE DOCUMENTS ATTACHED HERETO COLLECTIVELY DESCRIBE PROPOSED RESTRUCTURING TRANSACTIONS OF THE COMPANY PARTIES THAT WILL BE EFFECTUATED THROUGH VOLUNTARY CASES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE ON THE TERMS AND SUBJECT TO THE CONDITIONS SET FORTH HEREIN.

THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER, ACCEPTANCE OR SOLICITATION WITH RESPECT TO ANY SECURITIES, LOANS OR OTHER INSTRUMENTS OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER, ACCEPTANCE OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE LAWS, INCLUDING APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON ANY OF THE PARTIES HERETO.

THIS RESTRUCTURING SUPPORT AGREEMENT IS THE PRODUCT OF SETTLEMENT DISCUSSIONS AMONG THE PARTIES HERETO. ACCORDINGLY, THIS RESTRUCTURING SUPPORT AGREEMENT IS PROTECTED BY RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER APPLICABLE STATUTES OR DOCTRINES PROTECTING THE USE OR DISCLOSURE OF CONFIDENTIAL SETTLEMENT DISCUSSIONS.

THIS RESTRUCTURING SUPPORT AGREEMENT DOES NOT PURPORT TO SUMMARIZE ALL OF THE TERMS, CONDITIONS, REPRESENTATIONS, WARRANTIES, AND OTHER PROVISIONS WITH RESPECT TO THE RESTRUCTURING TRANSACTIONS (AS DEFINED HEREIN) DESCRIBED HEREIN, WHICH RESTRUCTURING TRANSACTIONS WILL BE SUBJECT TO THE COMPLETION OF DEFINITIVE DOCUMENTS INCORPORATING THE TERMS SET FORTH HEREIN, AND THE CLOSING OF ANY RESTRUCTURING TRANSACTION SHALL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH DEFINITIVE DOCUMENTS AND THE APPROVAL RIGHTS OF THE PARTIES SET FORTH HEREIN AND IN SUCH DEFINITIVE DOCUMENTS.

### *RESTRUCTURING SUPPORT AGREEMENT*

This RESTRUCTURING SUPPORT AGREEMENT (including all exhibits, annexes, and schedules attached hereto in accordance with <u>Section 14.02</u>, as amended, supplemented, or otherwise modified from time to time in accordance with the terms hereof, this "**Restructuring Support Agreement**" or this "**Agreement**") is made and entered into as of November 1, 2024 (the "**Execution Date**"), by and among the following parties:[1]

    (i)    Franchise Group, Inc. ("**FRG**"), a Delaware corporation, and each of its subsidiaries and Affiliates, including any parent entities, in each case, listed on **Exhibit A** to this

---

[1]    Capitalized terms used but not defined in the preamble and Recitals to this Agreement have the meanings ascribed to them in <u>Section 1.01</u>.

Agreement that have executed and delivered counterpart signature pages to this Agreement to counsel to the Ad Hoc Group (the Entities in this <u>clause (i)</u>, collectively, the "**Company Parties**"); and

(ii)    the undersigned beneficial holders of, or investment advisors, sub-advisors or managers of discretionary funds, accounts or sub-accounts that beneficially hold, First Lien Claims (the "**Consenting First Lien Lenders**") that have executed and delivered counterpart signature pages to this Agreement or a Joinder to counsel to the Company Parties and counsel to the Ad Hoc Group.

## *RECITALS*

**WHEREAS**, the Company Parties and the Consenting First Lien Lenders have in good faith and at arms' length negotiated or been apprised of certain restructuring and recapitalization transactions with respect to the Company Parties' capital structure on the terms set forth in this Agreement and as specified in the restructuring term sheet attached as **Exhibit B** hereto (the "**Restructuring Term Sheet**", and together with the DIP Term Sheet, and including all exhibits, annexes, and schedules thereto, collectively, the "**Term Sheets**" and, including all exhibits, annexes, and schedules thereto, collectively, the "**Restructuring Transactions**");

**WHEREAS**, the Parties intend to implement the Restructuring Transactions pursuant to this Agreement and the other Definitive Documents by (i) commencing Store-Closing and Liquidation Sales at American Freight and (ii) either (a) effectuating a sale of all or substantially all of the remaining assets of the Debtors, which may be through one or more sales of the assets or Equity Interests of the Debtors, as further set forth herein, pursuant to sections 363 or 1129 of the Bankruptcy Code and the Bidding Procedures (each, a "**Sale Transaction**") or (b) consummating, pursuant to the Plan, the equitization of all allowed First Lien Claims into 100% of Reorganized Common Equity (subject to dilution from (1) the MIP (as defined in the Restructuring Term Sheet), (2) the DIP Premium Conversion (as defined in the Restructuring Term Sheet), if applicable, (3) the DIP Equitization (as defined in the Restructuring Term Sheet), and (4) the New Warrants, if applicable), as further set forth in the Restructuring Term Sheet (a "**Plan Transaction**"), in each case, by having the Debtors commence voluntary cases under chapter 11 of the Bankruptcy Code (the cases commenced, the "**Chapter 11 Cases**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"), on the terms and conditions set forth in this Agreement (including the Term Sheets); <u>provided</u> that, subject to Section 8 hereof, in the event that a Sufficient Bid has not been received by the Bid Deadline, the Sale Process shall be terminated and the Plan Transaction shall be implemented; and

**WHEREAS**, the Parties have agreed to take certain actions in support of the Restructuring Transactions on the terms and conditions set forth in this Agreement and the Term Sheets.

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

2

*AGREEMENT*

**Section 1.**      *Definitions and Interpretation*.

1.01.   <u>Definitions</u>.  The following terms shall have the following definitions:

"**<u>ABL Claims</u>**" means any Claim on account of ABL Loans arising under or pursuant to the ABL Credit Agreement or the other ABL Loan Documents.

"**<u>ABL Credit Agreement</u>**" means that certain Third Amended and Restated Loan and Security Agreement, dated as of March 10, 2021, among Franchise Group, Inc., as a borrower, and the other borrowers and guarantors party thereto, the ABL Credit Agreement Agent, and the lenders party thereto from time to time, as amended, restated, amended or restated, supplemented, or otherwise modified from time to time.

"**<u>ABL Credit Agreement Agent</u>**" means JPMorgan Chase Bank, N.A. in its capacity as administrative agent and collateral agent for the lenders under the ABL Credit Agreement.

"**<u>ABL Loan Documents</u>**" means the ABL Credit Agreement and any Financing Agreements (as defined in the ABL Credit Agreement).

"**<u>ABL Loans</u>**" means the loans arising under or pursuant to the ABL Credit Agreement.

"**<u>Ad Hoc Group</u>**" means that certain ad hoc group of Consenting First Lien Lenders, represented by, among others, Paul Hastings and Lazard, as may be reconstituted from time to time.

"**<u>Ad Hoc Group Advisors</u>**" means (a) Paul Hastings LLP, as counsel to the Ad Hoc Group ("**<u>Paul Hastings</u>**"), (b) Lazard Frères & Co., as financial advisor to the Ad Hoc Group ("**<u>Lazard</u>**"), (c) Landis Rath & Cobb LLP, as Delaware counsel to the Ad Hoc Group, and (d) such other professionals that may be retained by or on behalf of the Ad Hoc Group (including the retention of any such professional made by Paul Hastings), solely in the case referred to in this clause (d), with the consent of the Company Parties (each individually an "**<u>Ad Hoc Group Advisor</u>**").

"**<u>Affiliate</u>**" has the meaning set forth in section 101(2) of the Bankruptcy Code as if such Entity were a debtor in a case under the Bankruptcy Code.  For the avoidance of doubt, none of (a) Conn's, Inc., (b) B. Riley Financial Inc. and (c) each of their respective Affiliates (excluding Freedom VCM Holdings, LLC and its subsidiaries) shall be "Affiliates" of the Company Parties for purposes of this Agreement.

"**<u>Agreement</u>**" has the meaning set forth in the preamble to this Agreement and, for the avoidance of doubt, includes all the exhibits, annexes, and schedules attached hereto in accordance with <u>Section 14.02</u> (including the Term Sheets, which are expressly incorporated herein and made a part of this Agreement).

"**<u>Agreement Effective Date</u>**" has the meaning set forth in <u>Section 2.01</u>.

"**Agreement Effective Period**" means, with respect to a Party, the period from (a) the later of (i) the Agreement Effective Date and (ii) the date such Party becomes a Party to this Agreement, to (b) the Termination Date applicable to that Party.

"**Alternative Restructuring**" means (a) any sale, disposition, restructuring, reorganization, merger, amalgamation, acquisition, consolidation, dissolution, debt investment, equity investment, financing (debt or equity, including any debtor-in-possession financing or exit financing), use of cash collateral, liquidation or winding up, exchange offer, tender offer, asset sale, share issuance, consent solicitation, recapitalization, plan of reorganization, share exchange, business combination, joint venture, partnership, or similar transaction involving any one or more Company Parties or any controlled Affiliates of the Company Parties or the debt, equity, or other interests in any one or more Company Parties or any controlled Affiliates of the Company Parties, other than as contemplated by this Agreement, including the Term Sheets, and other than actions taken in the ordinary course of business, or (b) any other transaction involving one or more Company Parties or any controlled Affiliates of the Company Parties that is an alternative to and/or inconsistent with the Restructuring Transactions.  For the avoidance of doubt, nothing in this Agreement shall prohibit the Company Parties from soliciting either (i) debtor-in-possession financing proposals or (ii) proposals to use cash collateral, in each case, prior to the Petition Date; provided that the Company Parties cannot enter into any such debtor-in-possession financing or agreement to use cash collateral without either (x) the consent of the Required Consenting First Lien Lenders or (y) an exercise of their fiduciary out and termination of this Agreement, in each case in accordance with Section 12.02(c), to the extent applicable.

"**Alternative Restructuring Proposal**" means any material plan, inquiry, proposal, offer, bid, term sheet or agreement, whether written or oral, with respect to an Alternative Restructuring. For the avoidance of doubt, any bid received by the Company Parties in connection with the Sale Process shall not constitute an Alternative Restructuring Proposal.

"**American Freight**" means American Freight FFO, LLC, Franchise Group Newco Intermediate AF, LLC, and each of Franchise Group Newco Intermediate AF, LLC's subsidiaries.

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

"**Bankruptcy Court**" has the meaning set forth in the Recitals to this Agreement.

"**Bid Deadline**" has the meaning set forth in Section 4.01(i).

"**Bidding Procedures**" means procedures approved pursuant to the Bidding Procedures Order governing the submission and evaluation of bids to purchase all or substantially all of the Debtors' assets (excluding the assets of American Freight that are subject to the Store-Closing and Liquidation Sales).

"**Bidding Procedures Motion**" means the motion to be filed by the Debtors in the Chapter 11 Cases seeking entry of the Bidding Procedures Order, which shall be in form and substance acceptable to the Company Parties and the Required Consenting First Lien Lenders, each in their sole discretion.

"**Bidding Procedures Order**" means an order of the Bankruptcy Court approving the Bidding Procedures, which shall be in form and substance acceptable to the Company Parties and the Required Consenting First Lien Lenders, each in their sole discretion.

"**Business Day**" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the State of New York.

"**Causes of Action**" means any Claims, interests, damages, remedies, causes of action, demands, rights, actions, controversies, proceedings, agreements, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, whether arising before, on, or after the date hereof, in contract, tort, Law, equity, or otherwise.

"**Chapter 11 Cases**" has the meaning set forth in the Recitals to this Agreement.

"**Claim**" has the meaning ascribed to it in section 101(5) of the Bankruptcy Code.

"**Company Claims/Interests**" means any Claim against, or Interest in, any Company Party.

"**Company Parties**" has the meaning set forth in the preamble to this Agreement.

"**Confidentiality Agreement**" means an executed confidentiality agreement, including with respect to the issuance of a "cleansing letter" or other public disclosure of material non-public information, in connection with any proposed Restructuring Transactions between FRG, on the one hand, and any Consenting First Lien Lender, on the other.

"**Confirmation**" means entry of the Confirmation Order on the docket of the Chapter 11 Cases.

"**Confirmation Hearing**" means the hearing held by the Bankruptcy Court to consider Confirmation of the Plan pursuant to sections 1128 and 1129 of the Bankruptcy Code.

"**Confirmation Order**" means the order entered by the Bankruptcy Court confirming the Plan, which shall be in form and substance acceptable to the Company Parties and the Required Consenting First Lien Lenders, each in their sole discretion.

"**Consent**" means any consent, novation, approval, authorization, qualification, waiver, registration or notification to be obtained from, filed with or delivered to a Governmental Entity or any other Person.

"**Consenting First Lien Lenders**" has the meaning set forth in the preamble to this Agreement.

"**Debtors**" means the Company Parties that commence Chapter 11 Cases, which shall be all of the parties set forth in **Exhibit A** to this Agreement.

"**Definitive Documents**" means, collectively, each of the documents listed in (and subject to the terms of) Section 3.01, each of which shall be in form and substance acceptable to the Company Parties and the Required Consenting First Lien Lenders, each in their sole discretion.

"**DIP Agent**" means the administrative and collateral agent under the DIP Credit Agreement, its successors, assigns, or any replacement agent appointed pursuant to the terms of the DIP Credit Agreement, each of which shall be acceptable to the Required Lenders (as defined therein).

"**DIP Credit Agreement**" means the debtor-in-possession financing agreement by and among certain Company Parties, the DIP Agent, and the lenders party thereto setting forth the terms of the DIP Facility, which shall be in form and substance acceptable to the Company Parties and the Required Consenting First Lien Lenders, each in their sole discretion.

"**DIP Documents**" means, collectively, the DIP Motion, the DIP Orders, and the DIP Credit Agreement and any other agreements, documents, and instruments delivered or entered into in connection therewith, including, without limitation, any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents, as any of the foregoing may be amended, modified, or supplemented from time to time in accordance with the terms hereof, each of which shall be in form and substance acceptable to the Company Parties and the Required Consenting First Lien Lenders, each in their sole discretion.

"**DIP Facility**" means the loans under the debtor-in-possession financing facility on the terms and conditions set forth in the DIP Term Sheet.

"**DIP Motion**" means the motion filed by the Company Parties seeking entry of the DIP Orders, together with all exhibits thereto and any declarations, affidavits or other documents filed in connection with such motion, which shall be in form and substance acceptable to the Company Parties and the Required Consenting First Lien Lenders, each in their sole discretion.

"**DIP Orders**" means the Interim DIP Order and Final DIP Order.

"**DIP Term Sheet**" means the debtor in possession financing term sheet attached as Exhibit 1 to the Restructuring Term Sheet.

"**Disclosure Statement**" means the disclosure statement with respect to the Plan and all exhibits, appendices, schedules, related documents, ballots, and procedures related to the solicitation of votes to accept or reject the Plan, in each case, as amended, supplemented, or otherwise modified from time to time in accordance with the terms thereof, and any supplements, modifications and amendments thereto, which shall be in form and substance acceptable to the Company Parties and the Required Consenting First Lien Lenders, each in their sole discretion.

"**Disclosure Statement Order**" means the order of the Bankruptcy Court approving the Disclosure Statement as a disclosure statement meeting the applicable requirements of the Bankruptcy Code and, to the extent necessary, approving the related Solicitation Materials, which

shall be in form and substance acceptable to the Company Parties and the Required Consenting First Lien Lenders, each in their sole discretion.

"**Entity**" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

"**Equity Interest**" means, collectively, the shares (or any class thereof) of capital stock (including common stock and preferred stock), limited liability company interests, and any other equity, ownership, membership, or profits interests of any Company Party, and options, warrants, rights, or other securities or agreements to acquire or subscribe for, or which are convertible into the shares (or any class thereof) of capital stock (including common stock and preferred stock), limited liability company interests, or other equity, ownership, membership, or profits interests of any Company Party (in each case whether or not arising under or in connection with any employment agreement).

"**Exchange Act**" means the Securities and Exchange Act of 1934, as amended.

"**Execution Date**" has the meaning set forth in the preamble to this Agreement.

"**Executory Contract**" means any contract to which one or more Debtors is a party that is subject to assumption or rejection under section 365 or 1123 of the Bankruptcy Code.

"**Existing Equity Interest**" means any Equity Interest in a Company Party existing as of the Agreement Effective Date.

"**Existing Intercreditor Agreement**" means, collectively, that certain (i) Amended and Restated First Lien/Second Lien Intercreditor Agreement, dated as of November 22, 2021, among Franchise Group, Inc., the other grantors referred to therein, the First Lien Credit Agreement Agent, as collateral agent, and the Second Lien Credit Agreement Agent, and (ii) Amended Intercreditor Agreement, dated as of November 22, 2021, among the ABL Credit Agreement Agent, the First Lien Credit Agreement Agent, the Second Lien Credit Agreement Agent, Franchise Group, Inc., Valor Acquisition, LLC, Franchise Group Newco Intermediate AF, LLC Pet Supplies "Plus", LLC, as borrowers, the other borrowers from time to time party thereto, and the other loan parties from time to time party thereto, in each case, as amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof.

"**Final DIP Order**" means an order of the Bankruptcy Court approving the DIP Facility and granting the Debtors the authority to use cash collateral and provide "adequate protection" (as such term is defined in sections 361 and 363 of the Bankruptcy Code) to the First Lien Lenders on a final basis.

"**Finance Documents**" means, collectively, (a) the First Lien Credit Agreement, and (b) all other documents entered into pursuant to or in connection with the foregoing document in clause (a) of this definition (including, but not limited to, any cash management arrangements and ancillary facilities).

"**First Day Pleadings**" means the first-day and second-day motions, pleadings, applications and related orders that are necessary and/or desirable to file upon the commencement

of the Chapter 11 Cases, each of which shall be in form and substance acceptable to the Company Parties and the Required Consenting First Lien Lenders, each in their sole discretion.

"**First Lien Claims**" means any Claim on account of First Lien Loans arising under or pursuant to the First Lien Credit Agreement or the other First Lien Loan Documents.

"**First Lien Credit Agreement**" means that certain First Lien Credit Agreement, dated as of March 10, 2021, among Franchise Group, Inc., as lead borrower, the other borrowers and guarantors party thereto, the First Lien Credit Agreement Agent, and the lenders party thereto from time to time, as amended, restated, amended or restated, supplemented, or otherwise modified from time to time.

"**First Lien Credit Agreement Agent**" means Wilmington Trust, National Association (as successor to JPMorgan Chase Bank, N.A.), in its capacity as successor administrative agent and successor collateral agent for the First Lien Lenders.

"**First Lien Lenders**" means beneficial holders of, or investment advisors, sub-advisors or managers of discretionary funds, accounts or sub-accounts that beneficially hold, First Lien Claims.

"**First Lien Loan Documents**" means the "Loan Documents" as defined in the First Lien Credit Agreement.

"**First Lien Loans**" means the term loans arising under or pursuant to the First Lien Credit Agreement.

"**FRG**" has the meaning set forth in the preamble to this Agreement.

"**Governmental Entity**" means any U.S. or non-U.S. federal, state, local, or foreign government or any agency, bureau, board, commission, court, or arbitral body, department, political subdivision, regulatory or administrative authority, tribunal or other instrumentality thereof, or any self-regulatory organization.  For the avoidance of doubt, the term Governmental Entity includes any Governmental Unit (as such term is defined in section 101(27) of the Bankruptcy Code).

"**HoldCo Credit Agreement**" means that certain Credit Agreement, dated as of August 21, 2023, among Freedom VCM, Inc., as borrower, Freedom VCM Interco, Inc., as holdings, Alter Domus (US) LLC, in its capacity as administrative agent and collateral agent, and the lenders party thereto from time to time, as amended, restated, amended or restated, supplemented, or otherwise modified from time to time.

"**HoldCo Entities**" means Freedom VCM Holdings, LLC, Freedom VCM Interco Holdings, Inc., Freedom Receivables II, LLC, Freedom VCM Receivables, Inc., Freedom VCM Interco, Inc., and Freedom VCM, Inc., collectively.

"**HoldCo Loans**" means the term loans arising under or pursuant to the HoldCo Credit Agreement.

"**Initial Parties**" has the meaning set forth in <u>Section 2.01</u>.

"**Interest**" means any and all issued, authorized, or outstanding Equity Interests in any Debtor, whether or not transferable, and all rights arising with respect thereto.

"**Interim DIP Order**" means an order of the Bankruptcy Court approving the DIP Facility and granting the Debtors the authority to use cash collateral and provide "adequate protection" (as such term is defined in sections 361 and 363 of the Bankruptcy Code) to the First Lien Lenders on an interim basis.

"**Joinder**" means a joinder to this Agreement substantially in the form attached hereto as **Exhibit C**.

"**Law**" means any federal, state, local, or foreign law (including, in each case, any common law), statute, code, ordinance, rule, regulation, decree, injunction, order, ruling, assessment, writ or other legal requirement, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a Governmental Entity of competent jurisdiction.

"**Limited Waiver Amendment**" means that certain Fourth Amendment to First Lien Credit Agreement, dated as of August 19, 2024 among FRG, the other Company Parties party thereto, the First Lien Lenders party thereto, and the First Lien Credit Agreement Agent.

"**Liquidator**" means Hilco Merchant Resources, LLC or another liquidation consultant acceptable to the Required Consenting First Lien Lenders and on terms acceptable to the Required Consenting First Lien Lenders to advise the Company Parties in connection with, among other things, the liquidation of American Freight and the Store-Closing and Liquidation Sales of American Freight.

"**Management Conference Call**" has the meaning set forth in <u>Section 7.01(m)</u>.

"**Manager**" has the meaning set forth in <u>Section 14.21</u>.

"**Milestone**" or "**Milestones**" has the meaning set forth in <u>Section 4.01</u>.

"**New Organizational Documents**" means the new Organizational Documents of the Reorganized Debtors, to be entered into on the Plan Effective Date, including certificates of incorporation, limited liability company agreements, stockholders or shareholders agreements, operating agreements, equity subscription or purchase agreements, charters or by-laws, which shall be consistent in all material respects with this Agreement and the applicable terms of the Restructuring Term Sheet, and otherwise in form and substance acceptable to the Company Parties and the Required Consenting First Lien Lenders, each in their sole discretion.

"**New TopCo**" means Franchise Group, Inc. or any other Entity designated as such that will, directly or indirectly, own 100% of the Equity Interests in, or substantially all of the assets of, Franchise Group, Inc. upon consummation of the Restructuring Transactions, as mutually agreed by the Company Parties and the Required Consenting First Lien Lenders.

"**New Warrants**" means warrants exercisable for Reorganized Common Equity on the terms and conditions set forth in the Restructuring Term Sheet.

"**New Warrants Documentation**" means any and all agreements, certificates, instruments or other documents required to implement, issue, and distribute, or that otherwise govern or evidence, the New Warrants, which shall be in form and substance acceptable to the Company Parties and the Required Consenting First Lien Lenders, each in their sole discretion.

"**No Recourse Party**" has the meaning set forth in Section 14.24.

"**Organizational Documents**" means, with respect to any Person other than a natural person, the documents by which such Person was organized or formed (such as a certificate of incorporation, certificate of formation, certificate of limited partnership, or articles of organization) or which relate to the internal governance of such Person (such as by-laws or a partnership agreement, or an operating, limited liability company or members agreement).

"**Outside Date**" shall mean May 1, 2025, as such date may be extended by the Required Consenting First Lien Lenders for up to three (3) consecutive thirty (30) day periods.

"**Parties**" means the Initial Parties and any other Consenting First Lien Lender that becomes party to this Agreement in accordance with this Agreement.

"**Permits**" means any license, permit, registration, authorization, approval, certificate of authority, accreditation, qualification, or similar document or authority that has been issued or granted by any Governmental Entity or Third Party Association, if applicable.

"**Permitted Transferee**" means each transferee of any Company Claims/Interests who meets the requirements of Section 9.01.

"**Person**" means an individual, a partnership, a joint venture, a limited liability company, a corporation, a trust, an unincorporated organization, a group, a Governmental Entity, a Third Party Association, or any legal Entity or association.

"**Petition Date**" means the first date any of the Company Parties other than the HoldCo Entities commences a Chapter 11 Case.

"**Plan**" means a joint prearranged chapter 11 plan of reorganization for the Debtors through which the Restructuring Transactions will be effectuated, which plan shall be consistent with the Restructuring Term Sheet and the other applicable provisions of this Agreement (including the other Term Sheets), and otherwise in form and substance acceptable to the Company Parties and the Required Consenting First Lien Lenders, each in their sole discretion.

"**Plan Effective Date**" has the meaning ascribed to such term in the Restructuring Term Sheet.

"**Plan Release**" means customary mutual releases by the Parties to be included in the Plan as set forth in the Restructuring Term Sheet, and otherwise in form and substance acceptable to the Company Parties and the Required Consenting First Lien Lenders, each in their sole discretion.

"**Plan Supplement**" means any compilation of documents and forms of documents (including term sheets), agreements, schedules, and exhibits to the Plan, including (i) the New Organizational Documents, (ii) the Schedule of Retained Causes of Action, (iii) the Take-Back Debt Documents, (iv) the Restructuring Transactions Memorandum, (v) the Rejected Contracts/Lease List, and (vi) any and all other documents necessary to effectuate the Restructuring Transactions or that are contemplated by the Plan subject to this Agreement, which shall be filed by the Debtors prior to the Confirmation Hearing, and additional documents filed with the Bankruptcy Court prior to the Plan Effective Date as amendments to the Plan Supplement, each of which shall be in form and substance acceptable to the Company Parties and the Required Consenting First Lien Lenders, each in their sole discretion, and consistent with the Term Sheets, where applicable.

"**Plan Transaction**" has the meaning set forth in the Recitals to this Agreement.

"**Prepetition HoldCo Loan Claims**" means any Claim on account of HoldCo Loans arising under or pursuant to the HoldCo Credit Agreement.

"**PSP**" means, collectively, Franchise Group Intermediate PSP, LLC and each of its subsidiaries.

"**Qualified Marketmaker**" means an Entity that (a) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers Company Claims/Interests (or enter with customers into long and short positions in Company Claims/Interests), in its capacity as a dealer or market maker in Company Claims/Interests, and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

"**Rejected Contracts/Lease List**" means the list (as determined by the Debtors) of Executory Contracts and/or Unexpired Leases (including any amendments or modifications thereto), if any, that will be rejected pursuant to the Plan.

"**Related Fund**" means, with respect to any Person, any fund, account or investment vehicle that is controlled, advised or managed by (a) such Person, (b) an Affiliate of such Person, or (c) the same investment manager, advisor or subadvisor that controls, advises or manages such Person or an Affiliate of such investment manager, advisor or subadvisor.

"**Reorganized Common Equity**" means the common Equity Interests of the Reorganized Debtors authorized under the New Organizational Documents of the Reorganized Debtors and issued on the Plan Effective Date pursuant to the Plan Transaction or in connection with the consummation of the Sale Transaction.

"**Reorganized Debtors**" means any Debtor, or any successor thereto, by merger, consolidation, reorganization, or otherwise, in the form of a corporation, limited liability company, partnership, or other form, as the case may be, on and after the Plan Effective Date, including New TopCo.

"**Required Consenting First Lien Lenders**" means, as of the relevant date, Consenting First Lien Lenders that are members of the Ad Hoc Group holding, collectively, in excess of 66

2/3% of the aggregate outstanding principal amount of First Lien Loans that are held by Consenting First Lien Lenders that are members of the Ad Hoc Group at such time.

"**Restructuring Support Agreement**" has the meaning set forth in the preamble to this Agreement.

"**Restructuring Term Sheet**" has the meaning set forth in the Recitals to this Agreement.

"**Restructuring Transactions**" has the meaning set forth in the Recitals to this Agreement.

"**Restructuring Transactions Memorandum**" means a document to be included in the Plan Supplement that will set forth the material components of the Restructuring Transactions, including a summary of any transaction steps necessary to complete the Plan, and shall otherwise be in form and substance acceptable to the Company Parties and the Required Consenting First Lien Lenders, each in their sole discretion.

"**Rules**" means Rule 501(a)(1), (2), (3), and (7) of the Securities Act.

"**Sale Documents**" means all agreements, instruments, pleadings, orders or other related documents utilized to launch the Sale Process and implement and consummate the Sale Transaction, each of which shall contain terms and conditions that are materially consistent with this Agreement, and otherwise be in form and substance acceptable to the Company Parties and the Required Consenting First Lien Lenders, each in their sole discretion.

"**Sale Order**" means the order entered by the Bankruptcy Court authorizing and approving the Sale Transaction, which shall be in form and substance acceptable to the Company Parties and the Required Consenting First Lien Lenders, each in their sole discretion.

"**Sale Process**" has the meaning set forth in the Restructuring Term Sheet.

"**Sale Toggle Event**" means entry into one or more qualifying asset purchase agreements or other definitive document to consummate a Sale Transaction, solely to the extent entered into in connection with a Sufficient Bid and in compliance with the Bidding Procedures Order.

"**Sale Transaction**" has the meaning set forth in the Recitals to this Agreement.

"**Schedule of Retained Causes of Action**" means the schedule of Causes of Action that shall vest in the Reorganized Debtors on the Plan Effective Date, which will be contained in the Plan Supplement.

"**Second Lien Claims**" means any Claim on account of term loans arising under or pursuant to the Second Lien Credit Agreement.

"**Second Lien Credit Agreement**" means that certain Second Lien Credit Agreement, dated as of March 10, 2021, among Franchise Group, Inc., and the other borrowers and guarantors party thereto, the Second Lien Credit Agreement Agent, and the lenders party thereto from time to time, as amended, restated, amended or restated, supplemented, or otherwise modified from time to time.

"**Second Lien Credit Agreement Agent**" means Alter Domus (US) LLC, in its capacity as administrative agent and collateral agent for the lenders under the Second Lien Credit Agreement.

"**Second Lien Pari Passu Claims**" means any Claim on account of term loans arising under or pursuant to the Second Lien Pari Passu Credit Agreement.

"**Second Lien Pari Passu Credit Agreement**" means that certain Sidecar Pari Passu Second Lien Credit Agreement, dated as of August 21, 2023, among Franchise Group, Inc., and the other borrowers and guarantors party thereto, the Second Lien Pari Passu Credit Agreement Agent, and the lenders party thereto from time to time, as amended, restated, amended or restated, supplemented, or otherwise modified from time to time.

"**Second Lien Pari Passu Credit Agreement Agent**" means Alter Domus (US) LLC, in its capacity as administrative agent and collateral agent for the lenders under the Second Lien Pari Passu Credit Agreement.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Solicitation Materials**" means all documents, ballots, forms and other materials provided in connection with solicitation of votes on the Plan pursuant to sections 1125 and 1126 of the Bankruptcy Code (other than the Disclosure Statement), each of which shall be in form and substance acceptable to the Company Parties and the Required Consenting First Lien Lenders, each in their sole discretion.

"**Store-Closing and Liquidation Sales**" has the meaning set forth in the Restructuring Term Sheet.

"**Store-Closing and Liquidation Sales Documents**" means all documents or pleadings necessary or desirable to facilitate the Store-Closing and Liquidation Sales, each of which shall be in form and substance acceptable to the Company Parties and the Required Consenting First Lien Lenders, each in their sole discretion.

"**Sufficient Bid**" has the meaning set forth in the Restructuring Term Sheet.

"**Take-Back Debt Agent**" means the administrative agent for the Take-Back Debt Lenders under the Take-Back Debt Documents, or any successor administrative agents thereunder.

"**Take-Back Debt Credit Agreement**" means the credit agreement governing or evidencing the Take-Back Debt Facility to be entered into on the Plan Effective Date by and among Reorganized Debtors, the guarantors from time to time party thereto, the Take-Back Debt Lenders, the Take-Back Debt Agent, and the other Entities party thereto from time to time.

"**Take-Back Debt Documents**" means the Take-Back Debt Credit Agreement, together with any other agreements and documents executed or delivered in connection therewith, each as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, each of which shall be in form and substance acceptable to the Company Parties and the Required Consenting First Lien Lenders, each in their sole discretion.

"**Take-Back Debt Facility**" means the take-back debt financing facility reflecting the terms and conditions set forth in the Restructuring Term Sheet.

"**Take-Back Debt Lenders**" means the lenders party to the Take-Back Debt Credit Agreement.

"**Tax Code**" means the Internal Revenue Code of 1986, as amended.

"**Taxes**" means all present and future taxes, levies, imposts, deductions, charges, assessments, duties and withholdings and any charges of a similar nature (including interest, additions to tax, and penalties with respect thereto) that are imposed by any government or other taxing authority.

"**Term Sheets**" has the meaning set forth in the Recitals to this Agreement.

"**Termination Date**" means the date on which termination of this Agreement is effective in accordance with Sections 12.01, 12.02, 12.03, or 12.04.

"**Third Party Association**" means any trade, industry, business or sector association, body, group or council, or similar Entity.

"**Transaction Expenses**" means all reasonable and documented fees, costs and expenses of each of the Ad Hoc Group Advisors in connection with the negotiation, formulation, preparation, execution, delivery, implementation, consummation, and/or enforcement of this Agreement and/or any of the other Definitive Documents, and/or the transactions contemplated hereby or thereby, including any amendments, waivers, consents, supplements, or other modifications to any of the foregoing, and, to the extent applicable, consistent with any engagement letters or fee reimbursement letters entered into between the applicable Company Parties, on the one hand, and any Ad Hoc Group Advisor, on the other hand (as supplemented and/or modified by this Agreement).

"**Transfer**" means to sell, resell, reallocate, use, pledge, assign, transfer, loan, grant, hypothecate, participate, donate, or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales, or other transactions); provided however, that any pledge in favor of a bank or broker dealer at which a Consenting First Lien Lender maintains an account, where such bank or broker dealer holds a security interest or other encumbrance over property in the account generally, shall not be deemed a "Transfer" for any purposes hereunder; provided, further, that if a pledge or encumbrance exists, the pledgor maintains its voting rights for purposes of this Agreement.

"**Transferee Qualified Marketmaker**" has the meaning set forth in Section 9.04.

"**Unexpired Lease**" means any lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 or 1123 of the Bankruptcy Code.

1.02.   <u>Interpretation</u>.  For purposes of this Agreement:

(a)   in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender;

(b)   capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form;

(c)   unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions;

(d)   unless otherwise specified, any reference herein to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, restated, amended and restated, supplemented, or otherwise modified or replaced from time to time; <u>provided</u> that any capitalized terms herein which are defined with reference to another agreement, are defined with reference to such other agreement as of the date of this Agreement, without giving effect to any termination of such other agreement or amendments to such capitalized terms in any such other agreement following the date hereof;

(e)   unless otherwise specified, all references herein to "Sections" are references to Sections of this Agreement;

(f)   the words "herein," "hereof," and "hereto" refer to this Agreement in its entirety rather than to any particular portion of this Agreement;

(g)   captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Agreement;

(h)   references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable limited liability company Laws;

(i)   the use of "include" or "including" is without limitation, whether stated or not; and

(j)   (i) the phrase "counsel to the Company Parties" refers in this Agreement to each counsel specified in <u>Section 14.10(a)</u> and (ii) "counsel to the Ad Hoc Group" refers in this Agreement to each counsel specified in <u>clause (a)</u> in the definition of "Ad Hoc Group Advisors" in <u>Section 1.01</u>.

**Section 2.**   *Effectiveness of this Agreement*.

2.01.   This Agreement shall become effective and binding upon each of the parties that has executed and delivered counterpart signature pages to this Agreement on the date on which all of the following conditions have been satisfied or waived by the applicable Party or Parties in

accordance with this Agreement (such date, the "**Agreement Effective Date**" and such parties, the "**Initial Parties**"):

(a)     each of the Company Parties shall have executed and delivered counterpart signature pages of this Agreement to counsel to the Company Parties and counsel to the Ad Hoc Group;

(b)     the following shall have executed and delivered counterpart signature pages of this Agreement to counsel to the Company Parties and counsel to the Ad Hoc Group:  holders of at least 50% in number of holders of First Lien Loans and at least 66 2/3% of the aggregate outstanding principal amount of First Lien Loans, in each case, as mutually confirmed by the Company Parties and the Ad Hoc Group, as of the Agreement Effective Date (which may be by email from counsel);

(c)     the Company Parties shall have paid to the applicable advisors all accrued and unpaid Transaction Expenses incurred up to (and including) the Agreement Effective Date in accordance with Section 14.20(a);

(d)     counsel to the Company Parties shall have given notice to counsel to the Ad Hoc Group in the manner set forth in Section 14.10 hereof (by email or otherwise) that the other conditions to the Agreement Effective Date set forth in this Section 2.01 have occurred.

**Section 3.**     *Definitive Documents*.

3.01.   The Definitive Documents governing the Restructuring Transactions shall include this Agreement (including the Term Sheets) and all other agreements, instruments, pleadings, orders, forms, questionnaires and other documents (including all exhibits, schedules, supplements, appendices, annexes, instructions, and attachments thereto) that are utilized to implement or effectuate, or that otherwise relate to, the Restructuring Transactions, including each of the following, as applicable:

(a)     any documents in connection with any First Day Pleadings and all orders sought pursuant thereto, including any cash management orders and critical vendor orders;

(b)     the DIP Documents (including the DIP Motion and DIP Orders);

(c)     the Disclosure Statement;

(d)     the Disclosure Statement Order;

(e)     the Solicitation Materials;

(f)     the Plan, including the Plan Release;

(g)     the Plan Supplement;

(h)     the Confirmation Order;

(i)      the Take-Back Debt Documents;

(j)      the New Organizational Documents;

(k)      the Bidding Procedures Motion;

(l)      the Bidding Procedures Order;

(m)      the Sale Documents, if applicable;

(n)      the Sale Order, if applicable;

(o)      the New Warrants Documentation;

(p)      the Restructuring Transactions Memorandum;

(q)      the Store-Closing and Liquidation Sales Documents;

(r)      such other material agreements, instruments and definitive documentation relating to a recapitalization or restructuring of the Company Parties as is necessary or desirable to support, facilitate, implement, document, otherwise give effect to, or consummate all or any part of the Restructuring Transactions; and

(s)      any other material exhibits, schedules, amendments, modifications, supplements, appendices, or other documents and/or agreements relating to any of the foregoing.

3.02.   The Definitive Documents (other than this Agreement) remain subject to negotiation and completion, as applicable.  Upon completion, the Definitive Documents and every other document, deed, agreement, filing, notification, letter or instrument related to the Restructuring Transactions shall contain terms, conditions, representations, warranties, and covenants consistent in all material respects with the terms of this Agreement, and shall otherwise be in form and substance acceptable to the Company Parties and the Required Consenting First Lien Lenders in their sole discretion.

**Section 4.**      *Milestones; Consummation of the Restructuring Transactions.*

4.01.   On and after the Agreement Effective Date, the Company Parties shall implement the Restructuring Transactions in accordance with the following milestones (each, a "**Milestone**", together, the "**Milestones**"), in each case, unless extended or waived in writing by the Required Consenting First Lien Lenders in their sole discretion (which extension or waiver can be provided via e-mail from counsel to the Required Consenting First Lien Lenders):

(a)      no later than November 4, 2024, the Company Parties shall have delivered substantially complete drafts of the First Day Pleadings, the DIP Documents (including the DIP Motion and the proposed Interim DIP Order), the Bidding Procedures Motion, the proposed Bidding Procedures Order, the Plan, the Disclosure Statement, and the Solicitation Materials to the Ad Hoc Group Advisors;

(b)      no later than November 4, 2024, the Company Parties shall have delivered a confidential information memorandum in connection with the Sale Process to the Ad Hoc Group Advisors;

(c)      no later than November 4, 2024, the Company Parties shall have engaged the Liquidator pursuant to that certain Letter Agreement Governing Inventory Disposition;

(d)      no later than November 4, 2024, the Petition Date shall have occurred;

(e)      no later than one (1) day after the Petition Date, the Debtors shall have filed with the Bankruptcy Court the First Day Pleadings, the DIP Motion (including the proposed Interim DIP Order), and the Bidding Procedures Motion (including the proposed Bidding Procedures Order);

(f)      no later than three (3) days after the Petition Date, the Debtors shall have filed with the Bankruptcy Court the Plan, the Disclosure Statement, and the Solicitation Materials;

(g)      no later than five (5) days after the Petition Date, the Bankruptcy Court shall have entered the Interim DIP Order;

(h)      no later than five (5) days after the Petition Date, the Bankruptcy Court shall have entered an interim order approving procedures for the Store-Closing and Liquidation Sales at American Freight;

(i)      no later than twenty-eight (28) days after the Petition Date, the Bankruptcy Court shall have entered the Bidding Procedures Order, which shall require, among other things, the submission of any (i) non-binding indications of interest on or before forty (40) days after the Petition Date and (ii) Qualified Bids (as defined in the Bidding Procedures) by no later than eighty (80) days after the Petition Date (the "**Bid Deadline**"); provided that the Sale Process shall not be terminated prior to the expiration of the Bid Deadline;

(j)      no later than forty-five (45) days after the Petition Date, the Bankruptcy Court shall have entered the Final DIP Order;

(k)      no later than forty-five (45) days after the Petition Date, the Bankruptcy Court shall have approved the Disclosure Statement and the Solicitation Materials;

(l)      to the extent more than one Sufficient Bid is received by the Bid Deadline, by no later than eighty-five (85) days after the Petition Date, the Debtors shall commence an auction for the Debtors' assets in accordance with the terms of the Bidding Procedures Order; provided that if there is only one Sufficient Bid received by the Bid Deadline, then the Sale Toggle Event shall occur;

(m)      to the extent more than one Sufficient Bid is received by the Bid Deadline, no later than ninety (90) days after the Petition Date, the Bankruptcy Court shall have entered the Sale Order; provided that if there is not more than one Sufficient Bid received by the Bid Deadline, then the Bankruptcy Court shall have entered the Sale Order no later than eighty-seven (87) days after the Petition Date;

(n)      no later than ninety (90) days after the Petition Date, the Bankruptcy Court shall have entered the Confirmation Order; and

(o)      no later than the earlier of (i) ten (10) days after entry of the Confirmation Order and/or the Sale Order, if applicable (ii) one hundred twenty (120) days after the Petition Date, the Plan Effective Date shall have occurred and all the Restructuring Transactions (irrespective of whether the Restructuring Transactions occur pursuant to the Plan Transaction or the Sale Transaction) shall have been implemented and consummated.

**Section 5.**      ***Commitments of the Consenting First Lien Lenders***.

5.01.   <u>General Commitments, Forbearances, and Waivers</u>.

(a)      During the Agreement Effective Period, each Consenting First Lien Lender, on a several and not joint basis, agrees, in respect of all of its Company Claims/Interests, subject to <u>Section 6</u> hereof, to:

(i)      support the Restructuring Transactions, act in good faith, and vote or consent, to the extent applicable, and exercise any powers or rights available to it (including in any board, shareholders', or creditors' meeting or in any process requiring voting or approval to which they are legally entitled to participate) in each case in favor of any matter requiring approval to the extent necessary to implement the Restructuring Transactions; <u>provided</u> that no Consenting First Lien Lender shall be obligated to (x) waive (to the extent waivable by such Consenting First Lien Lender) any condition to the consummation of any part of the Restructuring Transactions set forth in (or to be set forth in) any Definitive Document, or (y) approve any Definitive Document that is not in form and substance consistent with its consent rights as set forth herein;

(ii)      subject to the terms of any applicable Confidentiality Agreements, use commercially reasonable efforts to cooperate with and assist the Company Parties in obtaining additional support for the Restructuring Transactions from the Company Parties' other stakeholders, to the extent reasonably prudent, including by making the Ad Hoc Group Advisors available to such other stakeholders or their advisors, as applicable, for the purposes of responding to inquiries by such stakeholders and/or obtaining support for the Restructuring Transactions;

(iii)      forbear from exercising or directing any Person to exercise remedies on account of, any breach by any Company Party of, and any default or event of default (howsoever described) under, the applicable Finance Documents that shall or may arise as a result of, directly or indirectly, any of the steps, actions, or transactions expressly required or contemplated by, or expressly undertaken pursuant to this Agreement, the Restructuring Term Sheet, any Definitive Document, and commencement of any Chapter 11 Cases; <u>provided</u> that (x) no Consenting First Lien Lender shall be required hereunder to provide any trustee and/or agent or other Person under any applicable Finance Documents with any additional indemnities or similar undertakings in connection with taking any such action other than those contained in any applicable Finance Documents, (y) no Consenting First Lien Lender shall be required to take any actions contemplated by this <u>Section 5.01(a)(iii)</u> unless expressly contemplated by this Agreement, and (z) nothing in this <u>Section 5.01(a)(iii)</u> shall require the Consenting First Lien Lenders to waive any default or event of default, or any of the obligations arising under, or liens or other encumbrances created by,

19

any of the Finance Documents; provided, further, for the avoidance of doubt, that unless the Restructuring Transactions are consummated, it is understood and agreed that any forbearance granted pursuant to this Section 5.01(a)(iii) shall be effective during the Agreement Effective Period only and shall not be deemed to be a permanent forbearance from the exercise of remedies on account of any default or event of default arising under the First Lien Credit Agreement; and

(iv)     without limiting any rights under Section 12.01, negotiate in good faith and, to the extent it is contemplated to become a party thereto, execute, deliver, and use commercially reasonable efforts to perform their obligations under, and consummate the transactions contemplated by the Definitive Documents and any other required agreements to effectuate and consummate the Restructuring Transactions as contemplated by this Agreement.

(b)     During the Agreement Effective Period, each Consenting First Lien Lender on a several and not joint basis, agrees, in respect of all of its Company Claims/Interests, subject to Section 6 hereof, that it shall not directly or indirectly:

(i)     object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(ii)     propose or file any Alternative Restructuring;

(iii)     file or join in any motion, pleading, or other document with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, is not consistent with this Agreement and the Restructuring Transactions, including the Sale Transaction or the Plan Transaction, as applicable;

(iv)     initiate, or have initiated on its behalf, any litigation or proceeding of any kind with respect to the Chapter 11 Cases, this Agreement, or the Restructuring Transactions contemplated herein against the Company Parties or the other Parties other than to enforce this Agreement or any Definitive Document or as otherwise permitted under this Agreement;

(v)     exercise any right or remedy for the enforcement, collection, or recovery of any of Company Claims/Interests;

(vi)     object to, delay, impede, or take any other action to interfere with the Company Parties' ownership and possession of their assets, wherever located, or interfere with the automatic stay arising under section 362 of the Bankruptcy Code; or

(vii)     direct any other Person to take any of the actions listed in clauses (i) through (vi) of this Section 5.01(b).

5.02.     Commitments with Respect to Chapter 11 Cases.

(a)     In addition to the commitments, covenants, agreements and other obligations set forth in Section 5.01, during the Agreement Effective Period, each Consenting First Lien Lender that is entitled to vote to accept or reject the Plan pursuant to its terms, on a several and not joint basis, agrees that it shall:

20

(i)    subject to receipt by such Consenting First Lien Lender of the Disclosure Statement and the Solicitation Materials, vote each of its Company Claims/Interests to accept the Plan by delivering its duly executed and completed ballot accepting the Plan on a timely basis following the commencement of the solicitation of the Plan and its actual receipt of the Disclosure Statement and any related Solicitation Materials;

(ii)    subject to receipt by such Consenting First Lien Lender of the Disclosure Statement and the Solicitation Materials, not object to the Plan Releases, and, to the extent it is permitted to elect whether to opt out of the Plan Releases, elect not to opt out of the Plan Releases by timely delivering its duly executed and completed ballot(s) indicating such election;

(iii)    to the extent applicable, fund its committed portion of the DIP Facility as and when due pursuant to the terms of the DIP Documents;

(iv)    cooperate, act in good faith, and use commercially reasonable efforts to consummate the Restructuring Transactions, including the Sale Transaction or the Plan Transaction, as applicable;

(v)    support, and not directly or indirectly object to, delay, impede, or take any other action in violation of this Agreement to interfere with any motion or other pleading or document filed by a Company Party in the Bankruptcy Court that is consistent with this Agreement;

(vi)    take actions as required by the Bankruptcy Court; and

(vii)    not change, withdraw, amend, or revoke (or cause to be changed, withdrawn, amended, or revoked) any vote or election referred to in clauses (i) and (ii) above; provided that such vote may be revoked (and, upon such revocation, deemed void *ab initio*) by such Consenting First Lien Lender at any time following the expiration or termination of the Agreement Effective Period with respect to such Consenting First Lien Lender (it being understood that any termination of the Agreement Effective Period with respect to a Consenting First Lien Lender shall entitle such Consenting First Lien Lender to change its vote in accordance with sections 1126 and 1127 or any other applicable provision of the Bankruptcy Code, and the Solicitation Materials with respect to the Plan shall be consistent with this proviso).

**Section 6.    *Additional Provisions Regarding the Consenting First Lien Lenders' Commitments*.** Notwithstanding anything contained in this Agreement, nothing in this Agreement shall: (a) subject to any Confidentiality Agreements in place as of the Agreement Effective Date, affect the ability of any Consenting First Lien Lender to consult with any other Consenting First Lien Lender, the Company Parties, or any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee) or any foreign proceeding related to the Restructuring Transactions; (b) impair or waive the rights of any Consenting First Lien Lender to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions; (c) prevent any Consenting First Lien Lender from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement; (d) limit the rights of a Consenting First Lien Lender under the Chapter 11 Cases, including appearing as a party in interest in any matter to be adjudicated in order to be heard concerning any

matter arising in the Chapter 11 Cases or any foreign proceeding, in each case, so long as the exercise of any such right is not inconsistent with such Consenting First Lien Lender's obligations under this Agreement; (e) limit the ability of a Consenting First Lien Lender to purchase, sell or enter into any transactions regarding the Company Claims/Interests, subject to the terms of this Agreement including Section 9 hereof; (f) except as and to the extent explicitly set forth herein, constitute a waiver or amendment of any term or provision of any Finance Document; (g) constitute a termination or release of any liens on, or security interests in, any of the assets or properties of the Company Parties that secure the obligations under any Finance Document; (h) except as and to the extent explicitly set forth in this Agreement, require any Consenting First Lien Lender to incur, assume, become liable in respect of or suffer to exist any expenses, liabilities, or other obligations, or agree to or become bound by any commitments, undertakings, concessions, indemnities, or other arrangements that could result in expenses, liabilities, or other obligations to such Consenting First Lien Lender; (i) prevent a Consenting First Lien Lender from taking any action that is required in order to comply with applicable Law; provided that if any Consenting First Lien Lender proposes to take any action that is otherwise inconsistent with this Agreement or the Restructuring Transactions in order to comply with applicable Law, such Consenting First Lien Lender shall provide, to the extent possible without violating applicable Law, at least five (5) Business Days' advance, written notice to the Parties; (j) prohibit any Consenting First Lien Lender from taking any action that is not inconsistent with this Agreement or the Restructuring Transactions; (k) except as and to the extent explicitly set forth in this Agreement, limit the ability of any Consenting First Lien Lender to enforce the terms of the Existing Intercreditor Agreement (including exercising any rights or remedies available to the Consenting First Lien Lender); (l) require any Consenting First Lien Lender to fund or commit to fund any additional amounts (other than as agreed in connection with the DIP Facility) without such Consenting First Lien Lender's written consent; or (m) require or obligate any Consenting First Lien Lender to (i) waive (to the extent waivable by such Consenting First Lien Lender) any condition to the consummation of any part of the Restructuring Transactions set forth in (or to be set forth in) any Definitive Document, or (ii) approve any Definitive Document that is not in form and substance consistent with its consent rights set forth herein.

**Section 7.**  *Commitments of the Company Parties*.

7.01.  Affirmative Commitments.  Except as set forth in Section 8, during the Agreement Effective Period, the Company Parties agree to:

(a)  support, act in good faith, and take all commercially reasonable actions necessary, or reasonably requested by the Required Consenting First Lien Lenders to implement and consummate the Restructuring Transactions as contemplated by this Agreement and the Restructuring Term Sheet, including by promptly (i) commencing the Store-Closing and Liquidation Sales at American Freight, (ii) commencing the Chapter 11 Cases and solicitation of the Plan pursuant to the Disclosure Statement and related Solicitation Materials in accordance with the applicable Milestones; (iii) launching the Sale Process to market all or substantially all of the remaining assets of the Debtors in order to determine the highest and/or best offers for the purchase of such assets subject to the terms of the Bidding Procedures Order and this Agreement; and (iv) (A) to the extent the Sale Toggle Event shall have occurred, consummating the Sale Transaction, and (B) to the extent that a Sufficient Bid has not been received on or prior to the Bid Deadline, promptly terminating the Sale Process, unless otherwise agreed by the Required Consenting First

Lien Lenders, and pursuing exclusively the Plan Transaction, in each case in accordance with this Agreement;

(b)      to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring Transactions contemplated herein, take all commercially reasonable steps necessary to address any such impediment, including, timely filing a formal objection to any motion, application or other proceeding filed with the Bankruptcy Court by any Person seeking the entry of an order: (i) directing the appointment of an examiner with expanded powers or a trustee; (ii) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code; (iii) dismissing the Chapter 11 Cases; (iv) approving an Alternative Restructuring Proposal; (v) for relief that (x) is inconsistent with this Agreement in any material respect, or (y) would, or would reasonably be expected to, frustrate the purposes of this Agreement in any material respect, including by preventing the consummation of the Restructuring Transactions; (vi) modifying or terminating any Debtor's exclusive right to file and/or solicit acceptances of a plan of reorganization; or (vii) challenging (x) the amount, validity, allowance, character, enforceability, or priority of any Company Claims/Interests of any of the Consenting First Lien Lenders, or (y) the validity, enforceability or perfection of any lien or other encumbrance securing (or purporting to secure) any Company Claims/Interests of any of the Consenting First Lien Lenders;

(c)      use commercially reasonable efforts to obtain any and all Permits, Consents, and/or any other third-party approvals that are necessary for the implementation or consummation of any part of the Restructuring Transactions;

(d)      negotiate in good faith and execute, deliver, perform their obligations under, and consummate the transactions contemplated by, the Definitive Documents and any other required agreements to effectuate and consummate the Restructuring Transactions as contemplated by this Agreement;

(e)      use commercially reasonable efforts to seek additional support for the Restructuring Transactions from their other material stakeholders to the extent reasonably prudent;

(f)      subject to the consent rights set forth herein, (i) complete the preparation, as soon as reasonably practicable after the Execution Date, of the Disclosure Statement and any Solicitation Materials in order to commence the solicitation of the Plan in accordance with the Milestones, (ii) provide drafts of the Disclosure Statement, the Plan, any Solicitation Materials, and each other Definitive Document to, and afford a reasonable opportunity for comment and review of such documents by, the Ad Hoc Group Advisors, which opportunity of comment and review shall be not less than five (5) days in advance of any filing with the Bankruptcy Court; provided that if delivery of such document at least five (5) days in advance of such filing is impracticable under the circumstances, such document shall be delivered as soon as otherwise practicable, and shall afford them a reasonable opportunity under the circumstances to comment on such documents, and (iii) consult with the Ad Hoc Group Advisors regarding the form and substance of the Disclosure Statement and Solicitation Materials, the Plan, and each other Definitive Document, sufficiently in advance of the filing with the Bankruptcy Court, and not file with the Bankruptcy Court the Disclosure Statement, Solicitation Materials, the Plan, and each other Definitive Document unless such document is in form and substance consistent with the

consent rights set forth herein; <u>provided</u> that the obligations of the Company Parties under this <u>Section 7.01(f)</u> shall in no way alter or diminish any right expressly provided to any applicable Consenting First Lien Lender under this Agreement to review, comment on, and/or consent to the form and/or substance of any document in accordance with the terms hereof;

(g)     to the extent permitted by Law, promptly notify the Ad Hoc Group Advisors in writing (email being sufficient) (and in any event, for items (i)-(vii) of this paragraph, within one (1) Business Day) of (i) the initiation, institution, or commencement of any proceeding by a Governmental Entity (or communications indicating that the same may be contemplated or threatened) involving any of the Company Parties (including any assets, Permits, businesses, operations, or activities of any of the Company Parties) or any of their respective current or former officers, employees, managers, directors, members, or equity holders (in their capacities as such), (ii) the initiation, institution, or commencement by any Person of any proceeding involving any of the Company Parties (or communications indicating that the same may be contemplated or threatened) that would result in or is likely to have a material impact in any manner on any of the Company Parties' businesses (including any assets, Permits, businesses, operations, or activities of any of the Company Parties) or any of their respective current or former officers, employees, managers, directors, members, or equity holders (in their capacities as such), (iii) the initiation, institution, or commencement of any proceeding by a Governmental Entity or other Person challenging the validity of the transactions contemplated by this Agreement or any other Definitive Document or seeking to enjoin, restrain, or prohibit this Agreement or any other Definitive Document or the consummation of the transactions contemplated hereby or thereby, (iv) any material breach by any of the Company Parties in any respect of any of their obligations, representations, warranties, or covenants set forth in this Agreement, (v) the happening or existence of any event that shall have made any of the conditions precedent to any Person's obligations set forth in (or to be set forth in) any of the Definitive Documents or this Agreement, including the section of the Restructuring Term Sheet entitled "Conditions Precedent to the Plan Effective Date", incapable of being satisfied prior to the Outside Date, (vi) the occurrence of a "Termination Event" pursuant to <u>Section 12</u>, and/or (vii) the receipt of notice from any Governmental Entity or other Person alleging that the Consent of such Person is or may be required under any Organizational Document, material contract, Permit, Law, or otherwise in connection with the consummation of any part of the Restructuring Transactions;

(h)     maintain the good standing and legal existence of each Company Party under the Laws of the state or jurisdiction in which it is incorporated, organized, or formed, except to the extent that any failure to maintain such Company Party's good standing arises solely as a result of the filing of the Chapter 11 Cases;

(i)     if any Company Party receives an Alternative Restructuring Proposal, (i) promptly notify the Ad Hoc Group Advisors (in each case, no later than one (1) Business Day after the receipt of such Alternative Restructuring Proposal), with such notification to include the material terms thereof (but not the identity of the Person(s) involved), and (ii) respond promptly to reasonable information requests and questions from the Ad Hoc Group Advisors with respect to the impact of such Alternative Restructuring Proposal on the Restructuring Transactions and any action taken or proposed to be taken by the Company Parties in response thereto, but not to include the identity of the Person(s) involved;

(j)      (i) conduct their businesses and operations in the ordinary course in a manner that is consistent with past practices and in compliance with Law, (ii) maintain their physical assets, properties, and facilities in their working order condition and repair as of the Agreement Effective Date, in the ordinary course, in a manner that is consistent with past practices, and in compliance with Law (ordinary wear and tear and casualty and condemnation excepted), (iii) maintain their respective books and records in the ordinary course, in a manner that is consistent with past practices, and in compliance with Law, (iv) maintain all of their material insurance policies, or suitable replacements therefor, in full force and effect, in the ordinary course, in a manner that is consistent with past practices, and in compliance with Law, and (v) use commercially reasonable efforts to preserve intact their business organizations and relationships with third parties (including creditors, lessors, licensors, franchisees, vendors, customers, suppliers, and distributors) and employees in the ordinary course, in a manner that is consistent with past practices, in each case, except (1) as required by Law, (2) as required pursuant to the DIP Orders or as may be required to adhere to the terms of any applicable budget approved in connection with the DIP Facility (or as may otherwise be related thereto), (3) as otherwise agreed by the Required Consenting First Lien Lenders or (4) as otherwise expressly provided in this Agreement or for actions taken by any member of the Company Parties in connection with the Chapter 11 Cases (including, for avoidance of doubt, in connection with the Store-Closing and Liquidation Sales at American Freight) in accordance with the terms of this Agreement and the applicable Definitive Documents;

(k)      provide responses in a reasonably timely manner, whether by directing the Company Parties' advisors to respond or otherwise, to reasonable diligence requests from the Ad Hoc Group Advisors for purposes of the Consenting First Lien Lenders' due diligence investigation in respect of the assets, liabilities, operations, businesses, finances, strategies, prospects, and affairs of the Company Parties;

(l)      unless the Sale Process has been terminated under the terms of this Agreement and/or the Sale Documents, if any Person seeks to submit a bid, indicates any interest in participating in the Sale Process, or otherwise communicates with any Company Party with respect to a potential Sale Transaction in each case, in writing (including by email): (i) promptly notify the Ad Hoc Group Advisors in writing (email being sufficient) with such notification accompanied by a copy of such bid or communication; (ii) use commercially reasonable efforts to promptly make any such Person available to the Ad Hoc Group Advisors, in each case, no later than one (1) Business Day after the receipt of any such bid or communication; and (iii) keep the Ad Hoc Group Advisors informed with respect to all material discussions, negotiations, and communications with any such Person;

(m)      (i) use commercially reasonable efforts to keep the Consenting First Lien Lenders informed about the operations of the Company Parties, (ii) use commercially reasonable efforts to direct the current employees, officers, advisors, and other representatives of the Company Parties to provide, to the Ad Hoc Group Advisors, upon written request to the Company Parties' advisors and subject to obtaining approval of the Company Parties (not to be unreasonably withheld or delayed), (1) reasonable access during normal business hours to the Company Parties' books, records, and facilities, and (2) upon written request to the advisors of the Company Parties (which may be by email), reasonable access to the senior management and advisors of the Company Parties for the purposes of evaluating the Company Parties' assets, liabilities, operations, businesses, finances, strategies, prospects, and affairs, and (iii) use commercially reasonable

efforts to arrange for a teleconference (the "Management Conference Call") to take place bi-weekly, which Management Conference Call shall (1) require participation by at least one senior member of the Company Parties' management team and permit participation by the Company Parties' counsel and advisors and such Consenting First Lien Lenders and their advisors as elect to participate therein, who shall be provided with an invitation to, and details of, such Management Conference Call as soon as reasonably practicable prior to the scheduled date therefor, and (2) be intended for purposes of discussing the Company Parties' financials and such other information and matters reasonably related thereto or reasonably requested by the Required Consenting First Lien Lenders;

(n)     if applicable, promptly certify upon request of any Consenting First Lien Lender that pursuant to 26 CFR § 1.1445-2, it is not a "United States real property holding corporation" as defined in the Internal Revenue Code of 1986 (as amended) and any applicable regulations promulgated thereunder;

(o)     unless the Sale Process has been terminated under the terms of this Agreement and/or the Sale Documents, host weekly telephone conference calls on Mondays at 2:00 p.m. (ET) among Ducera Securities LLC and Lazard to provide a status update on the Sale Process;

(p)     support the filing of a customary stock trading order that restricts (i) the accumulation and disposition of stock by Persons who own (as determined for tax Law purposes), or would own, more than approximately 4.5% of the equity of the Company Parties during the pendency of the Chapter 11 Cases, and (ii) the claiming of a worthlessness deduction under section 165 of the Tax Code with respect to the stock of any Company Party;

(q)     to the extent reasonably requested by the Required Consenting First Lien Lenders, commence a process to solicit a whole business securitization of PSP; and

(r)     implement the Restructuring Transactions in accordance with the Milestones, unless waived or extended in writing by the Required Consenting First Lien Lenders (which waiver or extension may be effected through email exchanged between counsel to the Company Parties and counsel to the Ad Hoc Group).

7.02.   Negative Commitments.  Except as set forth in Section 8, during the Agreement Effective Period, each of the Company Parties shall not, without the prior written consent of the Required Consenting First Lien Lenders, directly or indirectly:

(a)     object to, delay, impede, or take any other action with the intent to interfere with acceptance, implementation, or consummation of the Restructuring Transactions, other than pursuant to the express terms and conditions of this Agreement;

(b)     take any action that is inconsistent in any material respect with, or is intended to frustrate or impede approval, implementation, and consummation of the Restructuring Transactions described in, this Agreement (including the Term Sheets), the Plan or any of the other Definitive Documents, other than pursuant to the express terms and conditions of this Agreement;

(c)     (i) execute, deliver, and/or file with the Bankruptcy Court any agreement, instrument, motion, pleading, order, form, or other document that is to be utilized to implement or

effectuate, or that otherwise relates to, this Agreement, the Plan, and/or the Restructuring Transactions, including any Definitive Documents, that, in whole or in part, is not (x) consistent in any material respect with this Agreement or (y) otherwise in form and substance acceptable to the Required Consenting First Lien Lenders pursuant to their respective consent rights set forth herein, or, if applicable, file any pleading with the Bankruptcy Court seeking authorization to accomplish or effect any of the foregoing, or (ii) waive, amend, or modify any of the Definitive Documents, or file with the Bankruptcy Court a pleading seeking to waive, amend, or modify any term or condition of any of the Definitive Documents, in either case, which waiver, amendment, modification, or filing contains any provision that is not (x) consistent in all material respects with this Agreement and the Restructuring Term Sheet, or (y) otherwise acceptable to the Required Consenting First Lien Lenders pursuant to their consent rights set forth herein;

(d)      (i) seek discovery in connection with, prepare, or commence any proceeding or other action that challenges (1) the amount, validity, allowance, character, enforceability, or priority of any Company Claims/Interests of any of the Consenting First Lien Lenders, or (2) the validity, enforceability, or perfection of any lien or other encumbrance securing any Company Claims/Interests of any of the Consenting First Lien Lenders; (ii) otherwise seek to restrict any contractual rights of any of the Consenting First Lien Lenders under the Finance Documents; (iii) otherwise commence any action against any of the Consenting First Lien Lenders; or (iv) support any Person in connection with any of the acts described in <u>clause (i)</u> or <u>clause (ii)</u> of this <u>Section 7.02(d)</u>;

(e)      assert, or support any assertion by any third party, that, in order to act on the provisions of <u>Section 12</u> hereof, the Consenting First Lien Lenders shall be required to obtain relief from the automatic stay from the Bankruptcy Court (and the Company Parties' hereby waive, to the greatest extent possible, the applicability of the automatic stay to the giving of any termination notice in accordance with <u>Section 12</u> hereof); <u>provided</u> that nothing herein shall prejudice any Party's right to argue that the giving of such termination notice or the exercise of any remedy was not proper under the Agreement;

(f)      except as contemplated by this Agreement, consummate any transaction pursuant to any contract with respect to debtor-in-possession financing, cash collateral usage, exit financing, and/or other financing arrangements without the advance written consent of the Required Consenting First Lien Lenders;

(g)      grant or agree to grant any increase in the wages, salary, bonus, commissions, retirement benefits, severance, or other compensation or benefits of any director, manager, employee, or officer of any Company Party, whether scheduled prior to, as of or after the Agreement Effective Date, except for any increase that is done in the ordinary course of business consistent with past practices, in accordance with the Restructuring Transactions contemplated by this Agreement, or otherwise with the consent of the Required Consenting First Lien Lenders;

(h)      incur or commit to incur any capital expenditures, other than capital expenditures that are included in any applicable budget approved pursuant to the Interim DIP Order or Final DIP Order, except as approved by the Required Consenting First Lien Lenders;

(i)      make or change any material tax election (including, with respect to any Company Party that is treated as a partnership or disregarded Entity for U.S. federal income tax purposes, an election to be treated as a corporation for U.S. federal income tax purposes), file any material amended tax return, enter into any closing agreement with respect to Taxes for an amount greater than $50,000, consent to any extension or waiver of the limitations period applicable to any material Tax claim or assessment other than in the ordinary course of business, enter into any installment sale transaction, adopt or change any material accounting methods, practices, or periods for Tax purposes, make or request any Tax ruling, enter into any Tax sharing or similar agreement or arrangement (other than agreements entered in the ordinary course of business the primary purpose of which are not Taxes), or settle any Tax claim or assessment for an amount greater than $50,000;

(j)      take or permit any action that would result in a (i) disaffiliation of any Company Party from the Company Parties' consolidated income tax group under section 1502 of the Tax Code, (ii) realization of any material taxable income outside of the ordinary course of business of the Company Parties' business, or (iii) change of ownership of any Company Party under section 382 of the Tax Code, in each case, except as contemplated by the transactions described herein;

(k)      except to the extent permitted by Section 8.02, seek, solicit, knowingly encourage, propose, assist in, consent to, or vote for, enter into, pursue, consummate, or participate in any discussions or any agreement with any Person regarding, any Alternative Restructuring Proposal;

(l)      except to the extent permitted by this Agreement, amend or propose to amend any Company Party's certificate or articles of incorporation, certificate of formation, bylaws, limited liability company agreement, partnership agreement, or similar Organizational Documents;

(m)      commence the solicitation with respect to the Plan unless the Disclosure Statement and the Solicitation Materials shall be in form and substance consistent with the consent rights set forth herein; or

(n)      consummate the Restructuring Transactions unless each of the applicable conditions to the consummation of such transactions set forth in this Agreement, the Restructuring Term Sheet, the Disclosure Statement, and the other applicable Definitive Documents has been satisfied or waived by the applicable Persons in accordance with the terms of this Agreement and the applicable Definitive Documents.

**Section 8.**    *Additional Provisions Regarding Company Parties' Commitments*.

8.01.    Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require a Company Party or the board of directors, board of managers, or similar governing body of a Company Party, after consulting with outside counsel, to take any action or to refrain from taking any action with respect to the Restructuring Transactions to the extent, upon advice of counsel, they determine, in good faith, that taking or failing to take such action would be inconsistent with applicable Law or its fiduciary obligations under applicable Law, and any such action or inaction pursuant to this Section 8.01 shall not be deemed to constitute a breach of this Agreement; provided that if (and on each occasion) a Company Party determines to take any

action or to refrain from taking any action with respect to the Restructuring Transactions in accordance with this <u>Section 8.01</u>, such Company Party shall provide written notice of such determination to the Ad Hoc Group Advisors promptly, and in no event, later than two (2) days of such Company Party making such determination.

8.02.    Notwithstanding anything to the contrary in this Agreement (but subject to <u>Section 8.01</u>), except as may be set forth in the Bidding Procedures, each Company Party and its respective directors, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives shall have the right to: (a) provide access to non-public information concerning any Company Party to any Entity that provides an unsolicited Alternative Restructuring Proposal and enters into with the Company Parties a reasonable and customary confidentiality agreement, nondisclosure agreement or agreement that includes confidentiality provisions, in any such case that covers such information; and (b) respond to unsolicited Alternative Restructuring Proposals received by any of the Company Parties; <u>provided</u> that if any Company Party receives an unsolicited Alternative Restructuring Proposal, then such Company Party shall (A) within two (2) days of receiving such proposal, notify counsel to the Ad Hoc Group of the receipt of such proposal; (B) provide counsel to the Ad Hoc Group with regular updates as to the status and progress of such Alternative Restructuring Proposal; and (C) use commercially reasonable efforts to respond promptly to reasonable information requests and questions from counsel to the Ad Hoc Group relating to such Alternative Restructuring Proposal.  At all times prior to the date on which the Company Parties enter into a definitive agreement with respect to an Alternative Restructuring, the Company Parties shall provide the Ad Hoc Group Advisors with all relevant information regarding (i) any negotiations and/or material discussions relating to any such Alternative Restructuring, and/or (ii) any amendments, modifications, or other changes to, or any further material developments of, any such Alternative Restructuring, in any such case as is necessary to keep such counsel contemporaneously informed as to the status and substance of such discussions, negotiations, amendments, modifications, changes, and/or developments.

8.03.    Nothing in this Agreement shall: (a) impair or waive the rights of any Company Party to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions; or (b) prevent any Company Party from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

**Section 9.**    *Transfer of Interests and Securities*.

9.01.    During the Agreement Effective Period, except pursuant to the consummation of the Restructuring Transactions, no Consenting First Lien Lender shall Transfer any ownership (including any beneficial ownership as defined in the Rule 13d-3 under the Exchange Act) in any Company Claims/Interests to any affiliated or unaffiliated party, including any party in which it may hold a direct or indirect beneficial interest, unless either (i) the transferee executes and delivers to counsel to the Company Parties and counsel to the Ad Hoc Group, at or before the time such Transfer is effective, a Joinder or (ii) the transferee is a Consenting First Lien Lender and the transferee provides notice of such Transfer (including the amount and type of Company Claims/Interests Transferred) to counsel to the Company Parties and counsel to the Ad Hoc Group within five (5) days after the occurrence of the Transfer.  For the avoidance of doubt, nothing in this Agreement shall alter the Company Parties' consent rights to Transfers in any applicable Finance Documents.

9.02.    Upon compliance with the requirements of <u>Section 9.01</u>, the transferee shall be deemed a Consenting First Lien Lender, and the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of the rights and obligations in respect of such transferred Company Claims/Interests.  Any Transfer in violation of <u>Section 9.01</u> shall be void *ab initio*.  Any Consenting First Lien Lender that effectuates a permitted Transfer to a Permitted Transferee shall have no liability under this Agreement arising from or related to the failure of the Permitted Transferee to comply with the terms of this Agreement.

9.03.    This Agreement shall in no way be construed to preclude the Consenting First Lien Lenders from acquiring additional Company Claims/Interests; <u>provided</u> that (a) such additional Company Claims/Interests shall automatically and immediately upon acquisition by a Consenting First Lien Lender be deemed subject to the terms of this Agreement and such Consenting First Lien Lender shall be deemed to have executed this Agreement in respect of all of its Company Claims/Interests (regardless of when or whether notice of such acquisition is given to counsel to the Company Parties and counsel to the Ad Hoc Group); and (b) such Consenting First Lien Lender must provide notice of such acquisition (including the amount and type of Company Claim/Interest acquired) to counsel to the Company Parties and counsel to the Ad Hoc Group.

9.04.    Notwithstanding <u>Section 9.01</u>, a Qualified Marketmaker that acquires any Company Claims/Interests with the purpose and intent of acting as a Qualified Marketmaker for such Company Claims/Interests shall not be required to execute and deliver a Joinder in respect of such Company Claims/Interests and shall not be subject to the requirements in the proviso of <u>Section 9.03</u> hereof if: (a) such Qualified Marketmaker subsequently transfers such Company Claims/Interests (by purchase, sale, assignment, participation, or otherwise) within ten (10) Business Days of its acquisition to a transferee that is an Entity that is not an Affiliate, Related Fund, or affiliated Entity with a common investment advisor; (b) the transferee otherwise is a Permitted Transferee; and (c) the Transfer otherwise is a permitted Transfer under <u>Section 9.01</u>.  To the extent that a Consenting First Lien Lender is acting in its capacity as a Qualified Marketmaker, it may Transfer (by purchase, sale, assignment, participation, or otherwise) any right, title, or interests in Company Claims/Interests that the Qualified Marketmaker acquires after the Agreement Effective Date from a holder of the Company Claims/Interests who is not a Consenting First Lien Lender without the requirement that the transferee be a Permitted Transferee.  For the avoidance of doubt, if a Qualified Marketmaker acquires any Company Claims/Interests from a Consenting First Lien Lender and is unable to Transfer such Company Claims/Interests within the ten (10) Business Day-period referred to above, the Qualified Marketmaker shall execute and deliver a Joinder in respect of such Company Claims/Interests.  Notwithstanding the immediately preceding sentence, a Qualified Marketmaker may Transfer any right, title, or interest in any Company Claims/Interests that it acquires from a Consenting First Lien Lender to another Qualified Marketmaker (the "**Transferee Qualified Marketmaker**") without the requirement that the Transferee Qualified Marketmaker execute and deliver to each of counsel to the Company Parties and counsel to the Ad Hoc Group, a Joinder in respect of such Company Claims/Interests or be a Permitted Transferee, if such Transferee Qualified Marketmaker Transfers the right, title or interest in such Company Claims/Interests within ten (10) Business Days of its acquisition from the Qualified Marketmaker to a transferee that (A) is a Consenting First Lien Lender or Permitted Transferee at the time of such Transfer or (B) becomes a Consenting First Lien Lender or Permitted Transferee by the date of settlement of such Transfer by signing a Joinder.    From the date of such Qualified Marketmaker's acquisition or such Company

Claims/Interests through the date such Company Claims/Interests are Transferred in accordance herewith, the Qualified Marketmaker shall vote such Company Claims/Interests as the Required Consenting First Lien Lenders shall direct.

9.05.    Notwithstanding anything to the contrary in this Section 9, the restrictions on Transfer set forth in this Section 9 shall not apply to the grant of any liens or encumbrances on any Company Claims/Interests in favor of a bank or broker-dealer holding custody of such Company Claims/Interests in the ordinary course of business and which lien or encumbrance is released upon the Transfer of such claims and interests; provided that (a) such lien or encumbrance does not provide or otherwise entitle such party to any voting rights with respect to such Company Claims/Interests and (b) upon any foreclosure of any such lien or encumbrance, such bank or broker-dealer holding custody of such Company Claims/Interests shall become a party to this Agreement by executing a Joinder and become subject to, among other items, the restrictions on Transfer set forth in this Section 9.

9.06.    In connection with any Transfer permitted by this Section 9, each of the transferor and the transferee shall deliver to the Company Parties such information and documentation as reasonably requested by such Company Parties (including as requested by any transfer agent of such Company Parties) in order to validly effectuate such Transfer and/or substantiate compliance with any applicable law.

9.07.    In addition, a Person that owns or controls First Lien Claims may become a party hereto as a Consenting First Lien Lender by executing and delivering to counsel to the Company Parties and counsel to Ad Hoc Group a Joinder, in which event such Person shall be deemed to be a Consenting First Lien Lender hereunder to the extent of the First Lien Claims owned and controlled by such Person.

**Section 10.**    *Representations and Warranties of Consenting First Lien Lenders*.    Each Consenting First Lien Lender severally, and not jointly, represents and warrants that the following statements are true and correct, as of the date such Consenting First Lien Lender executes and delivers this Agreement or a Joinder, as applicable:

(a)    it (i) is the beneficial or record owner (which shall be deemed to include any unsettled trades) of the face amount of the Company Claims/Interests or is the nominee, investment manager, or advisor for beneficial holders of the Company Claims/Interests reflected in such Consenting First Lien Lender's signature page to this Agreement or a Joinder, as applicable (subject to any Transfer by such Consenting First Lien Lender made after the Agreement Effective Date that is described in a notice delivered pursuant to Section 9.01), and (ii) having made reasonable inquiry, is not the beneficial or record owner of any Company Claims/Interests other than those reflected in such Consenting First Lien Lender's signature page to this Agreement or a Joinder, as applicable (subject to any Transfer to such Consenting First Lien Lender made after the Agreement Effective Date that is described in a notice delivered pursuant to Section 9.01);

(b)    it has the full power and authority to act on behalf of, vote, and consent to matters concerning, such Company Claims/Interests (or, with respect to Company Claims/Interests subject to an agreement to purchase which has not closed as of the date hereof, will have such power and authority upon closing);

(c)     such Company Claims/Interests are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition, transfer, or encumbrances of any kind, that would adversely affect in any way such Consenting First Lien Lender's ability to perform any of its obligations under this Agreement at the time such obligations are required to be performed; and

(d)     it has the full power to vote, approve changes to, and Transfer all of its Company Claims/Interests referable to it as contemplated by this Agreement subject to applicable Law (or, with respect to Company Claims/Interests subject to an agreement to purchase which has not closed as of the date hereof, will have such power upon closing).

**Section 11.     *Mutual Representations, Warranties, and Covenants*.**  Each of the Parties, on a several and not joint basis, represents, warrants, and covenants to each other Party, as of the date such Party executes and delivers this Agreement or a Joinder, as applicable:

(a)     it is validly existing and in good standing under the Laws of the state or jurisdiction of its organization, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

(b)     except as expressly provided in this Agreement, the Plan, and the Bankruptcy Code, no consent or approval (other than that of the BR Member and BK Member, each as defined in the Second Amended and Restated Limited Liability Company Agreement of Freedom VCM Holdings, LLC, dated January 19, 2024) is required by any other Person in order for it to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement;

(c)     except as expressly provided in this Agreement, the Plan, and the Bankruptcy Code, the entry into and performance by it of, and the transactions contemplated by, this Agreement do not, and will not, conflict in any material respect with any Law or regulation applicable to it or with any of its Organizational Documents;

(d)     except as expressly provided in this Agreement, the Plan, and the Bankruptcy Code, it has (or will have, at the relevant time) all requisite corporate or other power and authority to enter into, execute, and deliver this Agreement and to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement; and

(e)     it is not party to any restructuring or similar agreements or arrangements with the other Parties to this Agreement or any other Person that have not been disclosed to all Parties to this Agreement.

**Section 12.     *Termination Events*.**

12.01.  <u>Consenting First Lien Lender Termination Events</u>.  This Agreement may be terminated with respect to all Parties by the Required Consenting First Lien Lenders upon the delivery to each other Party of a written notice in accordance with <u>Section 14.10</u> at any time upon the occurrence of the following events:

(a)    the execution, delivery, and/or filing of any Definitive Document that is not acceptable to the Required Consenting First Lien Lenders pursuant to their consent rights set forth herein that remains unacceptable to the Required Consenting First Lien Lenders for one (1) calendar day after such terminating Required Consenting First Lien Lenders promptly transmit a written notice to the Company Parties, which may be by email from the Ad Hoc Group Advisors to counsel to the Company Parties, detailing any such lack of acceptance.  For the avoidance of doubt, any such cure period shall apply solely to the Required Consenting First Lien Lenders' lack of consent;

(b)    the breach (or inaccuracy, as applicable) in any respect by a Company Party of any of the representations, warranties, covenants, or other obligations or agreements of the Company Parties set forth in this Agreement, which breach has a material impact on the Company Parties or the Restructuring Transactions, that remains uncured (if susceptible to cure) for five (5) Business Days after such terminating Required Consenting First Lien Lenders transmit a written notice to the Company Parties in accordance with Section 14.10 detailing any such breach;

(c)    any of the Milestones is not achieved on the date set forth herein, except where such Milestone has been waived or extended by the Required Consenting First Lien Lenders, or the failure to achieve the Milestone is directly caused by, or results from, an act, omission, or delay by one or more Consenting First Lien Lender;

(d)    the issuance by any Governmental Entity, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for ten (10) days after such terminating Required Consenting First Lien Lenders transmit a written notice to the Company Parties in accordance with Section 14.10 hereof detailing any such issuance; provided that this termination right may not be exercised by any Consenting First Lien Lenders that sought or requested such ruling or order in contravention of any obligation set out in this Agreement; provided further that, at the Company Parties' sole cost and expense, the Consenting First Lien Lenders will work in good faith to assist the Company Parties in seeking to overturn or vacate such ruling or order;

(e)    the happening or existence of any event that shall have made any of the conditions precedent to the consummation of the Restructuring Transactions as set forth in this Agreement (if any), the Plan, or the section of the Restructuring Term Sheet entitled "Conditions Precedent to the Plan Effective Date", if applicable, incapable of being satisfied prior to the Outside Date, except where such condition precedent has been waived by the applicable Parties; provided that the right to terminate this Agreement under this Section 12.01(e) shall not be available to any Consenting First Lien Lenders if the happening or existence of such event is directly caused by, or results from, the breach by such Consenting First Lien Lenders of its covenants, agreements, or other obligations under this Agreement;

(f)    any Company Party, other than as expressly contemplated herein, without the consent of the Required Consenting First Lien Lenders, (i) commences a voluntary case under the Bankruptcy Code other than the Chapter 11 Cases; (ii) consents to the appointment of, or taking possession by, a receiver, liquidator, assignee, custodian, trustee, or sequestrator (or similar official) of any Company Party or a material portion of the property or assets of any Company

Party; (iii) seeks any arrangement, adjustment, protection, or relief of its debts other than the Chapter 11 Cases; or (iv) makes any general assignment for the benefit of its creditors;

(g)      (i) the commencement of an involuntary case against any Company Party under the Bankruptcy Code that is not dismissed or withdrawn within twenty-one (21) calendar days; or (ii) a court of competent jurisdiction enters a ruling, judgment, or order that appoints, or that authorizes or permits the taking of possession by, a receiver, liquidator (except the Liquidator), assignee, custodian, trustee, or sequestrator (or similar official) of any Company Party, any Interests held by any Company Party, or a material portion of the property or assets of any Company Party;

(h)      any Company Party (i) publicly announces, or communicates in writing to any other Party, its intention not to support or pursue the Restructuring Transactions; (ii) (A) in the event that a Sufficient Bid has been received on or prior to the Bid Deadline, withdraws or terminates any part of the Sale Process or (B) in the event that a Sufficient Bid has not been received at least 48 hours prior to the Auction (as defined in the Bidding Procedures), conducts an Auction (as defined in the Bidding Procedures) for the sale of the Debtors' assets; (iii) provides notice to the Ad Hoc Group Advisors that it is exercising its rights pursuant to Section 8.01; or (iv) publicly announces, or communicates in writing to any other Party, that it intends to enter into, or has entered into, definitive documentation with respect to, an Alternative Restructuring;

(i)      the Plan Effective Date has not occurred by the Outside Date (as such date may have been extended in accordance with the provisions of this Agreement);

(j)      the Bankruptcy Court enters an order denying Confirmation of the Plan and such order remains in effect for three (3) Business Days after entry of such order;

(k)      the Bankruptcy Court grants relief that is inconsistent with this Agreement or the Restructuring Term Sheet in any material respect;

(l)      if applicable, the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Company Party seeking an order (without the prior written consent of the Required Consenting First Lien Lenders), (A) converting one or more of the Chapter 11 Cases of a Company Party to a case under chapter 7 of the Bankruptcy Code, (B) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in one or more of the Chapter 11 Cases of a Company Party, (C) dismissing any of the Chapter 11 Cases, (D) approving an Alternative Restructuring Proposal, or (E) rejecting this Agreement;

(m)      the Bankruptcy Court enters an order terminating any Company Party's exclusive right to file and/or solicit acceptances of a plan of reorganization or the Company Parties let such periods/rights lapse;

(n)      except as set forth in the Bidding Procedures or in connection with any Sale Transaction, without the prior written consent of the Required Consenting First Lien Lenders, any Debtor (A) withdraws the Plan; (B) publicly announces, or communicates in writing to any other Party, its intention to withdraw the Plan or not support the Plan; (C) moves to voluntarily dismiss any of the Chapter 11 Cases; or (D) moves for court authority to sell any material asset or assets without the written consent of the Required Consenting First Lien Lenders;

(o)    any of the Company Parties (A) files any motion seeking to avoid, disallow, subordinate, or recharacterize any Company Claims/Interests, lien, or interest held by any Consenting First Lien Lender in any capacity; or (B) shall have supported any application, adversary proceeding, or Cause of Action referred to in the immediately preceding subsection (A) filed by a third party, or consents to the standing of any such third party to bring such application, adversary proceeding, or Cause of Action;

(p)    the Bankruptcy Court grants relief terminating, annulling, or modifying the automatic stay (as set forth in section 362 of the Bankruptcy Code) with regard to any asset of the Company Parties having an aggregate fair market value in excess of $3,000,000 without the prior written consent of the Required Consenting First Lien Lenders; provided, however, that any modification of the automatic stay expressly provided by the DIP Orders or any orders entered in connection with any First Day Pleadings, shall not constitute a termination event;

(q)    the Bankruptcy Court enters an order invalidating, disallowing, subordinating, recharacterizing or limiting, as applicable, any of the First Lien Claims, or any of the encumbrances that secure (or purport to secure) the First Lien Claims;

(r)    any Debtor consummates debtor-in-possession financing, cash collateral usage, exit financing and/or other financing arrangement that is in an amount, on terms and conditions, or otherwise in form and substance, that is/are not acceptable to the Required Consenting First Lien Lenders;

(s)    any Company Party's use of cash collateral or debtor-in-possession financing has been validly terminated in accordance with the respective terms thereof;

(t)    the occurrence of any default or event of default under the DIP Documents or DIP Orders, as applicable, that has not been cured or waived (if susceptible to cure or waiver) by the applicable percentage of lenders in accordance with the terms of the DIP Documents or DIP Orders, as applicable;

(u)    after entry by the Bankruptcy Court of the DIP Orders, Disclosure Statement Order, or Confirmation Order, as applicable, such order is reversed, stayed, dismissed, vacated, reconsidered, modified or amended, in each case, in a manner materially inconsistent with this Agreement without the written consent of the Required Consenting First Lien Lenders;

(v)    the occurrence of an Event of Default under the First Lien Credit Agreement that would permit acceleration or otherwise automatically accelerates the outstanding obligations thereunder, other than the "Specified Defaults" (as defined in the Limited Waiver Amendment), or any Event of Default expressly contemplated herein, that shall not have been cured within any applicable grace periods or waived pursuant to the terms of the First Lien Credit Agreement; or

(w)    any Company Party terminates this Agreement pursuant to Section 12.02.

12.02. Company Party Termination Events.  Any Company Party may terminate this Agreement as to all Parties upon prior written notice to all Parties in accordance with Section 14.10 upon the occurrence of any of the following events (unless waived in writing by the Company Parties):

(a)        termination by the Required Consenting First Lien Lenders;

(b)        the breach (or inaccuracy, as applicable) in any material respect by the Consenting First Lien Lenders of any of the representations, warranties, covenants or other obligations or agreements of the Consenting First Lien Lenders set forth in this Agreement, such that the non-breaching Consenting First Lien Lenders own or control less than 50% in number of holders of First Lien Loans and less than 66 2/3% in aggregate principal amount of all outstanding prepetition First Lien Loans and such breach remains uncured (if susceptible to cure) for five (5) Business Days after the Company Parties transmit a written notice to the breaching Consenting First Lien Lenders in accordance with <u>Section 14.10</u> detailing any such breach;

(c)        the board of directors, board of managers, or such similar governing body of any Company Party determines in accordance with <u>Section 8.01</u> hereof, after consulting with outside counsel (i) that proceeding with any of the Restructuring Transactions would be inconsistent with the exercise of its fiduciary duties or applicable Law, or (ii) in the exercise of its fiduciary duties, to pursue an Alternative Restructuring Proposal; or

(d)        the issuance by any Governmental Entity, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for five (5) days after such terminating Company Party transmits a written notice in accordance with <u>Section 14.10</u> detailing any such issuance; <u>provided</u> that this termination right shall not apply to or be exercised by any Company Party that sought or requested such ruling or order in contravention of any obligation or restriction set out in this Agreement.

12.03.   <u>Mutual Termination</u>.  This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual written agreement between the Company Parties and the Required Consenting First Lien Lenders.

12.04.   <u>Automatic Termination</u>.  This Agreement shall terminate with respect to all Parties automatically (1) without any further required action or notice immediately after the occurrence of the Plan Effective Date, or (2) on the Outside Date (as such date may have been extended in accordance with the provisions of this Agreement).

12.05.   <u>Effect of Termination</u>.   Upon the occurrence of the Termination Date, this Agreement shall be of no further force and effect and each of the Parties shall be released from its commitments, undertakings, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had, had it not entered into this Agreement, and shall be entitled to take all commercially reasonable actions, whether with respect to the Restructuring Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement, including with respect to any and all Claims or Causes of Action; <u>provided</u>, <u>however</u>, that in no event shall any such termination relieve any Party from (i) liability for its willful or intentional breach or non-performance of its obligations under this Agreement prior to the Termination Date or (ii) obligations under this Agreement which by their terms expressly survive termination of this Agreement.  Upon the occurrence of the Termination Date and, if applicable, prior to the Confirmation Order being entered by the Bankruptcy Court, any and all consents or ballots tendered by the Parties before the Termination Date shall be deemed, for all purposes, to

36

be null and void from the first instance and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring Transactions, this Agreement or otherwise. If this Agreement is terminated in accordance with this <u>Section 12</u>, each Consenting First Lien Lender shall have an opportunity to change or withdraw (or cause to change or withdraw) its vote to accept the Plan or its consent (regardless of whether any deadline for votes or consents, or for withdrawal thereof, set forth in the Disclosure Statement has passed) and no Company Party shall oppose any attempt by such Consenting First Lien Lender to change or withdraw (or cause to change or withdraw) such vote or consent at such time. Nothing in this Agreement shall be construed as prohibiting a Company Party or any of the Consenting First Lien Lenders from contesting whether any such termination is in accordance with its terms or to seek enforcement of any rights under this Agreement that arose or existed before the Termination Date. Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict (a) any right of any Company Party or the ability of any Company Party to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Consenting First Lien Lender, and (b) any right of any Consenting First Lien Lender, or the ability of any Consenting First Lien Lender, to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Company Party or Consenting First Lien Lender. No Party may terminate this Agreement (a) if such Party is in material breach of the terms of this Agreement and/or (b) on account of a termination event if the occurrence of such termination event was primarily caused by, or primarily resulted from, such Party's own action (or failure to act) in breach of the terms of this Agreement, except a termination pursuant to <u>Section 12.02(c)</u> or <u>(d)</u>. Nothing in this <u>Section 12.05</u> shall restrict any Company Party's right to terminate this Agreement in accordance with <u>Section 12.02(c)</u>.

**Section 13.    *Amendments and Waivers*.**

13.01. <u>Amendments and Waivers</u>.

(a)    This Agreement may not be modified, amended, or supplemented, and no condition or requirement of this Agreement may be waived, in any manner except in accordance with this <u>Section 13</u>.

(b)    This Agreement may be modified, amended, or supplemented, or a condition or requirement of this Agreement may be waived, in a writing (email being sufficient) signed: (i) in the case of a waiver, by the Party against whom the waiver is to be effective (it being understood that the Required Consenting First Lien Lenders may waive any conditions to the obligations of the Consenting First Lien Lenders or any rights of the Consenting First Lien Lenders under this Agreement), and (ii) in the case of a modification, amendment, or supplement, by the Company Parties and the Required Consenting First Lien Lenders; <u>provided</u> that (A) if the proposed modification, amendment, supplement, or waiver will result in a material change from the terms provided in this Agreement, including the Restructuring Term Sheet and other exhibits hereto or thereto, that has a disproportionate and adverse effect on a Consenting First Lien Lender, relative to all other Consenting First Lien Lenders, then the consent of such disproportionately and adversely affected Consenting First Lien Lender  (solely in its capacity as a Consenting First Lien Lender) shall also be required to effectuate such modification, amendment, supplement or waiver, and such disproportionately and adversely affected Consenting First Lien Lender shall be entitled

to terminate this Agreement as to itself only for any breach of this provision; and (B) any modification, amendment, or supplement to (1) this Section 13.01(b) or the Outside Date shall require the consent of all Parties, and (2) the definition for Required Consenting First Lien Lenders will require the consent of each Consenting First Lien Lender.

(c)      In determining whether any consent or approval has been given by the Required Consenting First Lien Lenders, any Company Claims/Interests held by any then-existing Consenting First Lien Lender that is in material breach of its covenants, obligations, or representations under this Agreement shall be excluded from such determination, and the Company Claims/Interests, as applicable, held by such Consenting First Lien Lender shall be treated as if they were not outstanding.

(d)      Any proposed modification, amendment, waiver or supplement that does not comply with this Section 13 shall be ineffective and void *ab initio*.

(e)      The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power, or remedy under this Agreement shall operate as a waiver of any such right, power, or remedy or any provision of this Agreement, nor shall any single or partial exercise of such right, power, or remedy by such Party preclude any other or further exercise of such right, power, or remedy or the exercise of any other right, power, or remedy.  All remedies under this Agreement are cumulative and are not exclusive of any other remedies provided by Law.

**Section 14.**     *Miscellaneous*

14.01.  Acknowledgement.  Notwithstanding any other provision herein, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a chapter 11 plan for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise.  Any such offer or solicitation will be made only in compliance with all applicable securities Laws, provisions of the Bankruptcy Code, and/or other applicable Law.

14.02.  Exhibits Incorporated by Reference; Conflicts.  Each of the exhibits, annexes, signatures pages, and schedules attached hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include such exhibits, annexes, and schedules.  In the event of any inconsistency between this Agreement (without reference to the exhibits, annexes, and schedules hereto) and the exhibits, annexes, and schedules hereto, this Agreement (without reference to the exhibits, annexes, and schedules thereto) shall govern.

14.03.  Further Assurances.  Subject to the other terms of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, or as may be required by order of the Bankruptcy Court, from time to time, to effectuate the Restructuring Transactions, as applicable.

14.04.  Complete Agreement.  Except as otherwise explicitly provided herein, this Agreement constitutes the entire agreement among the Parties with respect to the subject matter

hereof and supersedes all prior agreements, oral or written, among the Parties with respect thereto, other than any Confidentiality Agreement.

14.05. <u>GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM</u>.  THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF.  All actions arising out of or relating to this Agreement shall be brought by the Parties in either a state or federal court of competent jurisdiction in exclusively the State and County of New York, Borough of Manhattan. Notwithstanding anything to the contrary herein, upon the commencement of the Chapter 11 Cases, each of the Parties hereby agrees that, if the Chapter 11 Cases are pending, (i) the Bankruptcy Court shall have exclusive jurisdiction over all matters arising out of or in connection with this Agreement and (ii) each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, to the extent possible, in the Bankruptcy Court, and solely in connection with claims arising under this Agreement: (a) irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court; (b) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court; and (c) waives any objection that the Bankruptcy Court is an inconvenient forum or does not have jurisdiction over any Party hereto.

14.06. <u>TRIAL BY JURY WAIVER</u>.  EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

14.07. <u>Execution of Agreement</u>.  This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.  Except as expressly provided in this Agreement, each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

14.08. <u>Rules of Construction</u>.  This Agreement is the product of negotiations among the Company Parties and the Consenting First Lien Lenders, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof.  The Company Parties and the Consenting First Lien Lenders were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel.

14.09. <u>Successors and Assigns; Third Parties</u>.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable.  There are no third party beneficiaries under this Agreement, except that each No Recourse Party (as defined in <u>Section 14.24</u>) shall be a third party beneficiary of <u>Section 14.24</u>, and the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other Person, except in accordance with <u>Section 9</u> of this Agreement.

14.10.  <u>Notices</u>.  All notices hereunder shall be deemed given if in writing and delivered, by electronic mail, courier, or registered or certified mail (return receipt requested), to the following addresses (or at such other addresses as shall be specified by like notice):

(a)    if to a Company Party, to:

Franchise Group, Inc.
109 Innovation Court, Suite J
Delaware, OH 43015
Attention: Tiffany McMillan-McWaters
E-mail address: tmcwaters@franchisegrp.com

with copies to (which shall not constitute notice):

Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, NY 10019
Attention: Matthew A. Feldman; Debra McElligott Sinclair; Betsy L. Feldman
E-mail address: mfeldman@willkie.com; dsinclair@willkie.com; bfeldman@willkie.com

(b)    if to a Consenting First Lien Lender, to the address or e-mail address set forth on such member's signature page to this Agreement (or on the signature page to a Joinder in the case of any Consenting First Lien Lender that becomes a party hereto after the Agreement Effective Date), with copies to (which shall not constitute notice):

Paul Hastings LLP
200 Park Avenue
New York, NY 10166
Attention:  Jayme Goldstein; Jeremy Evans; Isaac Sasson
E-mail address: jaymegoldstein@paulhastings.com; jeremyevans@paulhastings.com; isaacsasson@paulhastings.com

(c)    Any notice given by delivery, mail, or courier shall be effective when received, and any notice delivered or given by electronic mail shall be effective when sent (so long as a message delivery failure or transmission error notification is not received by the sender).

14.11.  <u>Independent Due Diligence and Decision Making</u>.  Each Consenting First Lien Lender hereby confirms that its decision to execute this Agreement has been based upon its independent investigation of the operations, businesses, and financial and other conditions, and prospects of the Company Parties.

14.12.  <u>Enforceability of Agreement</u>.  Each of the Parties to the extent enforceable waives any right to assert that the exercise of termination rights under this Agreement is subject to the automatic stay provisions of the Bankruptcy Code, and expressly stipulates and consents hereunder to the prospective modification of the automatic stay provisions of the Bankruptcy Code for purposes of exercising termination rights under this Agreement, to the extent the Bankruptcy Court determines that such relief is required.

14.13.  <u>Waiver</u>.  If the Restructuring Transactions are not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights. Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms or the payment of damages to which a Party may be entitled under this Agreement.

14.14.  <u>Specific Performance</u>.  It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party, and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

14.15.  <u>Several, Not Joint, Claims</u>.  Except where otherwise specified, the agreements, representations, warranties, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

14.16.  <u>Severability and Construction</u>.  If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect if essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

14.17.  <u>Remedies Cumulative</u>.  All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at Law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party. No failure of any Party to exercise, and no delay in exercising, any such right, power, or remedy shall operate as a waiver of any such right, power, or remedy.

14.18.  <u>Capacities of Consenting First Lien Lenders</u>.  Each Consenting First Lien Lender has entered into this Agreement on account of all Company Claims/Interests that it holds (directly or through discretionary accounts that it manages or advises) and, except where otherwise specified in this Agreement, shall take or refrain from taking all actions that it is obligated to take or refrain from taking under this Agreement with respect to all such Company Claims/Interests.

14.19.  <u>Email Consents</u>.  Where a written consent, acceptance, approval, notice, or waiver is required pursuant to or contemplated by this Agreement, pursuant to <u>Section 7.02</u>, <u>Section 13</u>, or otherwise, including a written approval by the Company Parties or the Required Consenting First Lien Lenders, as applicable, such written consent, acceptance, approval, notice, or waiver shall be deemed to have occurred if such written consent, acceptance, approval, notice, or waiver is given or made by the applicable Party(ies) or counsel to the applicable Party(ies) to the other applicable Party(ies) or counsel to the other applicable Party(ies) by electronic mail.

14.20.  <u>Transaction Expenses</u>.

(a)      Whether or not the transactions contemplated by this Agreement are consummated, the Company Parties hereby agree, on a joint and several basis, to pay in cash the Transaction

Expenses as follows: (i) all accrued and unpaid Transaction Expenses incurred up to (and including) the Agreement Effective Date for which reasonably detailed invoices (which may be drafted to ensure the maintenance of all applicable legal privileges, and with the level of detail consistent with prior invoices sent by the Ad Hoc Group Advisors to the Company Parties) have been received by the Company Parties no later than the Agreement Effective Date shall be paid in full in cash on the Agreement Effective Date; (ii) prior to the Petition Date and after the Agreement Effective Date, all accrued and unpaid Transaction Expenses shall be paid in full in cash by the Company Parties on a monthly basis within ten (10) days of receipt of reasonably detailed invoices (which may be drafted to ensure the maintenance of all applicable legal privileges, and with the level of detail consistent with prior invoices sent by the Ad Hoc Group Advisors to the Company Parties), and otherwise in accordance with the applicable professional's engagement letter or other contractual arrangement with the Company Parties, and, in any event, no later than the Business Day prior to the Petition Date following receipt of summary invoices (which may be drafted to ensure the maintenance of all applicable legal privileges) to the extent received no fewer than three (3) Business Days prior to such date; (iii) after the Petition Date (to the extent permitted by order of the Bankruptcy Court) all accrued and unpaid Transaction Expenses shall be paid in full in cash by the Company Parties on a regular and continuing basis promptly (but in any event within ten (10) days) following receipt of summary invoices (which may be drafted to ensure the maintenance of all applicable legal privileges) and shall otherwise be paid in accordance with subsection (v); (iv) upon termination of this Agreement (other than a termination of this Agreement pursuant to Section 12.04, which is addressed in clause (v) of this Section 14.20(a)), all accrued and unpaid Transaction Expenses incurred up to (and including) the Termination Date shall be paid in full in cash promptly (but in any event within ten (10) days) following receipt of summary invoices (which may be drafted to ensure the maintenance of all applicable legal privileges, and which shall be in form and substance consistent with Delaware practice); and (v) on the Plan Effective Date, all accrued and unpaid Transaction Expenses incurred up to (and including) the Plan Effective Date shall be paid in full in cash against receipt of summary invoices (which may be drafted to ensure the maintenance of all applicable legal privileges, and which shall be in form and substance consistent with Delaware practice).  To the extent applicable, the Plan and any DIP Order shall contain appropriate provisions to give effect to the obligations under this Section 14.20.

(b)    The Company Parties hereby acknowledge and agree that the Consenting First Lien Lenders have expended, and will continue to expend, considerable time, effort, and expense in connection with this Agreement and the negotiation of the Restructuring Transactions, and that this Agreement provides substantial value to, is beneficial to, and is necessary to preserve, the Company Parties, and that the Consenting First Lien Lenders have made a substantial contribution to the Company Parties and the Restructuring Transactions.  To the extent applicable, subject to the approval of the Bankruptcy Court, the Company Parties shall reimburse or pay (as the case may be) all reasonable and documented Transaction Expenses pursuant to section 1129(a)(4) of the Bankruptcy Code or otherwise.  The Company Parties hereby acknowledge and agree that the Transaction Expenses are of the type that should be entitled to treatment as, and the Company Parties shall seek treatment of such Transaction Expenses as, administrative expense claims pursuant to sections 503(b) and 507(a)(2) of the Bankruptcy Code.  For the avoidance of doubt, nothing in this Section 14.20(b) shall require the Debtors to assume this Agreement during the Chapter 11 Cases.

14.21.  <u>Relationship Among Parties</u>.  It is understood and agreed that no Consenting First Lien Lender owes any duty of trust or confidence of any kind or form to any other Party as a result of entering into this Agreement, and there are no commitments among or between the Consenting First Lien Lenders, in each case except as expressly set forth in this Agreement.  In this regard, it is understood and agreed that any Consenting First Lien Lender may trade in Company Claims/Interests without the consent of any other Party, subject to applicable securities laws and the terms of this Agreement, including <u>Section 9</u>; <u>provided</u>, <u>however</u>, that no Consenting First Lien Lender shall have any responsibility for any such trading to any other Person by virtue of this Agreement.  No prior history, pattern, or practice of sharing confidences among or between the Parties shall in any way affect or negate this understanding and agreement.  No Consenting First Lien Lender shall, nor shall any action taken by a Consenting First Lien Lender pursuant to this Agreement, be deemed to be acting in concert or as any group with any other Consenting First Lien Lender with respect to the obligations under this Agreement nor shall this Agreement create a presumption that the Consenting First Lien Lenders are in any way acting in concert or as a group.  The decision to commit to enter into the transactions contemplated by this Agreement has been made independently by each Party hereto.  The Parties acknowledge that all representations, warranties, covenants, and other agreements made by or on behalf of any Consenting First Lien Lender that is a separately managed account of an investment manager signatory hereto (the "<u>**Manager**</u>") are being made only with respect to the assets managed by such Manager on behalf of such Consenting First Lien Lender, and shall not apply to (or be deemed to be made in relation to) any assets or interests that may be beneficially owned by such Consenting First Lien Lender that are not held through accounts managed by such Manager.

14.22.  <u>Survival</u>.  Notwithstanding (i) any Transfer of any Company Claims/Interests in accordance with this Agreement or (ii) the termination of this Agreement in accordance with its terms, the terms, provisions, agreements, and obligations set forth in <u>Section 1.02</u>, <u>Section 12.05</u>, <u>Section 13</u> and <u>Section 14</u> (other than <u>Section 14.03</u> in the event of a termination of this Agreement other than pursuant to clause (1) of <u>Section 12.04</u>), the proviso in <u>Section 5.02(a)(vii)</u>, and any defined terms used in any of the foregoing Sections or proviso (solely to the extent used therein), shall survive such termination and shall continue in full force and effect in accordance with the terms hereof.  Notwithstanding the termination of this Agreement, the Company Parties will comply with their obligations (or the obligations of their successors in interest) to pay the Transaction Expenses that have been incurred as of the Termination Date pursuant to <u>Section 14.20</u> hereof.

14.23.  <u>Publicity; Confidentiality</u>.

(a)      The Company Parties shall submit drafts to the Ad Hoc Group Advisors of any press releases or other public statement or public disclosure of the existence or terms of this Agreement or any amendment to the terms of this Agreement at least two (2) Business Days prior to making any such disclosure; <u>provided</u> that if delivery of such document at least two (2) Business Days in advance of such disclosure is impracticable under the circumstances, such document shall be delivered as soon as otherwise practicable, and shall afford them a reasonable opportunity under the circumstances to comment on such documents and disclosures and shall incorporate any such reasonable comments in good faith.

(b)     Except as required by Law, no Party or its advisors shall (x) other than as necessary during live court proceedings and in filings in connection with the Chapter 11 Cases, use the name of any Consenting First Lien Lender in any public manner (including in any press release) with respect to this Agreement, the Restructuring Transactions, or any of the Definitive Documents, or (y) disclose to any Person, other than advisors to the Company Parties, the principal amount or percentage of any Company Claims/Interests held by any Consenting First Lien Lender without such Consenting First Lien Lender's prior written consent (it being understood and agreed that each Consenting First Lien Lender's signature page to this Agreement shall be redacted to remove the name of such Consenting First Lien Lender and the amount and/or percentage of Company Claims/Interests held by such Consenting First Lien Lender); provided, however, that (i) if such disclosure is required by Law, the disclosing Party shall afford the relevant Consenting First Lien Lender a reasonable opportunity to review and comment in advance of such disclosure and shall take all commercially reasonable measures to limit such disclosure and (ii) the foregoing shall not prohibit the disclosure of the aggregate percentage or aggregate principal amount of Company Claims/Interests held by the Consenting First Lien Lenders, collectively.  Notwithstanding the provisions in this Section 14.23, (x) any Party may disclose the identities of the other Parties in any action to enforce this Agreement or in any action for damages as a result of any breaches hereof, and (y) any Party may disclose, to the extent expressly consented to in writing by a Consenting First Lien Lender such Consenting First Lien Lender's identity and individual holdings.

14.24.  No Recourse.  This Agreement may only be enforced against the named parties hereto (and then only to the extent of the specific obligations undertaken by such parties in this Agreement).  All claims or Causes of Action (whether in contract, tort, equity, or any other theory) that may be based upon, arise out of, or relate to this Agreement, or the negotiation, execution, or performance of this Agreement, may be made only against the Persons that are expressly identified as parties hereto (and then only to the extent of the specific obligations undertaken by such parties herein).  No past, present, or future direct or indirect director, manager, officer, employee, incorporator, member, partner, stockholder, equity holder, trustee, Affiliate, controlling person, agent, attorney, or other representative of any party hereto (including any person negotiating or executing this Agreement on behalf of a party hereto), nor any past, present or future direct or indirect director, manager, officer, employee, incorporator, member, partner, stockholder, equity holder, trustee, Affiliate, controlling person, agent, attorney, or other representative of any of the foregoing (other than any of the foregoing that is a Party hereto) (any such Person, a "**No Recourse Party**"), shall have any liability with respect to this Agreement or with respect to any proceeding (whether in contract, tort, equity, or any other theory that seeks to "pierce the corporate veil" or impose liability of an Entity against its owners or Affiliates or otherwise) that may arise out of or relate to this Agreement, or the negotiation, execution, or performance of this Agreement.

14.25.  Computation of Time.  Bankruptcy Rule 9006(a) applies in computing any period of time prescribed or allowed herein.

14.26.  Tax Matters.  Each Party hereby acknowledges and agrees that the terms of the Restructuring Transactions shall be structured to minimize the tax impact of the Restructuring Transactions on the Company Parties and the Consenting First Lien Lenders while preserving or otherwise maximizing favorable tax attributes (including tax basis) of the Reorganized Debtors,

as a result of the consummation of the Restructuring Transactions to the extent practicable, in each case as determined by the Consenting First Lien Lenders.

**IN WITNESS WHEREOF**, the Parties hereto have executed this Agreement on the day and year first above written.

[*Signature Pages Follow.*]

**Company Parties' Signature Page to
the Restructuring Support Agreement**

FREEDOM VCM HOLDINGS, LLC
FREEDOM VCM INTERCO HOLDINGS, INC.
FREEDOM VCM INTERCO, INC.
FREEDOM VCM RECEIVABLES II, LLC
FREEDOM VCM RECEIVABLES, INC.
FREEDOM VCM, INC.
FRANCHISE GROUP, INC.
FRANCHISE GROUP ACQUISITION TM, LLC
FRANCHISE GROUP NEW HOLDCO, LLC
FRANCHISE GROUP INTERMEDIATE HOLDCO, LLC
FRANCHISE GROUP INTERMEDIATE L, LLC
FRANCHISE GROUP INTERMEDIATE PSP, LLC
FRANCHISE GROUP NEWCO PSP, LLC
PSP MIDCO, LLC
PET SUPPLIES "PLUS", LLC
PSP GROUP, LLC
PSP SERVICE NEWCO, LLC
WNW FRANCHISING, LLC
WNW STORES, LLC
PSP STORES, LLC
PSP FRANCHISING, LLC
PSP SUBCO, LLC
PSP DISTRIBUTION, LLC
FRANCHISE GROUP INTERMEDIATE V, LLC
FRANCHISE GROUP NEWCO V, LLC
VALOR ACQUISITION, LLC
VITAMIN SHOPPE INDUSTRIES LLC
VITAMIN SHOPPE GLOBAL, LLC
VITAMIN SHOPPE MARINER, LLC
VITAMIN SHOPPE PROCUREMENT SERVICES, LLC
VITAMIN SHOPPE FRANCHISING, LLC
VITAMIN SHOPPE FLORIDA, LLC
BETANCOURT SPORTS NUTRITION, LLC
FRANCHISE GROUP INTERMEDIATE B, LLC
BUDDY'S NEWCO, LLC
BUDDY'S FRANCHISING AND LICENSING, LLC
FRANCHISE GROUP INTERMEDIATE SL, LLC
FRANCHISE GROUP NEWCO SL, LLC
EDUCATE, INC.
AMERICAN FREIGHT FFO, LLC
FRANCHISE GROUP NEWCO INTERMEDIATE AF, LLC
AMERICAN FREIGHT GROUP, LLC

AMERICAN FREIGHT HOLDINGS, LLC
AMERICAN FREIGHT, LLC
AMERICAN FREIGHT MANAGEMENT COMPANY, LLC
FRANCHISE GROUP INTERMEDIATE S, LLC
FRANCHISE GROUP NEWCO S, LLC
AMERICAN FREIGHT FRANCHISING, LLC
HOME AND APPLIANCE OUTLET, LLC
AMERICAN FREIGHT OUTLET STORES, LLC
AMERICAN FREIGHT FRANCHISOR, LLC
FRANCHISE GROUP INTERMEDIATE BHF, LLC
FRANCHISE GROUP NEWCO BHF, LLC

By: _____
Name: ANDREW M. LAURENCE
Title: Chief Executive Officer

Authorized Signatory

*[Signature Page to Restructuring Support Agreement]*

[*Consenting First Lien Lenders' signature pages on file with the Company Parties.*]

## EXHIBIT A

### Company Parties

| |
|---|
| 1.  Freedom VCM Holdings, LLC |
| 2.  Freedom VCM Interco Holdings, Inc. |
| 3.  Freedom VCM Interco, Inc. |
| 4.  Freedom Receivables II, LLC |
| 5.  Freedom VCM Receivables, Inc. |
| 6.  Freedom VCM, Inc. |
| 7.  Franchise Group, Inc. |
| 8.  Franchise Group Acquisition TM, LLC |
| 9.  Franchise Group New Holdco, LLC |
| 10. Franchise Group Intermediate Holdco, LLC |
| 11. Franchise Group Intermediate L, LLC |
| 12. Franchise Group Intermediate PSP, LLC |
| 13. Franchise Group Newco PSP, LLC |
| 14. PSP Midco, LLC |
| 15. Pet Supplies "Plus", LLC |
| 16. PSP Group, LLC |
| 17. PSP Service Newco, LLC |
| 18. WNW Franchising, LLC |
| 19. WNW Stores, LLC |
| 20. PSP Stores, LLC |
| 21. PSP Franchising, LLC |
| 22. PSP Subco, LLC |
| 23. PSP Distribution, LLC |
| 24. Franchise Group Intermediate V, LLC |
| 25. Franchise Group Newco V, LLC |
| 26. Valor Acquisition, LLC |
| 27. Vitamin Shoppe Industries LLC |
| 28. Vitamin Shoppe Global, LLC |
| 29. Vitamin Shoppe Mariner, LLC |
| 30. Vitamin Shoppe Procurement Services, LLC |
| 31. Vitamin Shoppe Franchising, LLC |
| 32. Vitamin Shoppe Florida, LLC |
| 33. Betancourt Sports Nutrition, LLC |
| 34. Franchise Group Intermediate B, LLC |
| 35. Buddy's Newco, LLC |
| 36. Buddy's Franchising and Licensing, LLC |
| 37. Franchise Group Intermediate SL, LLC |
| 38. Franchise Group Newco SL, LLC |
| 39. Educate, Inc. |
| 40. American Freight FFO, LLC |
| 41. Franchise Group Newco Intermediate AF, LLC |

| |
|---|
| 42. American Freight Group, LLC |
| 43. American Freight Holdings, LLC |
| 44. American Freight, LLC |
| 45. American Freight Management Company, LLC |
| 46. Franchise Group Intermediate S, LLC |
| 47. Franchise Group Newco S, LLC |
| 48. American Freight Franchising, LLC |
| 49. Home and Appliance Outlet, LLC |
| 50. American Freight Outlet Stores, LLC |
| 51. American Freight Franchisor, LLC |
| 52. Franchise Group Intermediate BHF, LLC |
| 53. Franchise Group Newco BHF, LLC |

## EXHIBIT B

**Restructuring Term Sheet**

*Execution Version*

## FRANCHISE GROUP, INC. AND CERTAIN AFFILIATES

## RESTRUCTURING TERM SHEET

## NOVEMBER 1, 2024

This term sheet (together with all exhibits, annexes, and schedules attached hereto, this "**Restructuring Term Sheet**") sets forth certain material terms of the proposed Restructuring Transactions contemplated under the Restructuring Support Agreement, dated as of November 1, 2024 (together with all exhibits, annexes, and schedules attached thereto, including this Restructuring Term Sheet, in each case, as amended, supplemented or modified in accordance with its terms, the "**RSA**"), to which this Restructuring Term Sheet is attached.[1]

**THIS RESTRUCTURING TERM SHEET IS NOT (NOR WILL IT BE CONSTRUED AS) AN OFFER, ACCEPTANCE OR SOLICITATION WITH RESPECT TO ANY SECURITIES, LOANS OR OTHER INSTRUMENTS OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY PLAN OF REORGANIZATION, IT BEING UNDERSTOOD THAT SUCH AN OFFER, ACCEPTANCE OR SOLICITATION, IF ANY, ONLY WILL BE MADE IN COMPLIANCE WITH APPLICABLE PROVISIONS OF SECURITIES, BANKRUPTCY, AND/OR OTHER LAWS.**

**THIS RESTRUCTURING TERM SHEET DOES NOT PURPORT TO SUMMARIZE ALL OF THE TERMS, CONDITIONS, REPRESENTATIONS, WARRANTIES, AND OTHER PROVISIONS WITH RESPECT TO THE RESTRUCTURING TRANSACTIONS DESCRIBED HEREIN, WHICH RESTRUCTURING TRANSACTIONS WILL BE SUBJECT TO THE COMPLETION OF DEFINITIVE DOCUMENTS INCORPORATING, AND CONSISTENT WITH, THE TERMS SET FORTH HEREIN AND IN THE RSA.  THE CLOSING OF ANY RESTRUCTURING TRANSACTION WILL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH DEFINITIVE DOCUMENTS.**

**THIS RESTRUCTURING TERM SHEET HAS BEEN PRODUCED FOR SETTLEMENT PURPOSES ONLY AND IS SUBJECT TO RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER SIMILAR APPLICABLE STATE AND FEDERAL STATUTES, RULES AND LAWS.  NOTHING IN THIS RESTRUCTURING TERM SHEET SHALL BE DEEMED OR CONSTRUED AS AN ADMISSION OF FACT OR LIABILITY OF ANY KIND OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS AND CONDITIONS DESCRIBED IN THE RSA, DEEMED BINDING ON ANY OF THE PARTIES TO THE RSA.**

---

[1]    Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the RSA.

| OVERVIEW | |
|---|---|
| **Debtors:** | The Company Parties that are listed on <u>Exhibit A</u> to the RSA, which shall also be signatories to the RSA. |
| **Claims and Interests to be Restructured:** | The Claims against, and the Interests in, the Debtors to be amended, restructured, discharged, compromised, or Unimpaired by the Restructuring Transactions, in each case consistent with the terms and conditions described in this Restructuring Term Sheet will include, without limitation, the following:<br><br>**Prepetition ABL Loan Claims**: consisting of approximately $248.7 million in outstanding principal, plus interest, fees, and other expenses pursuant to the ABL Credit Agreement.<br><br>**Prepetition First Lien Loan Claims**: consisting of approximately $1.097 billion in outstanding principal, plus interest, fees, and other expenses pursuant to the First Lien Credit Agreement.<br><br>**Prepetition Second Lien Loan Claims**: consisting of approximately $125 million in outstanding principal, plus interest, fees, and other expenses pursuant to the Second Lien Credit Agreement.<br><br>**Prepetition HoldCo Loan Claims**: consisting of approximately $514.7 million in outstanding principal, plus interest, fees, and other expenses pursuant to the HoldCo Credit Agreement.<br><br>**General Unsecured Claims**: consisting of any Claim (other than Intercompany Claims, DIP Claims, Prepetition First Lien Loan Claims, Prepetition Second Lien Loan Claims, Prepetition HoldCo Loan Claims, and Prepetition ABL Loan Claims) that is neither secured nor entitled to priority under the Bankruptcy Code or an order of the Bankruptcy Court (collectively, the "**General Unsecured Claims**").  The General Unsecured Claims shall be classified as follows:<br><br>(i)    General Unsecured Claims against Franchise Group, Inc.;<br><br>(ii)   General Unsecured Claims against American Freight;<br><br>(iii)  General Unsecured Claims against Buddy's;<br><br>(iv)   General Unsecured Claims against PSP;<br><br>(v)    General Unsecured Claims against Vitamin Shoppe;<br><br>(vi)   General Unsecured Claims against the HoldCo Entities other than TopCo; and<br><br>(vii)  General Unsecured Claims against TopCo. |

|  | **Subordinated Claims**: consisting of any prepetition Claim that is subject to subordination pursuant to sections 510(b)–(c) of the Bankruptcy Code or otherwise (collectively, the "**Subordinated Claims**").<br><br>**Existing Equity Interests**: consisting of all Equity Interests in the Debtors as of the Plan Effective Date.  The Existing Equity Interests shall be classified as follows:<br><br>(i)      **Existing TopCo Equity Interests**:  any Existing Equity Interests in TopCo; and<br><br>(ii)     **Existing Intercompany Equity Interests**:  any Existing Equity Interests other than Existing TopCo Equity Interests. |
|---|---|
| **Overview of the Restructuring:** | The Restructuring Transactions will be consummated pursuant to confirmation in the Chapter 11 Cases of the Plan implementing the terms and conditions set forth in this Restructuring Term Sheet, the RSA, and the DIP Term Sheet.<br><br>The Plan will be structured such that the Debtors shall concurrently:<br><br>(a)      conduct going out of business sales and implement store closing procedures at American Freight on the terms and conditions set forth in the Store-Closing and Liquidation Sales Documents and the Plan (collectively, the "**Store-Closing and Liquidation Sales**"); and<br><br>(b)      conduct a marketing and sale process pursuant to section 363 of the Bankruptcy Code and the Bidding Procedures (the "**Sale Process**"), and, either (i) solely if a Sufficient Bid (as defined below) is received by the Debtors and a Sale Toggle Event shall have occurred, execute and consummate the Sale Transaction, or (ii) to the extent a Sufficient Bid is not received at least 48 hours prior to the Auction (as defined in the Bidding Procedures), promptly provide for the Sale Process to be terminated and, unless otherwise agreed by the Required Consenting First Lien Lenders, exclusively pursue consummation of the Plan Transaction resulting in the equitization of Allowed Prepetition First Lien Loan Claims into 100% of Reorganized Common Equity (subject to dilution from (1) the MIP (as defined below), (2) the DIP Premium Conversion (as defined below), if applicable, (3) the DIP Equitization (as defined below), and (4) the New Warrants, if applicable);<br><br>in each case, in compliance with the applicable Milestones, which shall be undertaken and prosecuted with the support of the Consenting First Lien Lenders on the terms and conditions set forth in the Plan, and which shall (x) be consistent with the RSA in all material respects or (y) otherwise in form and substance acceptable to the Required Consenting First Lien Lenders pursuant to their respective consent rights set forth in the RSA.  The Plan to be filed in connection with the RSA shall provide for, among other things, the foregoing dual-track process and the classification and treatment of Claims and Interests |

|  | as specifically provided for herein irrespective of whether the Restructuring Transactions occur pursuant to the Plan Transaction or the Sale Transaction.

In addition to any proceeds from the Store-Closing and Liquidation Sales (the "**Liquidation Proceeds**"), unless otherwise agreed by the Required Consenting First Lien Lenders, in the event the Debtors consummate a Sale Transaction pursuant to a Sufficient Bid, the proceeds therefrom (collectively, the "**Sale Proceeds**") shall be distributed in accordance with this Restructuring Term Sheet and the Plan.

Irrespective of whether the Restructuring Transactions are consummated through the Plan Transaction or the Sale Transaction, the existing ABL Credit Agreement shall be kept in place during the Chapter 11 Cases on its existing terms and in compliance with the Applicable Borrowing Base (as defined in the DIP Term Sheet), subject to any paydowns of the Prepetition ABL Loan Claims resulting from their ratable share of any Liquidation Proceeds (subject to the Existing ABL Intercreditor Agreement (as defined in the DIP Term Sheet)), and shall otherwise receive the treatment for the Prepetition ABL Loan Claims set forth herein.

Irrespective of whether the Restructuring Transactions are consummated through the Plan Transaction or the Sale Transaction, on the Plan Effective Date, or as soon as practicable thereafter, each holder of an Allowed Claim or Allowed Interest, shall receive under the Plan the treatment described in this Restructuring Term Sheet in full and final satisfaction, settlement, release, and discharge of and in exchange for such holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to among the Reorganized Debtors, the Required Consenting First Lien Lenders (if applicable, as set forth in this Restructuring Term Sheet), and the holder of such Allowed Claim or Allowed Interest. |
| **Definitive Documents:** | Any documents contemplated by this Restructuring Term Sheet, including any Definitive Documents, that are not executed or remain the subject of negotiation or completion as of the Agreement Effective Date, shall be in form and substance acceptable to the Company Parties and the Required Consenting First Lien Lenders, each in their sole discretion.  Failure to reference such rights and obligations as it relates to any document referenced in this Restructuring Term Sheet shall not impair such rights and obligations. |
|  | **DIP MATTERS** |
| **DIP Financing:** | As more fully set forth in the debtor in possession financing term sheet attached as **Exhibit 1** hereto (together with all exhibits, annexes, and schedules thereto, the "**DIP Term Sheet**"), certain of the Consenting First Lien Lenders will provide the DIP Facility on the terms and conditions set forth in the RSA and this Restructuring Term Sheet, which shall be backstopped by certain members of the Ad Hoc Group and/or their respective Related Funds (each, a "**DIP Backstop Party**" and collectively, the "**DIP Backstop Parties**"). |

| | |
|---|---|
| **DIP Backstop:** | All holders of First Lien Claims (and/or one or more Related Funds of such holders) who sign the RSA prior to the closing of the DIP syndication process will be eligible to subscribe for their *pro rata* share of the DIP Facility based on their respective *pro rata* holdings of their Allowed First Lien Claims pursuant to syndication procedures acceptable to the Required Consenting First Lien Lenders.  To the extent a holder of First Lien Claims (x) does not execute the RSA and (in which case, such holder shall have no right to subscribe for any portion of the DIP Facility) or (y) executes the RSA but does not subscribe for its portion of the DIP Facility in accordance with the syndication procedures, then (in either case) each DIP Backstop Party shall, severally and not jointly, increase its share of the DIP Facility for any portion of the DIP Facility that is not subscribed for (or not permitted to be subscribed for) by such holder (the "**DIP Backstop**").<br><br>The DIP Backstop Parties shall subscribe for their respective *pro rata* shares of the DIP Backstop based on their respective *pro rata* holdings of First Lien Claims held by all DIP Backstop Parties as of October 30, 2024 (each such respective share, a "**DIP Backstop Percentage**").<br><br>In consideration for the DIP Backstop, the Debtors shall pay to the DIP Backstop Parties a non-refundable put option premium in respect of the DIP Backstop (the "**DIP Backstop Premium**") equal to 10.00% of the aggregate amount of the New Money Commitments (as defined in the DIP Term Sheet) under the DIP Facility, which shall be fully earned upon entry of the Interim DIP Order and due and payable in kind on the date of entry of the Interim DIP Order and to be included in the principal amount of the Tranche A DIP Loans. |
| **DIP Premium Election:** | Subject to entry of the Interim DIP Order, and to the extent the Restructuring Transactions are consummated through the Plan Transaction, each holder of DIP Claims (and/or one or more Related Funds of such holder) that received a DIP Backstop Premium or Commitment Premium (as defined in the DIP Term Sheet) as of closing of the DIP syndication process, and each holder of DIP Claims that receives an Exit Premium (as defined in the DIP Term Sheet) shall be entitled to elect, at its sole discretion, to convert such DIP Backstop Premium, Commitment Premium or Exit Premium into Reorganized Common Equity at a 25% discount to total equity value of the Reorganized Debtors based on the midpoint enterprise value set forth in the Disclosure Statement (the "**DIP Premium Conversion**").[2] |
| | **EXIT FUNDING** |
| **Take-Back Debt Facility:** | To the extent the Restructuring Transactions are consummated through the Plan Transaction, on the Plan Effective Date, the Reorganized Debtors shall enter into a Take-Back Debt Facility in the maximum amount necessary to ensure that the Reorganized Debtors are in compliance with the Pro Forma Leverage Cap (as defined below), provided, for the avoidance of doubt, that |

---

[2]    Note to Draft: Mechanics of DIP Premium Conversion to be agreed among the Parties prior to the Confirmation Date.

the Take-Back Debt Facility shall be no greater than the Pro Forma Leverage Cap which will be made up of, as further set forth below, a first-lien term loan consisting of all DIP Claims arising from the Tranche A DIP Loans (as defined in the DIP Term Sheet), and certain DIP Claims arising from the Tranche B DIP Loans (as defined in the DIP Term Sheet), in each case as of the Plan Effective Date, and each having, among other things, the following terms:

(a)   <u>Borrower</u>:  New TopCo or some other Entity designated as such, as mutually agreed by the Debtors and the Required Consenting First Lien Lenders.

(b)   <u>Guarantor</u>:  Each Reorganized Debtor (other than the Borrower), subject to customary exclusions.

(c)   <u>Interest Rate</u>:  SOFR + 8.00%, <u>provided</u> that, at the Borrower's election, the Borrower may pay up to 2.00% of the Take-Back Term Loans in kind.

(d)   <u>Maturity</u>:  5 years after the Plan Effective Date.

(e)   <u>Call Protection</u>:  103/102/101.

(f)   <u>Collateral</u>: First lien on substantially all of the Reorganized Debtors' assets and second lien on any ABL Priority Collateral (as defined in the Existing ABL Intercreditor Agreement), in each case subject to customary exclusions.

(g)   <u>Other</u>:

1.   the Take-Back Debt Credit Agreement shall include customary affirmative and negative covenants, events of default, representations and warranties, prepayment requirements, indemnities and reimbursements in each case, of transactions of the type described herein;

2.   the Take-Back Debt Credit Agreement shall allow for a securitization of PSP, subject to minimum proceeds and maximum pricing thresholds to be agreed to between the Company Parties and the Required Consenting First Lien Lenders, with any such proceeds used to pay down the Take-Back Term Loans on a *pro rata* basis; and

3.   the Reorganized Debtors shall use commercially reasonable efforts to obtain within sixty (60) days of the Plan Effective Date a public rating (but not any particular rating) in respect of the Take-Back Debt Facility.

| | |
|---|---|
| **New ABL Facilities:** | To the extent the Restructuring Transactions are consummated through the Plan Transaction, the Prepetition ABL Loan Claims shall be treated in the following alternative manners: (1) if the holders of Prepetition ABL Loan Claims so elect, amending and extending the existing ABL Credit Agreement |

| | |
|---|---|
| | on terms and conditions acceptable to the Debtors, the Required Consenting First Lien Lenders, and the requisite holders of Prepetition ABL Loan Claims (the "**Amended & Restated ABL Facility**"), (2) refinanced by an exit asset based loan facility (the "**Exit ABL Facility**") provided by third parties acceptable to the Debtors and the Required Consenting First Lien Lenders, in an amount necessary to refinance all Allowed Prepetition ABL Loan Claims outstanding under the existing ABL Credit Agreement upon such terms and conditions acceptable to the Required Consenting First Lien Lenders and the Debtors, (3) refinanced by a take-back term facility with an aggregate principal amount equal to the Allowed amount of the Prepetition ABL Loan Claims, which facility shall (a) be secured by the same collateral securing the Prepetition ABL Loan Claims with the same priorities, (b) mature within six (6) years of the Plan Effective Date, and (c) bear an interest rate to be established by the Required Consenting First Lien Lenders and the Debtors, or otherwise set forth by the Bankruptcy Court (the "**Take-Back ABL Term Loan Facility**"), or (4) at the election of the Required Consenting First Lien Lenders, reinstated (together with the Take-Back ABL Term Loan Facility, the Amended & Restated ABL Facility and the Exit ABL Facility, collectively, the "**Applicable ABL Exit Facility**"). |
| **New Warrants:** | To the extent the Restructuring Transactions are consummated through the Plan Transaction and the Second Lien Condition is satisfied, on the Plan Effective Date, New TopCo shall issue to holders of Allowed Prepetition Second Lien Loan Claims New Warrants to purchase up to 5.0% of the outstanding Reorganized Common Equity on the Plan Effective Date (immediately after giving effect to the consummation of the Restructuring Transactions to occur on the Plan Effective Date, including all payments and distributions to be made on or as of the Plan Effective Date, and subject to dilution from the MIP. The New Warrants shall have a term of five (5) years from the Plan Effective Date (subject to earlier termination upon the occurrence of a "liquidity event") and an initial exercise price equal to the aggregate amount of all Allowed DIP Claims, Allowed Prepetition First Lien Loan Claims, and Allowed Prepetition ABL Loan Claims. The New Warrants shall not be subject to any anti-dilution provisions (including any economic anti-dilution provisions), other than the adjustments for splits, reverse splits, and similar structural transactions that are not liquidity events. |
| | **TREATMENT OF CLAIMS AND INTERESTS** |
| **Intercompany Claims:** | Restructuring Transaction. In the event of the Plan Transaction, on or after the Plan Effective Date, (a) any and all Intercompany Claims between and among Franchise Group, Inc. and any of its direct or indirect subsidiaries (including, for the avoidance of doubt, American Freight, the BHF Entities, Buddy's, Educate, PSP, and Vitamin Shoppe) shall, at the option of the Debtors and the Required Consenting First Lien Lenders, either be (i) extinguished, canceled and/or discharged on the Plan Effective Date or (ii) reinstated and otherwise survive the Debtors' restructuring by virtue of such Intercompany Claims being left Unimpaired; and (b) any and all Intercompany Claims between and among the HoldCo Entities shall, at the option of the Debtors, in consultation with the Required Consenting First Lien Lenders, either be (i) extinguished, |

| | |
|---|---|
| | canceled and/or discharged on the Plan Effective Date or (ii) reinstated and otherwise survive the Debtors' restructuring by virtue of such Intercompany Claims being left Unimpaired.  To the extent any such Intercompany Claim is reinstated, or otherwise adjusted (including by contribution, distribution in exchange for new debt or equity, or otherwise), paid or continued as of the Plan Effective Date, any such transaction may be effected on or after the Plan Effective Date without any further action by the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person.<br><br>Sale Transaction.  In the event of a Sale Transaction, any and all Intercompany Claims between and among any Debtors whose equity is not purchased by the Successful Bidder shall, at the option of the Debtors, either be (i) extinguished, canceled and/or discharged on the Plan Effective Date or (ii) reinstated and otherwise survive the Debtors' restructuring by virtue of such Intercompany Claims being left Unimpaired.  To the extent any such Intercompany Claim is reinstated, or otherwise adjusted (including by contribution, distribution in exchange for new debt or equity, or otherwise), paid or continued as of the Plan Effective Date, any such transaction may be effected on or after the Plan Effective Date without any further action by the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person. |
| **DIP Claims:** | In full satisfaction, settlement, release and discharge of the Allowed DIP Claims, on the Plan Effective Date, (i) if the Plan Transaction is consummated, (x) first, all Allowed DIP Claims arising from Tranche A DIP Loans (other than those Tranche A DIP Loans comprised of the DIP Backstop Premiums, the Commitment Premium, and the Exit Premium that are converted into Reorganized Common Equity pursuant to the DIP Premium Conversion) shall be converted into loans under the Take-Back Debt Facility, on a dollar-for-dollar basis, (y) second, the Allowed DIP Claims arising from Tranche B DIP Loans shall be converted into the loans under Take-Back Debt Facility, ratably, on a dollar-for-dollar basis, <u>provided</u> that the sum of clauses (x) and (y) hereof together shall be no greater than the amount necessary to cause the Reorganized Debtors to have pro forma net debt of $600 million as of the Plan Effective Date after giving effect to the Restructuring Transactions (the "**Pro Forma Leverage Cap**"), and (z) third, any Allowed DIP Claims (other than Allowed DIP Claims arising from Tranche A DIP Loans) that remain outstanding after giving effect to the transactions contemplated in clauses (x) and (y) hereof shall be converted into Reorganized Common Equity at a 25% discount to total equity value of the Reorganized Debtors based on the midpoint enterprise value set forth in the Disclosure Statement (the "**DIP Equitization**")[3], or (ii) if a Sale Transaction is consummated, unless otherwise agreed to by the Required DIP Lenders, all Allowed DIP Claims shall be indefeasibly paid in full in Cash from Sale Proceeds.  Upon payment in full of all Allowed DIP Claims, all Liens and security interests granted to secure such obligations, whether in the Chapter 11 Cases or otherwise, shall be terminated and of no further force or effect. |
| **Administrative Claims:** | Except to the extent that a holder of an Allowed Administrative Claim agrees to a different treatment, on the applicable distribution date, or as soon |

| | |
|---|---|
| | thereafter as is reasonably practicable, the holder of such Allowed Administrative Claim shall receive Cash in an amount equal to such Allowed Claim or such other treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code; provided, however, that, to the extent consistent with the DIP Budget (as defined in the DIP Term Sheet), Allowed Administrative Claims representing liabilities incurred in the ordinary course of business by any of the Debtors, as debtors in possession, shall be paid in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any orders or agreements governing, instruments evidencing, or other documents relating to, such liabilities; provided, further, that any Allowed Administrative Claim that has been assumed by a Successful Bidder under the applicable Sale Documents shall not be an obligation of the Debtors and shall not be entitled to any recovery from the Estates under the Plan. |
| **Professional Fee Claims:** | The Debtors shall establish and fund the Professional Fee Escrow Account prior to the Plan Effective Date with Cash equal to the Professional Fee Escrow Amount; provided that the Plan Administrator shall use Cash on hand to increase the amount of the Professional Fee Escrow Account to the extent fee applications are filed after the Plan Effective Date in excess of the amount held in the Professional Fee Escrow Account based on such estimates.<br><br>The Bankruptcy Court shall determine the Allowed amounts of Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules, and the Confirmation Order. The Reorganized Debtors or the Plan Administrator, as applicable, shall pay Professional Fee Claims in Cash to such Professional Persons in the amount the Bankruptcy Court allows from funds held in the Professional Fee Escrow Account, as soon as reasonably practicable after such Professional Fee Claims are Allowed by entry of an order of the Bankruptcy Court; provided that the Debtors' and the Reorganized Debtors' obligations to pay Allowed Professional Fee Claims shall not be limited or deemed limited to funds held in the Professional Fee Escrow Account. To the extent that funds held in the Professional Fee Escrow Account are insufficient to satisfy the Allowed amount of Professional Fee Claims owing to the Professional Persons, the Plan Administrator shall pay such amounts within ten (10) Business Days after entry of the order approving such Professional Fee Claims.<br><br>The terms governing the Professional Fee Escrow Account and submission of Professional Fee Claims will be further delineated in the Plan. |
| **Priority Tax Claims:** | Except to the extent that a holder of an Allowed Priority Tax Claim agrees to less favorable treatment, in consultation with the Required Consenting First Lien Lenders, each holder of an Allowed Priority Tax Claim shall receive, in exchange for full and final satisfaction, settlement, release, and the discharge |

---

[3]    Note to Draft: For illustrative purposes, if, after accounting for the conversion of the Tranche A DIP Loans into loans under the Take-Back Debt Facility, there remains $250 million of availability up to the Pro Forma Leverage Cap, and there is $500 million of Tranche B DIP Loans outstanding, each holder of a Tranche B DIP Loan would receive its ratable share of $250 million of Take-Back Term Loans, with the remaining $250 million of Tranche B Term Loans being ratably equitized in accordance with the DIP Equitization.

| | |
|---|---|
| | of each Allowed Priority Tax Claim, either: (a) on the applicable distribution date, or as soon thereafter as is reasonably practicable, Cash in an amount equal to such Claim; or (b) deferred Cash payments following the Plan Effective Date, over a period ending not later than five (5) years after the Petition Date, in an aggregate amount equal to the Allowed amount of such Priority Tax Claim (with any interest to which the holder of such Priority Tax Claim may be entitled calculated in accordance with section 511 of the Bankruptcy Code); provided that all Allowed Priority Tax Claims that are not due and payable on or before the Plan Effective Date shall be paid in the ordinary course of business as they become due; provided, further, that (i) in the event of the Plan Transaction, notwithstanding any provision of the Plan to the contrary, any Claim on account of a "use tax" assessed or assessable under applicable state law shall be assumed by and reinstated against the applicable Reorganized Debtor and (ii) in the event of an Sale Transaction, any Allowed Priority Tax Claim that has been expressly assumed by a Successful Bidder under the Sale Documents shall not be an obligation of the Debtors.  On the Plan Effective Date, any Liens securing any Allowed Priority Tax Claims shall be deemed released, terminated, and extinguished, in each case without further notice to or order of the Bankruptcy Court, act, or action under applicable law, regulation, order or rule, or the vote, consent, authorization or approval of any Person.<br><br>Terms governing submission of Priority Tax Claims will be further delineated in the Plan. |
| **U.S. Trustee Fees:** | After the Plan Effective Date, the Debtors, Reorganized Debtors, and Plan Administrator (if appointed), as applicable, shall pay any and all applicable U.S. Trustee Fees in full in Cash when due and payable.  The Debtors, Reorganized Debtors, and Plan Administrator (if appointed), as applicable, shall remain obligated to pay any applicable U.S. Trustee Fees until the earliest of the closure, dismissal, or conversion to a case under Chapter 7 of the Bankruptcy Code of the case of that particular Debtor for whom the Debtors, Reorganized Debtors, or Plan Administrator (if appointed), as applicable, is responsible. |
| **Class 1**<br><br>**Priority Non-Tax Claims:** | The legal, equitable and contractual rights of the holders of Allowed Priority Non-Tax Claims are unaltered by the Plan.  Except to the extent that a holder of an Allowed Priority Non-Tax Claim agrees to a lesser treatment, on the applicable distribution date, each holder of an Allowed Priority Non-Tax Claim shall receive, in consultation with the Required Consenting First Lien Lenders: (i) Cash in an amount equal to such Allowed Claim; or (ii) such other treatment that will render such Allowed Priority Non-Tax Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code.  In the event of a Sale Transaction, any Allowed Priority Non-Tax Claim that has been expressly assumed by the applicable Successful Bidder under the applicable Sale Documents shall not be an obligation of the Debtors.<br><br>**Unimpaired – Presumed to accept.** |
| **Class 2** | The legal, equitable and contractual rights of the holders of Allowed Other Secured Claims are unaltered by the Plan.  Except to the extent that a holder |

| | |
|---|---|
| **Other Secured Claims:** | of an Allowed Other Secured Claim agrees to a different treatment, on the applicable distribution date each holder of an Allowed Other Secured Claim shall receive: (i) Cash in an amount equal to such Allowed Claim; or (ii) such other treatment that will render such Other Secured Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code; provided, however, that, to the extent consistent with the DIP Budget (as defined in the DIP Term Sheet), Other Secured Claims incurred by a Debtor in the ordinary course of business may be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto, without further notice to or order of the Bankruptcy Court; provided, further, that in the event of an Sale Transaction, any Other Secured Claim that has been expressly assumed by the applicable Successful Bidder under the applicable Sale Documents shall not be an obligation of the Debtors.<br><br>Each holder of an Allowed Other Secured Claim shall retain the Liens securing its Allowed Other Secured Claim as of the Plan Effective Date until full and final satisfaction of such Allowed Other Secured Claim is made as provided herein.  Upon the full payment or other satisfaction of each Allowed Other Secured Claim in accordance with the Plan, the Liens securing such Allowed Other Secured Claim shall be deemed released, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person.<br><br>**Unimpaired – Presumed to accept.** |
| **Class 3**<br><br>**Prepetition ABL Loan Claims:** | On the Plan Effective Date, each holder of an Allowed Prepetition ABL Loan Claim will receive its *pro rata* share of:<br><br>(i)     to the extent the Restructuring Transactions are consummated through the Plan Transaction (A) the Liquidation Proceeds resulting from the sale of any ABL Priority Collateral, and (B) proceeds of (x) the Exit ABL Facility, (y) the Amended & Restated ABL Facility, or (z) the Take-Back ABL Term Loan Facility; provided that, at the election of the Required Consenting First Lien Lenders in their sole discretion, the Prepetition ABL Loan Claims shall be reinstated; or<br><br>(ii)    to the extent the Restructuring Transactions are consummated through the Sale Transaction, (a) the Liquidation Proceeds resulting from the sale of any ABL Priority Collateral and (b) payment in full in Cash from Sale Proceeds on account of its Allowed Prepetition ABL Loan Claim.<br><br>**Impaired – Entitled to vote.** |
| **Class 4**<br><br>**Prepetition First Lien Loan Claims:** | On the Plan Effective Date, each holder of an Allowed Prepetition First Lien Loan Claim will receive its *pro rata* share of:<br><br>(i)     to the extent the Restructuring Transactions are consummated through the Plan Transaction, (A) Liquidation Proceeds resulting |

| | |
|---|---|
| | from the sale of any Term Priority Collateral (as defined in the Existing ABL Intercreditor Agreement) and (B) 100% of the Reorganized Common Equity (subject to dilution by (1) the MIP (as defined below), (2) the DIP Premium Conversion, and (3) the DIP Equitization); or |
| | (ii)    to the extent the Restructuring Transactions are consummated through the Sale Transaction, payment in full, in Cash on account of its Allowed Prepetition First Lien Loan Claim. |
| | **Impaired – Entitled to vote.** |
| **Class 5**<br><br>**Prepetition Second Lien Loan Claims:** | On the Plan Effective Date, each holder of an Allowed Prepetition Second Lien Loan Claim will receive: |
| | (i)    to the extent the Restructuring Transactions are consummated through a Plan Transaction, (A) its *pro rata* share of Liquidation Proceeds after payment of the Allowed Prepetition First Lien Loan Claims in full, in Cash, resulting from the sale of any Term Priority Collateral, and (B)(1) solely if the class votes to accept the Plan, the New Warrants, or (2) if the class votes to reject the Plan, its *pro rata* share of the greater of (x) recovery such claimant would be entitled to receive under section 1129(a)(7) of the Bankruptcy Code or (y) any treatment that may be agreed to by the Debtors and the Required Consenting First Lien Lenders; or |
| | (ii)    to the extent the Restructuring Transactions are consummated through the Sale Transaction, (a) its ratable share of Liquidation Proceeds after payment of the Allowed Prepetition First Lien Loan Claims in full, in Cash, *plus* (b) its *pro rata* share of the Prepetition Second Lien Lender Distribution.  If the proceeds of the Sale Transaction do not result in a Prepetition Second Lien Lender Distribution, then such holder of a Prepetition Second Lien Loan Claim shall receive no further consideration on account of its Prepetition Second Lien Loan Claim. |
| | **Impaired – Entitled to vote.** |
| **Class 6-A**<br><br>**General Unsecured Claims against Franchise Group, Inc.:** | On the Plan Effective Date, each holder of an Allowed General Unsecured Claim at Franchise Group, Inc. will receive: |
| | (i)    to the extent the Restructuring Transactions are consummated through a Plan Transaction, its *pro rata* share of any treatment that may be agreed to by the Debtors and the Required Consenting First Lien Lenders for the applicable class; or |
| | (ii)    to the extent the Restructuring Transactions are consummated through a Sale Transaction, its *pro rata* share of the OpCo General Unsecured Claims Distribution allocable to Franchise Group, Inc., if any.  If the proceeds of the Sale Transaction do not result in a OpCo General Unsecured Claims Distribution, then such holder |

| | |
|---|---|
| | of a General Unsecured Claim at Franchise Group, Inc. shall receive no further consideration on account of its General Unsecured Claim at Franchise Group, Inc.<br><br>**Impaired – Entitled to vote.** |
| **Class 6-B**<br><br>**General Unsecured Claims against American Freight:** | On the Plan Effective Date, each holder of an Allowed General Unsecured Claim at American Freight will receive the greater of (x) the recovery such claimant would be entitled to receive under section 1129(a)(7) of the Bankruptcy Code (*i.e.*, its *pro rata* share of any residual Liquidation Proceeds), and (y) its *pro rata* share of any treatment that may be agreed to by the Debtors and the Required Consenting First Lien Lenders for the applicable class.<br><br>**Impaired – Entitled to vote.** |
| **Class 6-C**<br><br>**General Unsecured Claims against Buddy's:** | On the Plan Effective Date, each holder of an Allowed General Unsecured Claim at Buddy's will receive:<br><br>(i)     to the extent the Restructuring Transactions are consummated through a Plan Transaction, the greater of (x) the recovery such claimant would be entitled to receive under section 1129(a)(7) of the Bankruptcy Code, and (y) its *pro rata* share of any treatment that may be agreed to by the Debtors and the Required Consenting First Lien Lenders for the applicable class; or<br><br>(ii)    to the extent the Restructuring Transactions are consummated through the Sale Transaction, its *pro rata* share of the OpCo General Unsecured Claims Distribution allocable to Buddy's, if any.  If the proceeds of the Sale Transaction do not result in a OpCo General Unsecured Claims Distribution, then such holder of a General Unsecured Claim at Buddy's shall receive no further consideration on account of its General Unsecured Claim at Buddy's.<br><br>**Impaired – Entitled to vote.** |
| **Class 6-D**<br><br>**General Unsecured Claims against PSP:** | On the Plan Effective Date, each holder of an Allowed General Unsecured Claim at PSP will receive:<br><br>(i)     to the extent the Restructuring Transactions are consummated through the Plan Transaction, the greater of (x) the recovery such claimant would be entitled to receive under section 1129(a)(7) of the Bankruptcy Code, and (y) its *pro rata* share of any treatment that may be agreed to by the Debtors and the Required Consenting First Lien Lenders for the applicable class; or<br><br>(ii)    to the extent the Restructuring Transactions are consummated through the Sale Transaction, its *pro rata* share of the OpCo General Unsecured Claims Distribution allocable to PSP, if any.  If the proceeds of the Sale Transaction do not result in a OpCo General Unsecured Claims Distribution, then such holder of a |

|  | General Unsecured Claim at PSP shall receive no further consideration on account of its General Unsecured Claim at PSP.<br><br>**Impaired – Entitled to vote.** |
|---|---|
| **Class 6-E**<br><br>**General Unsecured Claims against Vitamin Shoppe:** | On the Plan Effective Date, each holder of an Allowed General Unsecured Claim at Vitamin Shoppe will receive:<br><br>(i)     to the extent the Restructuring Transactions are consummated through the Plan Transaction, the greater of (x) the recovery such claimant would be entitled to receive under section 1129(a)(7) of the Bankruptcy Code, and (y) its *pro rata* share of any treatment that may be agreed to by the Debtors and the Required Consenting First Lien Lenders for the applicable class; or<br><br>(ii)    to the extent the Restructuring Transactions are consummated through the Sale Transaction, its *pro rata* share of the OpCo General Unsecured Claims Distribution allocable to Vitamin Shoppe, if any.  If the proceeds of the Sale Transaction do not result in a OpCo General Unsecured Claims Distribution, then such holder of a General Unsecured Claim at Vitamin Shoppe shall receive no further consideration on account of its General Unsecured Claim at Vitamin Shoppe.<br><br>**Impaired – Entitled to vote.** |
| **Class 7**<br><br>**Prepetition HoldCo Loan Claims:** | On the Plan Effective Date, each holder of an Allowed Prepetition HoldCo Loan Claim will receive:<br><br>(i)     to the extent the Restructuring Transactions are consummated through the Plan Transaction, no consideration on account of its Prepetition HoldCo Loan Claim; or<br><br>(ii)    to the extent the Restructuring Transactions are consummated through the Sale Transaction, its *pro rata* share of the Prepetition HoldCo Lender Distribution, if any.  If the proceeds of the Sale Transaction do not result in a Prepetition HoldCo Lender Distribution, then such holder of a Prepetition HoldCo Loan Claim shall receive no further consideration on account of its Prepetition HoldCo Loan Claim.<br><br>**Impaired – Entitled to vote.** |
| **Class 8**<br><br>**General Unsecured Claims against the HoldCo Entities:** | Except to the extent that a holder of an Allowed HoldCo General Unsecured Claim agrees to less favorable treatment on account of their claim, on the Plan Effective Date, or as soon as practicable thereafter, each holder of an Allowed HoldCo General Unsecured Claim shall receive:<br><br>(i)     to the extent the Restructuring Transactions are consummated through the Plan Transaction, no distribution on account of its HoldCo General Unsecured Claim, which shall be released, |

| | |
|---|---|
| | discharged and extinguished, as the case may be, and shall be of no further force or effect, and such holder shall receive no recovery on account of such Allowed HoldCo General Unsecured Claim; or |
| | (ii)    to the extent the Restructuring Transactions are consummated through the Sale Transaction, its *pro rata* share of the HoldCo General Unsecured Claims Distribution, if any.  If the proceeds of the Sale Transaction do not result in a HoldCo General Unsecured Claims Distribution, then such holder of a HoldCo General Unsecured Claims Distribution shall receive no further consideration on account of its HoldCo General Unsecured Claim. |
| | **Impaired – Entitled to vote.** |
| **Class 9**<br><br>**General Unsecured Claims against TopCo:** | Except to the extent that a holder of an Allowed TopCo General Unsecured Claim agrees to less favorable treatment, on the Plan Effective Date, or as soon as practicable thereafter, each holder of an Allowed TopCo General Unsecured Claim shall receive: |
| | (i)    to the extent the Restructuring Transactions are consummated through the Plan Transaction, (x) its *pro rata* share of Cash (if any) held by TopCo, or (y) if there is no Cash held at TopCo, then such holder of a TopCo General Unsecured Claim shall receive no further consideration on account of its TopCo General Unsecured Claim; or |
| | (ii)    to the extent the Restructuring Transactions are consummated through the Sale Transaction, its *pro rata* share of the TopCo General Unsecured Claims Distribution, if any.  If the proceeds of the Sale Transaction do not result in a TopCo General Unsecured Claims Distribution, then such holder of a TopCo General Unsecured Claim shall receive no further consideration on account of its TopCo General Unsecured Claim. |
| | **Impaired – Entitled to vote.** |
| **Class 10**<br><br>**Subordinated Claims:** | Except to the extent that a holder of a Subordinated Claim agrees to less favorable treatment, on the Plan Effective Date, or as soon as practicable thereafter, each holder of a Subordinated Claim shall receive: |
| | (i)    to the extent the Restructuring Transactions are consummated through the Plan Transaction, no distribution on account of its Subordinated Claim, which shall be released, discharged and extinguished, as the case may be, and shall be of no further force or effect, and such holder shall receive no recovery on account of such Allowed Subordinated Claim; or |
| | (ii)    to the extent the Restructuring Transactions are consummated through the Sale Transaction, its *pro rata* share of the Subordinated Claims Distribution, if any.  If the proceeds of the |

| | |
|---|---|
| | Sale Transaction do not result in a Subordinated Claims Distribution, then such holder of a Subordinated Claim shall receive no further consideration on account of its Subordinated Claim.<br><br>**Impaired – Entitled to vote.** |
| **Class 11**<br><br>**Existing TopCo Equity Interests:** | Except to the extent that a holder of an Allowed Existing TopCo Equity Interest agrees to less favorable treatment, on the Plan Effective Date, or as soon as practicable thereafter, each holder of an Allowed Existing TopCo Equity Interest shall receive:<br><br>(i)    to the extent the Restructuring Transactions are consummated through the Plan Transaction, (A) its *pro rata* share of Cash (if any) held by TopCo after payment of TopCo General Unsecured Claims, or (B) if (A) does not exist, no consideration on account of its Allowed Existing TopCo Equity Interest; or<br><br>(ii)    to the extent the Restructuring Transactions are consummated through the Sale Transaction, its *pro rata* share of the TopCo General Unsecured Claims Distribution after payment of TopCo General Unsecured Claims, if any.  If the proceeds of the Sale Transaction do not result in a TopCo General Unsecured Claims Distribution in excess of the TopCo General Unsecured Claims, no consideration on account of its TopCo General Unsecured Claim.<br><br>**Impaired – Entitled to vote.** |
| **Class 12**<br><br>**Existing Intercompany Equity Interests:** | On the Plan Effective Date, whether the Restructuring Transactions are consummated through the Plan Transaction or the Sale Transaction, each holder of an Allowed Existing Intercompany Equity Interest shall receive no distribution on account of its Existing Intercompany Equity Interest, which shall, at the election of the Debtors, be (i) extinguished, canceled and/or discharged on the Plan Effective Date, or (ii) reinstated and otherwise survive the Debtors' restructuring by virtue of such Existing Intercompany Equity Interest being left Unimpaired; <u>provided</u>, that, in the event the Restructuring Transactions are consummated through the Plan Transaction, such election shall be with the consent of Required Consenting First Lien Lenders.<br><br>**Impaired – Deemed to Reject.** |
| | **GENERAL PROVISIONS** |
| **Executory Contracts and Unexpired Leases:** | On the Plan Effective Date, in the event of a Plan Transaction, except as otherwise provided in herein, any Executory Contracts and Unexpired Leases (i) not previously assumed, or (ii) not previously rejected pursuant to an order of the Bankruptcy Court, will be deemed assumed as of the Plan Effective Date pursuant to sections 365 and 1123 of the Bankruptcy Code *except* any Executory Contract or Unexpired Lease (1) identified on the Rejected |

|  | Contracts/Lease List (which shall initially be filed with the Plan Supplement) as a contract or lease to be rejected, (2) that is the subject of a separate motion or notice to reject pending as of the Confirmation Date, or (3) that previously expired or terminated pursuant to its own terms (disregarding any terms the effect of which is invalidated by the Bankruptcy Code).<br><br>The Company Parties and the Required Consenting First Lien Lenders will work together in good faith to determine which Executory Contracts and Unexpired Leases shall be assumed, assumed and assigned, or rejected in the Chapter 11 Cases; provided that, to the extent the Restructuring Transactions are consummated through the Plan Transaction, if requested by the Required Consenting First Lien Lenders, (x) Vitamin Shoppe shall reject any and all Executory Contracts or Unexpired Leases held by such Debtor(s), and (y) the Debtors shall reject any Executory Contracts or Unexpired Leases explicitly identified by the Required Consenting First Lien Lenders between (i) any of the Debtors, on the one hand, and (ii) any Specified Party, on the other hand.<br><br>On the Plan Effective Date, in the event of a Sale Transaction, except as otherwise provided herein, any Executory Contract or Unexpired Lease (i) not previously assumed, (ii) not assumed and assigned in accordance with any Sale Documents, (iii) not previously rejected pursuant to an order of the Bankruptcy Court, or (iv) not subject of a pending motion to reject, assume or assume and assign, will be deemed rejected as of the Plan Effective Date. |
| **New Board:** | In the event of a Plan Transaction the new board of directors or board of managers of New TopCo (the "**New Board**") and the new board of directors, board of managers or similar governing body of the Reorganized Debtors shall be appointed on the Plan Effective Date by the Required Consenting First Lien Lenders, in their sole discretion, and consist of a number of members determined by the Required Consenting First Lien Lenders, in their sole discretion. |
| **Management/Employee Incentive Plans:** | In the event of a Plan Transaction, the New Board shall: (x) adopt and implement management incentive plans (collectively, the "**MIP**") at each operating company or (y) shall assume, amend or reject the existing long term incentive plans with the current members of the senior management team of Franchise Group's direct or indirect subsidiaries, in each case structured to incentivize operating performance and align economic interests on terms and conditions acceptable to the New Board and the Required Consenting First Lien Lenders. If applicable, the MIP shall provide for the issuance of equity or equity-linked awards representing up to 10% of the Reorganized Common Equity on a fully diluted basis, to be allocated by the New Board. |
| **Employment Arrangements:** | In the event of a Plan Transaction, the Reorganized Debtors will either assume or reject the existing agreements with the current members of the senior management team of Franchise Group, or will enter into new compensation arrangements, as applicable, on the Plan Effective Date with some or all such individuals who agree to such new arrangements, which assumption or rejection must be approved by the Required Consenting First Lien Lenders and |

| | which new arrangements, as applicable, must be acceptable to the Reorganized Debtors and the Required Consenting First Lien Lenders. |
|---|---|
| **Vesting of Assets:** | In the event of a Plan Transaction, on the Plan Effective Date, pursuant to sections 1141(b)–(c) of the Bankruptcy Code, all assets of the Debtors (other than the assets of American Freight sold in the Store-Closing and Liquidation Sales) will vest in the Reorganized Debtors free and clear of all liens, Claims, and encumbrances. |
| **Conditions Precedent to Confirmation:** | Confirmation of the Plan is subject to the satisfaction or waiver of the following conditions to confirmation of the Plan:<br><br>(a) the DIP Order shall have been entered by the Bankruptcy Court and shall remain in full force and effect;<br><br>(b) the Debtors shall have paid in full in Cash (or the Debtors shall pay in full in Cash substantially contemporaneously with consummation of the Restructuring Transactions) all Transaction Expenses incurred or estimated to be incurred, through the proposed Confirmation Date in accordance with the DIP Order;<br><br>(c) the final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been filed in a manner consistent in all material respects with the Plan;<br><br>(d) entry of the Disclosure Statement Order;<br><br>(e) entry of the Confirmation Order;<br><br>(f) the RSA, the DIP Facility, and the DIP Order, shall not have been terminated in accordance with its respective terms, and there shall not have occurred and be continuing any event, act, or omission that, but for the expiration of time, would permit the Required Consenting First Lien Lenders to terminate the RSA or the DIP Order, or the DIP Facility in accordance with its respective terms upon the expiration of such time; and<br><br>(g) in the event of a Sale Transaction, the receipt of a Sufficient Bid and the Sale Documents shall not have been terminated in accordance with its terms. |
| **Conditions Precedent to the Plan Effective Date:** | The occurrence of the Plan Effective Date will be subject to the satisfaction or waiver of the following conditions to effectiveness of the Plan:<br><br>(a) the Confirmation Order shall have become a final and non-appealable order, which shall not have been stayed, reversed, vacated, amended, supplemented or otherwise modified, unless otherwise agreed by the Debtors and the Required Consenting First Lien Lenders;<br><br>(b) each of the applicable Definitive Documents shall have been executed and effectuated and remain in full force and effect, and any conditions |

precedent related thereto or contained therein shall have been satisfied before or contemporaneously with the occurrence of the Plan Effective Date or otherwise waived in accordance with such applicable Definitive Documents;

(c) any non-technical and/or immaterial amendments, modifications or supplements to the Plan shall be acceptable to the Debtors and the Required Consenting First Lien Lenders, except as otherwise provided in Section 14.3 of the Plan;

(d) the RSA, the DIP Facility, and the DIP Order, shall not have been terminated in accordance with its respective terms, and there shall not have occurred and be continuing any event, act, or omission that, but for the expiration of time, would permit the Required Consenting First Lien Lenders to terminate the RSA or the DIP Order, or the DIP Facility in accordance with its respective terms upon the expiration of such time;

(e) to the extent a Plan Transaction is implemented, all of the actions set forth in the Restructuring Transactions Memorandum, as applicable, shall have been completed and implemented;

(f) there shall not have been instituted or threatened or be instituted any action, proceeding, application, claim, counterclaim, or investigation (whether formal or informal) by any Governmental Entity (x) making illegal, enjoining, or otherwise prohibiting the consummation of the Restructuring Transaction contemplated herein, in the RSA, and in the Definitive Documents or (y) imposing a material award, claim, injunction, fine or penalty that, in each case, both (1) is not dischargeable, as determined by the Bankruptcy Court in the Confirmation Order, and (2) has a material adverse effect on the financial condition or operations of the Reorganized Debtors, taken as whole;

(g) the Debtors have obtained all authorizations, consents and regulatory approvals, if any, required to be obtained, and filing all notices and reports, if any, required to be filed, by the Debtors in connection with the Plan's effectiveness;

(h) the Reorganized Common Equity to be issued and/or delivered on the Plan Effective Date (as set forth in the Plan) shall have been validly issued by New TopCo, shall be fully paid and non-assessable, and shall be free and clear of all taxes, liens and other encumbrances, pre-emptive rights, rights of first refusal, subscription rights and similar rights, except for any restrictions on transfer as may be imposed by (i) applicable securities Laws and (ii) the New Organizational Documents of New TopCo;

(i) all conditions precedent to the effectiveness of the Take-Back Credit Agreement shall have been satisfied or duly waived by the party whose

|  | consent is required thereunder, and the Take-Back Credit Agreement shall be in full force and effect; |
|---|---|
|  | (j) all conditions precedent to the effectiveness of the Applicable ABL Exit Facility shall have been satisfied or duly waived by the party whose consent is required thereunder, and the Applicable ABL Exit Facility shall be in full force and effect; |
|  | (k) all requisite filings with any Governmental Entity and third parties shall have become effective, and all such Governmental Entity and third parties shall have approved or consented to the Restructuring Transactions, to the extent required; |
|  | (l) the New Organizational Documents shall be in full force and effect; |
|  | (m) any and all requisite regulatory approvals, KYC requirements, and any other authorizations, consents, rulings, or documents required to implement and effectuate the Restructuring Transactions shall have been obtained; |
|  | (n) all accrued and unpaid Transaction Expenses shall have been paid in full by the Debtors; |
|  | (o) the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan; |
|  | (p) in the event of a Sale Transaction, the Sale Documents, as applicable, not having been terminated in accordance with their terms; and |
|  | (q) all closing conditions and other conditions precedent in the RSA shall have been satisfied or waived in accordance with the terms thereof. |
| **Discharge and Injunction:** | In the event of a Plan Transaction, the Plan will contain customary discharge and injunction provisions acceptable to the Company Parties and the Required Consenting First Lien Lenders. |
| **Retention of Jurisdiction:** | The Plan will provide for a broad retention of jurisdiction by the Bankruptcy Court for (i) resolution of Claims, (ii) allowance of compensation and expenses for pre-Plan Effective Date services, (iii) resolution of motions, adversary proceedings, or other contested matters, (iv) entry of such orders as necessary to implement or consummate the Plan and any related documents or agreements, and (v) other purposes. |
| **Restructuring Transactions:** | In the event of a Plan Transaction, on the Plan Effective Date or as soon as reasonably practicable thereafter, the Debtors or Reorganized Debtors, as applicable, may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Restructuring Transactions under and in connection with the Plan. |

| | |
|---|---|
| **Freedom Allocated Fees and Expenses:** | Payment of any fees or expenses (including any director, officer, and manager fees, to the extent applicable) allocable to Freedom VCM Holdings, LLC with respect to the restructuring (including the Restructuring Transactions) or administration of the Chapter 11 Cases shall be conditioned upon an allocation among Freedom VCM Holdings, LLC and the other Debtors to be agreed upon in good faith between the Debtors and the Required Consenting First Lien Lenders (the "<u>Freedom Allocated Fees and Expenses</u>").  Freedom VCM Holdings, LLC shall be required to use any Cash it has on hand to pay its ratable share of such Freedom Allocated Fees and Expenses, if any; <u>provided</u>, that, for the avoidance of doubt, Freedom VCM Holdings, LLC, shall not otherwise use any of its Cash until an agreement is reached on the Freedom Allocated Fees and Expenses; <u>provided</u>, <u>further</u>, that if the allocation results in Freedom VCM Holdings, LLC holding a claim against another Debtor, such claim shall be entitled to administrative expense priority, which administrative expense priority shall be junior in priority to the DIP Claims. |
| **Securities Exemption:** | In the event of a Plan Transaction, the issuance and distribution under the Plan of the Reorganized Common Equity and the New Warrants shall be exempt from registration under the Securities Act under section 1145(a) of the Bankruptcy Code, and/or Section 4(a)(2) of the Securities Act or Regulation D of the Securities Act. |
| **Tax Considerations:** | To the extent practicable, a Plan Transaction contemplated by this Restructuring Term Sheet will be structured in a manner that is the most tax-efficient for the Reorganized Debtors (for the avoidance of doubt, such contemplated structure may include a "Bruno's transaction" pursuant to which the Debtors sell the assets and/or equity of all or certain Debtors in a taxable transaction to an indirect subsidiary of a Reorganized Debtor), which structure shall be acceptable to the Required Consenting First Lien Lenders and the Debtors in their sole discretion. |

**SELECT ADDITIONAL DEFINITIONS**

| | |
|---|---|
| "<u>**Administrative Claim**</u>" | Any right to payment constituting a cost or expense of administration incurred during the Chapter 11 Cases of a kind specified under section 503(b) of the Bankruptcy Code and entitled to priority under sections 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including (i) the actual and necessary costs and expenses incurred after the Petition Date and through the Plan Effective Date of preserving the Estates and operating the businesses of the Debtors (such as wages, salaries, or commissions for services and payments for goods and other services and leased premises), and (ii) Transaction Expenses. |
| "<u>**Allowed**</u>" | With reference to any Claim or Interest against a Debtor, any Claim or Interest against a Debtor (a)(i) that is timely filed by the Bar Date or (ii) as to which there exists no requirement for the holder of a Claim to file such Claim under the Plan, the Bankruptcy Code, the DIP Order, the Bankruptcy Rules or a Final Order, (b)(i) that is listed in the Schedules as not contingent, not unliquidated, and not disputed and (ii) for which no contrary proof of claim has been timely filed, or (c) allowed under the Plan, the DIP Order, or by a Final Order.  With respect to any Claim described in clause (a) above, such Claim will be |

21

| | |
|---|---|
| | considered allowed only if, and to the extent that, (A) no objection to the allowance of such Claim has been asserted, or may be asserted, on or before the time period set forth in the Plan, and no request for estimation or other challenge, including, without limitation, pursuant to section 502(d) of the Bankruptcy Code or otherwise, has been interposed and not withdrawn within the applicable period fixed by the Plan or applicable law, (B) an objection to such Claim is asserted and such Claim is subsequently allowed pursuant to a Final Order, (C) such Claim is settled pursuant to an order of the Bankruptcy Court, or (D) such Claim is allowed pursuant to the Plan or any agreements related thereto and such allowance is approved and authorized by the Bankruptcy Court; provided, however, that notwithstanding the foregoing, the Reorganized Debtors will retain all claims and defenses with respect to allowed Claims that are reinstated or otherwise Unimpaired pursuant to the Plan. |
| "**American Freight**" | Collectively, Franchise Group Newco Intermediate AF, LLC and each of its subsidiaries, and American Freight FFO, LLC. |
| "**Bar Date**" | The dates by which proofs of claim must be filed with respect to Claims against the Debtors, as ordered by the Bankruptcy Court pursuant to a bar date order or other applicable order, or pursuant to the Plan. |
| "**BHF Entities**" | Collectively, Franchise Group Intermediate BHF, LLC and Franchise Group Newco BHF, LLC.  For the avoidance of doubt, "BHF Entities" does not include Conn's, Inc. |
| "**Buddy's**" | Collectively, Franchise Group Intermediate B, LLC and each of its subsidiaries. |
| "**Cash**" | The legal currency of the United States and equivalents thereof. |
| "**Confirmation Date**" | The date on which the Bankruptcy Court enters the Confirmation Order. |
| "**DIP Claims**" | Any Claim on account of DIP Loans arising under or pursuant to the DIP Credit Agreement or the other DIP Documents. |
| "**DIP Closing Date**" | The date of the satisfaction (or waiver) of each of the conditions precedent to the initial funding of the DIP Facility after entry of the Interim DIP Order. |
| "**DIP Loans**" | Loans arising under or pursuant to the DIP Credit Agreement. |
| "**Educate**" | Collectively, Franchise Group Intermediate SL, LLC, Franchise Group Newco SL, LLC, and Educate, Inc. |
| "**Estate(s)**" | Individually or collectively, the estate or estates of the Debtors created under section 541 of the Bankruptcy Code. |
| "**Existing Intercompany Equity Interests**" | Any Existing Equity Interests other than the Existing TopCo Equity Interest. |

| "**Final Order**" | An order, ruling, or judgment of the Bankruptcy Court (or other court of competent jurisdiction) that (i) is in full force and effect, (ii) is not stayed, and (iii) is no longer subject to review, reversal, vacatur, modification, or amendment, whether by appeal or by writ of certiorari; *provided, however*, that the possibility that a motion under Rules 50 or 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule (or any analogous rules applicable in such other court of competent jurisdiction) may be filed relating to such order, ruling, or judgment shall not cause such order, ruling, or judgment not to be a Final Order. |
|---|---|
| "**HoldCo Entities**" | Collectively, Freedom VCM Interco Holdings, Inc., Freedom Receivables II, LLC, Freedom VCM Receivables, Inc., Freedom VCM Interco, Inc., Freedom VCM, Inc., and TopCo. |
| "**HoldCo General Unsecured Claim**" | Any General Unsecured Claims against the HoldCo Entities other than TopCo. |
| "**HoldCo General Unsecured Claims Distribution**" | To the extent the Restructuring Transactions are consummated pursuant to a Sale Transaction, an amount equal to (a) the aggregate net Cash Sale Proceeds (if any) allocable to any particular HoldCo Entity, *less* (b) the aggregate amount required to pay in full in Cash all Allowed Claims that are senior to HoldCo General Unsecured Claims in priority of payment under the Bankruptcy Code (after taking into account all structurally senior Allowed Claims) (including, without limitation, the satisfaction in full of the DIP Claims, and, if applicable, the Prepetition HoldCo Loan Claims including any interest, fees, or premiums payable thereon) or applicable nonbankruptcy law. |
| "**Impaired**" | With respect to a Claim, Interest, or a class of Claims or Interests, "impaired" within the meaning of sections 1123(a)(3) and 1124 of the Bankruptcy Code. |
| "**Intercompany Claim**" | Any Claim against a Debtor held by another Debtor. |
| "**Lien**" | Any "lien," as defined in section 101(37) of the Bankruptcy Code. |
| "**OpCo General Unsecured Claims Distribution**" | To the extent the Restructuring Transactions are consummated pursuant to a Sale Transaction, an amount equal to (a) the aggregate net Cash Sale Proceeds (if any) allocable to any particular Debtor (other than any HoldCo Entity), *less* (b) the aggregate amount required to pay in full in Cash all Allowed Claims that are senior to General Unsecured Claims of that particular Debtor in priority of payment under the Bankruptcy Code (including the satisfaction in full of the DIP Claims, the Prepetition ABL Loan Claims, the Prepetition First Lien Loan Claims, and the Prepetition Second Lien Loan Claims, including any interest, fees, or premiums payable thereon) or applicable nonbankruptcy law. |
| "**Other Priority Claim**" | Any Claim other than an Administrative Claim or a Priority Tax Claim that is entitled to priority of payment as specified in section 507(a) of the Bankruptcy Code. |
| "**Other Secured Claim**" | A Secured Claim other than an Administrative Claim, Priority Tax Claim, Other Priority Claim, DIP Claim, Prepetition ABL Loan Claim, Prepetition |

| | First Lien Loan Claim, Prepetition Second Lien Loan Claim, or Prepetition HoldCo Loan Claim. |
|---|---|
| "**Plan Administrator**" | The Person or Entity (or any successor thereto) who, on and after the Plan Effective Date, shall have the rights, powers, and duties set forth in the Plan, and whose identity and compensation shall be agreed to by the Debtors in consultation with the Required Consenting First Lien Lenders and shall be set forth in the Plan Supplement; provided to the extent the Restructuring Transactions are consummated pursuant to the Plan Transaction, the Plan Administrator shall be appointed by the Required Consenting First Lien Lenders. |
| "**Plan Effective Date**" | The date that the Plan confirmed by the Bankruptcy Court becomes effective. |
| "**Plan Transaction**" | Has the meaning ascribed to it in the recitals to the RSA. |
| "**Prepetition HoldCo Lender Distribution**" | To the extent the Restructuring Transactions are consummated pursuant to a Sale Transaction, an amount equal to (a) the aggregate net Cash Sale Proceeds (if any) allocable to Freedom VCM Interco, Inc. or Freedom VCM, Inc. (after taking into account any structurally senior claims) less (b) the aggregate amount required to pay in full in Cash all Allowed Claims after taking into account all structurally senior Allowed Claims and all Allowed Claims that are senior to Prepetition HoldCo Loan Claims in priority of payment under the Bankruptcy Code (including the satisfaction in full of the DIP Claims including any interest, fees, or premiums payable thereon) or applicable nonbankruptcy law. |
| "**Prepetition Second Lien Lender Distribution**" | To the extent the Restructuring Transactions are consummated pursuant to a Sale Transaction, an amount equal to (a) the aggregate net Cash Sale Proceeds less (b) the aggregate amount required to pay in full in Cash all Allowed Claims that are senior to Prepetition Second Lien Loan Claims in priority of payment under the Bankruptcy Code (including, without limitation, the satisfaction in full of the DIP Claims, the Prepetition ABL Loan Claims, and the Prepetition First Lien Loan Claims, including any interest, fees, or premiums payable thereon) or applicable nonbankruptcy law. |
| "**Priority Non-Tax Claims**" | Any Claim, other than a DIP Claim, an Administrative Claim, a Professional Fee Claim or a Priority Tax Claim, entitled to priority in payment as specified in section 507(a) of the Bankruptcy Code. |
| "**Priority Tax Claim**" | Any Secured Claim or unsecured Claim of a governmental unit of the kind entitled to priority of payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code. |
| "**Professional Fee Claim**" | Any Claim by a Professional Person for compensation for services rendered or reimbursement of expenses incurred by such Professional Person on or after the Petition Date through and including the Confirmation Date under sections 328, 330, 331, 503(b)(2), 503(b)(4), or 503(b)(5) of the Bankruptcy Code (including transaction and success fees) to the extent such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court. To the extent the Bankruptcy Court denies or reduces by a Final Order any amount of a |

| | Professional Persons's requested fees and expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Professional Fee Claim. |
|---|---|
| "**Professional Fee Escrow Account**" | An account funded by the Debtors with Cash no later than the Plan Effective Date in the amount equal to the Professional Fee Escrow Amount. |
| "**Professional Fee Escrow Amount**" | The aggregate amount of Professional Fee Claims and other unpaid fees and expenses the Professional Persons have incurred or will incur in rendering services in connection with the Chapter 11 Cases prior to and as of the Plan Effective Date, which shall be estimated pursuant to the method set forth in the Plan. |
| "**Professional Person**" | All Persons (a) retained by order of the Bankruptcy Court in connection with the Chapter 11 Cases, pursuant to sections 327, 328, 363, or 1103 of the Bankruptcy Code, excluding any ordinary course professionals retained pursuant to an order of the Bankruptcy Court, or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code. |
| "**PSP**" | Collectively, Franchise Group Intermediate PSP, LLC and each of its subsidiaries. |
| "**Required DIP Lenders**" | The lenders constituting "Required Lenders" under the DIP Credit Agreement. |
| "**Sale Transaction**" | Has the meaning ascribed to it in the recitals to the RSA. |
| "**Schedules**" | The schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs filed by the Debtors pursuant to section 521 of the Bankruptcy Code. |
| "**Second Lien Condition**" | The class of Prepetition Second Lien Loan Claims shall have voted to accept the Plan by the Voting Deadline. |
| "**Secured Claim**" | A Claim (i) secured by a lien on collateral to the extent of the value of such collateral as (a) set forth in the Plan, (b) agreed to by the holder of such Claim and the Debtors, or (c) determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code, or (ii) secured by the amount of any right of setoff of the holder thereof in accordance with section 553 of the Bankruptcy Code. |
| "**Specified Party**" | Any of the following: (a) any current or former holders of Interests (other than Franchise Group, Inc. or any of its subsidiaries), (b) any current or former Affiliate of any Person described in clause (a) of this definition, or (c) any current or former partner, officer, director, principal, employee or agent of any Person described in clause (a) or clause (b) of this definition. |
| "**Subordinated Claims Distribution**" | To the extent the Restructuring Transactions are consummated pursuant to a Sale Transaction, an amount equal to (a) the aggregate net Cash Sale Proceeds (if any) allocable to any particular Debtor, *less* (b) the aggregate amount |

| | required to pay in full in Cash all Allowed Claims that are senior to Subordinated Claims in priority of payment under the Bankruptcy Code (after taking into account all structurally senior Allowed Claims) (including, to the extent applicable, the satisfaction in full of the DIP Claims, the Prepetition ABL Loan Claims, the Prepetition First Lien Loan Claims, the Prepetition Second Lien Loan Claims, the Prepetition HoldCo Loan Claims, the HoldCo General Unsecured Claims, and the TopCo General Unsecured Claims, including any interest, fees, or premiums payable thereon) or applicable nonbankruptcy law. |
|---|---|
| "**Successful Bidder**" | Has the meaning ascribed to such term in the Bidding Procedures. |
| "**Sufficient Bid**" | A qualified bid for a Sale Transaction, or series of qualified bids (so long as each such qualified bid does not contemplate a sale of any assets covered by any such other qualified bid as of at least 48 hours prior to the Auction) for a Sale Transaction aggregated together, that the Debtors and the Required Consenting First Lien Lenders determine have satisfied, among other things, the following conditions and are otherwise acceptable to the Debtors and the Required Consenting First Lien Lenders: (a) be a good faith, *bona fide*, irrevocable bid, (b) be in writing and executed by a duly authorized representative of the bidder, (c) unless otherwise agreed by the Required Consenting First Lien Lenders in their sole discretion, provide for receipt by the Debtors of aggregate Cash consideration sufficient for the indefeasible payment in full in Cash at the closing of the Sale Transaction contemplated by such qualified bid(s) of: (1) all of the Prepetition First Lien Loan Claims, (2) all of the Prepetition ABL Loan Claims, and (3) all of the DIP Claims, in each case, including any fees, premiums and accrued but unpaid interest (including postpetition interest at the default contract rate, if applicable) on any of such Claims, (d) be accompanied by a Cash deposit equal to at least 10% of the purchase price, (e) include written evidence acceptable to the Company Parties demonstrating appropriate corporate or similar governance authorization of the bidder(s) to consummate the Sale Transaction contemplated by the proposed bid(s), (f) include written evidence that demonstrates that the bidder has the necessary financial ability to timely close the Sale Transaction contemplated by the proposed qualified bid(s) (including written evidence of the bidder's internal financial resources and ability to finance its bid with Cash on hand, available lines of credit, uncalled capital commitments or otherwise available funds), (g) not contain conditions or contingencies of any kind, relating to financing, internal approvals, due diligence, third party consents or approvals (other than governmental or regulatory consents that may be required to consummate the proposed Sale Transaction, including any antitrust approval that may be required under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, which shall be described in the bid together with evidence satisfactory to the Debtors and the Required Consenting First Lien Lenders of the ability to obtain such approvals or consents as soon as reasonably practicable), the satisfaction or achievement of any financial targets, thresholds or metrics, the absence of any material adverse effect since a date earlier than the date the bid was submitted, or any other conditions or contingencies other than conditions to closing that are customary for sales to non-"stalking horse" bidders in sales of assets under section 363 of the Bankruptcy Code (but, for the avoidance of doubt, excluding any of the |

|  | conditions set forth in this clause (g)), (h) be reasonably likely to be consummated (if selected as the winning bid) promptly following entry of the Sale Order or Confirmation Order, as applicable, or otherwise within a time frame acceptable to the Debtors and the Required Consenting First Lien Lenders, and (j) in the case of a series of qualified bids (so long as each such qualified bid does not contemplate a sale of any assets covered by any such other qualified bid as of at least 48 hours prior to the Auction) for a Sale Transaction aggregated together, each qualified bid in such series is conditioned on the consummation of the other qualified bid(s) in such series at substantially the same time by no later than March 4, 2025. |
|---|---|
| "**Take-Back Term Loans**" | Any term loans arising under or pursuant to the Take-Back Debt Credit Agreement. |
| "**TopCo**" | Freedom VCM Holdings, LLC. |
| "**TopCo General Unsecured Claim**" | General Unsecured Claims against TopCo. |
| "**TopCo General Unsecured Claims Distribution**" | To the extent the Restructuring Transactions are consummated pursuant to a Sale Transaction, an amount equal to (a) the aggregate net Cash Sale Proceeds (if any) allocable to TopCo, *less* (b) the aggregate amount required to pay in full in Cash all Allowed Claims that are senior to TopCo General Unsecured Claims in priority of payment under the Bankruptcy Code (after taking into account all structurally senior Allowed Claims) (including, without limitation, the satisfaction in full of the DIP Claims, including any interest, fees, or premiums payable thereon) or applicable nonbankruptcy law. |
| "**Unimpaired**" | With respect to a Claim, Interest, or a class of Claims or Interests, not "Impaired". |
| "**Vitamin Shoppe**" | Collectively, Franchise Group Intermediate V, LLC and each of its subsidiaries. |
| "**Voting Deadline**" | The date and time to be set by the Bankruptcy Court as the deadline for holders of Impaired Claims to vote to accept or reject the Plan. |

## EXHIBIT 1

**DIP Term Sheet**

*Execution Version*

**Franchise Group, Inc.**

**DIP Term Sheet**

This term sheet (together with all exhibits, annexes, and schedules attached hereto, this "**DIP Term Sheet**") sets forth certain material terms of the proposed DIP Facility (as defined below). Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Restructuring Support Agreement, dated as of November 1, 2024 (together with all exhibits, annexes, and schedules attached thereto, including the Term Sheets, in each case, as amended, supplemented or modified in accordance with its terms, the "**RSA**"), to which this DIP Term Sheet is attached as an exhibit to the Restructuring Term Sheet.

This DIP Term Sheet does not constitute a commitment to lend or provide any financing nor does it address all terms that would be required in connection with the DIP Facility or that will be set forth in the DIP Documents (as defined below), which are subject to negotiation and further subject to execution of definitive documents, pleadings and proposed forms of orders, all of which shall be in form and substance acceptable to the Company Parties and the Required Consenting First Lien Lenders, each in their sole discretion.

| | |
|---|---|
| **Borrowers** | Franchise Group, Inc., a Delaware corporation (the "**Lead Borrower**"), Franchise Group Newco PSP, LLC, a Delaware limited liability company ("**FG Newco PSP**"), Valor Acquisition, LLC, a Delaware limited liability company ("**Valor**"), Franchise Group Newco Intermediate AF, LLC, a Delaware limited liability company ("**FG Newco Intermediate AF**", and together with the Lead Borrower, FG Newco PSP and Valor, individually, a "**Borrower**" and, collectively, the "**Borrowers**"), each in their respective capacities as debtors and debtors-in-possession. |
| **Guarantors** | Each direct or indirect subsidiary of any of the Borrowers, as secured obligors, and each of Freedom VCM Holdings, LLC, Freedom Receivables II, LLC, Freedom VCM Interco Holdings, Inc., and Freedom VCM Receivables, Inc., as secured obligors solely with respect to the outstanding DIP Obligations of the Tranche A DIP Loans (each as defined below) (collectively, together with the Borrowers, the "**Secured Loan Parties**"), and each of Freedom VCM, Inc., and Freedom VCM Interco, Inc., as unsecured obligors unless, with respect to Freedom VCM, Inc., and Freedom VCM Interco, Inc., the requisite holders of Holdco Claims consent to such parties being secured obligors (collectively, together with the Secured Loan Parties, the "**Loan Parties**"), each in their respective capacities as debtors and debtors-in-possession. |
| | With respect to Freedom VCM Holdings, LLC, the DIP Obligations shall be repaid, first from DIP Collateral comprised of Unencumbered Property of all Secured Loan Parties (other than Freedom VCM Holdings, LLC), second, from all other DIP Collateral of all Secured Loan Parties (other than Freedom VCM Holdings, LLC), and third, from assets at Freedom VCM Holdings, LLC. Payment of any fees or expenses (including any director, officer, and manager fees, to the extent applicable) allocable to Freedom VCM Holdings, LLC with respect to the restructuring (including the Restructuring Transactions) or administration of the Chapter 11 Cases shall be conditioned upon an allocation among Freedom VCM Holdings, LLC and the other Debtors to be agreed upon in good faith between the Debtors and the Required Consenting First Lien Lenders (the "Freedom Allocated Fees and Expenses").    Freedom VCM |

| | |
|---|---|
| | Holdings, LLC shall be required to use any Cash it has on hand to pay its ratable share of such Freedom Allocated Fees and Expenses, if any; provided, that, for the avoidance of doubt, Freedom VCM Holdings, LLC, shall not otherwise use any of its Cash until an agreement is reached on the Freedom Allocated Fees and Expenses; provided, further, that if the allocation results in Freedom VCM Holdings, LLC holding a claim against another Debtor, such claim shall be entitled to administrative expense priority, which administrative expense priority shall be junior in priority to the DIP Claims. |
| **DIP Agent** | The administrative agent and the collateral agent for the DIP Lenders (as defined below) with respect to the DIP Facility (in such capacities, the "**DIP Agent**") shall be a financial institution selected by, and qualified to perform the duties customarily associated with such roles as determined by, the Required DIP Lenders (as defined below), which shall be reasonably acceptable to the Lead Borrower (it being understood that Wilmington Trust, National Association is acceptable to the Lead Borrower). |
| **DIP Lenders** | One or more beneficial holders of First Lien Loans (or any designated Related Funds (as defined in the RSA) of such holders) who become party to the DIP Credit Agreement (as defined below) from time to time in accordance with its terms (each a "**DIP Lender**", and collectively, the "**DIP Lenders**"); provided that any DIP Lender must be a party to the RSA prior to acquiring any DIP Loans (as defined below); provided further that all beneficial holders of First Lien Claims shall be presented with the option to become a party to the RSA pursuant to the Syndication Procedures (as defined below). |
| **Prepetition ABL Facility** | That certain Third Amended and Restated Loan and Security Agreement, dated as of March 10, 2021, among the Borrowers, each of the other loan parties party thereto, JPMorgan Chase Bank, N.A. in its capacity as administrative agent and collateral agent (in such capacities, the "**ABL Credit Agreement Agent**"), and the lenders party thereto from time to time (collectively, the "**ABL Lenders**", and together with the ABL Credit Agreement Agent and the other ABL secured parties under the ABL Credit Agreement and the other ABL Loan Documents, collectively, the "**ABL Secured Parties**") (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**ABL Credit Agreement**"; the obligations thereunder and under the other ABL Loan Documents, the "**ABL Secured Obligations**"; and the liens and security interests granted in connection therewith, the "**ABL Liens**") (the "**ABL Facility**"). |
| **Prepetition First Lien Facility** | That certain First Lien Credit Agreement, dated as of March 10, 2021, among the Borrowers, each of the other loan parties party thereto, Wilmington Trust, National Association, in its capacity as administrative agent and collateral agent (in such capacities, the "**First Lien Credit Agreement Agent**"), and the lenders party thereto from time to time (collectively, the "**First Lien Lenders**", and together with the First Lien Credit Agreement Agent and the other secured parties under the First Lien Credit Agreement and the other First Lien Loan Documents, collectively, the "**First Lien Secured Parties**") (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**First Lien Credit Agreement**"; the obligations thereunder and |

| | |
|---|---|
| | under the other First Lien Loan Documents, the "**First Lien Secured Obligations**"; and the liens and security interests granted in connection therewith, the "**First Lien Liens**") (the "**First Lien Facility**"). |
| **Prepetition Second Lien Facility** | That certain Second Lien Credit Agreement, dated as of March 10, 2021, among the Borrowers, each of the other loan parties party thereto, Alter Domus (US) LLC, in its capacity as administrative agent and collateral agent (in such capacities, the "**Second Lien Credit Agreement Agent**"), and the lenders party thereto from time to time (the "**Second Lien Lenders**", and together with the Second Lien Credit Agreement Agent and the other secured parties under the Second Lien Credit Agreement and the other Second Lien Loan Documents[1], collectively, the "**Second Lien Secured Parties**") (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Second Lien Credit Agreement**"; the obligations thereunder and under the other Second Lien Loan Documents, the "**Second Lien Secured Obligations**"; and the liens and security interests granted in connection therewith, the "**Second Lien Liens**") (the "**Second Lien Facility**"). |
| **Prepetition Second Lien Sidecar Facility** | That certain Sidecar Pari Passu Second Lien Credit Agreement, dated as of August 21, 2023, among the Borrowers, each of the other loan parties party thereto, Alter Domus (US) LLC, in its capacity as administrative agent and collateral agent (in such capacities, the "**Second Lien Sidecar Credit Agreement Agent**"), and the lenders party thereto from time to time (the "**Second Lien Sidecar Lenders**", and together with the Second Lien Sidecar Credit Agreement Agent and the other secured parties under the Second Lien Sidecar Credit Agreement and the other Second Lien Sidecar Loan Documents[2], collectively, the "**Second Lien Sidecar Secured Parties**" and, together with the ABL Secured Parties, the First Lien Secured Parties, and the Second Lien Secured Parties, the "**Prepetition Secured Parties**") (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Second Lien Sidecar Credit Agreement**"; the obligations thereunder and under the other Second Lien Sidecar Loan Documents, the "**Second Lien Sidecar Secured Obligations**" and, together with the ABL Secured Obligations, the First Lien Secured Obligations, and the Second Lien Secured Obligations, the "**Prepetition Secured Obligations**"; and the liens and security interests granted in connection therewith, the "**Second Lien Sidecar Liens**" and, together with the ABL Liens, the First Lien Liens, and the Second Lien Liens, the "**Prepetition Liens**") (the "**Second Lien Sidecar Facility**"). |
| **Existing Intercreditor Agreements** | That certain (i) Amended and Restated Intercreditor Agreement, dated as of November 22, 2021, among the Lead Borrower, the other Loan Parties from time to time thereto, the ABL Credit Agreement Agent, the First Lien Credit |

---

[1]   As used herein, "**Second Lien Loan Documents**" means the "Loan Documents" as defined in the Second Lien Credit Agreement.

[2]   As used herein, "**Second Lien Sidecar Loan Documents**" means the "Loan Documents" as defined in the Second Lien Sidecar Credit Agreement (and together with the ABL Loan Documents, the First Lien Loan Documents, and the Second Lien Loan Documents, collectively, the "**Prepetition Loan Documents**").

|  | Agreement Agent, the Second Lien Credit Agreement Agent, and the Second Lien Sidecar Credit Agreement Agent (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Existing ABL Intercreditor Agreement**"); and (ii) Amended and Restated First Lien/Second Lien Intercreditor Agreement, dated as of November 22, 2021, among the Lead Borrower, the other Loan Parties from time to time party thereto, the First Lien Credit Agreement Agent, the Second Lien Credit Agreement Agent, and the Second Lien Sidecar Credit Agreement Agent (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Existing 1L/2L Intercreditor Agreement**", and together with the Existing ABL Intercreditor Agreement, collectively, the "**Existing Intercreditor Agreements**"). |
|---|---|
| **Permitted Liens** | (a) Any valid liens ("**Permitted Prior Liens**") that are (i) in existence on the Petition Date, (ii) either perfected as of the Petition Date or perfected subsequent to the Petition Date under section 546(b) of the Bankruptcy Code, (iii) senior in priority to the Prepetition Liens, and (iv) permitted to be incurred under the Prepetition Loan Documents; and<br><br>(b) liens permitted to have seniority over the DIP Liens (as defined below) securing the DIP Facility as specified in the DIP Credit Agreement (as determined by the Required DIP Lenders). |
| **Interim and Final DIP Orders** | The order approving the DIP Facility on an interim basis, which shall be in form and substance, and upon terms and conditions, acceptable in all respects to the Loan Parties, the DIP Agent and the Required DIP Lenders (the "**Interim DIP Order**"), shall authorize and approve, among other matters, (i) the Loan Parties' entry into the DIP Documents, (ii) the making of the DIP Loans (as defined below), (iii) the granting of the superpriority claims and liens against the Loan Parties and their assets in accordance with the DIP Documents with respect to the DIP Collateral (as defined below), (iv) the payment of the DIP Premiums (as defined in the Restructuring Term Sheet), (v) those items set forth below in "Stipulations, Waivers, Releases and Protections", (vi) the use of Cash Collateral (as defined below), and (vii) the granting of adequate protection to the ABL Secured Parties, the First Lien Secured Parties, the Second Lien Secured Parties, and the Second Lien Sidecar Secured Parties  (collectively, the "**DIP Matters**").<br><br>The order approving the DIP Facility on a final basis, which shall be in form and substance, and upon terms and conditions, acceptable in all respects to the Loan Parties, the DIP Agent and the Required DIP Lenders (the "**Final DIP Order**" and, together with the Interim DIP Order, the "**DIP Orders**"), shall authorize and approve on a final basis, among other matters, the DIP Matters. |
| **Adequate Protection** | As adequate protection against the risk of any post-petition diminution in the value of the ABL Liens in all collateral securing the ABL Secured Obligations (collectively, the "**ABL Collateral**"), the First Lien Liens in all collateral securing the First Lien Secured Obligations (collectively, the "**First Lien Collateral**"), the Second Lien Liens in all collateral securing the Second Lien Secured Obligations (collectively, the "**Second Lien Collateral**"), and the Second Lien Sidecar Liens in all collateral securing the Second Lien Sidecar |

Secured Obligations (collectively, the "**Second Lien Sidecar Collateral**" and, together with the ABL Collateral, the First Lien Collateral, and the Second Lien Collateral, the "**Prepetition Collateral**"), in each case, which is as a result of, or arises from, or is attributable to, among other things, the imposition of the automatic stay, the use, sale or lease of such Prepetition Collateral, including Cash Collateral, the granting of priming liens and claims as set forth herein and the imposition of the Carve-Out (as defined below) (any such diminution, "**Diminution in Value**"), the Prepetition Secured Parties shall be granted the following adequate protection, subject in all cases to the Carve-Out and the Permitted Prior Liens, and, to the extent set forth in **Annex II** attached hereto, the DIP Liens and the DIP Superpriority Claims (as defined below):

(a) The First Lien Credit Agreement Agent, on behalf of the First Lien Secured Parties, shall be granted the following as adequate protection: (A) to the extent of any Diminution in Value of the First Lien Liens in First Lien Collateral, validly perfected replacement liens on any security interests in all DIP Collateral (the "**First Lien Adequate Protection Liens**"), which replacement liens shall have the priority set forth on **Annex II** attached hereto, as applicable; (B) to the extent of any Diminution in Value of the First Lien Liens in First Lien Collateral, a superpriority administrative expense claim as contemplated by section 507(b) of the Bankruptcy Code against each of the Loan Parties, on a joint and several basis, which claim shall (i) have priority over any and all other claims against the Loan Parties and their estates, now existing or hereafter arising, including, without limitation, of the kinds specified in or ordered pursuant to sections 105, 326, 327, 328, 330, 331, 364, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726, 1113 and 1114 of the Bankruptcy Code (other than the Carve-Out) (the "**First Lien Adequate Protection Claims**"), and (ii) be subject to the priorities set forth on **Annex II** attached hereto, as applicable; (C) payment of accrued but unpaid post-petition interest in cash at the non-default rate as the same becomes due and payable under the First Lien Credit Agreement (other than with respect to the interest payment due in October 2024 added to the principal amount of the First Lien Loans); (D) the payment of the reasonable and documented out-of-pocket fees and expenses of the First Lien Credit Agreement Agent and the Consenting First Lien Lenders; provided, however, that the foregoing shall be limited to the pre-petition and post-petition fees and expenses of (i) Seward & Kissel LLP, as counsel to the First Lien Credit Agreement Agent, (ii) a single firm as local counsel to the First Lien Credit Agreement Agent, and (iii) the Ad Hoc Group Advisors; and (E) the Borrowers shall provide copies of any financial reports (including the weekly delivery of a rolling 13 week cash flow, budget, and supporting information) to the aforementioned counsel and advisors to the extent otherwise provided to the DIP Lenders; and

(b) The ABL Credit Agreement Agent, on behalf of the ABL Secured Parties, shall be granted the following adequate protection: (A) to the extent of any Diminution in Value of the ABL Liens in ABL Collateral, validly perfected replacement liens on any security interests in all DIP Collateral (the "**ABL Adequate Protection Liens**"), which

replacement liens shall have the priority set forth on **Annex II** attached hereto, as applicable; and (B) to the extent of any Diminution in Value of the ABL Liens in ABL Collateral, a superpriority administrative expense claim as contemplated by section 507(b) of the Bankruptcy Code against each of the Loan Parties, on a joint and several basis, which claim shall (i) have priority over any and all other claims against the Loan Parties and their estates, now existing or hereafter arising, including, without limitation, of the kinds specified in or ordered pursuant to sections 105, 326, 327, 328, 330, 331, 364, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726, 1113 and 1114 of the Bankruptcy Code (other than the Carve-Out) (the "**ABL Adequate Protection Claims**"), and (ii) be subject to the priorities set forth on **Annex II** attached hereto, as applicable.

(c) Additional adequate protection for the ABL Lenders, as agreed to by the Debtors and the Required Consenting First Lien Lenders.

(d) The Second Lien Credit Agreement Agent, on behalf of the Second Lien Secured Parties, shall be granted the following as adequate protection: (A) to the extent of any Diminution in Value of the Second Lien Liens in Second Lien Collateral, validly perfected replacement liens on any security interests in all DIP Collateral (the "**Second Lien Adequate Protection Liens**"), which replacement liens shall have the priority set forth on **Annex II** attached hereto, as applicable; and (B) to the extent of any Diminution in Value of the Second Lien Liens in Second Lien Collateral, a superpriority administrative expense claim as contemplated by section 507(b) of the Bankruptcy Code against each of the Loan Parties, on a joint and several basis, which claim shall (i) have priority over any and all other claims against the Loan Parties and their estates, now existing or hereafter arising, including, without limitation, of the kinds specified in or ordered pursuant to sections 105, 326, 327, 328, 330, 331, 364, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726, 1113 and 1114 of the Bankruptcy Code (other than the Carve-Out) (the "**Second Lien Adequate Protection Claims**"), and (ii) be subject to the priorities set forth on **Annex II** attached hereto, as applicable.

(e) The Second Lien Sidecar Credit Agreement Agent, on behalf of the Second Lien Sidecar Secured Parties, shall be granted the following as adequate protection: (A) to the extent of any Diminution in Value of the Second Lien Sidecar Liens in Second Lien Sidecar Collateral, validly perfected replacement liens on any security interests in all DIP Collateral (the "**Second Lien Adequate Protection Liens**" and, together with the First Lien Adequate Protection Liens, the ABL Adequate Protection Liens, and the Second Lien Adequate Protections Liens, the "**Adequate Protection Liens**"), which replacement liens shall have the priority set forth on **Annex II** attached hereto, as applicable; and (B) to the extent of any Diminution in Value of the Second Lien Sidecar Liens in Second Lien Sidecar Collateral, a superpriority administrative expense claim as contemplated by section 507(b) of the Bankruptcy Code against each of the Loan Parties, on a joint and several basis, which claim shall (i) have priority over any and

|  | all other claims against the Loan Parties and their estates, now existing or hereafter arising, including, without limitation, of the kinds specified in or ordered pursuant to sections 105, 326, 327, 328, 330, 331, 364, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726, 1113 and 1114 of the Carve-Out Code (other than the Carve-Out) (the "**Second Lien Sidecar Adequate Protection Claims**" and, together with the First Lien Adequate Protection Claims, the ABL Adequate Protection Claims, and the Second Lien Adequate Protection Claims, the "**Adequate Protection Claims**"), and (ii) be subject to the priorities set forth on **Annex II** attached hereto, as applicable. |
|---|---|
| **Carve-Out** | The Prepetition Liens, the DIP Liens, the Adequate Protection Liens, and all Adequate Protection Claims granted under the DIP Orders, shall be subject to and subordinate to the Carve-Out.<br><br>For purposes hereof, "**Carve-Out**" means an amount equal to the sum of (i) all unpaid fees required to be paid to the clerk of the Bankruptcy Court under section 156(c) of title 28 of the United States Code and to the Office of the United States Trustee (the "**U.S. Trustee**") under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate pursuant to 31 U.S.C. § 3717 (without regard to the notice set forth in clause (iii) below) (collectively, the "**Statutory Fees**"), which Statutory Fees shall not be subject to any budget; (ii) all unpaid reasonable fees and expenses up to $25,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in clause (iii) below); (iii) to the extent allowed by the Bankruptcy Court at any time, whether by interim order, procedural order, or otherwise (which order has not been vacated or stayed), all accrued and unpaid fees and expenses (in each case, including any restructuring, sale, success, or other transaction fee of any investment bankers or financial advisors of the Loan Parties when and if earned pursuant to the terms and conditions of an engagement letter approved by the Bankruptcy Court in these Chapter 11 Cases) (collectively, "**Allowed Professional Fees**") incurred by persons or firms retained by the Loan Parties pursuant to sections 327, 328, or 363 of the Bankruptcy Code (collectively, the "**Loan Party Professionals**") and any official statutory committee of unsecured creditors (the "**Official Committee**"), if appointed in the Chapter 11 Cases, pursuant to sections 328 or 1103 of the Bankruptcy Code (the "**Committee Professionals**"), at any time before or on the first day following delivery by the DIP Agent or, if applicable, the First Lien Credit Agreement Agent, of a Carve-Out Trigger Notice, whether allowed by the Bankruptcy Court prior to or after delivery of a Carve-Out Trigger Notice, and, in the case of any Committee Professionals, not to exceed the aggregate amounts set forth for the Committee Professionals in the Approved Budget (as defined below); and (iv) Allowed Professional Fees of Loan Party Professionals and any Committee Professionals, in an aggregate amount not to exceed $4,000,000, incurred after the first day following delivery by the DIP Agent of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "**Post-Carve-Out Trigger Notice Cap**").<br><br>For purposes of the foregoing, the "**Carve-Out Trigger Notice**" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent, acting at the direction of the Required DIP Lenders under the DIP Documents |

|  | (or, after the DIP Obligations have been paid in full, the First Lien Credit Agreement Agent acting at the direction of the Required Consenting First Lien Lenders under the First Lien Credit Agreement) to the Loan Parties, their lead restructuring counsel, the U.S. Trustee, and counsel to the Official Committee (if any), which notice may be delivered following the occurrence and during the continuation of an Event of Default (as defined below), stating that the Post-Carve-Out Trigger Notice Cap has been invoked; provided, that nothing herein shall be construed to impair the ability of any party to object to the fees, expenses, reimbursement, or compensation described in clauses (i), (ii), (iii) or (iv) above on any grounds. |
|---|---|
| **Type and Amount of the DIP Facility** | Senior secured superpriority debtor-in-possession term loan credit facility (the "**DIP Facility**", and the loans outstanding thereunder, the "**DIP Loans**"), comprised of the following: |
|  | (a) aggregate principal amount of commitments of up to $250 million, *plus* applicable fees and premiums (the "**New Money Commitments**"), pursuant to which the DIP Lenders shall provide new money first-out delayed-draw term loans ("**Tranche A DIP Loans**") as follows, in each case, subject to the Approved Budget: (A) $125,000,000 shall be borrowed in a single borrowing on the Closing Date, (B) an aggregate principal amount not to exceed $50,000,000 shall be borrowed in a single borrowing on or after the entry of the Final Order, and (C) an aggregate principal amount not to exceed $75,000,000 may be borrowed in a single borrowing on or after the entry of the Confirmation Order, and (iv) other amounts not to exceed the New Money Commitments, after accounting for the draws under the foregoing subclauses (i)–(iii), may be drawn solely to the extent set forth in the Approved Budget and approved by the Required DIP Lenders in their sole discretion; and |
|  | (b) a second-out roll up facility (the "**Tranche B DIP Loans**") pursuant to which, effective immediately upon the completion of the Syndication on the Syndication Date (each as defined in the Syndication Procedures), up to $500 million of the First Lien Secured Obligations (together with accrued and unpaid interest thereon) held by the DIP Lenders (or any of their respective designated Related Funds) as of the Syndication Date shall be, on the Syndication Date, automatically deemed "rolled up" and converted into the DIP Facility, on a cashless two dollars of Tranche B DIP Loans for every dollar of principal amount of Tranche A DIP Loans (i.e., $250,000,000 ), based upon such Person's (or any of its designated Approved Funds) pro rata share of principal amount of Tranche A DIP Loans, and, shall automatically be deemed to be substituted and exchanged for, and shall be deemed to be, Tranche B DIP Loans for all purposes hereunder as if originally funded on the Closing Date. |
|  | DIP Loans that are repaid or prepaid may not be reborrowed. |
| **Use of Proceeds** | The proceeds of the Tranche A DIP Loans shall be used only (i) to make adequate protection payments as required in the DIP Documents and the DIP Orders, (ii) to pay the administrative costs of the Chapter 11 Cases (including professional fees and expenses) and the Restructuring Transactions, (iii) to fund |

|  | the Carve-Out and to make payments under the Carve-Out in accordance with the terms of the DIP Orders and (iv) for general corporate purposes, in each case, solely to the extent in accordance with and subject to the credit agreement governing the terms of the DIP Facility (the "**DIP Credit Agreement**", and together with all security and collateral agreements related thereto, the "**DIP Documents**") and the DIP Orders (including the Approved Budget, subject to the Permitted Variance Covenant (as defined below)). |
|---|---|
| **Closing Date** | The date of the satisfaction (or waiver) of each of the conditions precedent to the initial funding of the DIP Facility after entry of the Interim DIP Order (the "**Closing Date**"). |
| **Maturity** | The DIP Facility shall mature on the earliest to occur of: <br><br> (i)    one hundred and eighty (180) days after the Closing Date, which may be extended by the Required Supermajority Lenders for up to three (3) consecutive 30-day periods; <br><br> (ii)    11:59 p.m. New York City Time on the date that is five (5) days after the Petition Date if the Interim DIP Order, which shall be in form and substance acceptable to the Company Parties and the Required Consenting First Lien Lenders, each in their sole discretion, has not been entered by the Bankruptcy Court prior to such date and time; <br><br> (iii)    11:59 p.m. New York City Time on the date that is forty-five (45) days after the Petition Date if the Final DIP Order, which shall be in form and substance acceptable to the Company Parties and the Required Consenting First Lien Lenders, each in their sole discretion, has not been entered by the Bankruptcy Court prior to such date and time; <br><br> (iv)    the Plan Effective Date; <br><br> (v)    dismissal of any of the Chapter 11 Cases or conversion of any of the Chapter 11 Cases into a case under chapter 7 of the Bankruptcy Code; <br><br> (vi)    consummation of a sale of all or substantially all assets or equity of the Loan Parties (other than to another Loan Party), other than a sale transaction pursuant to a Sufficient Bid or is otherwise consented to by the Required Supermajority Lenders in their sole discretion; <br><br> (vii)    termination of the RSA; and <br><br> (viii)    the acceleration of the DIP Loans and the termination of the commitments under the DIP Facility in accordance with the terms of the DIP Documents. |
| **Amortization** | None. |
| **Payments and Interest Rates** | As set forth on **Annex I** attached hereto. |
| **Mandatory Prepayments** | Mandatory prepayments of the DIP Loans shall be required in an amount equal to (i) 100% of net cash proceeds of any event of loss (excluding D&O and business interruption insurance) or condemnation (subject to the Existing |

| | Intercreditor Agreements, as applicable), (ii) 100% of net cash proceeds from the issuance of post-petition indebtedness not permitted by the DIP Credit Agreement, (iii) 100% of net cash proceeds from the post-petition issuance of any equity of the Borrowers or any controlled subsidiary thereof, (iv) 100% of the net cash proceeds of extraordinary receipts (excluding D&O insurance, to the extent such proceeds are not payable to the Debtors or the estates pursuant to the terms of any such applicable D&O insurance policy, and business interruption insurance), and (v) 100% of the net cash proceeds of any sale of assets of any of the Loan Parties or their subsidiaries (other than asset sales in the ordinary course of business) (subject to the Existing Intercreditor Agreements, as applicable), in each case, subject to the Documentation Principles (as defined below). Net cash proceeds from any mandatory prepayment shall be applied toward repayment of the DIP Loans on a *pro rata* basis and will result in a dollar-for-dollar permanent reduction of then outstanding principal amounts thereof and shall be without premium or penalty.<br><br>Proceeds from any mandatory prepayment shall first be applied toward repayment of the Tranche A DIP Loans on a *pro rata* basis and then to the repayment of the Tranche B DIP Loan on a *pro rata* basis. |
|---|---|
| **Voluntary Prepayments** | Permitted, in whole or in part, subject to limitations as to minimum amounts, without premium or penalty. Proceeds from any voluntary prepayment shall first be applied toward repayment of the Tranche A DIP Loans on a *pro rata* basis and then to the repayment of the Tranche B DIP Loans on a *pro rata* basis. |
| **Collateral and Priority** | Subject to the Carve-Out and to Permitted Prior Liens, as security for the prompt payment and performance of all amounts due under the DIP Facility, including, without limitation, all principal, interest, premiums, payments, fees, costs, expenses, indemnities or other amounts (collectively, the "**DIP Obligations**"), effective as of the Petition Date, the DIP Agent, for the benefit of itself and the DIP Lenders, shall be granted automatically and properly perfected liens and security interests ("**DIP Liens**") in all assets and properties of each of the Secured Loan Parties and their bankruptcy estates, whether tangible or intangible, real, personal or mixed, wherever located, whether now owned or consigned by or to, or leased from or to, or hereafter acquired by, or arising in favor of, the Secured Loan Parties (including under any trade names, styles or derivations thereof), whether prior to or after the Petition Date, including, without limitation, all of the Secured Loan Parties' rights, title and interests in (1) all ABL Collateral and First Lien Collateral, (2) all money, cash and cash equivalents; (3) all funds in any deposit accounts, securities accounts, commodities accounts or other accounts (together with all money, cash and cash equivalents, instruments and other property deposited therein or credited thereto from time to time); (4) all accounts and other receivables (including those generated by intercompany transactions); (5) all contracts and contract rights; (6) all instruments, documents and chattel paper; (7) all securities (whether or not marketable); (8) all goods, as-extracted collateral, furniture, machinery, equipment, inventory and fixtures; (9) all real property interests; (10) all interests in leaseholds; (11) all franchise rights; (12) all patents, tradenames, trademarks (other than intent-to-use trademarks), copyrights, licenses and all other intellectual property; (13) all general intangibles, tax or other refunds, or insurance proceeds (excluding D&O and business interruption insurance, but not |

proceeds from any D&O insurance policies, to the extent such proceeds are not payable to the Debtors or the estates, which shall be subject to the DIP Liens); (14) all equity interests, capital stock, limited liability company interests, partnership interests and financial assets; (15) all investment property; (16) all supporting obligations; (17) all letters of credit and letter of credit rights; (18) all commercial tort claims; (19) subject to entry of a Final DIP Order, all proceeds of or property recovered, whether by judgment, settlement or otherwise, from any and all claims and causes of action of any Secured Loan Party's estate seeking avoidance under chapter 5 of the Bankruptcy Code, any applicable Uniform Voidable Transfer Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or any other similar state statute, common law or otherwise ("**Avoidance Action Proceeds**"); (20) all books and records (including, without limitation, customers lists, credit files, computer programs, printouts and other computer materials and records); (21) to the extent not covered by the foregoing, all other goods, assets or properties of the Secured Loan Parties, whether tangible, intangible, real, personal or mixed; and (22) all products, offspring, profits, and proceeds of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, including any and all proceeds of any insurance (including any business interruption and property insurance), indemnity, warranty or guaranty payable to such Secured Loan Party from time to time with respect to any of the foregoing (collectively, the "**DIP Collateral**"); *provided*, that DIP Collateral shall exclude other assets to be mutually agreed among the Borrowers and the Required DIP Lenders, but shall include any and all proceeds and products of such excluded assets, unless such proceeds and products otherwise separately constitute excluded assets. Notwithstanding anything herein to the contrary, the security interest over the DIP Collateral shall be created and perfected by the Interim DIP Order and Final DIP Order, as applicable, and no mortgages or other perfection documentation (other than UCC-1 financing statements), including mortgages, control agreements, landlord waivers, foreign law perfection actions or third-party consents or orders, shall be required; *provided*, *further*, upon the reasonable request of the DIP Lenders, the Loan Parties shall make filings or take any other actions with respect to the perfection of liens.

The DIP Liens shall have the following priorities (subject in all cases to the Carve-Out):

i.   *First Liens on Unencumbered Property*. Pursuant to section 364(c)(2) of the Bankruptcy Code, the DIP Liens shall be valid, binding, continuing, enforceable, non-avoidable, fully and automatically perfected first priority liens and security interests in all DIP Collateral that is not subject to valid, perfected and non-avoidable liens or security interests in existence as of the Petition Date (or perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code), including, subject to entry of the Final DIP Order, Avoidance Action Proceeds (collectively, "**Unencumbered Property**"), which DIP Liens shall be subject and subordinate only to the Carve-Out.

ii.  *Priming DIP Liens and Liens Junior to Certain Other Liens*. Pursuant to sections 364(c)(3) and 364(d) of the Bankruptcy Code, the DIP Liens shall be valid, binding, continuing, enforceable, non-avoidable, fully

|  | and automatically perfected in all DIP Collateral (other than as described in <u>clause (i)</u> above), which DIP Liens (a) shall be subject and subordinate only to (1) the Carve-Out, (2) Permitted Prior Liens, (3) solely with respect to ABL Priority Collateral (as defined in the Existing ABL Intercreditor Agreement) and DIP Collateral of a type that would otherwise constitute ABL Priority Collateral (which, for the avoidance of doubt, shall not include any proceeds of the DIP Facility), the ABL Liens, (b) shall be senior to any and all other liens and security interests in DIP Collateral, including, without limitation, all liens and security interests in any DIP Collateral that would otherwise be subject to the First Lien Liens (including, without limitation, any First Lien Adequate Protection Liens), the Second Lien Liens, and the Second Lien Sidecar Liens, and (c) shall otherwise be subject to the priorities set forth in **Annex II** attached hereto. |
|  | iii. *Liens Senior to Other Liens.* Except to the extent expressly permitted hereunder, subject to the Carve-Out and Permitted Prior Liens, the DIP Liens and the DIP Superpriority Claims (as defined below) shall not be made subject to or *pari passu* with (a) any lien, security interest or claim heretofore or hereinafter granted in any of the Chapter 11 Cases or any successor cases, including any lien or security interest granted in favor of any federal, state, municipal or other governmental unit (including any regulatory body), commission, board or court for any liability of the Secured Loan Parties, (b) any lien or security interest that is avoided or preserved for the benefit of the Secured Loan Parties and their estates under section 551 of the Bankruptcy Code or otherwise, (c) any intercompany or affiliate claim, lien or security interest of the Secured Loan Parties or their affiliates, or (d) any other lien, security interest or claim arising under section 363 or 364 of the Bankruptcy Code granted on or after the date hereof. |
|  | Subject to entry of the Interim DIP Order, the DIP Obligations, at the option of the Required DIP Lenders, to be exercised in their sole and absolute discretion, shall be repaid (a) first, from the DIP Collateral comprising Unencumbered Property and (b) second, from all other DIP Collateral. |
| **Guarantees** | Each Loan Guarantor shall unconditionally guarantee, on a joint and several basis, all DIP Obligations arising under or in connection with the DIP Facility. |
| **DIP Superpriority Claims** | Subject to the Carve-Out, the DIP Obligations shall be allowed superpriority administrative expense claims under section 364(c)(1) of the Bankruptcy Code against each of the Loan Parties, on a joint and several basis, which claims shall have priority over any and all other claims against the Loan Parties and their estates, now existing or hereafter arising, including, without limitation, of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 552(b), 726, 1113 and 1114 of the Bankruptcy Code, with recourse against all DIP Collateral (the "**DIP Superpriority Claims**"), which DIP Superpriority Claims shall be subject to the priorities set forth in **Annex II** attached hereto. |
| **Use of Cash** | The Loan Parties shall be permitted to use Cash Collateral for the purposes and solely to the extent provided for in the Approved Budget, the Interim DIP Order |

| | |
|---|---|
| **Collateral** | and the Final DIP Order. |
| **Milestones** | The Loan Parties shall comply with the Milestones set forth in Section 4.01 of the RSA (as such Milestones may be extended in accordance with the terms therein), which Milestones shall be incorporated into the DIP Credit Agreement. |
| **Documentation** | The DIP Facility (including the terms and conditions applicable thereto) shall be documented pursuant to and evidenced by (a) the DIP Credit Agreement, negotiated in good faith, in form and substance reasonably acceptable to the Borrowers and the Required DIP Lenders, which shall (i) reflect the terms set forth herein, (ii) reflect the terms of the Interim DIP Order or the Final DIP Order, as applicable, (iii) have usual and customary provisions for debtor-in-possession financings of this kind and provisions that are necessary to effectuate the financing contemplated hereby, as determined by the Borrowers and the Required DIP Lenders, (iv) be based on the First Lien Credit Agreement and (v) be mutually agreed among the Borrowers and the Required DIP Lenders, (b) the Interim DIP Order, (c) the Final DIP Order, and (d) other legal documentation or instruments as are, in each case, usual and customary for debtor-in-possession financings of this type and/or reasonably necessary to effectuate the financing contemplated hereby, as determined by the Loan Parties and the Required DIP Lenders (this paragraph, the "**Documentation Principles**"); _provided_, that, notwithstanding anything herein to the contrary, the DIP Liens on the DIP Collateral shall be created and perfected by the Interim DIP Order and Final DIP Order, as applicable, and no mortgages or other perfection documentation (other than UCC-1 financing statements), including mortgages, control agreements, landlord waivers, foreign law perfection actions or third party consents or orders, shall be required; _provided_, _further_, upon the reasonable request of the DIP Lenders, the Loan Parties shall make filings or take any other actions with respect to the perfection of liens. |
| **Representations and Warranties** | The DIP Documents shall contain usual and customary representations and warranties, subject to the Documentation Principles. |
| **Cash Flow Reporting; Variance Reporting; Variance Testing** | No later than 5:00 p.m. (New York City time) on every fourth Thursday following the Petition Date (each such Thursday, the "**Updated Budget Deadline**"), the Loan Parties shall deliver to the Ad Hoc Group Advisors and the DIP Agent a supplement to the Initial DIP Budget (each, an "**Updated Budget**"), covering the then-upcoming 13-week period that commences with Saturday of the calendar week immediately preceding such Updated Budget Deadline, in each case consistent with the form and detail set forth in the Initial DIP Budget and including a forecasted unrestricted cash balance as well as a line-item report setting forth the estimated fees and expenses to be incurred by each professional advisor on a weekly basis; _provided_, _however_, that (x) (i) the Updated Budget will be deemed, in each case, conditionally approved unless the Required DIP Lenders provide written notice of their objection to such Updated Budget (which notice may be provided by one of the Lender Professionals on their behalf via email) within four (4) Business Days of the delivery of such Updated Budget, and during such period, the Initial DIP Budget or most recent Approved Budget, as applicable, shall remain in effect (the "**Interim Approval Period**"), (ii) following the Interim Approval Period, if no objection is received |

from the Required DIP Lenders pursuant to clause (i), the Updated Budget shall be deemed the "**Approved Budget**," shall be in full force and effect and shall constitute the Approved Budget (which Approved Budget shall be the Initial DIP Budget until superseded by an approved Updated Budget), provided, that the Required DIP Lenders may, at any time after such four (4) Business Day period and until the date that is seven (7) Business Days after delivery of the Updated Budget, object to such Updated Budget, whereupon the Initial DIP Budget or most recent Approved Budget shall be deemed the Approved Budget, and (y) if the Required DIP Lenders do not provide written notice of their objection to such Updated Budget (which notice of disapproval may be provided by one the Ad Hoc Group Advisors on their behalf via email) within such seven (7) Business Days period, the Updated Budget shall be in full force and effect and shall constitute the Approved Budget; (iii) the Required DIP Lenders shall not have any obligation to approve any Updated Budget, and (iv) no modification to the Initial DIP Budget or any Updated Budget, any reforecasting of any information relating to any period covered thereby or the inclusion of new line items in any Updated Budget, as the case may be, shall in any event be effective without the affirmative written consent of the Required DIP Lenders (which may be provided by one of the Ad Hoc Group Advisors on their behalf via email).

Not later than 5:00 p.m. New York City time every Thursday (commencing with Thursday of the week immediately following the first full week after the week in which the Petition Date occurs) (each such Thursday, the "**Variance Report Deadline**"), the Borrower shall deliver to the Ad Hoc Group Advisors and the DIP Lenders a variance report, each in form, detail and substance satisfactory to the Required DIP Lenders in their sole discretion (each, a "**Variance Report**"), setting forth the difference between, on a line-by-line and aggregate basis, (i) actual operating receipts and budgeted operating receipts as set forth in the Approved Budget in effect for the relevant periods, as the case may be (the "**Receipts Variance**"), and (ii) actual operating disbursements and budgeted operating disbursements as set forth in the Approved Budget in effect for the relevant periods, as the case may be (the "**Disbursements Variance**"), in each case, for the Applicable Period (as defined below), in each case, together with a reasonably detailed explanation of such Receipts Variance and Disbursements Variance.

The Loan Parties shall not permit the Receipts Variance or the Disbursements Variance with respect to any Applicable Period to exceed the Permitted Variance (as defined below) (the "**Permitted Variance Covenant**").

"**Applicable Period**" means, (w) with respect to the first Variance Report, the first full one-week period ending on the Friday of the week immediately preceding the first Variance Report Deadline, (x) with respect to the second Variance Report, the first full two-week period ending on the Friday of the week immediately preceding the second Variance Report Deadline, (y) with respect to the third Variance Report, the first full three-week period ending on the Friday of the week immediately preceding the third Variance Report Deadline, and (z) with respect to the fourth Variance Report, and each Variance Report thereafter, the four-week period ending on the Friday of the week immediately preceding the applicable Variance Report Deadline.

|  | "**Permitted Variance**" means, (i) with respect to the first Variance Report, no limitations on Disbursements Variance and Receipts Variance, (ii) with respect to the second Variance Report, Disbursements Variance less than 25% and Receipts Variance less than 25%, (iii) with respect to the third Variance Report, Disbursements Variance less than 20% and Receipts Variance less than 20% and (iv) with respect to the fourth Variance Report and every Variance Report thereafter, Disbursements Variance less than 15% and Receipts Variance less than 15%, in each case under the foregoing clauses (i) through (iv), on an aggregate basis (and not on a line item basis) and excluding, in any event, any professional fees. |
|---|---|
| **Affirmative and Negative Covenants** | The DIP Documents shall contain usual and customary affirmative and negative covenants for facilities of this type, including limitations on all non-ordinary course incurrence of indebtedness, liens, dispositions of assets, mergers, restricted payments, investments, fundamental changes, transactions with affiliates, burdensome agreements, prepayments of debt and use of proceeds of DIP Facility and Cash Collateral, subject to the Documentation Principles; provided, that, without limitation, the DIP Documents shall require: |

(i) five (5) days' advance delivery of all material pleadings, motions and other material documents filed with the Bankruptcy Court on behalf of the Loan Parties in the Chapter 11 Cases to the Ad Hoc Group Advisors, unless not reasonably practicable under the circumstances (in which case, as soon as reasonably practicable prior to filing);

(ii) compliance with the Milestones and the Permitted Variance Covenant;

(iii) the Borrower and its subsidiaries shall maintain Liquidity (as defined in the First Lien Credit Agreement) at all times of at least $50 million (the "**Liquidity Covenant**"), to be determined as of the Friday of the immediately preceding testing period, and the Borrower shall certify as to compliance with such minimum Liquidity Covenant on a weekly basis in connection with delivery of the Variance Report;

(iv) the Borrower shall use commercially reasonable efforts to obtain a public rating (but not any particular rating) in respect of the DIP Loans made available under this Agreement from each of S&P and Moody's on or before seventy-five (75) days after the Closing Date;

(v) delivery of monthly financial statements including an income statement for such month, balance sheet as of the end of such month and a cash flow statement for such month;

(vi) weekly conference calls and/or video calls among the Loan Parties' relevant senior management, the Loan Parties' advisors, the Ad Hoc Group Advisors and the DIP Lenders, which update calls may cover the Loan Parties' financial performance, the latest budget approved for variance testing, the Loan Parties' variance reports, and the other information provided pursuant to the reporting covenant described above; and

(vii) certain covenants materially consistent with those set forth in the RSA and Section 5.16 of the First Lien Credit Agreement.

For the avoidance of doubt, the DIP Documents shall not include any financial

| | |
|---|---|
| | maintenance covenants not otherwise set forth herein. |
| **Conditions Precedent to Closing and the Initial Borrowing** | The Closing Date under the DIP Facility, and the initial borrowing thereunder, shall be subject to customary conditions to closing for facilities of this type, including the following: |

(i)    no later than five (5) days after the Petition Date, the Bankruptcy Court shall have entered the Interim DIP Order, and the Interim DIP Order shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed without the prior written consent of the Required DIP Lenders;

(ii)    the preparation, authorization and execution of the DIP Documents with respect to the DIP Facility, in form and substance consistent with this DIP Facility Term Sheet and otherwise reasonably acceptable to the Loan Parties, the Required DIP Lenders and the DIP Agent;

(iii)    the delivery of a 13-week cash flow projection (the "**Initial DIP Budget**") in form and substance acceptable to the Required DIP Lenders, reflecting (i) the Loan Parties' anticipated cash receipts and disbursements for each calendar week during the period from the week in which the Petition Date occurs through and including the end of the thirteenth calendar week thereafter, and (ii) a professional fee accrual budget with respect to the anticipated fees and expenses to be incurred by the Loan Party Professionals, the Committee Professionals (if any), and other professionals during the thirteen week period;

(iv)    the ABL Secured Parties shall have agreed to permit the use of Cash Collateral, and adequate protection, pursuant to the Interim DIP Order on terms and conditions set forth herein and otherwise acceptable to the Required DIP Lenders, in each case, solely to the extent required, and subject to the terms and conditions, under the Existing ABL Intercreditor Agreement;

(v)    the delivery of (i) a secretary's (or other officer's) certificate or a statement of no change as to documentation previously delivered of the Borrowers and each of the other Loan Parties, dated as of the Closing Date and in such form as is customary for the jurisdiction in which the relevant Loan Party is organized, with appropriate insertions and attachments; and (ii) a customary closing officer's certificate of the Borrowers;

(vi)    all premiums, payments, fees, costs and expenses (including, without limitation, the fees and expenses of the Ad Hoc Group Advisors and all other counsel, financial advisors and other professionals of the DIP Lenders and DIP Agent (whether incurred before or after the Petition Date) to the extent earned, due and owing, and including estimated fees and expenses through the Closing Date) then due and payable shall have been paid;

(vii)    the DIP Lenders shall have received from the Borrowers and each of the Loan Parties, at least three (3) Business Days prior to the Closing Date, (a) documentation and other information requested by any DIP Lender that is required by regulatory authorities under applicable "know your

|  | customer" and anti-money laundering rules and regulations, including the USA Patriot Act and (b) if a Borrower qualifies as a "legal entity customer" under the beneficial ownership regulations, the DIP Lenders shall have received from such Borrower, at least one (1) Business Day prior to the Closing Date, a beneficial ownership certification in relation to such Borrower; |
|  | (viii) payment of the applicable Commitment Premium and the DIP Backstop Premium (as defined in the Restructuring Term Sheet); and |
|  | (ix) the Closing Date shall have occurred on or before the date that is one (1) Business Day after the date of entry of the Interim DIP Order unless the Required DIP Lenders consent to a later date. |
| **Conditions to Each Borrowing** | In addition to the conditions precedent noted above, each borrowing under the DIP Facility shall be subject to further customary conditions to closing for facilities of this type, including, without limitation: |
|  | (i) solely in the case of any borrowing after the Closing Date, no later than forty-five (45) days after the Petition Date, the Bankruptcy Court shall have entered the Final DIP Order. |
|  | (ii) the DIP Agent shall have a fully perfected lien on the DIP Collateral pursuant to the Interim DIP Order to the extent required by the DIP Documents and the Interim DIP Order, having the priorities set forth in the Interim DIP Order; |
|  | (iii) the DIP Agent shall have received a signed borrowing request from the Borrower; |
|  | (iv) since the date of the Agreement Effective Date, there shall have been no event, development or circumstance that has had, or would reasonably be expected to have, a material adverse effect (pursuant to the Documentation Principles); |
|  | (v) the representations and warranties of each Loan Party set forth in the DIP Credit Agreement and in each other DIP Document shall be true and correct in all material respects on and as of such date as if made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date, in which case they shall be true and correct in all material respects as of such earlier date; provided, that any representation and warranty that is qualified as to "materiality", "Material Adverse Effect" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on such respective dates; |
|  | (vi) all first day motions filed by the Loan Parties on the Petition Date and related orders entered by the Bankruptcy Court in the Chapter 11 Cases (including any motions related to cash management or any critical vendor or supplier motions) shall be in form and substance acceptable to the Company Parties and the Required Consenting First Lien Lenders, each in their sole discretion; |
|  | (vii) no Event of Default shall exist or would result from the initial borrowing |

|  | or from the application of the proceeds therefrom; and |
|  | (viii)  the RSA shall have been executed and be in full force and effect and no event of default shall have occurred and be continuing thereunder except to the extent such default or event of default has been cured or waived in accordance with the terms of the RSA. |
| **Events of Default** | The DIP Documents shall contain usual and customary events of default for facilities of this type, subject to the Documentation Principles (including grace periods and materiality qualifiers), including, without limitation (the "**Events of Default**"): |

The DIP Documents shall contain usual and customary events of default for facilities of this type, subject to the Documentation Principles (including grace periods and materiality qualifiers), including, without limitation (the "**Events of Default**"):

(i)     the Loan Parties' failure to pay principal, or interest and other amounts (other than professional fees) when due under the DIP Documents or the DIP Orders, subject, in each case, to a three (3) day grace period;

(ii)    the Loan Parties' failure to pay professional fees when due under the DIP Documents or DIP Orders, subject to a three (3) day grace period;

(iii)   the Closing Date shall not have occurred within three (3) Business Days after the date of entry of the Interim DIP Order unless the Required DIP Lenders consent to a later date;

(iv)    any act or occurrence that would, upon the delivery of notice, permit the RSA to be terminated, unless such act or occurrence was waived, cured, or extended in accordance with the terms of the RSA;

(v)     the Loan Parties' failure to satisfy in any materials respect any of the Milestones, subject to any waiver or extension of such Milestones pursuant to the terms of the RSA;

(vi)    the Loan Parties' failure to (i) conduct a marketing and sale process for the Loan Parties' assets, other than pursuant to the Bidding Procedures, or (ii) promptly terminate the Sale Process if the Loan Parties have not received a Sufficient Bid on or before the Bid Deadline, in each case, without the consent of the Required Consenting First Lien Lenders;

(vii)   the Loan Parties' breach of the Permitted Variance Covenant; and

(viii)  the filing by the Loan Parties of chapter 11 plan of reorganization (or any amendment thereof) other than a Plan that is consistent in all material respects with the RSA, without the consent of the Required Consenting First Lien Lenders.

Upon the occurrence and during the continuation of an Event of Default, at the written direction of the Required DIP Lenders, in accordance with the DIP Orders, without further order from or application to the Bankruptcy Court, the automatic stay provisions of section 362 of the Bankruptcy Code shall be vacated and modified to the extent necessary to permit the DIP Agent, acting at the direction of the Required DIP Lenders, to (A) deliver to the Borrowers a notice declaring the occurrence of an Event of Default, (B) declare the termination, reduction, or restriction of the commitments under the DIP Facility, (C) declare the DIP Loans then outstanding to be due and payable, (D) declare the termination, reduction or restriction on the ability of the Loan Parties to use any Cash Collateral, (E) terminate the DIP Facility, (F) charge the default rate

of interest under the DIP Facility, (G) freeze all monies in any deposit accounts of the Loan Parties, (H) exercise any and all rights of setoff, (I) exercise any right or remedy with respect to the DIP Collateral or the DIP Liens, or (J) take any other action or exercise any other right or remedy permitted under the DIP Documents, the DIP Orders or applicable law; provided, however, that in the case of the enforcement of rights against the DIP Collateral pursuant to clauses (D), (F), (G), (H), (I) and (J) above, (i) the DIP Agent, acting at the request of the Required DIP Lenders, shall provide counsel to the Loan Parties, counsel to the Official Committee (if any), and the Office of the United States Trustee with five (5) days' prior written notice (such period, the "**Remedies Notice Period**"), and (ii) during the Remedies Notice Period, the DIP Agent shall refrain from exercising its rights and remedies and the Loan Parties and/or any Official Committee shall be permitted to request an emergency hearing before the Bankruptcy Court (which request must be made prior to the conclusion of the Remedies Notice Period and shall seek consideration of such request on an expedited basis) solely to the extent they, in good faith, dispute the occurrence of an Event of Default, to consider on an expedited basis whether an Event of Default has in fact occurred or is continuing; provided, further, that during the Remedies Notice Period, the Loan Parties shall be permitted to use Cash Collateral solely to fund expenses critically necessary to preserve the value of the Loan Parties' business, as determined by Required DIP Lenders.

The DIP Lenders' right to enforce the remedies provided in the DIP Orders and in the DIP Credit Agreement is subject to the DIP Lenders satisfying their obligations occasioned by the issuance of a Carve-Out Trigger Notice.

| | |
|---|---|
| **Stipulations, Waivers, Releases and Protections** | Upon entry of the Interim DIP Order:<br><br>1. The Loan Parties shall stipulate (a) to the validity, extent, security, enforceability, priority and perfection of the First Lien Liens, (b) to the amount, validity and lack of defense, counterclaim or offset of any kind to the First Lien Secured Obligations, and (c) that all cash of the Loan Parties constitutes "cash collateral" of the First Lien Secured Parties for purposes of section 363 of the Bankruptcy Code ("**Cash Collateral**"). The DIP Orders shall provide that an Official Committee and any other party in interest must file a pleading with the Bankruptcy Court challenging the validity, extent, perfection and/or priority of any claims or security interest of the First Lien Secured Parties prior to the date that is seventy-five (75) days after entry of the Interim DIP Order by the Bankruptcy Court in the Chapter 11 Cases (the "**Challenge Period**"). Failure of the Official Committee or any other party in interest to file such a pleading with the Bankruptcy Court shall forever bar such party from making such a challenge.<br><br>2. The Loan Parties shall, subject to the Final DIP Order, waive any right to surcharge pursuant to section 506(c) of the Bankruptcy Code the DIP Collateral with respect to the DIP Lenders and the First Lien Collateral with respect to the First Lien Secured Parties.<br><br>3. The Loan Parties shall, subject to the Final DIP Order, waive the equitable doctrine of "marshalling" against the DIP Collateral with respect to the DIP Lenders and the First Lien Collateral with respect to the First Lien Secured |

|  | Parties. |
|---|---|
|  | 4.  The First Lien Secured Parties shall, subject to the Final DIP Order, be entitled to the benefit of section 552(b) of the Bankruptcy Code, and the Loan Parties shall waive the "equities of the case exception" under section 552(b) of the Bankruptcy Code with respect to the First Lien Secured Parties. |
|  | 5.  The Loan Parties shall waive and forever release and discharge any and all claims and causes of action against each of the DIP Lenders and the First Lien Secured Parties (and their respective related parties and representatives) as of the date of the applicable DIP Order. |
|  | 6.  Except for an Official Committee investigation (but not to litigate, contest, initiate, assert, join, commence, support or prosecute any claim, cause of action or other challenge, including by way of discovery, with respect to the validity, extent, enforceability, security, perfection or priority of any of the DIP Liens, First Lien Liens, DIP Obligations, or First Lien Secured Obligations) during the Challenge Period and subject to an investigation budget acceptable to the Required DIP Lenders, no Cash Collateral, proceeds of the DIP Facility, or any cash or other amounts shall be used to (a) investigate, challenge, object to or contest the validity, extent, enforceability, security, perfection or priority of any of the DIP Liens, First Lien Liens, DIP Obligations, or First Lien Secured Obligations, (b) investigate or initiate any claim or cause of action against any of the DIP Lenders or the First Lien Secured Parties, (c) object to or seek to prevent, hinder or delay or take any action to adversely affect the rights or remedies of the DIP Lenders or the First Lien Secured Parties, or (d) seek to approve superpriority claims or grant liens or security interests (other than those expressly permitted under the DIP Documents and the DIP Orders) that are senior to or *pari passu* with the DIP Liens, DIP Superpriority Claims, the Adequate Protection Liens or Adequate Protection Claims granted hereunder, or the First Lien Liens. |
|  | 7.  The DIP Lenders shall have the unqualified right to credit bid all DIP Obligations and the First Lien Secured Parties shall have the unqualified right to credit bid all First Lien Secured Obligations. |
|  | 8.  The DIP Lenders and the First Lien Secured Parties shall be entitled to good faith protection under section 364(e) of the Bankruptcy Code. |
| **Expenses and Indemnification** | The DIP Credit Agreement shall provide for the payment of all reasonable, documented, out-of-pocket costs and expenses of the DIP Agent and the DIP Lenders, including, without limitation, the payment of all reasonable, documented, out-of-pocket fees and expenses of the Ad Hoc Group Advisors.  The DIP Credit Agreement shall also provide for customary indemnification by each of the Loan Parties, on a joint and several basis, of each of the DIP Lenders (together with their related parties and representatives). |
| **Assignments** | The DIP Credit Agreement shall contain assignment provisions that are usual and customary for financings of this type and as determined in accordance with the Documentation Principles and shall also require that each assignee or |

|  | participant shall become a party to the RSA prior to or concurrently with acquiring any DIP Loans. |
|---|---|
| **Amendments** | Usual and customary for facilities of this type requiring the consent of the Required DIP Lenders, except for amendments customarily requiring approval by adversely affected DIP Lenders under the DIP Facility.<br><br>"**Required DIP Lenders**" shall mean DIP Lenders (other than the fronting lender) holding greater than 50.1% of the aggregate amount of commitments in respect of the Tranche A DIP Loans.<br><br>"**Required Supermajority DIP Lenders**" shall mean DIP Lenders (other than the fronting lender) holding greater than 66.67% of the aggregate amount of commitments in respect of the Tranche A DIP Loans. |
| **Governing Law** | This DIP Facility Term Sheet and the DIP Documents shall be governed by the laws of the State of New York (except as otherwise set forth therein). During the pendency of the Chapter 11 Cases, the Bankruptcy Court shall maintain exclusive jurisdiction with respect to the interpretation and enforcement of the DIP Documents and the exercise of the remedies by the DIP Lenders and preservation of the value of the DIP Collateral. |
| **Counsel to the DIP Lenders** | Paul Hastings LLP. |
| **Investment Banker to the DIP Lenders** | Lazard Frères & Co. |
| **Syndication and Fronting** | All beneficial holders of First Lien Claims who sign the RSA on or before closing of the syndication process may participate in the DIP Facility on a *pro rata* basis based upon their holdings of First Lien Loans pursuant to syndication procedures acceptable to the Required DIP Lenders (the "**Syndication Procedures**"), which procedures shall be attached as an exhibit to the Interim DIP Order. Company Parties shall facilitate, and pay for all fees and expenses concerning, fronting the Tranche A DIP Loans. |
| **Agreement to Roll** | Notwithstanding anything to the contrary herein, each DIP Lender shall agree that, on the Plan Effective Date and so long as the RSA remains in effect (and there shall not have occurred and be continuing any event, act, or omission that, upon the delivery of a notice would permit the Required Consenting First Lien Lenders to terminate the RSA), the Tranche A DIP Loans and Tranche B DIP Loans held by each DIP Lender (or any of its designated Related Funds) shall convert either into "Loans" under the Take-Back Debt Facility (as such term is defined in the RSA) or Reorganized Common Equity, in each case in accordance with the terms set forth in the RSA and Restructuring Term Sheet (as may be amended). |

**Annex I**

Interest and Certain Payments

| | |
|---|---|
| Interest Rate: | The DIP Loans shall bear interest at a rate per annum equal to the adjusted SOFR rate (subject to a floor of 1.0%) <u>plus</u> (i) with respect to the Tranche A DIP Loans, 10.00%, and (ii) with respect to the Tranche B DIP Loans, 4.75%. |
| Interest Payment Dates: | Interest shall be payable in cash on a quarterly basis in arrears, upon any prepayment due to acceleration and at final maturity. |
| Commitment Premium: | The Borrowers shall pay to the DIP Lenders a non-refundable commitment premium (the "**Commitment Premium**") equal to 2.5% of the aggregate principal amount of the New Money Commitment of each DIP Lender, which shall be fully earned upon entry of the Interim DIP Order, and due and payable in kind on the date of entry of the Interim DIP Order and to be included in the principal amount of the Tranche A DIP Loans. |
| Exit Premium: | The Borrowers shall pay to the DIP Lenders a non-refundable exit premium (the "**Exit Premium**") equal to 2.5% of the aggregate amount of the DIP Obligations as of the Plan Effective Date, which shall be fully earned upon entry of the Interim DIP Order and due and payable in the form of Tranche A DIP Loans upon any prepayment in full or immediately prior to the Maturity Date. |
| Default Rate: | During the continuance of an event of default, principal, overdue interest, overdue premium and fees and other overdue amounts shall bear interest at 2.00% per annum above the rate otherwise applicable to such obligations. |
| Rate and Payment Basis: | All per annum rates shall be calculated on the basis of a year of 360 days. All amounts payable under this DIP Term Sheet shall be made in Dollars. |

*      *      *      *

**Annex II**

| Priority | DIP Collateral that constitutes ABL Priority Collateral or that would otherwise constitute ABL Priority Collateral | DIP Collateral that constitutes Term Loan Priority Collateral[3] or that would otherwise constitute Term Loan Priority Collateral | Unencumbered Property | Claims |
|---|---|---|---|---|
| *First* | Carve-Out and Permitted Prior Liens | Carve-Out and Permitted Prior Liens | Carve-Out | Carve-Out |
| *Second* | ABL Adequate Protection Liens | DIP Liens | DIP Liens | DIP Superpriority Claims |
| *Third* | ABL Liens | First Lien Adequate Protection Liens | First Lien Adequate Protection Liens and ABL Adequate Protection Liens | First Lien Adequate Protection Claims and ABL Adequate Protection Claims |
| *Fourth* | DIP Liens | First Lien Liens | Second Lien Adequate Protection Liens and Second Lien Sidecar Adequate Protection Liens | Second Lien Adequate Protection Claims and Second Lien Sidecar Adequate Protection Liens |
| *Fifth* | First Lien Adequate Protection Liens | Second Lien Adequate Protection Liens and Second Lien Sidecar Adequate Protection Liens | | |
| *Sixth* | First Lien Liens | Second Lien Liens and Second Lien Sidecar Liens | | |
| *Seventh* | Second Lien Adequate Protection Liens and Second Lien Sidecar Adequate Protection Liens | ABL Adequate Protection Liens | | |
| *Eighth* | Second Lien Liens and Second Lien Sidecar Liens | ABL Liens | | |

---

[3]  Note to Draft:  As defined in the Existing ABL Intercreditor Agreement.

**EXHIBIT C**

**Form of Joinder**

The undersigned ("**Joinder Party**") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of November 1, 2024 (as amended, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof, the "**Agreement**"), by and among the Company Parties and the Consenting First Lien Lenders party thereto.  Capitalized terms used and not otherwise defined herein shall have the meanings set forth in the Agreement.

1.     Agreement to be Bound.  The Joinder Party hereby agrees to be bound by all of the terms of the Agreement, a copy of which is attached hereto as **Annex I** (as the same has been or may hereafter be amended, supplemented, amended and restated, or otherwise modified from time to time in accordance with the provisions hereof).  The Joinder Party shall hereafter be deemed to be a "Consenting First Lien Lenders" and a "Party" for all purposes under the Agreement and with respect to all Company Claims/Interests held such Joinder Party.

2.     Representations and Warranties.  The Joinder Party hereby makes the representations and warranties of the Parties and Consenting First Lien Lenders set forth in the Agreement to each other Party.

3.     Notice.  The Joinder Party shall deliver an executed copy of this joinder agreement (the "**Joinder**") to the Parties identified in Section 14.10 of the Agreement.

*[Signature Page Follows.]*

**[JOINING PARTY]**

_____
Name:
Title:


Address:


E-mail address(es):


| *Aggregate Amounts Beneficially Owned or Managed on Account of:* | |
|---|---|
| First Lien Claims: | |
| Second Lien Claims: | |
| Second Lien Pari Passu Claims: | |
| Prepetition HoldCo Loan Claims: | |
| ABL Claims: | |
| Existing Equity Interests: | |

**<u>Annex I to Joinder</u>**

Restructuring Support Agreement

[*intentionally omitted*]

**Exhibit 3**

**Initial Budget**

**Franchise Group, Inc.**
**Weekly DIP Budget**

*($ in millions)*

| | | | | | | | Post Petition | | | | | | | 13-Weeks |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week: | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | |
| Type: | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst |
| Period Starting: | 11/2/2024 | 11/9/2024 | 11/16/2024 | 11/23/2024 | 11/30/2024 | 12/7/2024 | 12/14/2024 | 12/21/2024 | 12/28/2024 | 1/4/2025 | 1/11/2025 | 1/18/2025 | 1/25/2025 | |
| Period Ending: | 11/8/2024 | 11/15/2024 | 11/22/2024 | 11/29/2024 | 12/6/2024 | 12/13/2024 | 12/20/2024 | 12/27/2024 | 1/3/2025 | 1/10/2025 | 1/17/2025 | 1/24/2025 | 1/31/2025 | |
| **Total Operating Receipts** | 62.3 | 66.4 | 64.9 | 61.9 | 63.7 | 65.9 | 61.9 | 57.8 | 50.6 | 50.2 | 45.8 | 44.9 | 49.4 | 745.7 |
| **Total Operating Disbursements** | (31.3) | (75.6) | (67.6) | (54.5) | (60.3) | (41.9) | (51.2) | (47.0) | (66.1) | (42.7) | (36.9) | (52.8) | (61.3) | (679.3) |
| **Net Operating Cash Flow** | 31.0 | (9.2) | (2.7) | 7.4 | 3.3 | 24.0 | 10.6 | 10.8 | (5.5) | 7.4 | 8.9 | (7.8) | (11.9) | 66.4 |
| Non Operating Disbursements | | | | | | | | | | | | | | |
| Debt Service | (0.1) | (0.1) | (0.7) | (0.2) | (0.1) | - | - | (0.2) | (3.3) | (0.1) | (21.2) | (0.6) | (0.3) | (26.8) |
| AF Liquidator Fees | - | - | (0.1) | (0.2) | (0.3) | (0.3) | (0.3) | (0.3) | (0.4) | (0.6) | - | - | - | (2.4) |
| Other Expenses | (0.6) | (1.8) | - | - | - | - | - | - | - | - | - | - | - | (2.3) |
| **Total Non Operating Disbursements** | (0.6) | (1.9) | (0.9) | (0.4) | (0.3) | (0.3) | (0.3) | (0.5) | (3.7) | (0.7) | (21.2) | (0.6) | (0.3) | (31.6) |
| **Total Disbursements Prior to Professional Fees** | (31.9) | (77.5) | (68.4) | (54.9) | (60.7) | (42.2) | (51.5) | (47.5) | (59.8) | (43.4) | (58.1) | (53.4) | (61.6) | (710.8) |
| Professional Fees | (1.1) | - | - | (0.2) | (3.8) | - | (0.2) | (4.0) | (3.9) | (6.5) | (3.9) | (3.6) | (3.4) | (30.6) |
| **Total Disbursements** | (33.0) | (77.5) | (68.4) | (55.1) | (64.5) | (42.2) | (51.6) | (51.5) | (63.6) | (49.9) | (62.0) | (57.0) | (65.0) | (741.4) |
| **Net Cash Flow** | 29.3 | (11.1) | (3.6) | 6.9 | (0.8) | 23.7 | 10.2 | 6.3 | (13.0) | 0.3 | (16.2) | (12.0) | (15.6) | 4.3 |
| BOP Cash Balance | 14.3 | 141.6 | 124.5 | 106.9 | 110.8 | 103.0 | 117.7 | 115.9 | 285.3 | 251.2 | 253.5 | 237.3 | 225.3 | 14.3 |
| Net Cash Flow | 29.3 | (11.1) | (3.6) | 6.9 | (0.8) | 23.7 | 10.2 | 6.3 | (13.0) | 0.3 | (16.2) | (12.0) | (15.6) | 4.3 |
| DIP New Money Draw | 100.0 | - | - | - | - | - | - | 150.0 | - | - | - | - | - | 250.0 |
| (Funding)/Draw of GOB Proceeds Escrow | (2.0) | (6.0) | (14.0) | (3.0) | (7.0) | (9.0) | (12.0) | (7.0) | (1.0) | 2.0 | - | - | - | (59.0) |
| **EOP Cash Balance** | 141.6 | 124.5 | 106.9 | 110.8 | 103.0 | 117.7 | 115.9 | 265.3 | 251.2 | 253.5 | 237.3 | 225.3 | 209.6 | 209.6 |

**Exhibit 4**

| Priority | DIP Collateral that constitutes ABL Priority Collateral or that would otherwise constitute ABL Priority Collateral | DIP Collateral that constitutes Term Loan Priority Collateral or that would otherwise constitute Term Loan Priority Collateral | Unencumbered Property | Claims |
|---|---|---|---|---|
| *First*[11] | Carve Out and Permitted Prior Liens | Carve Out and Permitted Prior Liens | Carve Out | Carve Out |
| *Second* | ABL Adequate Protection Liens | DIP Liens | DIP Liens | DIP Superpriority Claims |
| *Third* | Prepetition ABL Liens | First Lien Adequate Protection Liens | First Lien Adequate Protection Liens and ABL Adequate Protection Liens | First Lien Adequate Protection Claims and ABL Adequate Protection Claims |
| *Fourth* | DIP Liens | Prepetition First Lien Liens | Second Lien Adequate Protection Liens and Second Lien Sidecar Adequate Protection Liens | Second Lien Adequate Protection Claims and Second Lien Sidecar Adequate Protection Claims |
| *Fifth* | First Lien Adequate Protection Liens | Prepetition Second Lien Liens and Prepetition Second Lien Sidecar Liens | | |
| *Sixth* | Prepetition First Lien Liens | Second Lien Adequate Protection Liens and Second Lien Sidecar Adequate Protection Liens | | |
| *Seventh* | Second Lien Adequate | ABL Adequate Protection | | |

[11] The superpriority status of the Carve Out, with respect to both administrative claims against the Debtors and/or liens on the DIP Collateral, shall be subject to the entry of the Final Order.

| | | Liens | Prepetition ABL Liens |
|---|---|---|---|
| | | Protection Liens and Second Lien Sidecar Adequate Protection Liens | Prepetition Second Lien Liens and Prepetition Second Lien Sidecar Liens |
| ***Eighth*** | | | |